## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UNITEK GLOBAL SERVICES, INC., *et al.*,[1] | Case No. 14- 12471_____ (   ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF ANDREW J. HERNING IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Andrew J. Herning, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer and Treasurer of UniTek Global Services, Inc. ("UniTek"), a company organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these case (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), UniTek and nine of its direct and indirect subsidiaries each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: UniTek Global Services, Inc. (3445), UniTek Holdings, Inc. (4120), UniTek Midco, Inc. (5642), UniTek Acquisition, Inc. (4123), Nex-link USA Communications, Inc. (9084), UniTek USA, LLC (0279), Pinnacle Wireless USA, Inc. (1746), DirectSAT USA, LLC (3465), FTS USA, LLC (6247), Advanced Communications USA, Inc. (0091).  For the avoidance of doubt, Wirecomm Systems (2008) Inc. (FKA UniTek Canada), an affiliate of the Debtors and wholly owned subsidiary of UniTek USA, LLC, is not a Debtor in the Chapter 11 Cases (as defined herein).  The Debtors' main corporate address is 1777 Sentry Parkway West, Gwynedd Hall, Suite 302, Blue Bell, Pennsylvania 19422.

Debtors filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3.     I submit this declaration (this "<u>First Day Declaration</u>") pursuant to Bankruptcy Rule 1007 to provide an overview of the Debtors and the Chapter 11 Cases and support the Debtors' chapter 11 petitions and "first day" motions (each, a "<u>First Day Motion</u>," and collectively, the "<u>First Day Motions</u>").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.     PRELIMINARY STATEMENT

4.     After extensive, good-faith negotiations amongst the Debtors and their secured lenders, the parties have achieved agreement on a fully consensual restructuring transaction to be implemented swiftly through a prepackaged chapter 11 plan of reorganization (the "<u>Plan</u>" and the accompanying disclosure statement, the "<u>Disclosure Statement</u>"),[3] which will achieve the Debtors' restructuring goals by:  (a) reducing the Debtors' total operating company funded debt

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Motion or the Plan (as defined herein), as applicable.

[3] Copies of the Plan and Disclosure Statement were Filed contemporaneously with this First Day Declaration and are available on the Debtors' restructuring website at: http://dm.epiq11.com/UniTek. Any descriptions of the Plan in this First Day Declaration are intended only to provide a summary of certain key terms of the Plan and are qualified in their entirety by reference to the entire Plan and exhibits thereto.

by approximately $90 million, excluding original issue discount costs; (b) providing the Debtors with commercially reasonable, long term financing and access to incremental commitments that will enable the Debtors to support their future business needs; and (c) continuing the Debtors' relationship with DIRECTV, LLC ("DIRECTV"), the Debtors' largest customer.

5.      The Plan contemplates, among other things, the occurrence of the following transactions: (i) portions of the Debtors' secured debt will be converted into a new first lien debt facility; (ii) portions of the Debtors' secured debt will be converted into 100% of the equity in the reorganized Debtors; and (iii) allowed general unsecured claims will be either paid (a) after the Effective Date when due and payable in the ordinary course of business and in accordance with prior custom and practice established between the Debtors and the holder of such claim or (b) in full in cash on the later of (x) the effective date of the Plan, (y) when such claim becomes allowed, or (z) as otherwise determined by the Bankruptcy Court or agreed upon by the parties.

6.      Prior to the Petition Date, the Debtors, a all of their secured lenders, and DIRECTV entered into a Plan Support Agreement, pursuant to which the parties agreed, among other things, to support confirmation of the Plan. In addition, prior to the Petition Date, the Debtors solicited votes on the Plan from their secured lenders (the only impaired creditors under the Plan that were not deemed to reject the Plan) and every creditor that was entitled to vote on the plan cast a ballot in favor of the Plan. Accordingly, the Debtors intend to seek confirmation of the Plan on an expedited basis and to emerge from chapter 11 as soon as possible.

## II.      GENERAL BACKGROUND

### A.      Overview of the Debtors' Businesses

7.      The Debtors are a full service provider of technical services to customers in the wireless telecommunications, public safety, satellite television and broadband cable industries in the United States and Canada.  The Debtors' services include network engineering and design,

construction and project management, comprehensive installation and fulfillment, and wireless telecommunication infrastructure services.  The Debtors' primary client base consists of satellite television, broadband cable and other telecommunications companies, contractors, and municipalities and related agencies, including leading media and telecommunication companies such as DIRECTV, AT&T, Comcast, Ericsson, Sprint, T-Mobile, Charter Communications, Time Warner Cable and Rogers Communications.  The Debtors' customers utilize the Debtors' services to build and maintain their infrastructure and networks and to provide residential and commercial fulfillment services, which is critical to their ability to deliver voice, video and data services to end users.

8.      UniTek is organized as a Delaware corporation and was originally incorporated in 1987 as Adina, Inc.  Following a series of corporate actions, mergers and acquisitions, UniTek took the name UniTek Global Services, Inc. in 2010. The Debtors' principal executive offices are located at 1777 Sentry Parkway West, Gwynedd Hall, Suite 302, Blue Bell, Pennsylvania 19422, and its telephone number is (267) 464-1700.

9.      Beginning on November 10, 2010, UniTek's common stock was listed on the NASDAQ Stock Market under the symbol "UNTK."   On August 12, 2014, the Listing Qualifications Staff (the "Staff") of The NASDAQ Stock Market LLC ("NASDAQ") notified UniTek that the Staff had determined to delist the common stock from NASDAQ.  Accordingly, trading in the common stock was suspended effective with the open of business on August 21, 2014, at which time the common stock became eligible to trade on the OTC Markets' OTC Pink Tier.  On September 11, 2014, NASDAQ took action to formally remove the common stock from listing and registration on NASDAQ by filing a Form 25-NSE with the SEC.

10.     As of September 30, 2014, the Debtors have approximately 2,500 employees, substantially all of whom are full-time.   The Debtors maintain a nucleus of technical and managerial personnel to supervise all projects and add employees and subcontractors as needed to complete specific projects.

**B.     The Debtors' Operations**

11.     The Debtors' two principal lines of service, or segments, and their relative importance to the Debtors' operations, based upon contribution to consolidated revenues, are: (i) comprehensive installation and fulfillment services ("Fulfillment"), whereby the Debtors deploy skilled technicians to install their customers' equipment, such as satellite dishes and television receiver units, for homes and businesses and (ii) wireless telecommunication construction, project management and systems integration ("Engineering and Construction"), whereby the Debtors assemble project teams of engineers and technicians to design and build large wireless infrastructure projects for their customers.   The Fulfillment and Engineering and Construction segments make up approximately 80 percent and 20 percent of the Debtors' businesses, respectively.

12.     UniTek operates through its wholly-owned subsidiaries, which are described as follows:

- DirectSat USA, LLC ("DirectSat") provides installation and fulfillment services for DIRECTV, the largest satellite television provider in the United States, and certain satellite internet providers;

- FTS USA, LLC ("FTS") provides installation and fulfillment services to broadband cable telecommunications companies such as Comcast, Charter Communications and Time Warner Cable;

- WireComm Systems (2008) Inc. ("WireComm") provides installation and fulfillment services to Rogers Communications, Inc., the largest broadband cable provider in Canada; and

- Pinnacle Wireless USA, Inc. ("Pinnacle") provides wireless telecommunication construction, project management and systems integration services for wireless telecommunication carriers, municipalities and related agencies.

13.    The Debtors' services are provided by a workforce of skilled technicians that is regionally and locally based throughout the United States and Canada.  The operations include approximately 80 field offices as illustrated in the following map.



14.    The Debtors' Fulfillment segment includes inventory warehousing and logistics, customer service and call center management, fleet management, and risk and safety compliance. The Debtors have developed innovative, leading-edge technologies and processes to manage its daily operations and to improve upon existing work processes.  In many markets, the Debtors are the primary providers of installation and fulfillment services to its customers; in other markets, the Debtors compete with other service providers for customers' business. The Fulfillment

segment consists of DirectSat, which comprises the Satellite television installation reporting unit and FTS and WireComm, which comprise the Debtors' broadband cable reporting unit.

15.     The Debtors are a full-service provider of construction, project management and systems integration services to customers in the wireless telecommunication and public safety industries.  The Debtors assemble project teams of engineers and technicians to design and build large wireless infrastructure projects for customers.   The Debtors' construction and project management services are designed to improve customers' wireless telecommunications infrastructure and include site acquisition, tower construction, equipment upgrades, radio frequency and network design and transmission base station installation and modification.  The Debtors' systems integration services are tailored to large-scale communications projects for transportation, public safety, entertainment, hospitality and enterprise-grade commercial real estate projects.  The Debtors provide turnkey solutions that integrate radio system design, the in-building antenna network, and the command and control systems for all subsystems such as spectrum, fiber networks, voice logging and GPS.  The Debtors are designing and constructing a number of projects that are critical to public safety.  The Debtors' Engineering and Construction segment in 2013 consisted of the wireless reporting unit.

### C.     The Debtors' Prepetition Organizational Structure

16.     The Debtors' organizational chart is below:



\* These Debtors were dissolved for corporate purposes but have not yet been dissolved for tax purposes.
\*\* This entity is not a Debtor in the Chapter 11 Cases.

### D.     The Debtors' Prepetition Capital Structure

17.     As of the Petition Date, the substantial majority of the Debtors' liabilities consisted of funded debt (i.e., not trade debt) comprised of: (i) the revolving credit facility (the "ABL Facility") provided under that certain Revolving Credit and Security Agreement dated as of July 10, 2013, by and among UniTek and certain other Debtors, the lender parties thereto (the "ABL Facility Lenders"), and Apollo Investment Corporation, as agent for the ABL Facility Lenders (the "ABL Facility Agent") (as amended from time to time, the "ABL Facility Credit Agreement," and together with any other documents, schedules, instruments, or agreements related thereto, the "ABL Facility Credit Documents"); and (ii) the term loan (the "Term Loan Facility") provided under that certain Credit Agreement dated as of April 15, 2011, among UniTek and certain other Debtors, the lender parties thereto (the "Term Loan Lenders"), and

Cerberus Business Finance, LLC, in its capacity as successor administrative agent under the Term Loan Credit Agreement, (the "Term Loan Agent") (as amended from time to time, the "Term Loan Credit Agreement," and together with together with any other documents, schedules, instruments, or agreements related thereto, (the "Term Loan Credit Documents").

### (i)      The ABL Facility

18.      On July 10, 2013, the Debtors entered into the ABL Facility Credit Agreement pursuant to which the ABL Facility Lenders agreed to provide the Debtors with up to $75.0 million of revolving credit loans with a sublimit of $35 million for standby Letters of Credit. The ABL Facility Credit Agreement was amended prior to the commencement of the Chapter 11 Cases to allow certain Term Loan Lenders (the "Junior ABL Facility Lenders") to provide the Debtors with additional loans of $5 million pursuant to the ABL Facility Credit Agreement, which amount could, in the sole discretion of such lenders, be increased to up to an aggregate amount (together with such initial loans) of up to $25 million.  As of the Petition Date, the aggregate principal amount of loans (including accrued and unpaid interest) outstanding under the ABL Facility was approximately $47,605,728.59, which consists of $38,792,875.28 on account of Senior ABL Facility Loans and $8,812,453.31 on account of the Junior ABL Facility Loans, and the undrawn amount of all outstanding letters of credit issued under the ABL Facility was approximately $21,646,300.00.

### (ii)      The Term Loan Facility

19.      Pursuant to the Term Loan Credit Agreement, the Term Loan Lenders provided the Debtors with a term loan in the original face amount of $100 million.  UniTek had a right to increase this amount by $20 million, which it exercised on May 3, 2012, and a further right to increase this amount by an additional $15 million, which it exercised on or about September 14, 2012.  In connection with the refinancing of the Debtors' debt in July 2013, the parties, on July

25, 2013, entered into that certain Second Amendment and Limited Waiver to Credit Agreement. In connection with that amendment, UniTek issued to the Term Loan Lenders warrants to purchase 3.8 million shares of UniTek's common stock for $0.01 per share, which warrants were valued at approximately $13 million.  The Term Loan Credit Agreement was further amended prior to the commencement of the Chapter 11 Cases in connection with certain lenders under the Term Loan Credit Agreement providing additional borrowing capacity to the Debtors under the ABL Facility Credit Agreement. As of the Petition Date, approximately $143,252,713.27 (including accrued and unpaid interest) is outstanding under the Term Loan Facility.

## III.    EVENTS LEADING TO THE CHAPTER 11 CASES

20.    The satellite and broadband cable television markets are controlled by a small number of large companies, and, similarly, a few large wireless carriers control a significant portion of the wireless telecommunications market. As a result, the Debtors' businesses have been concentrated with a few large customers.  In the Engineering and Construction segment, where the Debtors service customers in the wireless telecommunication and public safety industries, the markets the Debtors serve are competitive and highly fragmented.  In these markets, a large number of multinational companies compete for large, national projects, and an even greater number of small, local businesses compete for smaller, one-time projects.  Many of the Debtors' competitors are well-established and have larger and better developed networks and systems, longer-standing relationships with customers and suppliers, greater name recognition and greater financial, technical and marketing resources.  These competitors can often subsidize competing services with revenues from other sources and may be able to offer their services at lower prices.

21.    The demand for the Debtors' outsourced infrastructure services is dependent upon the existence of projects with engineering, procurement, construction and management needs.

The wireless telecommunications market, which is one of the industries in which the Debtors compete, is particularly cyclical in nature and vulnerable to downturns in the telecommunications industry.  During times of economic slowdown, some of the Debtors' customers reduce their capital expenditures.  Further, customers, primarily among the Debtors' wireless communications subsidiaries, sometimes defer or cancel pending projects.  In early 2014, several mergers and rumored mergers in the wireless communications industry developed. This caused current and prospective customers to reduce or delay capital expenditures, pending clarity on platform technology and network integration.

22.     In addition to the foregoing, on April 12, 2013, UniTek announced that, as a result of an investigation by the Audit Committee of the Board of Directors, it had determined that certain employees of its Pinnacle division had engaged in fraudulent activities that resulted in improper revenue recognition.  Subsequent to the investigation, UniTek restated the financial results for the interim periods ended March 31, 2012, June 30, 2012 and September 29, 2012, the interim period and fiscal year ended December 31, 2011 and the interim period ended October 1, 2011.  Restated financial information as of and for those periods was included in UniTek's Annual Report on Form 10-K for the year ended December 31, 2012, which was filed with the SEC on August 12, 2013.

23.     The investigation, the restatement and related costs required the Debtors to incur $9 million of costs for professional services and consultants during 2013.  In addition, in response to tightening liquidity and events of default related to the events discussed above, the Debtors were forced to refinance their indebtedness with the ABL Credit Facility and amend the Term Loan Facility, they incurred a substantially non-cash extinguishment charge of $9 million

01:16262179.1

in connection with the refinancing, and they deferred to future periods additional costs of $20 million.

24.    The Debtors experienced net losses from continuing operations excluding impairment charges of $26 million and $25 million in 2013 and 2012, respectively. The Debtors' operating performance in 2014 has been materially worse, including net losses from continuing operations excluding impairment charges of $34 million for the eight months ended August 23, 2014.  The Debtors' financial performance resulted in defaults under the Term Loan Facility and the ABL Facility.

25.    In January 2014, the Debtors retained Stifel, Nicolaus & Company, Incorporated ("SNI"), and its affiliate Miller Buckfire & Co., LLC ("Miller Buckfire," and together with SNI, "Stifel"), to provide investment banking and related advisory services in pursuit of a merger or acquisition of the Debtors' businesses, as well as other strategic alternatives.

26.    The Debtors worked with Miller Buckfire to explore all avenues for a merger or acquisition of the Debtors' business.  On behalf of the Debtors, Miller Buckfire contacted 117 potential investors through March 2014, and subsequently sent 46 confidential information memoranda detailing the Debtors' businesses and the potential investment opportunity they represented. The Debtors set a deadline for initial, non-binding indications of interest of April 1, 2014 and received six initial non-binding indications of interest, four of which were deemed complete and acceptable indications of interest by the Debtors.  The Debtors, with Miller Buckfire, held management meetings with four potential investors in April 2014.  The Debtors gave these four parties access to a virtual data room of the Debtors' information on April 21, 2014 and responded to various diligence requests. A result of rumored changes in the Debtors' customer pool, the four potential investors dropped from the process, citing the enhanced risk

and uncertainty due to increased customer concentration and UniTek's first quarter performance, among other considerations.

27.    Following the withdrawal of various indications of interest, Miller Buckfire explored refinancing and recapitalization opportunities on behalf of the Debtors.  Through this effort, by the beginning of the third quarter of 2014, the Debtors received five recapitalization proposals from three parties and one additional preliminary acquisition proposal; however, by June 2014, the Debtors were experiencing materially weaker financial and operating performance than was forecast, and on May 18, 2014 DIRECTV, the Debtors' largest customer, announced it would be acquired by AT&T, another of the Debtors' major customers, further increasing the Debtors' customer concentration.  In addition, the Debtors have other material contracts with significant customers that expired, will be expiring (without renewal) or will likely be cancelled, thus reducing Debtors' revenues in 2013 and 2014. Furthermore, the Debtors' master service agreement with AT&T expired in August 2014 and was not renewed. This master service agreement accounted for 18% of the Debtors' revenue in 2013.  While the Debtors have taken steps to replace this lost revenue they have been unable to secure new contracts of the size and profitability of the AT&T contract within Pinnacle Wireless.  As a result of the foregoing developments, the remaining parties interested in refinancing or recapitalization transactions either declined to proceed or were unable to secure adequate financing to refinance or pay down the Debtors' existing debt.

28.    In response to the market environment and customer actions noted, the Debtors undertook extensive operational restructuring efforts over the nine months ended September 30, 2014.  The Debtors reduced headcount by 516 employees, resulting in expected annualized cost savings of $22 million.  Furthermore, the Debtors closed 18 facilities resulting in annualized rent

savings of $1 million.  The Debtors also expect to realize a total $8 million of annualized cost savings in connection with a rationalization of their vehicle fleet.  As further cost savings, the Debtors have implemented initiatives to improve their safety record, which are expected to result in insurance related cost savings of $2 million.  Despite these initiatives the Debtors recorded adjusted EBITDA of $14 million for the nine months ended September 27, 2014 versus adjusted EBITDA of $33 million for the nine months ended September 28, 2013.

29.     Concurrent with the Debtors' operational restructuring, refinancing and recapitalization efforts, in mid-June 2014, with the advice of Miller Buckfire, the Debtors approached the Term Loan Lenders to discuss various alternatives for converting debt to equity. These discussions accelerated in July 2014, and came to include the ABL Facility Lenders, as a result of diminishing liquidity and likely defaults under the Term Loan Credit Agreement and the ABL Facility Credit Agreement related to the Debtors' financial and operating performance. Starting on August 8, 2014, the Debtors entered into a series of forbearance agreements (and amendments thereto) with the Term Loan Lenders and ABL Facility Lenders, and on August 13, 2014, the Debtors entered into further amendments to the ABL Credit Agreement and the Term Loan Credit Agreement, which, among other things, provided the Debtors with much needed additional funding, consisting of $8.7 million of the Last Out Loans. The Last Out Loans were provided by a subset of the existing Term Loan Lenders on a secured, emergency basis to allow the Debtors to fund critical components of their business, including, vendors, suppliers and employee payroll. Each of two fundings of the Last Out Loans was made within 24 hours of the Debtors' need to make certain of the aforementioned payments. In August 2014, the Debtors also hired FTI Consulting ("FTI") to serve as financial advisors, and the Debtors, Miller Buckfire, and FTI worked in earnest with the Term Loan Lenders and the ABL Facility Lenders on a

comprehensive restructuring of the Debtors' capital structure on the terms embodied the Plan. In the course of negotiations, two of the three largest Junior ABL Facility Lenders informed the Debtors that they would not advance any additional Last Out Loans.

30.     On or about October 17, 2014, the Debtors, the ABL Facility Agent, DIRECTV, LLC and certain of the Term Loan Lenders (collectively, the "Plan Support Parties") entered into a Plan Support Agreement (the "Plan Support Agreement") pursuant to which the Plan Support Parties agreed to support confirmation of the Plan on the schedule described in the Plan Support Agreement. Pursuant to the terms of the Plan Support Agreement, concurrently herewith, the Debtors have filed a motion seeking approval of and authority to assume the Plan Support Agreement as a First Day Motion (as defined below), and a copy of the Plan Support Agreement will be attached as an exhibit to such motion.

31.     On or about October 21, 2014, prior to filing the Chapter 11 Cases, the Debtors caused a copy of the Plan, the Disclosure Statement, and the appropriate Ballots to be delivered to the Holders of Claims in Classes 3, 4 and 5 under the Plan, the Holders of Claims entitled to vote to accept or reject the Plan.  The Balloting Agent, on behalf of the Debtors, accepted such Ballots until November 3, 2014 at 11:00 a.m. (ET) (the "Voting Deadline"). As of the Voting Deadline, 100% of the Holders of Claims in Classes 3, 4 and 5 (the only Classes entitled to vote on the Plan) voted in favor of the Plan.

## IV.     EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

32.     Concurrently with the filing of the their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity. The Debtors request that the Court grant the relief requested in each of the First Day Motions as critical elements in ensuring a

smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, the Chapter 11 Cases. I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

### A.     ADMINISTRATIVE MOTIONS

#### 1.     Debtors' Motion for Entry of an Order Directing Joint Administration of the Their Chapter 11 Cases.

33.     The Debtors seek entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of UniTek.

34.     The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code and the Debtors' operations are largely interrelated.  Many of the motions, hearings, and orders in the Chapter 11 Cases will affect all Debtor entities.

35.     Joint administration of the Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

#### 2.     Debtors' Motion for entry of an Order (I) Extending the Debtors' Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Conditionally Waiving the Requirement of Filing Statement of Financial Affairs and Schedules of Assets and Liabilities.

36.     The Debtors seek entry of an order extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules

and Statements") through and including January 5, 2015 (the "Deadline"), without prejudice to the Debtors' right to request additional extensions should it become necessary, and waiving the requirement that the Debtors file the Schedules and Statements effective on the date of confirmation of the Plan if confirmation occurs on or before the Deadline.

37.     UniTek is a public reporting company and files quarterly and annual statements with the Securities and Exchange Commission, among other disclosures.  As a result, significant information regarding the Debtors and their operations is already publicly available to parties-in-interest.   The primary purpose of the Schedules and Statements is to arm creditors with information regarding the Debtors' assets, liabilities, and financial condition in advance of the meeting pursuant to section 341 of the Bankruptcy Code.   Under the Plan, creditors will be unimpaired by the Chapter 11 Cases and Plan, other than Holders of Claims in Classes 3, 4 and 5 (each of whom, as a class, has accepted their treatment under the plan).   As a result, I do not believe there will be an added benefit to general creditors from the incremental information in the Schedules and Statements beyond what is in the Debtors' publicly available information.  For Holders of Claims in Classes 3, 4 and 5, they received the Disclosure Statement.  If the Court approves the Disclosure Statement as containing adequate information and confirms the Plan, then the Schedules and Statements would be of dubious value to any party in interest.   As a result, I believe the relief requested is appropriate.

3. **Debtors' Motion for Entry of an Order (A) Scheduling an Objection Deadline and Combined Hearing on their Disclosure Statement and Plan Confirmation, (B) Approving Form and Notice of Confirmation hearing, (C) Establishing Procedures for Objections to the Disclosure Statement and the Plan (including the Proposed Assumption of Executory Contracts and Unexpired Leases and the Payment of Associated Cure Amounts), (D) Approving Solicitation Procedures, (E) Waiving the Requirement for Meetings of Creditors or Equity Holders, and (F) Granting Related Relief.**

38.     The Debtors seek entry of an order: (a) scheduling an objection deadline and a combined hearing (the "Confirmation Hearing") on the (i) adequacy of the Disclosure Statement and (ii) confirmation of the Plan; (b) approving the form and manner of notice of the Confirmation Hearing; (c) establishing procedures for objections to the Disclosure Statement and the Plan, including the proposed assumption pursuant to section 365 of the Bankruptcy Code of certain of the Debtors' executory contracts and unexpired leases (the "Executory Contracts and Unexpired Leases") and the payment of cure amounts associated therewith (the "Cure Amounts"), if any; (d) approving the solicitation procedures used in connection with the Debtors' prepetition solicitation of the Plan described in the motion and further discussed in the Disclosure Statement (the "Solicitation Procedures"); (e) waiving the requirement for meetings of creditors or equity holders; and (f) granting related relief.

39.     To effectuate the terms of the proposed consensual restructuring, on or about October 21, 2014, prior to commencing these Chapter 11 Cases, the Debtors caused a copy of the Plan, the Disclosure Statement, and the appropriate Ballots (as defined herein) to be delivered to the Holders (or the authorized signatory of such Holder[4]) of Claims in Classes Class 3, 4 and 5

---

[4] The Debtors delivered all Class 4 Ballots to the ABL Facility Agent, and the ABL Facility Agent submitted such Ballots on behalf of the Holders of Claims in Class 4 pursuant to the Subordination Agreement. *See In re Coastal Broad. Sys.*, 570 Fed. Appx. 188 (3d Cir 2014).

(the "<u>Voting Classes</u>"), the only impaired Classes of creditors entitled to vote to accept or reject the Plan.

40.     Due to the very small number of creditors entitled to vote on the Plan, the Debtors established November 3, 2014 at 11:00 a.m. (Prevailing Eastern Time) as the deadline (the "<u>Voting Deadline</u>") for the receipt of votes from the Holders (or the authorized signatory of such Holder) of Claims in the Voting Classes.  Epiq Bankruptcy Solutions, LLC (the "<u>Balloting Agent</u>") collected and tabulated Ballots received on or before the Voting Deadline.  As soon as reasonably practicable after the Petition Date, the Balloting Agent will file a voting report (the "<u>Voting Report</u>"), which will certify the results and methodologies for tabulation of Ballots accepting or rejecting the Plan with respect to Claims in the Voting Classes.

41.     The Plan and Disclosure Statement were subject to intensive prepetition review, negotiation, and comment by counsel and other advisors for the ABL Facility Agent and the Consenting Term Loan Lenders during the course of arm's-length negotiations with the Debtors, and the Debtors, in conjunction with their advisors, engaged in discussions with the ABL Facility Agent and the Consenting Term Loan Lenders regarding implementing a restructuring of the Debtors' debt obligations prior to launching solicitation of the Plan. Also, before commencing and during solicitation on the Plan, the Debtors and their advisors engaged in extensive discussions with the Holders of Claims in the Voting Classes. After beginning solicitation on the Plan, the Debtors, at the request of several of the Plan Support Parties, have made several minor, technical and non-material modifications to the Plan, none of which are adverse to any Holder of a Claim in the Voting Classes. Attached as **Exhibit B** to the motion is a redline of the Plan describing such revisions. The Debtors respectfully submit that all such revisions are permissible under section 1127 of the Bankruptcy Code and are sufficiently minor and insignificant that they

do not, individually or collectively, warrant resolicitation of the Plan. Moreover, all of the Plan Support Parties contemplated revisions to the Plan.[5] Accordingly, the Debtors intend to include a provision in the Confirmation Order that specifically approves revisions to the Plan, or any other Plan Restructuring Documents, and the Debtors reserve the right to make additional revisions to the Plan or any other Plan Restructuring Documents before the Confirmation Hearing and will file further redlines describing such revisions, if any.

42.     As of the Voting Deadline, 100% of the Holders of Claims in Classes 3, 4 and 5 (the only Classes entitled to vote on the Plan) voted in favor of the Plan.

B.     OPERATIONAL MOTIONS

1.     Debtors' Motion for Entry of an Order Authorizing (I) Payment of Prepetition Taxes and Fees, and (II) Financial Institutions to Process and Cash Related Checks and Transfers.

43.     The Debtors seek entry of an order authorizing them, in their sole discretion, to pay to the applicable taxing authorities in the ordinary course of business franchise, sales, use, real and personal property, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments, as they deem necessary, to various federal, state, and local governmental authorities accruing prior to the Petition Date (collectively, the "Taxes and Fees").

44.     The Debtors are seeking authority to pay up to $100,000 in prepetition Taxes and Fees during the Chapter 11 Cases.  I believe that many of the Taxes and Fees are entitled to priority under section 507 of the Bankruptcy Code and that all of the Taxes and Fees (to the extent valid) will be paid in full under the Plan.  The Debtors' failure to pay the Taxes and Fees

---

[5] Specifically, paragraph one of the PSA provides:

The Plan Restructuring Documents remain subject to negotiations and completion and shall, upon completion, contain terms, conditions, representations, warranties and covenants consistent with the terms of this PSA and shall otherwise be in form and substance reasonably acceptable to each of the Debtors, the ABL Facility Agent and the Required Term Loan Consenting Lenders, and the Plan shall be in form and substance reasonably acceptable to each of the Plan Support Parties.

could have a material adverse impact on their ability to operate their businesses during their stay in chapter 11.  Some of the Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid on time.  Moreover, certain of the outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities, and such funds do not constitute property of the Debtors' estates

45.     If the Debtors do not pay the Taxes and Fees in a timely manner, the Authorities may initiate audits, attempt to file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will materially and immediately harm the estates and distract the Debtors from their goal of an efficient and prompt exit from chapter 11 with a right-sized capital structure.  Such actions would unnecessarily divert the attention of the Debtors' management and employees from the Chapter 11 Cases and their goal of promptly implementing the Plan.  Authorization to pay the Taxes and Fees, which will otherwise be paid in full on the Effective Date of the Plan, will eliminate these distractions, while affording the Taxes and Fees the same treatment they will ultimately receive under the Plan

46.     I believe payment of the Taxes and Fees is prudent and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**2.     Debtors' Motion For Entry of (I) An Order (A) Authorizing (i) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Various Insurance Policies, and (ii) Continuation of Insurance Premium Financing Programs, and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (II) Interim and Final Orders Authorizing the Debtors to Maintain and Continue the Surety Bond Program With USSIC**

47.     The Debtors seek entry of an (I) order (A) authorizing, but not directing, the Debtors to (i) continue and, to the extent necessary, renew all of their prepetition insurance policies in the ordinary course of business and pay all prepetition obligations in respect thereof,

including payments on account of insurance brokerage and administration services, and (ii) continue the Debtors' insurance premium financing programs and enter into new premium financing programs, as necessary, under substantially similar terms, and (B) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing, and (II) interim and final orders authorizing the Debtors to maintain and continue that certain surety bond program (the "Surety Bond Program") with U.S. Speciality Insurance Company ("USSIC").

48.     In the ordinary course of their businesses, the Debtors maintain a number of Insurance Policies, including general liability, auto, umbrella, pollution/professional liability, property, inland marine, crime, cyber liability, employment practices, employed lawyers, fiduciary liability and directors and officers policies.  Continuation of the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many cases, such coverage is required by various contracts and laws that govern the Debtors.  Furthermore, it is my understanding that, pursuant to the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage, which coverage is provided by certain of the Insurance Policies.

49.     Because it is not economically advantageous for the Debtors to pay the premiums on each of their Insurance Policies on an annualized basis, from time to time, in the ordinary course of business, the Debtors finance the premiums on certain of the Insurance Policies.  If the Debtors are unable to continue making payments under the PFAs, the Premium Lenders may be permitted to terminate the relevant Insurance Policies.  The Debtors would then be required to obtain replacement policies on an expedited basis and likely at a significantly increased cost.

50.     Finally, the Debtors request authorization to honor their obligations in connection with their Surety Bond Program with USSIC regarding certain of the Debtors' work on the World Trade Center construction project.   The relevant construction contracts regarding this project require the maintenance of certain bonds and the Debtors have two Surety Bonds through USSIC.   Upon learning of the Debtors' planned chapter 11 filings, USSIC has asserted that it is not obligated to continue to provide credit postpetition pursuant to the Surety Bond Program and that it may seek to terminate or execute other remedies under the Surety Bonds and/or the related indemnity agreement.   The termination of the Bonded Contracts will have a significant, negative effect on the Debtors' business and restructuring.   While the Debtors do not necessarily agree that USSIC is entitled to terminate the Surety Bonds, in order to avoid potential disputes with USSIC regarding this matter, and the related disruptions to the Debtors' businesses and chapter 11 cases, the Debtors and USSIC have reached an agreement regarding the treatment of potential claims under the Indemnity Agreement in the unlikely event that one of the beneficiaries of the Surety Bonds seeks or threatens recourse against USSIC for UniTek's alleged breach of the Bonded Contracts while the Chapter 11 Cases are pending.

51.     For the foregoing reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**3.      Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility companies from, Discontinuing Altering, or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance.**

52.     The Debtors seek entry of interim and final orders:   (a) determining that the Utility Companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate

01:16262179.1

assurance and procedures governing the Utility Companies' requests for additional or different adequate assurance; and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

53.    The Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, natural gas, solid waste disposal, internet service, cellular telephone and other similar services (the "Utilities"). The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to 50% of the Debtors' estimated monthly costs for Utilities (collectively, the "Utility Deposit"), or approximately $192,987, and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

54.    If the Utility Companies are permitted to terminate services under section 366, the Debtors may be forced to suspend the affected operations, resulting in a severe disruption, loss of revenue and profits, and potentially the destruction of their businesses. Such disruption and loss would, at a minimum, cause substantial harm to the Debtors' efforts to expeditiously consummate the Plan and be detrimental to the estates and the Debtors' creditors. Accordingly, it is essential that the Utility Companies continue to provide their services without interruption.

55.    Prior to their chapter 11 filings, the Debtors timely made monthly payments to the Utility Companies. To the best of the Debtors' knowledge, there are no defaults or arrearages of any significance with respect to the Debtors' undisputed invoices from the Utility Companies, other than payment interruptions that may be incidental to the commencement of the Chapter 11 Cases.

56.     For the foregoing reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**4.      Debtors' Motion for Entry of an Order: (I) Authorizing Payment of Certain Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (II) Confirming Right to Continue Employee Programs, on Postpetition Basis, (III) authorizing payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepeition Claims Owing to Administrators of, or Third Party Providers Under, Employee Programs, (V) Authorizing Continuation of Workers' Compensation Program and Payment of Workers' Compensation Obligations and (VI) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments.**

57.     The Debtors are seeking (i) authorization to pay certain prepetition amounts owing to or for the benefit of current employees for compensation, benefits and reimbursable expenses; (ii) confirmation of the Debtors' right to continue postpetition, in the ordinary course of business, the employee-related plans, programs and policies in effect immediately prior to the filing of these cases; (iii) authorization to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirmation of the Debtors' right to continue to deduct and to transmit deductions from payroll checks as authorized by employees, as required under any employee-related plan, program or policy or as required by law; (v) authorization to pay any prepetition claims owing to the administrators of, or third party providers under, their employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their employees; (vi) authorization to continue their existing workers' compensation program and honor workers' compensation obligations; and (vii) certain related relief, as more fully described in the Employee Compensation and Benefits Motion.  I believe that no individual Employee will be

owed wages, salary, bonuses, incentives, and other compensation earned prior to the Petition Date in an amount exceeding $12,475.

58.     The Debtors have approximately 2,546 employees, consisting of 2,520 fulltime employees and 26 part-time employees (the "Employees").   The vast majority of these Employees rely exclusively on their full compensation, benefits, and reimbursement of their expenses to continue to pay their daily living expenses, and these Employees may be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid employee obligations.   I believe that if the Debtors are unable to honor all such obligations immediately, employee morale and loyalty will be jeopardized at a time when such support is critical.

59.     The uninterrupted continuation of the Debtors' businesses is critically dependent upon a stable work force.   Failure to honor the Obligations and continue these services would have a detrimental impact on the Employees and could result in attrition and disruptions in the Debtors' workforce at a time when the Debtors can ill afford it.   Further, such attrition and disruption would result in additional administrative burdens and costs as the Debtors attempt to stabilize their work-force in the same period that they are trying to promptly exit chapter 11. Failure to maintain Employee relations would imperil the Debtors' continued operation and thwart the purpose of the Debtors' efforts in these prepackaged cases – emerging from chapter 11 with a healthier balance sheet with minimal impact on the operational aspects of the Debtors' businesses.   On the other hand, payment of the Obligations will significantly aid the Debtors in achieving this goal.   Moreover, with respect to workers' compensation obligations, various statutory schemes require the Debtors to continue these programs to do business in the states in which they operate.   Finally, since the Plan proposes payment in full of all general unsecured claims, including those related to the Obligations, I believe that payment of amounts owing to

the Employees as of the Petition Date in the ordinary course of business will merely affect the timing of payment of such obligations.

60.      As a result of the foregoing, I believe it is in the best interest of the Debtors' and their estates to continue to honor Employee-related obligations as set forth in the Motion.

**5.      Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Prepetition Warranty Programs in the Ordinary Course.**

61.      The Debtors seek entry of an order authorizing them to honor their prepetition obligations to customers arising under various prepetition warranty agreements, and certain related relief as more fully described in the Warranty Programs Motion.

62.      In connection with most fulfillment and construction agreements entered into by the Debtors, Warranty Programs are provided to attract and retain certain key customers. The Warranty Programs are used to ensure customer satisfaction, but ultimately enhance the Debtors' cash flow. The Debtors' most significant Warranty Obligations are owed by DirectSAT USA, with respect to services provided to DirectTV, and Pinnacle Wireless USA, Inc., with respect to obligations under its World Trade Center agreement. In addition, the Debtors have certain other miscellaneous Warranty Obligations that they wish to honor while the Chapter 11 Cases are pending. As of the Petition Date, the Debtors estimate that they have approximately $1.1 million in liability under the Warranty Programs.

63.      I believe that a failure to honor the Warranty Programs would result in the loss of key customers, as well as credibility within the Debtors industry - costing far in excess of any theoretical savings that could be achieved through denial or postponement of these obligations. I further believe that the success and ultimate viability of the Debtors' businesses are dependent upon the Debtors' continuing relationship with their customers. In the competitive industry in which the Debtors operate, failure to honor Warranty Programs that are the same or similar to the

Debtors' competitors is certain to have a significant impact on the Debtors' ability to maintain existing customers, and likely to have a significant impact on the Debtors' ability to attract new ones.

64.    I believe that honoring the Warranty Obligations is prudent and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

> **6.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay Prepetition Claims of Trade Creditors in the Ordinary Course of Business.**

65.    The Debtors seek entry of an order authorizing them, in their sole discretion, to pay, or allow setoffs or recoupments by, creditors holding general unsecured claims arising from actual and necessary goods and services provided to the Debtors prepetition, claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, and creditors holding Claims supported by Liens (collectively, the "Trade Creditors") in the ordinary course of business, including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships or other business practices with the Trade Creditors, and to honor certain obligations (the "WEX Obligations") owed to Wright Financial Services Corporation ("WEX"), one of their credit card servicers, as more fully described in the Trade Claims Payment Motion.

66.    The Chapter 11 Cases are the culmination of a lengthy process to effect the successful reorganization of the Debtors' businesses through the Plan, while providing appropriate treatment for the Debtors' creditors.  I believe that a seamless transition into and through chapter 11 will preserve the value of the Debtors' business.  A fundamental aspect of the Debtors' efforts to minimize disruption during the Chapter 11 Cases is the Debtors' ability to maintain and develop their relationships with the Trade Creditors with whom the Debtors conduct business.  The Trade Creditors provide the Debtors with goods and services in the ordinary course of business including, among other things, materials used in the Debtors'

ordinary course network engineering and design, construction and project management, comprehensive installation and fulfillment and wireless telecommunication infrastructure services.  The Debtors estimate the total aggregate amount of payments to be made across all categories of Trade Creditors is approximately $23 million, and authority to pay, or allow setoffs and recoupments by, Trade Creditors in an amount not to exceed $15.4 million.

67.    Included among the Trade Claims, are certain amounts and obligations owing to WEX.  Prior to the commencement of these cases, the Debtors utilized WEX charge cards to provide fuel, oil and other automotive items for the Fleet.  After learning of the Debtors' prepetition solicitation of the Plan, WEX informed that Debtors that WEX would not provide post-petition credit through the WEX credit card program unless the Debtors obtained to authorization to honor the WEX Obligations.

68.    In many cases, including where a Trade Creditor may itself be facing financial hardship, the Debtors' failure to pay the claims of Trade Creditors may result in the Trade Creditors stopping work for, or deliveries to, the Debtors, which may severely disrupt the Debtors' business.  With respect to WEX, failure to honor the WEX Obligations could result in significant disruption to the Debtors' business operations by requiring an immediate alternative arrangement for charging fuel, oil, and other automotive items for the Fleet and by crippling the Fleet until such an arrangement could be made.  While in certain cases the Debtors may successfully bring an action before this Court to compel a Trade Creditor to perform, substantial damage—such as dissatisfied customers and related liability—will be incurred before the Debtors have succeeded in such action.  Additionally, the Debtors may have contracts that are not executory in nature and counterparties to those contracts may refuse to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors.

69.     I believe that any disruption to the Debtors' operations could risk the Debtors' ability to effectuate its restructuring – a restructuring which will substantially benefit the Debtors and their creditors.  Furthermore, since all Trade Creditors' claims are unimpaired under the Plan, I believe that the relief requested in the Trade Claims Payment Motion will not prejudice any party in interest.

70.     Accordingly, I believe it is prudent that the Debtors pay the claims of Trade Creditors and honor the WEX Obligations in the ordinary course during the Chapter 11 Cases, subject to Trade Creditors performing their obligations in accordance with Customary Terms.

**7.      Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Secured Postpetition Financing on a Superpriority Basis Pursuant to 11 U.S.C. §§ 105, 361, 362, and 353, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (C) Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364; and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001.**

71.     The Debtors seek entry of an order authorizing them to obtain secured postpetition financing on a superpriority basis under section 364 of the Bankruptcy Code, as provided in that certain Debtor-in-Possession Credit and Security Agreement, substantially in the form attached to the relevant motion as Exhibit B (as amended, modified, supplemented, restated or replaced from time to time, the "DIP Credit Agreement"), use Cash Collateral, as described in the Credit Agreement and defined in the Plan, provide adequate protection to the prepetition secured parties, as described in the proposed interim order approving the motion, and schedule interim and final hearings pursuant to Bankruptcy Rule 4001 with respect to the relief requested in the motion.

72.     In order to operate during these Chapter 11 Cases and effectuate the terms of the Plan, the Debtors will need to utilize prepetition collateral (including the Cash Collateral), as well as obtain additional, post-petition financing.  Without the use of the Cash Collateral and the

DIP Facility, the Debtors would be unable to pay operating expenses, including, without limitation employee payroll and other benefits, rent, utilities and the various other items reflected in the Budget (as defined in the motion and in the proposed interim order approving same).

73.    The Debtors are seeking entry of an interim order that, among other things, authorizes the Debtors to enter into the DIP Facility (as defined in the DIP Credit Agreement) and obtain credit and incur debt pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, as follows: (i)   commitments to lend an aggregate principal amount of up to $43,000,000 as term advances that, once borrowed and repaid, may not be reborrowed (the "Initial Commitments"); (ii) revolving credit commitments of $10,000,000 for the purpose of providing liquidity for working capital and general corporate purposes of the DirectSAT Business (the "Revolving Commitments"); (iii) commitments to purchase participations in, and reimburse the ABL Facility Agent for any amount drawn under, the $3.7 million letter of credit issued to secure certain obligations of the Other Business under the ABL Facility Credit Agreement, if and when such letter of credit is drawn (the "L/C Commitment"; collectively, the Initial Commitments, the Revolving Commitments, and the L/C Commitment are the "DIP Facility Commitments"); and (iv)  a roll up of all outstanding letters of credit under the ABL Facility existing as of the Petition Date (the "L/C Roll Up").

74.    The Debtors are also requesting a preliminary hearing on the motion and the Court's authorization that, until the Court enters a final order, a portion of the DIP Facility Commitments (as defined in the proposed interim order) may be borrowed by the Debtors in a maximum amount equal to the aggregate principal amount of $29,200,000 under the Initial Commitments, plus the full amount of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up.

75.     The Debtors and I believe that the entry into the DIP Credit Agreement to obtain the DIP Facility and the Debtors' use of Cash Collateral are necessary to maintain the value of the Debtors' businesses as a going concern, and prevent harm to the Debtors' employees and business operations that would result without access to liquidity to pay such operating expenses, among other items, reflected in the budget attached to the proposed interim order as an exhibit.

**8.      Debtors' Motion for Interim and Final Orders Pursuant to Sections 105, 362 and 541 of the Bankruptcy Code and Bankruptcy Rule 3001 Establishing Procedures for (I) Transfers of Claims, (II) Transfers of Equity Securities, (III) Claiming a Worthless Securities Deduction and (IV) Scheduling a Final hearing and Approving Procedures.**

76.     The Debtors seek entry of an order (A) establishing procedures with respect to (i) the ownership, acquisition and disposition of (x) beneficial interests in equity securities in UniTek Global and (y) certain claims against the Debtors and (ii) any claim by a holder of 50 percent or more of the stock of UniTek Global of a worthless securities deduction under section 165(g) of the Internal Revenue Code of 1986, as amended (the "IRC"), with respect to such stock (a "Worthless Securities Deduction"); and (B) scheduling a final hearing (the "Final Hearing") to consider granting the relief requested on a final basis.

77.     The Debtors have extremely valuable net operating losses and other tax attributes; however, the Debtors' ability to use their net operating losses and tax attributes to reduce their future income tax liability could be severely limited or even eliminated as a result of certain transfers of equity securities in UniTek Global, transfers of certain claims against the Debtors, or Worthless Securities Deductions claimed in respect of UniTek Global stock. Any such limitation or elimination could be detrimental to the Debtors' cash position and the overall reorganization process.

78.     Prior to commencing these Chapter 11 Cases, the Debtors took certain affirmative steps to protect their net operating losses and other tax attributes against damages on account of

debt or equity trading. In this Motion, the Debtors seek certain narrowly tailored procedures to supplement those affirmative steps and ensure that the Debtors are able to protect their net operating losses and tax attributes. To be clear, the Debtors are not seeking in this Motion an injunction on trading; rather the Debtors are simply seeking noticing procedures designed to monitor trading and assess risks to their net operating losses and tax attributes.

79.     As of December 31, 2013, UniTek Global had NOLs (as defined in the motion) amounting to approximately $133.0 million. However, UniTek Global's ability to use its net NOLs could be substantially limited if there were an "ownership change" as defined under section 382 of the Internal Revenue Code. In general, an ownership change would occur if certain ownership changes related to UniTek Global's stock held by 5% or greater stockholder exceeded 50%, measured over various measuring points over a rolling three-year period or, if shorter, since the last ownership change.  These provisions can be triggered not only by merger and acquisition activity, but also by normal market trading.  As a result, on or about August 28, 2014, UniTek Global and American Stock Transfer & Trust Company, LLC, as Rights Agent, entered into that certain  Section 382 Rights Agreement (along with all related agreements and documents, the "Rights Agreement"). The Rights Agreement, and the rights plan established therein, was designed to deter trading that would lead to the loss of UniTek Global's valuable NOLs and a resulting reduction in the Debtors' value. However, the Rights Agreement does not completely restrict trading in UniTek Global's stock, and thus, UniTek Global's valuable NOL could still be impacted by trading in UniTek Global's stock.

80.     In part as a measure to protect NOLs and Tax Attributes (as defined in the motion), pursuant to the Fourth Amendment to the Term Loan Credit Agreement, effective July 28, 2014, the Debtors instituted transfer restrictions applicable to the Term Loan Claims, which

effectively prohibited transfers, assignments and participations of the Term Loan Claims through January 1, 2015.   Pursuant to the Sixth Amendment to the Term Loan Credit Agreement, effective October 31, 2014, the Debtors extended such restrictions until the earlier of January 21, 2014 and the Effective Date of the Plan.

> **9.**     **Motion of the Debtors for an Order Pursuant to 11 U.S.C. §§ 105(a) and 365(a) Approving and authorizing the Assumption of the Plan Support Agreement.**

81.     The Debtors seek entry of an order approving and authorizing the Debtors to assume that the Plan Support Agreement.

82.     The Debtors and the other Plan Support Parties feared that a free-fall into bankruptcy would cause panic among the Debtors' vendors, customers, and employees, leading to a potential disruption in the Debtors' businesses and hampering their prospects for a successful reorganization.   As an alternative, the Plan Support Parties negotiated the PSA to provide a clear path towards reorganization and emergence from chapter 11, thus maintaining the value of the Debtors' underlying businesses. The PSA is the lynchpin of the Debtors' fully consensual restructuring strategy, which will ultimately culminate with confirmation and consummation of the Plan.

83.     Prior to filing these Chapter 11 Cases, the Debtors vigorously negotiated with the ABL Facility Agent and certain of the Term Loan Consenting Lenders (as defined in the PSA, the "Specified Lenders"), who together represent the majority of the Debtors' prepetition funded debt holders.  Signed by every Holder of Claims entitled to vote on the Plan, the PSA serves as the roadmap for the Debtors' successful emergence from chapter 11 under a plan of reorganization pursuant to which the Debtors will pay all Allowed General Unsecured Creditors in full.  The PSA has been made possible by the Debtors' and their stakeholders' collective

realization that the Debtors are in need of a balance sheet restructuring and that a chapter 11 filing without a consensual deal risks erosion of the value of the estates.

84.     In addition, the PSA also includes an important commitment from DIRECTV, the Debtors' largest customer, to support the Debtors restructuring efforts and continue doing business with them during these Chapter 11 Cases. DIRECTV's inclusion as a Plan Support Party is a fundamental and essential component of the Debtors' strategy to restructure its balance sheet in these Chapter 11 Cases

85.     DIRECTV and DirectSAT, one of the Debtors in the Chapter 11 Cases, are parties to that certain 2012 Homes Services Provider Agreement dated as of October 15, 2012, as amended (as defined in the PSA, the "HSP Agreement"), and each party to the HSP Agreement has the right to terminate the HSP Agreement *without cause* by giving the other party at least 180 days prior written notice (as defined in the PSA, an "HSP Termination Notice"). DIRECTV has agreed in the PSA that it shall not issue an HSP Termination Notice so long as certain conditions (as defined in the PSA, the "HSP Conditions") are satisfied.  The Debtors, along with the ABL Facility Lender and the Specified Term Loan Lenders, have considered the HSP Conditions at great length and believe that the Debtors can satisfy all of the HSP Conditions.

> **10.     Debtors' Motion for Entry of Order (I) Approving Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany Transactions, (III) Granting Administrative Priority Status to Post-Petition Intercompany Transactions, (IV) Authorizing Use of Prepetition Bank Accounts, and (V) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis.**

86.     As of the Petition Date, the Debtors maintained the following bank accounts (the "Bank Accounts") with various banks (the "Banks"):

(a)     Collection Account.   The Debtors receive funds primarily from corporate customers and governmental agencies, including federal, state, and local agencies.

Receipts from these sales are typically in the form of wire transfers, and checks which are deposited into a primary collection account at PNC Bank, N.A. (the "Collection Account"). The Collection Account is subject to an existing pre-petition account control agreement in favor of ABL Facility Agent (as defined in the Plan) (the "Existing DACA") . The Collection Account is swept on a daily basis.

(b)     Operating Accounts.  The Debtors have one primary operating account with PNC Bank, N.A. (the "Primary Operating Account").  Funds are transferred into the Primary Operating Account from the Collection Account on a daily basis.  The Debtors also have five additional zero balance operating accounts which hold operating funds for subdivisions of the Debtors' businesses (collectively, the "Subsidiary Operating Accounts").  Each of the Subsidiary Operating Accounts is funded through the Primary Operating Account as needed.

(c)     Payroll Accounts.  The Debtors maintain six payroll accounts (the "Payroll Accounts"), maintained separately for the various subdivisions of the Debtors' business, which are funded, as needed, and typically on a bi-weekly basis, from the Primary Operating Account to support the funding of the ADP accounts.  From these Payroll Accounts, the Debtors make (i) payroll and bonus payments, (ii) contributions to their employees' retirement plans (the "401(k) Payments") and (iii) contributions to their employees' health care, life insurance, workers' compensation, and disability programs and (iv) severance payments.  As needed, and generally on a bi-weekly basis, these funds (i) are debited through (ACH) into an account maintained by Automatic Data Processing ("ADP") and (ii) manual checks are also written from these accounts for missed payroll, prevailing wage adjustments or severance and termination payments.

01:16262179.1

(d)     Petty Cash Accounts.  The Debtors maintain two petty cash accounts with PNC

Bank, N.A. which are used for the petty cash needs of  the Pinnacle business related to

obtaining local licenses and permits (the "Petty Cash Accounts").  These Petty Cash

Accounts are funded from the Primary Operating Account and each Petty Cash Account

typically contain a balance of less than $6,000.

(e)     Additional Accounts.  The Debtors also maintain additional bonding and escrow

accounts with other financial institutions.

87.     The Debtors' cash management system (the "Cash Management System")

generally operates similarly to the centralized cash management systems used by other large,

diversified companies to manage the cash of numerous operating units in a cost-effective,

efficient manner.

88.     The Debtors' Cash Management System includes all activities necessary and

pertinent to collecting, disbursing and investing the Debtors' cash assets.  The Cash Management

System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer

cash as needed to respond to these requirements.  The Cash Management System is essential to

the efficient execution and achievement of the Debtors' strategic business objectives, and,

ultimately, to maximizing the value of the Debtors' estates.

### 3.      RETENTION APPLICATIONS

**11.      Application of the Debtors for Order, Pursuant to 28 U.S.C. § 156(c), Authorizing the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent to the Debtors, *Nunc Pro Tunc* to the Petition Date.**

89.     The Debtors seek entry of an order pursuant to 28 U.S.C.  § 156(c) appointing

Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent for the Debtors, effective

*nunc pro tunc* to the Petition Date.  This Application pertains only to the work to be performed

by Epiq under the Clerk of the Court's delegation of duties permitted by section 156(c) of the Judicial Code, Local Rule 2002-1(f) and the Claims Agent Protocol.  Among other things, Epiq will (i) prepare and serve required notices in the Chapter 11 Cases, (ii) maintain a list of all potential creditors, equity holders and other parties in interest, and a core mailing list; and (iii) maintain an official claims register for each Debtor, if necessary, and process all proofs of claim received, if any.

90.    The Debtors have thousands of potential parties in interest in the Chapter 11 Cases.  Although the Office of the Clerk of the Court ordinarily would serve notices on the Debtors' creditors and other parties in interest, it may not have the resources to undertake such tasks, especially in light of the size of the Debtors' creditor body and the expedited timelines that frequently arise in chapter 11 cases. The Debtors selected Epiq because it is one of the country's leading chapter 11 administration, solicitation, and balloting agent, and Epiq has expertise in facilitating other administrative aspects of chapter 11 cases.  Epiq also provides a competitive rate structure, and the Debtors selected Epiq after reviewing the qualification and pricing proposals of three separate firms.  I believe the employment of Epiq as claims and noticing agent in the Chapter 11 Cases is appropriate and in the best interest of the Debtors and their estates.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: November 3, 2014
      Blue Bell, Pennsylvania

**Andrew J. Herning**
Chief Financial Officer and Treasurer
UniTek Global Services, Inc.
1777 Sentry Parkway West
Gwynedd Hall, Suite 302
Blue Bell, Pennsylvania 19422

*Signature Page to First Day Declaration*