## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

x

------------------------------------------------------------

In re:                                                        :        Chapter 11

                                                              :

UNITEK GLOBAL SERVICES, INC., et al.,[1]     :        Case No.  14-12471 (PJW)

                                                              :

           Debtors.                                    :        Joint Administration Requested

------------------------------------------------------------ x

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING (A) SECURED POSTPETITION FINANCING ON A
### SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364,
### (B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND
### (C) ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364; AND
### (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

UniTek Global Services, Inc. ("UniTek") and its affiliated debtors in the above-captioned

cases (each a "Debtor," and collectively, the "Debtors") hereby submit this motion (the

"Motion") for the entry of an interim order, substantially in the form annexed hereto as

**Exhibit A** (the "Interim Order"), and a final order (the "Final Order" and, together with the

Interim Order, the "Orders"), under sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 2002,

4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

"Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: UniTek Global Services, Inc. (3445), UniTek Holdings, Inc. (4120), UniTek Midco, Inc. (5642), UniTek Acquisition, Inc. (4123), Nex-link USA Communications, Inc. (9084), UniTek USA, LLC (0279), Pinnacle Wireless USA, Inc. (1746), DirectSAT USA, LLC (3465), FTS USA, LLC (6247), Advanced Communications USA, Inc. (0091).  For the avoidance of doubt, Wirecomm Systems (2008) Inc. (FKA UniTek Canada), an affiliate of the Debtors and wholly owned subsidiary of UniTek USA, LLC, is not a Debtor in the Chapter 11 Cases (as defined herein).  The Debtors' main corporate address is 1777 Sentry Parkway West, Gwynedd Hall, Suite 302, Blue Bell, Pennsylvania 19422.

Delaware (as amended, the "Local Bankruptcy Rules"), (I) authorizing the Debtors[2] to (A) enter into a post-petition financing arrangement (as amended, modified and in effect from time to time, the "DIP Financing" or the "DIP Facility" and loans made thereunder, the "DIP Loans") on the terms and conditions set forth in the Interim Order and that certain Debtor-in-Possession Credit and Security Agreement, substantially in the form attached hereto as **Exhibit B** (as hereafter amended, restated, supplemented, or otherwise modified from time to time, in accordance with the Interim Order, the " DIP Credit Agreement," and together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and the Interim Order, including the Other Documents, collectively, the "DIP Documents"), and grant senior security interests and superpriority administrative expense status with respect to the DIP Obligations,[3] (B) use "Cash Collateral," as described in the DIP Credit Agreement and defined in the Interim Order, and (C) provide adequate protection to the Pre-Petition Secured Parties, as described in the DIP Credit Agreement and the Interim Order; and (II) scheduling interim and final hearings pursuant to Bankruptcy Rule 4001 with respect to the relief requested herein.  In support of the Motion and the relief requested herein, the Debtors rely on and incorporate by reference the *Declaration of Andrew J. Herning in Support of the First Day Motions* (the "First Day Declaration"), filed concurrently herewith, and respectfully state as follows:

---

[2] Note, however, that the only debtor-in-possession entities that will be borrowers under the DIP Credit Agreement, include UniTek Global Services, Inc., UniTek Acquisition, Inc., UniTek USA, LLC, Pinnacle Wireless USA, Inc., DirectSAT USA, LLC, and FTS USA, LLC.

[3] Capitalized terms not otherwise defined or referenced herein shall have the meanings ascribed to them in the DIP Credit Agreement, as applicable.  To the extent the use, definition or meaning of a capitalized term herein conflicts with the term's use, definition or meaning as provided for in the DIP Credit Agreement, the use, definition or meaning of the capitalized term found in the DIP Credit Agreement shall control.

## JURISDICTION

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 361, 362, 363, 364 and 507, and Bankruptcy Rules 2002, 4001, 6004 and 9014, and Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules.

## BACKGROUND

**A.      Introduction**

3.      On the date hereof (the "Petition Date"), each of the Debtors commenced in this Court a voluntary case under chapter 11 of the Bankruptcy Code in this Court (the "Chapter 11 Cases").  The Debtors are authorized to continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      As of the date hereof, no official committee of unsecured creditors has been appointed, and no request for appointment of a chapter 11 trustee or examiner has been made.

5.      On the Petition Date, the Debtors filed a joint prepackaged chapter 11 plan of reorganization (as it may be amended or supplemented, the "Plan"), which contemplates confirmation within 45 days and provides for the payment in full of all general unsecured claims in the ordinary course of business, as detailed more fully in the Plan.  As a result of the pre-petition solicitation of the Plan, 100 percent of the holders of the Pre-Petition Senior ABL Facility Loans, 100 percent of the holders of the Pre-Petition Junior ABL Facility Loans and 100 percent of the holders of the Pre-Petition Term Loan Indebtedness (as such terms are defined below and which collectively constitute all classes of impaired creditors under the Plan) voted unanimously to accept the Plan.

6.      The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

**B.      Overview of the Debtors' Businesses**

7.      The Debtors are a full service provider of technical services to customers in the wireless telecommunications, public safety, satellite television and broadband cable industries in the United States and Canada.  The Debtors' services include network engineering and design, construction and project management, comprehensive installation and fulfillment, and wireless telecommunication infrastructure services.  The Debtors' primary client base consists of satellite television, broadband cable and other telecommunications companies, contractors, and municipalities and related agencies, including leading media and telecommunication companies. The Debtors' customers utilize the Debtors' services to build and maintain their infrastructure and networks and to provide residential and commercial fulfillment services, which are critical to their ability to deliver voice, video and data services to end users.

8.      The Debtors' two principal lines of services are (i) comprehensive installation and fulfillment services by whereby the Debtors deploy skilled technicians to install their customers equipment such as television receiver units, into homes and businesses and (ii) wireless telecommunication construction, project management and systems integrations, whereby Debtors assemble project teams of engineers and technicians to design and build large wireless infrastructure projects for their customers.  These segments make up approximately 80 percent and 20 percent of the Debtors' businesses, respectively.

**C.      The Debtors' Prepetition Capital Structure**

9.      As of the Petition Date, the substantial majority of the Debtors' liabilities consisted of funded debt (i.e., not trade debt) comprised of: (i) the revolving credit facility (the

"ABL Facility") provided under that certain Revolving Credit and Security Agreement dated as of July 10, 2013, by and among UniTek and certain other Debtors, the lender parties thereto (the "ABL Facility Lenders"), and Apollo Investment Corporation, as agent for the ABL Facility Lenders (the "ABL Facility Agent") (as amended from time to time, the "ABL Facility Credit Agreement," and together with any other documents, schedules, instruments, or agreements related thereto, the "ABL Facility Credit Documents"); and (ii) the term loan (the "Term Loan Facility") provided under that certain credit agreement dated as of April 15, 2011, among UniTek and certain other Debtors, the lender parties thereto (the "Term Loan Lenders"), and Cerberus Business Finance, LLC, in its capacity as successor administrative agent under the Term Loan Credit Agreement, (the "Term Loan Agent") (as amended from time to time, the "Term Loan Credit Agreement," and together with any other documents, schedules, instruments, or agreements related thereto, the "Term Loan Credit Documents").

### a.    The ABL Facility

10.     On July 10, 2013, the Debtors entered into the ABL Facility Credit Agreement pursuant to which the ABL Facility Lenders agreed to provide the Debtors with up to $75.0 million of revolving credit loans with a sublimit of $35.0 million for standby Letters of Credit.  The ABL Facility Credit Agreement was amended before the commencement of the Chapter 11 Cases to allow certain Term Loan Lenders (the "Junior ABL Facility Lenders") to provide the Debtors with additional loans of $5.0 million pursuant to the ABL Facility Credit Agreement, which amount could, in the sole discretion of such lenders, be increased to an aggregate amount (together with such initial loans) of up to $25.0 million.  As of the Petition Date, approximately $47.6 million (including accrued and unpaid interest) is outstanding under the ABL Facility, including approximately $38.8 million on account of the Pre-Petition Senior ABL Facility Loans (as defined in the Interim Order), approximately $8.8 million on account of

the Pre-Petition Junior ABL Facility Loans (as defined in the Interim Order) provided by the

Junior ABL Facility Lenders, and the undrawn amount of all outstanding letters of credit issued

under the Pre-Petition ABL Facility was approximately $21,646,300.00.

      **b.**       **The Term Loan Facility**

      11.       Pursuant to the Term Loan Credit Agreement, the Term Loan Lenders provided

the Debtors with a term loan in the original face amount of $100.0 million. UniTek had a right

to increase this amount by $20.0 million, which it exercised on May 3, 2012, and a further right

to increase this amount by an additional $15.0 million, which it exercised on or about

September 14, 2012. In connection with the refinancing of the Debtors' debt in July 2013, the

Debtors and the Term Loan Lenders, on July 25, 2013, entered into that certain Second

Amendment and Limited Waiver to Credit Agreement. In connection with that amendment,

UniTek issued to the Term Loan Lenders warrants to purchase 3.8 million shares of UniTek's

common stock for $0.01 per share, which warrants were valued at approximately $13.1 million.

The Term Loan Credit Agreement was further amended before the commencement of the

Chapter 11 Cases to provide additional borrowing capacity to the Debtors under the ABL

Facility Credit Agreement. As of the Petition Date, approximately $143.3 million (including

accrued and unpaid interest) is outstanding under the Term Loan Facility.

**D.**       **The Debtors' Need for Use of Cash Collateral and Postpetition Financing**

      12.       In order to operate during these Chapter 11 Cases and effectuate the terms of the

Plan, the Debtors will need to utilize prepetition collateral (including the Cash Collateral), as

well as obtain additional, post-petition financing. Without the immediate use of the Cash

Collateral and the DIP Facility, the Debtors would be unable to pay operating expenses,

including, without limitation, amounts coming due to vendors, as well as employee payroll and

other benefits, rent, utilities and the various other items reflected in the Budget (as defined herein and in the Interim Order).

13.    As discussed in greater detail below, the Debtors believe that the use of Cash Collateral and entry into each of the DIP Documents, including the DIP Credit Agreement, is necessary to maintain the value of the Debtors' businesses as a going concern and prevent the harm to the Debtors' employees and business operations that would result without access to liquidity to pay such operating expenses.

## **RELIEF REQUESTED:**

14.    By this Motion, the Debtors seek entry of the Interim and Final Orders, *inter alia*:

(a)    authorizing the Debtors to enter into the DIP Facility pursuant to the DIP Documents, and obtain credit and incur debt (the "DIP Obligations," as defined in the Interim Order), pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, as follows:

i.    commitments to lend an aggregate principal amount of up to $43,000,000 as term advances that, once borrowed and repaid, may not be reborrowed (the "Initial Commitments");

ii.    revolving credit commitments of $10,000,000 for the purpose of providing liquidity for working capital and general corporate purposes of the DirectSAT Business (the "Revolving Commitments");

iii.    commitments to purchase participations in, and reimburse the ABL Facility Agent for any amount drawn under, the $3.7 million letter of credit (the "WTC Letter of Credit") issued to secure certain obligations of the Other Business under the ABL Facility Credit Agreement, if and when such WTC Letter of Credit is drawn (the "L/C Commitment"; collectively, the Initial Commitments, the Revolving Commitments, and the L/C Commitment are the "DIP Facility Commitments"); and

iv.    a roll up of all outstanding letters of credit under the ABL Facility existing as of the Petition Date (the "L/C Roll Up");

(b)    authorizing the Debtors to use the proceeds of the DIP Facility as expressly provided in the DIP Documents, and in accordance with the Budget (as defined in the DIP Credit Agreement) to:

i.    pay costs and expenses in connection with the DIP Facility and the Chapter 11 Cases, including the adequate protection payments with respect to the Pre-Petition

Indebtedness (as defined in the Interim Order), as provided for in the Interim Order and the DIP Documents;

        ii.     provide financing for working capital and other general corporate purposes of the Debtors, including but not limited to investments in other subsidiaries of the Debtors to the extent not prohibited under the DIP Documents;

        iii.     in the case of DIP Loans borrowed and letters of credit issued under the Revolving Commitments, solely to fund operations and working capital and general corporate purposes of the DirectSat Business;

        iv.     in the case of DIP Loans borrowed under the L/C Commitment solely to pay the Pre-Petition ABL Facility Agent, for any amount drawn under the WTC Letter of Credit, a $3.7 million letter of credit to secure certain obligations of the Other Business under the Pre-Petition ABL Credit Agreement, if and when such letter of credit is drawn;

        v.     in the case of DIP Loans borrowed under the Initial Commitments, to fund, among other things, the Separation of Business Transactions (as defined in the DIP Credit Agreement); and

        vi.     pay administration costs of these Chapter 11 Cases and claims or amounts approved by this Court;

        (c)     authorizing the Debtors to execute and deliver the DIP Documents, and to perform such other acts as may be necessary or desirable in connection therewith;

        (d)     authorizing the Debtors to grant to the DIP Agent and the DIP Lenders,[4] in accordance with the DIP Documents, subject to the Carve Out (as defined below and in the Interim Order), on the terms set forth in the DIP Documents, and the Interim Order, the following:

        i.     pursuant to 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claims in the Chapter 11 Cases, in respect of all DIP Obligations;

        ii.     pursuant to section 364(c)(2), as security for the repayment of the borrowings and other obligations arising under the DIP Documents, a senior first-priority lien on all assets of the Debtors, now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutes thereof, that are not subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

        iii.     pursuant to section 364(d) of the Bankruptcy Code, a senior first-priority priming lien on and security interest in all of the Debtors' assets (subject to Permitted Encumbrances (as defined in the DIP Documents) that have priority over such liens as a matter

---

[4] The terms "DIP Agent" and "DIP Lenders," as used herein, shall have the same meanings as provided for the terms "Agent" and "Lenders," respectively, in the DIP Credit Agreement.

of law (other than the Pre-Petition Liens (as defined in the Interim Order)), now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutions thereof, that are subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

(e)    authorizing the DIP Agent, at the direction of DIP Lenders constituting the Determining Lenders (as defined in the DIP Credit Agreement), to terminate the DIP Credit Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement), on terms specified in the Interim Order and in the DIP Credit Agreement;

(f)    authorizing, subject to entry of the Final Order, the Debtors to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions");

(g)    authorizing the Debtors' use, among other things, solely in accordance with the Budget, any cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code and described in the Interim Order) (the "Cash Collateral") in which the Pre-Petition Secured Parties may have an interest and the granting of adequate protection to the Pre-Petition Secured Parties with respect to any post-petition diminution in value of their interests in the Pre-Petition Collateral arising from, inter alia, the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral) and the priming of the liens of the Pre-Petition Secured Parties by the DIP Liens;

(h)    authorizing the Debtors to use proceeds from the Roll-Up L/C Commitment to repay any amount drawn on the outstanding letters of credit under the ABL Facility existing as of the Petition Date;

(i)    subject to and only effective upon the entry of a Final Order granting such relief, waiving any right of the Debtors to surcharge against the DIP Collateral or Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(j)    the Court's modification of the automatic stay imposed by section 362 of the Bankruptcy Code, to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

(k)    the Court's waiver of any applicable stay as provided in the provisions of the Bankruptcy Rules (including under Bankruptcy Rule 6004), and providing for the immediate effectiveness of the Interim Order;

(l)    scheduling a preliminary hearing on this Motion and the Court's authorization that during the period (the "Interim Period") commencing on the date of this Court's entry of the Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, and (b) the occurrence of the Maturity Date, a portion of the DIP Facility Commitments may be borrowed by the Debtors, subject to compliance with the terms,

conditions, and covenants contained in the DIP Documents, in a maximum amount equal to the aggregate principal amount of $29,200,000 under the Initial Commitments, plus the full amount of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up, and that the Debtors may utilize collateral, including Cash Collateral, on the terms set forth in the Interim Order; and

(m)    scheduling the final hearing (the "Final Hearing") as soon as practicable, and within 30 days after the Petition Date, to consider entry of the Final Order granting the relief requested in this Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and DIP Documents, and approving the Debtors' notice with respect to the Motion.

## A.    Use of Cash Collateral and Grant of Adequate Protection

15.    In order to finance their postpetition operations and effectuate the terms of the Plan, the Debtors require immediate use of Cash Collateral in which the ABL Facility Lenders and Term Loan Lenders have an interest.  The use of the Cash Collateral will provide the Debtors with the capital necessary to operate their businesses, pay their employees, and maintain the going concern value of their assets.

16.    The use of Cash Collateral, in the ordinary course of business and in accordance with the Budget, and the incurring of the DIP Obligations pursuant to the DIP Facility (described below) are subject to the terms and condition set forth in the Interim Order and the following adequate protection liens, superpriority claims, and payments.[5]

### a.    Replacement Liens

17.    The ABL Facility Lenders will receive a replacement lien on the DIP Collateral, junior to the Carve Out and the DIP Liens described fully in the DIP Credit Agreement (hereinafter referred to as the "ABL Facility Adequate Protection Liens").  The ABL Factility Adequate Protection Liens will be senior to all other claims on the DIP Collateral other than the Term Loan Lender replacement liens (hereinafter referred to as the "Term Loan Adequate

---

[5] For the avoidance of doubt, the relative priorities of the DIP Liens, the Adequate Protection Liens, Permitted Encumbrances, and superpriority claims will be governed as set forth in detail in the proposed Interim Order.

Protection Liens") on Term Debt Priority Collateral (as defined by an existing Intercreditor

agreement between the creditors under the pre-petition ABL Facility Credit Agreement and pre-

petition Term Loan Credit Agreement).

18.     The Term Loan Lenders will receive Term Loan Adequate Protection Liens on

the DIP Collateral, junior to the Carve Out and the DIP Liens, and senior to all other claims on

the DIP Collateral other than the ABL Facility Adequate Protection Liens on the ABL Priority

Collateral (as defined by an existing Intercreditor Agreement between the creditors under the

ABL Facility Credit Agreement and the Term Loan Credit Agreement).

**b.     Interest, Fees and Expenses**

19.     As further adequate protection, the ABL Facility Lenders shall be entitled to

payment of interest and fees (in each case, at the applicable non-default rate) due under the ABL

Facility Credit Documents, at the times specified therein, and subject to certain limitations

therein, as set forth in further detail in the proposed Interim Order.  The interest payments to be

paid to the ABL Facility Lenders as adequate protection will include certain unpaid pre-petition

interest that accrued in the days leading up to the Petition Date.

20.     Similarly, the Pre-Petition Term Loan Indebtedness will accrue interest following

the Petition Date at the applicable non-default rate, and such accrued post-petition interest will

be added to the principal balance of the claims of the Term Loan Lenders under the Term Loan

Credit Agreement, in accordance, and subject to the terms set forth in the proposed Interim

Order.

**c.     Superpriority Claim Status**

21.     To the extent of any post-petition diminution in value of the interests of the ABL

Facility Lenders and the Term Loan Lenders in the Pre-Petition Collateral, if any, the ABL

Facility Lenders and the Term Loan Lenders shall be granted an allowed superiority

administrative expense claim pursuant to Sections 503(b), 507(a) and 507(b) of the Bankruptcy

Code, subject to the Carve Out, and in the order of priorities set forth in the Interim Order.

         **d.**      **Payment of Professional Fees and Expenses**

      22.      The Debtors are further seeking to pay: (i) on the date of the first advance under

the DIP Facility, the outstanding prepetition reasonable and documented fees and expenses of

counsel and financial advisors to the ABL Facility Agent and the Senior ABL Facility Lenders,

counsel and financial advisors to the Term Loan Agent, and counsel to the Specified Term

Lenders (as defined in the Plan); and (ii) on an ongoing basis, from time to time after the Petition

Date, and without duplication, pursuant to the procedures set forth in paragraph 14 of the Interim

Order, all reasonable and documented fees and expenses incurred by the ABL Facility Agent and

the Term Loan Agent (acting in such capacities) and the Specified Term Lenders during and in

connection with these Chapter 11 Cases and required to be paid by the Debtors under the Pre-

Petition Credit Documents, as set forth in the proposed Interim Order.

**B.**      **Terms of the DIP Facility[6]**

      23.      The following chart contains a summary of the essential terms of the proposed

DIP Facility, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule

4001-2:

| TERM / RULE | DESCRIPTION AND LOCATION OF TERM |
|---|---|
| **Debtors/Borrowers**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Unitek Global Services, Inc., Unitek Acquisition, Inc., Pinnacle Wireless USA, Inc., Unitek USA, LLC, Advanced Communications USA, Inc., DirectSat USA, LLC and FTS USA, LLC, as debtors and debtors-in-possession (the "<u>Debtors</u> or <u>Borrowers</u>").[7]<br><br>(*See* pg. 1 of the DIP Credit Agreement; pg. 1 of the Interim Order.) |

---

[6] This section is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim Order.
[7] Capitalized terms not otherwise defined or referenced herein shall have the meanings ascribed to them in the DIP Credit Agreement. To the extent that any definition in this section conflicts with the definition provided in the DIP Credit Agreement, the definition provided in the DIP Credit Agreement shall govern.

| | |
|---|---|
| **DIP Agent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Wilmington Trust, as administrative and collateral agent for the DIP Lenders (in such capacity, the "<u>DIP Agent</u>")<br><br>(*See* pg. 1 of the DIP Credit Agreement; pg. 2 of the Interim Order.) |
| **DIP Lenders**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Apollo (hereinafter, the "<u>ABL Facility Agent</u>") or one or more of its affiliates, and each of their successors and assigns (collectively, the "<u>ABL Facility DIP Lenders</u>"); and certain "Lenders"[8] under the Term Credit Agreement and each of their successors and assigns (collectively, the "<u>Term Facility DIP Lenders</u>" and together with the ABL Facility DIP Lenders, the "<u>DIP Lenders</u>"), as further described in the DIP Credit Agreement.<br><br>(*See* pg. 1 of the DIP Credit Agreement.) |
| **DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)*<br><br>*Del. Bankr. L.R. 4001-2(a)(i)(E)* | The proposed DIP Facility consists of:<br><br>A.    commitments to lend an aggregate principal amount of up to $43,000,000 as term advances that, once borrowed and repaid, may not be reborrowed (the "<u>Initial Commitments</u>");<br><br>B.    revolving credit commitments of $10,000,000 for the purpose of providing liquidity for working capital and general corporate purposes of the DirectSAT Business (the "<u>Revolving Commitments</u>");<br><br>C.    commitments to purchase participations in, and reimburse the ABL Facility Agent for any amount drawn under, the $3.7 million letter of credit (the "<u>WTC Letter of Credit</u>") issued to secure certain obligations of the Other Business under the ABL Facility Credit Agreement, if and when such WTC Letter of Credit is drawn (the "<u>L/C Commitment</u>"; collectively, the Initial Commitments, the Revolving Commitments, and the L/C Commitment are the "<u>DIP Facility Commitments</u>"); and<br><br>D.    a roll up of all outstanding letters of credit under the ABL Facility existing as of the Petition Date (the "<u>L/C Roll Up</u>").  All loans and letters of credit made to or for the benefit of any of the Debtors on or after the Petition Date in accordance with the DIP Documents, all interest thereon and all fees, costs, expenses, indemnification obligations, and other liabilities owing by the Debtors to the DIP Lenders or the DIP Agent in accordance with and relating to this Interim Order and the other DIP Documents, including, without limitation, the "Obligations" as defined under the DIP Credit Agreement, shall hereinafter be referred to as the "<u>DIP Obligations</u>;":<br><br>(*See* § 2.1 of the DIP Credit Agreement; pp. 2-3 of the Interim Order.) |
| **Borrowing Limit on Interim Basis** | Pursuant to the Interim Order, the Debtors may borrow under the DIP Facility subject to the following limitations: |

---

[8] "Lenders" in this instance refers to the term as it is used under the Term Loan Credit Agreement.

| | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R.*<br><br>*4001-2(a)(ii)* | i.  up to an aggregate principal amount of approximately $29.2 million under the Initial Commitments;<br><br>ii.  the full amount of Revolving Commitments;<br><br>iii.  the full amount of the L/C Commitments; and<br><br>iv.  the L/C Roll Up.<br><br>(*See* ¶ 4(f) of the Interim Order.) |
| **Use of DIP Facility and Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii) and (iii)*<br><br>*Del. Bankr. L.R.*<br><br>*4001-2(a)(ii)* | The DIP Facility will be used as expressly provided in the DIP Documents and solely in accordance with the Budget (as defined in the DIP Credit Agreement):<br><br>i.  to pay costs, fees, and expenses in connection with the DIP Facility and adequate protection payments in respect of the Pre-Petition Indebtedness as provided for in the Interim Order and the DIP Documents;<br><br>ii.  to provide financing for working capital and for other general corporate purposes of the Debtors, including but not limited to investments in other subsidiaries of the Debtors to the extent not prohibited under the DIP Documents;<br><br>iii.  in the case of the DIP Loans borrowed and letters of credit issued under the Revolving Commitments, solely to fund operations and working capital and general corporate purposes of the DirectSAT Business;<br><br>iv.  in the case of DIP Loans borrowed under the L/C Commitment, solely to reimburse the ABL Facility Agent for any amount drawn under the WTC Letter of Credit, if and when such letter of credit is drawn;<br><br>v.  in the case of DIP Loans borrowed under the Initial Commitments, to fund, among other things, the Separation of Businesses Transactions (as defined in the DIP Credit Agreement); and<br><br>vi.  to pay administration costs of these Chapter 11 Cases and claims or amounts approved by this Court;<br><br>(*See* § 2.22 of the DIP Credit Agreement; pp. 3-4 of the Interim Order.) |
| **Additional Limitations on Use of Proceeds from DIP Facility, Cash Collateral and Carve Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R.*<br><br>*4001-2(a)(ii)* | Without the prior written consent, as applicable, of the Required Lenders or the Pre-Petition Agents, none of the DIP Loans, the Cash Collateral, the DIP Collateral, or the Carve Out may be used to:<br><br>i.  challenge or investigate the validity, perfection, priority, extent, or enforceability of any rights or obligations arising under or related to the DIP Documents, the Pre-Petition Credit Documents, or the liens or security interest securing the obligations under any of the foregoing or to pursue any causes of action of any kind, including a Challenge Proceeding, against the Pre-Petition Secured Parties or the DIP Lenders; *provided*, *however*, that, if a Committee is appointed, not more than $25,000 in the aggregate of proceeds of the Carve Out, any Cash Collateral, or any proceeds of the DIP Facility or the |

| | |
|---|---|
| | DIP Collateral may be used by such Committee for purposes of such investigation; |
| | ii.   object to, contest, delay, prevent, or interfere with the exercise of rights and remedies by the DIP Agent or the DIP Lenders; or |
| | iii.  to make any payment of professional fees for any other constituent group, including, but not limited to, the Committee, other than solely in accordance with the Budget, the DIP Documents, and this Interim Order. |
| | (*See* ¶ 24 of the Interim Order.) |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | (i)   Upfront Fee: 1.0% of the total DIP Facility Commitments, earned on the date of entry of the Interim Order (as defined below) and due and payable on the Closing Date;<br><br>(ii)  Extension Fee:  0.50% of the total DIP Facility Commitments, fully earned on the date of delivery of notice of an election to extend the maturity of the DIP Facility, and due and payable upon delivery of a notice of an election to exercise such extension;<br><br>(iii) Unused Commitment Fee:  0.5% per annum of the daily average unused portion of the DIP Facility Commitments, due and payable monthly in arrears and upon the maturity or termination of the DIP Facility; and<br><br>(iv)  Agency Fee:  to the DIP Agent, in its capacity as administrative agent under the DIP Credit Agreement, a fee as set forth in the Fee Letter (as defined in the DIP Credit Agreement).<br><br>(*See* §§ 3.3, 3.4(a), 3.4(c) and 13.3 of the DIP Credit Agreement.) |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L. R. 4001-2(a)(ii)* | The interest rates under the DIP Facility will be the Eurodollar Rate (as defined in the DIP Credit Agreement) + 8.50% per annum, with 1.0% per annum of such amount payable in kind, or, at the Debtors' election, the Alternate Base Rate (as defined in the DIP Credit Agreement) + 7.50% per annum, with 1.0% per annum of such amount payable in kind, payable monthly in arrears.<br><br>To the extent the ABL Facility Agent issues letters of credit under the Revolving Commitments, the initial letter of credit fees (excluding the fronting fee payable to the issuer thereof) payable to all lenders holding participations with respect to such letters of credit shall equal 8.00% per annum on the face amount of any such outstanding letters of credit, payable quarterly in arrears.<br><br>Letter of credit fees and interest rates applicable to the L/C Rollup (and the unfunded WTC Letter of Credit) shall be the applicable pre-Petition Date rates as set forth in the ABL Facility Credit Agreement.<br><br>The Debtors may elect interest periods of one, two or three months for Eurodollar Rate borrowings.<br><br>The Eurodollar Rate floor shall be 1.0% per annum. |

|  | The interest rates payable with respect to DIP Obligations under the DIP Facility shall increase by 2.0% per annum during the existence of an event of default under the DIP Facility.

*(See* §§ 2.2(b) and 3.1 of the DIP Credit Agreement.) |
|---|---|
| **Maturity**

*Fed. R. Bankr. P. 4001(c)(1)(B)*

*Del. Bankr. L.R. 4001-2(a)(ii)* | All DIP Obligations under the DIP Facility, accrued or otherwise, shall be due and payable in full on the earliest of

   i.   January 21, 2015, provided that this date may be extended (a) for an additional 30 days upon delivery of a notice and payment of the Extension Fee in each case on or after January 11, 2015 but before January 15, 2015, and (b) for a further 30 days upon delivery of notice and the consent of ABL Facility Agent and the Determining Lenders, in each case so long as no event of default under the DIP Facility has then occurred and is continuing;

   ii.   the effective date of a Chapter 11 plan of reorganization for the Borrowers; and

   iii.   the date on which maturity of the Loans is accelerated pursuant to the DIP Credit Agreement as a result of an event of default under the DIP Facility.

Notwithstanding the foregoing, as set forth in the Plan, upon the occurrence of the Effective Date of the Plan, each holder of a claim under the DIP Facility shall receive Tranche A New First Lien Debt in a face amount equal to the amount of such claim, and such holder shall thereupon be committed to fund the unfunded portion of its Revolving Commitment and L/C Commitment under the DIP Facility in accordance with the terms of the New First Lien Debt Term Sheet.

*(See* §§ 2.6 and 13.1 of the DIP Credit Agreement.) |
| **Prepayments** | The Debtors may optionally prepay amounts outstanding under the DIP Facility, together with accrued interest thereon.

Mandatory prepayments of the DIP Loans shall be required with net cash proceeds from asset sales outside the ordinary course of business, casualty or loss events and other events as outlined in the DIP Credit Agreement, subject to baskets and reinvestment provisions as further outlined in the DIP Credit Agreement.

*(See* § 2.21 of the DIP Credit Agreement.) |
| **Collateral**

*Fed. R. Bankr. P. 4001(c)(1)(B)*

*Del. Bankr. L.R. 4001-2(a)(i)(D)* | The DIP Facility will be secured by a priming, senior first-priority perfected lien, granted by the Debtors and approved by the Bankruptcy Court pursuant to section 364(c)(2) and 364(d) of the Bankruptcy Code, in all present and after-acquired assets of the Debtors, including all property of their respective estates in these Chapter 11 Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutes thereof (the " DIP Collateral"), subject only to the Carve Out and all as provided in the Interim Order and the Final Order (the "DIP Liens"). |

| | |
|---|---|
| | Upon entry of a Final Order, the priming, senior first priority perfected lien will also extend to avoidance actions and any proceeds thereof. |
| | By signing the Plan Support Agreement and voting to accept the Plan, the Determining Lenders and other Term Facility DIP Lenders consented to the priming under the DIP Facility. |
| | (*See* pp. 4-5; ¶ 9 of the Interim Order.) |
| **Priority and Liens; Carve Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)*<br><br>*Del. Bankr. L.R. 4001-2(a)(i)(F)* | All DIP Obligations of the Debtors under the DIP Facility at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases (the "Superpriority Claim"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) and/or 726, subject only to a Carve Out for:<br><br>i.    allowed, accrued, but unpaid professional fees, costs and expenses of the Debtors (other than any "success" or similar fees payable to such professionals) to the extent provided for in the Budget, incurred at any time before the DIP Agent's delivery of a Carve Out Trigger Notice (as defined below),<br><br>ii.   professional fees, costs and expenses of the Debtors incurred at any time in the Chapter 11 Cases after delivery of a Carve Out Trigger Notice not to exceed $250,000 and<br><br>iii.  the payment of fees and expenses pursuant to 28 U.S.C. § 1930 (collectively, the "Carve Out").<br><br>The Carve Out and any DIP Loans may not be used to investigate or challenge the validity, perfection, priority, extent, or enforceability of the DIP Facility or the indebtedness under the Prepetition Secured Credit Agreements, or the liens or security interests securing the DIP Facility or the indebtedness under the Prepetition Secured Credit Agreements, or assert any claims against the lenders or agents under the Prepetition Secured Credit Agreements.<br><br>"Carve Out Trigger Notice" means written notice to the Debtors that the Carve Out is invoked, which notice shall be delivered only after the occurrence and during the continuation of an event of default (including with respect to any applicable grace periods) under the DIP Facility.<br><br>(*See* §§ 4.1 and 7.24 of the DIP Credit Agreement; ¶¶ 7-8 of the Interim Order.) |
| **Adequate Protection**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | **ABL Facility Lenders**<br><br>Replacement Liens<br><br>The ABL Facility Agent, for itself and for the benefit of the ABL Facility Lenders is hereby granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "ABL Facility Adequate Protection Liens"), which liens shall:<br><br>i.    be subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Encumbrances; |

ii.    otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral; and

iii.    be subject in all respects to the Intercreditor Agreement.

For avoidance of doubt, the ABL Facility Adequate Protection Liens on Term Debt Priority Collateral shall be junior to the prepetition liens of the agent for the Term Loan Lenders and the Term Loan Adequate Protection Liens thereon, as defined below.

<u>Payments</u>

As further adequate protection, the ABL Facility Lenders (including the Junior ABL Facility Lenders) shall be entitled to payment of interest and fees (in each case, at the applicable non-default rate) due under the ABL Facility Credit Documents, including, for the avoidance of doubt, any such amounts accrued and unpaid before the Petition Date, at the times specified therein (and subject to the limitations therein on the portion of such interest payable in cash on account of the Junior ABL Facility Loans), and, notwithstanding anything to the contrary in the Subordination Agreement, the Junior ABL Facility Lenders shall be entitled to retain all such payments of interest and fees, without any obligation to turn over same to or for the benefit of the Senior ABL Facility Lenders; *provided, however*, that the ABL Facility Lenders shall cease to be bound by the agreements described in this sentence (excluding this proviso and the subsequent provisos to this sentence) in the event both (x) the Plan Support Agreement terminates or an Event of Default occurs that is not cured or waived and (y) the Senior ABL Facility Lenders elect by written notice to the Junior ABL Facility Lenders to cease to be bound by the agreements described in this sentence (excluding this proviso and the subsequent provisos to this sentence); *provided, further*, that to the extent the Senior ABL Facility Lenders make such election, all parties rights are reserved notwithstanding the entry of this Interim Order, the Final Order, or anything otherwise set forth herein; and *provided, further*, that all payments of interest and fees made prior to any such election shall not be subject to turn over.  Except as expressly set forth in the preceding sentence, the Subordination Agreement shall remain in full force and effect.

<u>ABL Superpriority Claim</u>

To the extent of any post-petition diminution in value of the interests of the ABL Facility Agent and the ABL Facility Lenders in the Pre-Petition Collateral (if any), the ABL Facility Agent, on behalf of itself and the ABL Facility Lenders, shall be granted, subject to the Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "<u>ABL Superpriority Claim</u>"), which ABL Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331,

503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

Solely in the event the ABL Facility Adequate Protection is insufficient to satisfy any allowed claims of the ABL Facility Agent and the ABL Facility Lenders related to any post-petition diminution in value of their interests in the Pre-Petition Collateral, the ABL Superiority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

**Term Loan Lenders**

Replacement Lien

The Term Loan Agent, for itself and for the benefit of the Term Loan Lenders, is hereby granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Term Loan Adequate Protection Liens;" and, the Term Loan Adequate Protection Liens together with the ABL Facility Adequate Protection Liens, the "Adequate Protection Liens"), which liens shall:

    i.    be subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Encumbrances;

    ii.    otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral; and

    iii.    be subject in all respects to the Intercreditor Agreement.

For avoidance of doubt, the Term Loan Adequate Protection Liens on ABL Priority Collateral shall be junior to the prepetition liens of the Prepetition ABL Facility Lenders and the ABL Facility Adequate Protection Liens thereon.

Interest

The Term Loan Lenders shall be entitled to accrue interest following the Petition Date (at the applicable non-default rate) and during these Chapter 11 Cases, and such accrued postpetition interest will be added to the principal balance of the claims of the Term Loan Lenders under the Term Loan Credit Agreement; *provided*, *however*, that if the Plan is not consummated, then the postpetition interest claim shall be treated in accordance with section 506(b), 506(c) or any other applicable provision of the Bankruptcy Code.

Term Loan Superpriority Claim

To the extent of any post-petition diminution in value of the interests of the Term Loan Agent and the Term Loan Lenders in the Pre-Petition Collateral (if any), the Term Loan Agent, on behalf of itself and the applicable Term Loan Lenders, shall be granted, subject to the Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "Term Loan Superpriority Claim"), which Term Loan Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided

|  | herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

Solely in the event the Term Loan Adequate Protection is insufficient to satisfy any allowed claims of the Term Loan Agent and the Term Loan Lenders related to any post-petition diminution in value of its interests in the Pre-Petition Collateral, the Term Loan Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

**Adequate Protection Professional Fees and Expenses**

The Debtors shall pay, pursuant to the Interim Order:

(i) on the date of the first advance under the DIP Facility, the outstanding prepetition reasonable and documented fees and expenses of counsel and financial advisor to the ABL Facility Agent and the Senior ABL Facility Lenders, counsel, and financial advisors to the Term Loan Agent, and counsel to the Specified Term Lenders (as defined in the Plan); and

(ii) on an ongoing basis, from time to time after the Petition Date, and without duplication, pursuant to the procedures set forth in this paragraph 14, all reasonable and documented fees and expenses incurred by the ABL Facility Agent and the Term Loan Agent (acting in such capacities) and the Specified Term Lenders (as defined in the Plan) during and in connection with these Chapter 11 Cases and required to be paid by the Debtors under the Pre-Petition Credit Documents.

(*See* ¶ 14 of the Interim Order.) |
| **Conditions to Closing**

*Fed. R. Bankr. P. 4001(c)(1)(B)*

*Del. Bankr. L.R. 4001-2(a)(ii)* | The conditions precedent to the Closing Date include the usual and customary conditions for financings of this type, including, among other things, delivery of financing documentation, payment of fees and expenses, governmental and third-party approvals, the receipt by the DIP Lenders of a copy of the Budget and the 13-Week Forecast, both in form and substance satisfactory to ABL Facility Agent and the Determining Lenders, the entry of an interim order (the "Interim Order") satisfactory to ABL Facility Agent and the Determining Lenders, which shall not be stayed, reversed, vacated or amended, receipt by the DIP Lenders of all first day motions, which must be acceptable to ABL Facility Agent and the Determining Lenders, and closing of the DIP Facility within 5 days following entry of the Interim Order.

The conditions precedent to all borrowings include customary notice of borrowing, no default or event of default under the DIP Facility, accuracy of representations and warranties in all material respects, compliance with the Budget, and entry of the applicable DIP Orders, which shall not be stayed, reversed, vacated or amended. |

| | These conditions are set out fully in Sections 8.1 and 8.2 of the DIP Credit Agreement. |
| | (*See* §§ 8.1 and 8.2 of the DIP Credit Agreement.) |
| **Representations and Warranties** | Customary and appropriate representations and warranties for debtor-in-possession financings, including without limitation representations and warranties that all necessary court authorizations are in full force and effect and shall not have been vacated, stayed, reversed, modified or amended, and other representations and warranties, as provided for in Article V of the DIP Credit Agreement. |
| | (*See* Article V of the DIP Credit Agreement.) |
| **Affirmative Covenants** | Affirmative and reporting covenants will be in substantially the same form as exists under the ABL Credit Agreement and such additional affirmative covenants as are customary and appropriate for a debtor-in-possession financing, including without limitation delivery to the DIP Lenders on a weekly basis of any amendments to the Budget and the Budget Variance (as defined below), and delivery to DIP Lenders of (and consultation with ABL Facility Agent and the Determining Lenders on) all other material pleadings to be filed in the Chapter 11 Cases. |
| | (*See* Articles VI and IX of the DIP Credit Agreement.) |
| **Negative Covenants** | Customary and appropriate negative covenants for debtor-in-possession financings, including, without limitation, restrictions on liens, indebtedness, consolidation or merger, disposition, affiliate transactions, dividends and distributions and other restricted payments, investments, sale and leaseback, changes in nature of the business, and amendments to governing documents, modification of indebtedness and cash management system (to be maintained in substantially the same form as required under the ABL Credit Agreement). |
| | (*See* Article VII of the DIP Credit Agreement.) |
| **Financial Covenants** | Debtors shall not permit: |
| | (i) for any Testing Period ending with a week ending after the Closing Date, the amount of Actual Cumulative Receipts for such Testing Period to be lower than the amount of Projected Cumulative Receipts for such Testing Period by more than (A) 20% of such amount of Projected Cumulative Receipts for such Testing Period, for the first Testing Period, and (B) 15% of such amount of Projected Cumulative Receipts for such Testing Period, for each Testing Period thereafter; |
| | (ii) for any Testing Period ending with a week ending after the Closing Date, the amount of Actual Cumulative Operating Disbursements for such Testing Period to be higher than the amount of Projected Cumulative Operating Disbursements for such Testing Period by more than 15% of such amount of Projected Cumulative Operating Disbursements for such Testing Period; |
| | (iii) for the period from the first day of the first calendar week of the Budget through Dec 6, 2014 (the "**Initial Cumulative Variance Testing Date**"), the |

| | |
|---|---|
| | amount of Actual Cumulative Operating Cash Flow to be more than $7,000,000 (in the aggregate) less than the amount of Projected Cumulative Operating Cash Flow (it being understood that compliance with this clause (iii) shall be demonstrated by the Borrowers to the reasonable satisfaction of the Determining Lenders on or prior to December 9, 2014); and |
| | (iv) as of any day that is a one month anniversary of the Initial Cumulative Variance Testing Date (each such date, a "**Cumulative Variance Testing Date**"), for the period from the first day of the first calendar week of the Budget through such Cumulative Variance Testing Date, the amount of Actual Cumulative Operating Cash Flow to be more than $7,000,000 (in the aggregate) less than the amount of Projected Cumulative Operating Cash Flow (it being understood that compliance with this clause (iv) shall be demonstrated by the Borrowers to the reasonable satisfaction of the Determining Lenders on or prior to the second Business Day following the applicable monthly anniversary). |
| | For the avoidance of doubt, the parties hereto acknowledge and confirm that the covenant in Section 6.10(b) of the DIP Credit Agreement measures, at the end of each applicable week or over the relevant period, cumulative variance for the period from the first day of the first calendar week of the Budget and ending with the last day of such applicable week or applicable period. |
| | "**Actual Cumulative Receipts**" shall mean, for any period of determination, the amount of operating cash collections for the Debtors and their Subsidiaries on a consolidated basis during such period (in each case calculated on an actual and not a GAAP basis). |
| | "**Projected Cumulative Receipts**" shall mean, for any period of determination, the amount of projected operating cash collections for the Debtors and their Subsidiaries on a consolidated basis during such period as set forth in the Budget. |
| | "**Actual Cumulative Operating Disbursements**" shall mean, for any period of determination, the amount of operating cash disbursements of the Debtors and their Subsidiaries on a consolidated basis during such period. |
| | "**Projected Cumulative Operating Disbursements**" shall mean, for any period of determination, the amount of projected operating cash disbursements of the Debtors and their Subsidiaries on a consolidated basis during such period as set forth in the Budget. |
| | "**Actual Cumulative Operating Cash Flow**" shall mean, for any period of determination, the Actual Cumulative Receipts for such period minus the Actual Cumulative Operating Disbursements for such period. |
| | "**Projected Cumulative Operating Cash Flow**" shall mean, for any period of determination, the Projected Cumulative Receipts for such period minus the Projected Cumulative Operating Disbursements for such period. |
| | (*See* § 6.10(b) of the DIP Credit Agreement.) |
| **Budget** | The budget shall be prepared and delivered by the Debtors on or prior to the |

| | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | Closing Date and shall reflect projected receipts and expenditures on a weekly basis from the Closing Date for the 13-week period (the "<u>13-Week Forecast</u>") following the Closing Date, and shall be in form and substance acceptable to ABL Facility Agent and the Determining Lenders, and shall be updated each week pursuant to amendments thereto as approved by ABL Facility Agent and the Determining Lenders (such budget, as so amended, the "<u>Budget</u>") (attached to the Interim Order as "**<u>Exhibit 1</u>**").<br><br>The Debtors shall deliver on a weekly basis to the DIP Lenders a variance report comparing receipts and expenditures to the Budget for the rolling 13-week period immediately following the date of each such delivery (a "<u>Budget Variance</u>").<br><br>(*See* § 6.10 of the DIP Credit Agreement; Exhibit 1 to the Interim Order.) |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Credit Agreement sets forth customary and appropriate events of default for debtor-in-possession financings, including, without limitation, the following:<br><br>i.  non-payment of principal, interest and fees when due,<br><br>ii.  failure to comply with the terms of the Budget,<br><br>iii.  default under affirmative, negative and financial covenants,<br><br>iv.  breaches of representations and warranties,<br><br>v.  default as to other indebtedness,<br><br>vi.  invalidity or impairment of documents,<br><br>vii.  judgments, change of control, or ERISA events,<br><br>viii.  failure of guaranty or lack of security interest,<br><br>ix.  dismissal or conversion of the Chapter 11 Cases or appointment of a chapter 11 trustee or an examiner or similar insolvency official or administrator with expanded powers,<br><br>x.  allowance of superpriority claims *pari passu* with the Superpriority Claims,<br><br>xi.  non-entry of Interim Order or Final Order in form and substance satisfactory to ABL Facility Agent and the Determining Lenders,<br><br>xii.  the failure of the Debtors to obtain a final order from the Bankruptcy Court reasonably satisfactory in form and substance to ABL Facility Agent and the Determining Lenders authorizing the DIP Facility (the "<u>Final Order</u>"; together with the Interim Order, the "<u>DIP Orders</u>") within 30 days after the Petition Date,<br><br>xiii.  filing by any Loan Party of a motion or pleading seeking to reverse, amend, stay or vacate the Interim Order or the Final Order or challenge the DIP Facility documentation, or consent by any Loan Party to any such motion or pleading filed by any other person, relief from the automatic stay with respect to the DIP Collateral or with respect to the exercise of termination rights under any material contract, the surcharge of any costs or expenses against the DIP |

| | | |
|---|---|---|
| | | Collateral, |
| | xiv. | non-compliance with the Interim Order or Final Order, |
| | xv. | modification or reversal of the Interim Order or the Final Order without the consent of ABL Facility Agent and DIP Lenders holding a majority of the funded and unfunded exposure under the DIP Facility (the "<u>Determining Lenders</u>"), |
| | xvi. | payment of prepetition liabilities without the consent of the Determining Lenders other than as set forth in the first day motions, |
| | xvii. | sale of assets outside the ordinary course of business without the consent of the Determining Lenders, |
| | xviii. | filing or court approval of any plan of reorganization without consent of ABL Facility Agent and the Determining Lenders, |
| | xix. | receipt by the Debtors of notice under the Plan Support Agreement (as defined below) of the occurrence of any "<u>PSA Termination Event</u>" (as defined in the Plan Support Agreement), or delivery of notice by the DIP Agent or any DIP Lender to the Debtors of any such occurrence (with a two business day cure period), |
| | xx. | the failure of the Plan Support Agreement to remain in full force and effect, |
| | xxi. | the termination of the HSP Agreement (as defined in the Plan Support Agreement) or the issuance by DIRECTV of an HSP Termination Notice (as defined in the Plan Support Agreement), and |
| | xxii. | any amendment, modification or supplement to the Plan Support Agreement that is adverse in any respect to the interests of the DIP Lenders. |
| | | (*See* Article X of the DIP Credit Agreement.) |
| **Amendments** | | Amendments and waivers will require the approval of Determining Lenders; provided that |
| | i. | the consent of each adversely affected DIP Lender will be required with respect to, among other things, increases in the commitment of such DIP Lender, reductions of principal, interest or fees or delays in the scheduled payment date therefor, releases of the Borrowers or the other Debtors of their respective obligations or release of all or substantially all of the DIP Collateral; and |
| | ii. | the consent of all DIP Lenders shall be required to effect any amendment with respect to interest rates on, or maturity of the DIP Facility or the definition of Determining Lenders. |
| | | (*See* § 16.2 of the DIP Credit Agreement; ¶ 26 of the Interim Order.) |
| **Payment of Professional Fees** | | The Debtors will pay on a current basis all reasonable and documented costs, fees and out of pocket expenses of the DIP Agent and the DIP Lenders and advisors to the DIP Agent and DIP Lenders, including costs, fees and expenses incurred in connection with the negotiation and documentation of the DIP Facility, and shall reimburse the DIP Agent and the DIP Lenders |

| | |
|---|---|
| | and such advisors for such other costs and expenses provided for in the DIP Credit Agreement |
| | (*See* § 16.9 of the DIP Credit Agreement; ¶ 5(e) of the Interim Order.) |
| **Waivers**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(i)(H)* | The DIP Orders shall provide customary waivers, including the waiver of the automatic stay in connection with the DIP Agent's and DIP Lenders' enforcement of remedies upon an event of default under the DIP Facility, the waiver of any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code, the waiver of any right to marshalling, and the waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code.<br><br>(*See* pg. 6, ¶¶ 11-12 of the Interim Order.) |
| **Stipulations etc.**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Pursuant to the DIP Orders, the Debtors shall provide customary stipulations as to the validity and priority of the DIP Facility and the Prepetition Secured Credit Agreements, it being understood that such stipulations shall be subject to a customary challenge period after the Petition Date by the Committee (if any), as set forth in the Interim Order.<br><br>If no such Challenge Proceeding is timely commenced, then:<br><br>   i.   any and all Challenge Proceedings by any party (as set forth in the Interim Order)  shall be deemed to be forever waived, released, and barred;<br><br>   ii.   to the extent not theretofore repaid, the Pre-Petition Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these  Chapter 11 Cases and any subsequent chapter 7 case;<br><br>   iii.   the Pre-Petition Liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3 of the Interim Order, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and<br><br>   iv.   the obligations under the Pre-Petition Credit Documents and the Pre-Petition Liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by the Debtors, any committee or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (as set forth in the Interim Order).<br><br>If any Challenge Proceeding is timely commenced, the stipulations and admissions in paragraph 3 of the Interim Order shall nonetheless remain binding and preclusive (as provided in the Interim Order) on the Debtors, any committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding.<br><br>The DIP Documentation shall not supersede the existing subordination agreement entered into with respect to the "Last Out Loans" (as defined in |

| | |
|---|---|
| | the ABL Credit Agreement) or the existing Intercreditor agreement entered into with respect to the Prepetition Secured Credit Agreements. |
| | (*See* ¶¶ 3, 23 of the Interim Order.) |
| **Release**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Subject to the entry of a Final Order, the Debtors shall: |
| | (a) release all claims against the current or future DIP Agent and DIP Lenders, and the former, current, and future Pre-Petition Agents and Pre-Petition Secured Lenders, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Pre-Petition Facilities, the Pre-Petition Credit Documents, or the transactions and relationships contemplated hereunder or thereunder, including, without limitation, |
| | i.     any so-called "lender liability" or equitable subordination claims or defenses, |
| | ii.     any and all claims and causes of action arising under the Bankruptcy Code, and |
| | iii.     any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the Pre-Petition Agents, the Pre-Petition Secured Lenders, DIP Agent, and the DIP Lenders; and |
| | (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the Pre-Petition Indebtedness, the Pre-Petition Liens, the DIP Obligations, and the DIP Liens. |
| | (*See* ¶ 21 of the Interim Order.) |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The Debtors will indemnify and hold harmless the Pre-Petition Secured Parties, the DIP Agent, and the DIP Lenders in respect of any claim or liability incurred with respect to or in any way related to, all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the Plan Support Agreement, the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. |
| | No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph 3(f), in the Pre-Petition Credit Documents, or in the DIP Documents, to indemnify and/or hold harmless the Pre-Petition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be. |
| | (*See* ¶ 3(f) of the Interim Order.) |

## JUSTIFICATIONS PURSUANT TO LOCAL RULE 4001-2(a)

24.    The terms of the DIP Financing in the Interim Order that require disclosure under Local Rule 4001-2(a)(i) are limited to seeking approval of (i) the Roll-Up L/C Commitment, pursuant to an Interim Order (disclosure required under Bankr. L.R. 4001-2(a)(i)(E)), (ii) waivers of any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code, any right to marshalling, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code ( disclosure required under Bankr. L.R. 4001-2(a)(i)(H)), and (iii) disparate treatment of professionals retained by Debtors (disclosure required under Bankr. L.R. 4001-2(a)(i)(F)).[9] While the Motion also seeks to grant liens on avoidance actions to prepetition secured creditors, such relief is only being requested pursuant to the Final Order.

25.    These terms are justified because the Debtors are in immediate and critical need of the DIP Facility.  As discussed above and further below, the Debtors, despite their extensive efforts to solicit proposals, were unable to obtain financing on an unsecured basis or on a secured basis solely on unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code.  The only acceptable proposal that would provide the critical liquidity to the Debtors needed to effectuate the terms of reorganization according to the Plan, was provided after extensive negotiations with the DIP Lenders on the terms set forth in the DIP Documents.  Without this financing, the Debtors would not be able to pay their employees or vendors, which is essential to operating their businesses as a going concern and, ultimately, exiting these Chapter 11 Cases.

---

[9] The treatment of professionals retained by the Debtors is justified because no office committee of creditors is anticipated in light of the Plan providing for the payment in full of all general unsecured creditors.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.      The DIP Facility Should Be Approved pursuant to Section 364(c) and (d) of the Bankruptcy Code**

26.      The DIP Facility is critical to the Debtors' ability to effectuate the terms of the Plan.  As described above, virtually all of the Debtors' assets are encumbered by the liens and security interests of the pre-petition secured lenders, there are no unencumbered funds with which the Debtors can pay ongoing, day-to-day operation expenses such as wages, rent, and utilities.  The only acceptable proposal to provide the necessary financing was in the form of secured credit, with an allowance of superpriority administrative claims (the "Superpriority Claims").

27.      Under section 364(c) of the Bankruptcy Code, the Bankruptcy Court may enter the Interim Order authorizing the Debtors to obtain post-petition financing from the DIP Lenders pursuant to the terms of the DIP Credit Agreement, in the form of secured credit with a superpriority administrative claim.  Courts may authorize debtors-in-possession to obtain secured credit under 364(c) upon finding that the debtors were "unable to obtain unsecured credit allowable under section 503(d)(1) of the [Bankruptcy Code]."  11 U.S.C. § 364(c); *see also In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying the motion for authorization to enter into a postpetition credit facility where the debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (finding that the debtor must show it has made a reasonable effort to seek alternative sources of financing under section 364 of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

28.     Courts rely on a three-part test to determine whether debtors are entitled to financing under section 364(c).  Courts will look for whether:

(a)     the debtors were unable to obtain unsecured credit with only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and the lender.

*See In re L.A. Dodgers LLC*, 457 B.R. at 312; *see also In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (citing *In re Crouse Grp., Inc.*, 71 B.R. at 549); *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

29.     Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest.  *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).

30.     As set forth in detail in the First Day Declaration, the Debtors hired Stifel, Nicolaus & Company, Incorporated ("SNI"), along with its affiliate Miller Buckfire & Co., LLC, ("Miller Buckfire," and together with SNI, "Stifel") in January 2014 to explore avenues for mergers or acquisitions.  Following the withdrawal of interested parties, Stifel pursued refinancing and recapitalization opportunities on behalf of the Debtors in the second quarter of 2014.  The Debtors received five recapitalization proposals from three parties and one additional acquisition proposal.  Following a materially weaker financial and operating performance than

was forecasted, the parties that had submitted proposals either declined to proceed or were unable to secure adequate financing to refinance or pay down the Debtors' existing debt.

31.    Concurrently with these efforts to refinance and recapitalize, and with the advice of Miller Buckfire, the Debtors approached the Term Loan Lenders and ABL Facility Lenders to discuss alternatives for converting debt to equity.  The discussions accelerated in July and August 2014 as a result of diminishing liquidity and defaults under the Term Loan Credit Agreement and ABL Facility Credit Agreement.  It was only through a series of forbearance agreements, and further amendments to the ABL Facility Credit Agreement and the Term Loan Credit Agreement, that the Debtors were able to obtain additional financing consisting of $8.7 million of the Last Out Loans.  The Last Out Loans were provided by a subset of the existing Term Loan Lenders on a secured, emergency basis to allow the Debtors to fund critical components of their business, including, vendors, suppliers and employee payroll.  Each of two fundings of the Last Out Loans was made within 24 hours of the Debtors' need to make certain of the aforementioned payments.  In August 2014, the Debtors then hired FTI Consulting to serve as financial advisors, and the Debtors, Miller Buckfire and FTI worked in earnest with the Term Loan Lenders and the ABL Facility Lenders, ultimately negotiating a restructuring of the Debtors' capital structure on the terms embodied in the Plan.  In the course of negotiations, two of the three largest Junior ABL Facility Lenders informed the Debtors that they would not advance any additional Last Out Loans.

32.    In the course of their negotiations and pursuit of other possible lenders, the Debtors learned that credit on unsecured terms was unavailable to them.  As discussed above, and in more detail in the First Day Declaration, the Debtors were unsuccessful in their efforts to obtain recapitalization proposals from incumbent or third parties that were adequate to pay down

or refinance the Debtors' debt.  Moreover, the Debtors' ability to obtain financing declined further because of their weakening financial performance.  In consultation with Miller Buckfire, the Debtors concluded that the only viable option was restructuring according to the terms of the Plan.  In order to effectuate the terms of the Plan, as described above, obtaining liquidity during the course of the Chapter 11 Cases was critical, and the DIP Lenders agreed to provide the DIP Facility on the terms described above, which included the granting of security interests in the assets of the Debtors, including Pre-Petition Collateral, as well as granting the DIP Lenders a superpriority administrative claim.

33.     Whether the proposed DIP Facility is necessary to preserve the assets of the estate is determined by application of the business judgment standard.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms and leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

34.     The terms of the DIP Facility, including the granting of the first priority liens and superpriority claim status, were negotiated at arm's-length.  The terms of the DIP Facility and other factors such as the DIP Lenders' existing familiarity with the Debtors' debt structure, operations and assets, as well as the speed with which the funds can be accessed, made the DIP Facility the best proposal available to the Debtors.  As discussed above, and in the First Day Declaration, the Debtors have an urgent need to obtain access to credit, to, among other things, continue the operation of their businesses.  Without rapid access to liquidity, the Debtors would be unable to fund critical components of their business, including, vendors, suppliers and employee payroll.  The inability to continue these operations would jeopardize the Debtors'

efforts to complete the reorganization under the Plan, which would be highly detrimental to the value of the Debtors' businesses as a going-concern.  As a result, the Debtors ultimately determined in their sound business judgment that the DIP Facility represented the best available post-petition financing under the circumstances.

35.     The terms of the proposed DIP Facility are fair and reasonable.  As previously stated above, and in detail in the First Day Declaration, the Debtors worked with their advisors, SNI, and Miller Buckfire, to solicit proposals for mergers or acquisitions and ultimately the refinancing and recapitalization of their businesses contemplated by the Plan.  The Debtors received multiple offers that were later rescinded, or that did not provide the adequate financing needed to refinance the Debtors' existing debts.  The terms of the DIP Facility are also fair and reasonable because they provide immediate liquidity that will enable the Debtors to complete the terms of their proposed Chapter 11 Plan, which allows for the payment in full of unsecured creditors.  As stated above and in the Interim Order, the DIP Lenders' superpriority administrative claim would only cover the proceeds of Avoidance Actions after the entry of a Final Order.  Additionally, the security interests and administrative expense claims granted to the DIP Lenders by the proposed DIP Facility and Interim Order are subject to a Carve Out, which is reasonable and necessary to ensure that official committees, if any, and the Debtors will be assured of the assistance of counsel.  *See Ames Dep't Stores*, 115 B.R. at 40.

**B.      Granting of  Senior Liens under Section 364(d) Is Warranted**

36.     If the debtor is unable to obtain credit solely under the provisions of Bankruptcy Code section 364(c), the court, after notice and a hearing, may authorize the debtor to obtain credit secured by a senior or equal lien on the property of the estate that is already subject to a

lien. Section 364(d) provides that a debtor may obtain credit secured by a priming lien under

364(d) if:

> (a) the debtor is unable to obtain such credit otherwise; and

> (b) there is adequate protection of existing lienholder.

> 11 U.S.C. § 364(d).

37.     As previously noted, substantially all of the Debtors' assets are encumbered, and

obtaining financing from an outside lender without granting a priming lien on the Debtors' assets

was not feasible.  Following extensive solicitation for refinancing and recapitalization, the

Debtors were unable to find a sufficient offer of secured credit to provide the much needed

liquidity until the Debtors and their team of advisors negotiated terms with the ABL Facility and

Term Loan Lenders.  The only lenders willing to provide the necessary refinancing and

recapitalization proposal already had outstanding liens on the Debtors' assets, pursuant to the

ABL Credit Agreement and Term Loan Agreement, pre-petition agreements that were subject to

forbearance agreements and further amendments in the course of negotiations.  In order to

finance the restructuring of the prepetition debt held by the prepetition lenders, including

obtaining liquidity through the course of the Chapter 11 Cases, the DIP Lenders required that the

Debtors grant them senior liens.  The Debtors were unable to secure additional liquidity without

granting a lien senior to the existing liens on the Debtors' property.  Further, the Pre-Petition

Secured Parties, whose interests would be primed, have willingly consented to the DIP

Financing, and the priming of their Pre-Petition Liens by the DIP Liens on all Pre-Petition

collateral.

38.     As required by section 364(d) of the Bankruptcy Code, the DIP Credit Agreement

and the Interim Order provide adequate protection to the Pre-Petition ABL Lenders and Pre-

Petition Term Lenders, in the form of replacement liens, as well as fees, and/or post-petition interest, in accordance with the terms of the DIP Credit Agreement and the Interim Order.  The adequate protection provisions are discussed in further detail above.

39.     Both the DIP Lenders and the Pre-Petition Secured Parties have agreed to the DIP Financing, provided that the DIP Liens, the Superpriority Claims and other protections granted in the Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of the proposed Interim Order, as provided in section 364(e) of the Bankruptcy Code.  The DIP Lenders and the Pre-Petition Secured Parties acted in good faith in agreeing to the DIP Financing.  The arm's-length negotiations took place between the Debtors, the DIP Lenders, 100 percent of the holders of the Pre-Petition Senior ABL Facility Loans, 100 percent of the holders of the Pre-Petition Junior ABL Facility Loans, and 100 percent of the holders of the Pre-Petition Term Loan Indebtedness, among others.  All classes of impaired secured lenders voted unanimously to accept the Plan, which provides that all general unsecured creditors will be paid in full.

40.     Because the Debtors were unable to obtain secured credit without priming the existing liens on their assets, and because the terms of the DIP Credit Agreement and the Interim order provide adequate protection for the pre-existing lienholders, the Debtors have satisfied the two requirements for allowing the Debtors to obtain post-petition financing secured by a priming first-priority lien under section 364(d) of the Bankruptcy Code.  The Debtors respectfully request approval of their request to obtain credit secured by a priming senior priority lien under section 364(d).

**C.     Use of Cash Collateral and Grant of Adequate Protection Is Necessary and Appropriate**

41.     In addition to the need for debtor in possession financing, the Debtors require immediate use of the Cash Collateral in accordance with the Budget and the Interim Order.  The Debtors require use of Cash Collateral to be able to pay the Debtors' operating expenses, including payroll and other overhead costs (such as rent and utilities), and to pay third-parties and vendors to ensure a continued supply of essential goods.  Without access to immediate liquidity, the Debtors will suffer irreparable harm.

42.     Bankruptcy Code section 363(c)(2) provides that the Debtors may not use, sell, or lease cash collateral unless: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."   11 U.S.C. § 363(c)(2).   In addition, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used… or proposed to be used… by a [debtor-in-possession], the court, with or without a hearing, shall prohibit or condition such use… as is necessary to provide adequate protection of such interests." 11 U.S.C. § 363(e).  Here, the prepetition secured parties have consented to the Debtors' use of the prepetition Cash Collateral in exchange for the adequate protection described above.

43.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (noting that "its application is left to the vagaries of each case… but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (*quoting In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  The Debtors submit that the proposed adequate protection, as described above, is fair and reasonable and in accordance with the principles of the Bankruptcy Code.  Further, the Prepetition Secured Parties

have agreed after arm's length negotiations, that the adequate protection is sufficient to allow the Debtors to use the Cash Collateral and also fully support and consent to the Debtors' incurrence of the indebtedness under the DIP Facility.

44.     Based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to access the Prepetition Collateral, including the Cash Collateral, and to provide the adequate protection as provided in the DIP Credit Agreement and in accordance with the terms set forth in the Interim Order.

**C.     The Debtors' Proposed Roll Up Should Be Approved under Section 363(b)**

45.     By this motion, the Debtors also seek authority, pursuant to section 363(b) of the Bankruptcy Code, to utilize the proceeds from the DIP Facility to the extent necessary to permanently repay amounts owed upon the draw of any outstanding letters of credit under the ABL Facility existing as of the Petition Date, such that, upon entry of the Final Order, the reimbursement obligation with respect to the outstanding letters of credit under the ABL Facility will have been "rolled-up" into the DIP Facility.

46.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  11 U.S.C. § 363(b). Courts have held that such transactions should be approved when they are supported by a sound business purpose.  *See, e.g.,Computer Sales Int'l Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003).

47.     The L/C Roll Up provided for under the DIP Credit Agreement is a critical component of the DIP Lenders' willingness to provide financing under the DIP Facility.  With no financing available on an alternative basis that was sufficient to recapitalize the Debtors' balance sheet, the Debtors had no choice other than to secure the financing offered by the DIP Lenders.

Had the Debtors not done so, they would be unable to pay employees and vendors, among other operating costs.

48.     Further, this is not an unusual component in DIP Financing.  This Court has approved numerous DIP financing arrangements that include a roll-up on similar terms. *See, e.g.*, *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014) (authorizing debtor-in-possession financing that included roll-up pursuant to final order);  In re *Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014) (authorizing debtor-in-possession financing that included roll-up pursuant to final order); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del.  Feb. 4, 2014) (authorizing debtor-in-possession financing that included roll-up pursuant to interim order); *In re Laboratory Partners, Inc.*, Case No. 13-12769 (PJW) (Bankr. D. Del. Oct. 29, 2013) (authorizing debtor-in-possession financing that included roll-up pursuant to interim order); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012) (authorizing debtor-in-possession financing that included roll-up pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC, et al.*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing debtor-in-possession financing that included roll-up pursuant to interim order); *see also Computer Sales Int'l Inc. v. Fed. Mogul Global, Inc.* (*In re Fed. Mogul Global, Inc.*), 293 B.R. at 126.

49.     Without financing on the terms of the DIP Documents, including the L/C Roll Up, the Debtors would not be able to operate their businesses during the course of the Chapter 11 Cases.  As such, the Debtors have articulated a sound business reason for rolling up the reimbursement obligation with respect to outstanding letters of credit under the ABL Facility existing as of the Petition Date.

**D.      Modification of the Automatic Stay**

50.      The proposed DIP Financing contemplates modifying the automatic stay under Bankruptcy Code Section 362 to the extent necessary to permit the DIP Agent to perform any act authorized or permitted under, or by virtue of, the Interim Order or the DIP Credit Agreement.

51.      Stay modification provisions of this type are standard features of postpetition debtor-in-possession financings and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

**E.      The Section 506(c) Waiver in the Final Order Should Be Approved**

52.      The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge any or all of the Pre-Petition Secured Parties or the DIP Lenders, their respective claims, or their respective collateral.  Agreeing to the waivers allowed the Debtors to obtain critical financing under the DIP Facility.  Further, such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estate (including a substantial carve-out for the benefit of administrative creditors)."  *In re Molten Metal Tech., Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see also Ansel Props., Inc. v. Nutri/Sys. of Fla. Assocs. (In re Nutri/Sys. of Fla. Assocs.)*, 178 B.R. 645, 649 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor-in-possession financing).

**F.      The Interim Order Should Be Granted**

53.      Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under Bankruptcy Code section 364 may not be commenced earlier than 14 days after the service of such motion.   Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on such a motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

54.      The Debtors respectfully request that the Court schedule and conduct an initial hearing on the Motion and authorize the Debtors, from the time of the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to utilize the Cash Collateral.

55.      Bankruptcy Rule 6003 provides that a bankruptcy court may grant certain forms of relief during the twenty-one (21) days immediately following the filing date, to the extent necessary to avoid immediate and irreparable harm.   The Debtors are seeking expeditious implementation of their pre-packaged Plan.   As described in detail above and in the First Day Declaration, the Debtors have an immediate need to obtain access to liquidity in under the DIP Facility, in order to operate their businesses, maintain critical relationships with vendors, suppliers and customers, make payroll and fund other working capital and operational needs. Failure to receive interim financing and the use of Cash Collateral would prevent the Debtors from being able to operate their businesses as a going concern and, as a result, from completing the restructuring contemplated under the Plan.

56.      The Debtors seek authority to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, to enter into the DIP Documents, and to borrow up to an aggregate principal amount of $29,200,000 under the Initial Commitments, plus the full amount

of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up. This relief contemplated in the Interim Order will provide the liquidity and resources needed to allow the Debtors to operate in the ordinary course while obtaining confirmation of the Plan and therefore avoid immediate and irreparable harm and prejudice to the businesses and all parties in interest pending the Final Hearing.

**G.     Establishing Notice Procedures and Scheduling Final Hearing**

57.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for the District of Delaware (the "United States Trustee"), (ii) the Debtors' thirty (30) largest unsecured creditors, (iii) counsel to certain of the DIP Lenders  (iv) counsel to the Pre-Petition Term Loan Agent, (v) counsel to the DIP Agent, (vi) the Internal Revenue Service, (vii) all appropriate state taxing authorities (viii) all known parties asserting a lien against the Collateral; (ix) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Initial Notice Parties"). The Debtors submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

58.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to the Initial Notice Parties and any party that has filed a request for notices prior to entry of the Interim Order. The Debtors request that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under Bankruptcy Code section 506(c) to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

59.     No previous request for the relief sought herein has been made to this Court or any other court.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

60.     To implement the relief sought in this Motion, the Debtors seek a waiver of the notice requirements of Bankruptcy Rule 6004(a), and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

61.     Pursuant to Local Rule 9013-1(m), requests for relief on less than seven days' notice and prior to the earlier of the creditors' committee formation meeting or the Bankruptcy Code Section 341 meeting of the creditors are "confined to matters of genuinely emergent nature required to preserve the assets of the estate and to maintain ongoing business operations and such other matters as the Court may deem appropriate." *Del. Bankr. L.R.* 9013-1(m)(ii).

62.     As set forth above, without access to capital, the continued operation of the Debtors' businesses would be incredibly burdensome resulting in serious and irreparable harm to the Debtors and their estates. Accordingly, the Debtors submit that they have satisfied the requirements of Local Rule 9013-1(m) to support immediate authority to access the requested capital under the DIP Facility.

## CONCLUSION

WHEREFORE the Debtors respectfully request that the Court: (i) enter an order substantially in the form of the proposed Interim Order attached hereto as **Exhibit A**; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) such other and further relief as this Court may deem just and proper.

Dated:  Wilmington, Delaware
        November 3, 2014

**MORGAN, LEWIS & BOCKIUS LLP**
Neil E. Herman
James O. Moore
Patrick D. Fleming
101 Park Avenue
New York, New York 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

- and –

**MORGAN, LEWIS & BOCKIUS LLP**

Justin W. Chairman
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001

- and –

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
Kenneth J. Enos (No. 4544)
Justin P. Duda (No. 5478)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253

*Proposed Co-Counsel to the Debtors*

**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNITEK GLOBAL SERVICES, INC., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507, AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507; (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND 9014; (IV) ESTABLISHING RELATED NOTICE REQUIREMENTS; AND (V) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion"), dated November 3, 2014, of UniTek Global Services, Inc. ("UniTek") and its affiliated debtors as debtors and debtors-in-possession (collectively, the "Debtors" or the "Borrowers") in the above-captioned chapter 11 cases (these "Cases"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure (as amended, the "Local Bankruptcy Rules") of the United States Bankruptcy Court for the District of Delaware (this "Court"), seeking, among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: UniTek Global Services, Inc. (3445), UniTek Holdings, Inc. (4120), UniTek Midco, Inc. (5642), UniTek Acquisition, Inc. (4123), Nex-link USA Communications, Inc. (9084), UniTek USA, LLC (0279), Pinnacle Wireless USA, Inc. (1746), DirectSAT USA, LLC (3465), FTS USA, LLC (6247), and Advanced Communications USA, Inc. (0091). The Debtors' main corporate address is 1777 Sentry Parkway West, Gwynedd Hall, Suite 302, Blue Bell, Pennsylvania 19422.

(I)        authorization for the Debtors to obtain post-petition financing (the "DIP Financing" or the "DIP Facility" and the loans made thereunder, the "DIP Loans") on the terms and conditions set forth in this Interim Order and the Debtor-in-Possession Credit and Security Agreement (substantially in the form attached to the Motion as **Exhibit B**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement,"[2] and together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, including the Other Documents as defined in the DIP Credit Agreement, collectively, the "DIP Documents"), by and among the Debtors, Wilmington Trust, National Association, as agent (the "DIP Agent"), and the lenders party thereto (the "DIP Lenders"), secured by the DIP Collateral (as defined below), providing for, *inter alia*:

A.        commitments to lend an aggregate principal amount of up to $43,000,000 as term advances that, once borrowed and repaid, may not be reborrowed (the "Initial Commitments");

B.        revolving credit commitments of $10,000,000 for the purpose of providing liquidity for working capital and general corporate purposes of the DirectSAT Business (the "Revolving Commitments");

C.        commitments to purchase participations in, and reimburse the ABL Facility Agent for any amount drawn under, the $3.7 million letter of credit (the "WTC Letter of Credit") issued to secure certain obligations of the Other Business under the ABL Facility Credit

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

01:16263176.1

2

Agreement, if and when such WTC Letter of Credit is drawn (the "L/C Commitment"; collectively, the Initial Commitments, the Revolving Commitments, and the L/C Commitment are the "DIP Facility Commitments"); and

D.      a roll up of all outstanding letters of credit under the ABL Facility existing as of the Petition Date (the "L/C Roll Up").  All loans and letters of credit made to or for the benefit of any of the Debtors on or after the Petition Date in accordance with the DIP Documents, all interest thereon and all fees, costs, expenses, indemnification obligations, and other liabilities owing by the Debtors to the DIP Lenders or the DIP Agent in accordance with and relating to this Interim Order and the other DIP Documents, including, without limitation, the "Obligations" as defined under the DIP Credit Agreement, shall hereinafter be referred to as the "DIP Obligations;"

(II)      authorization to use the proceeds of the DIP Facility as expressly provided in the DIP Documents and solely in accordance with the Budget (as defined in the DIP Credit Agreement):  (A) to pay costs, fees, and expenses in connection with the DIP Facility and adequate protection payments in respect of the Pre-Petition Indebtedness (as defined below) as provided for in this Interim Order and the DIP Documents; (B) to provide financing for working capital and for other general corporate purposes of the Debtors, including but not limited to investments in other subsidiaries of the Debtors to the extent not prohibited under the DIP Documents; (C) in the case of the DIP Loans borrowed and letters of credit issued under the Revolving Commitments, solely to fund operations and working capital and general corporate purposes of the DirectSAT Business; (D) in the case of DIP Loans borrowed under the L/C Commitment, solely to reimburse the Pre-Petition ABL Facility Agent (as defined below) for any amount drawn under the WTC Letter of Credit, if and when such letter of credit is drawn;

(E) in the case of DIP Loans borrowed under the Initial Commitments, to fund, among other things, the Separation of Businesses Transactions (as defined in the DIP Credit Agreement); and (F) to pay administration costs of these Cases and claims or amounts approved by this Court;

(III)    authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(IV)    that this Court grant to the DIP Lenders and the DIP Agent, in accordance with the relative priorities as set forth more fully below, and subject to the Carve Out (as defined below), the following:

A.    pursuant to section 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claim status in respect of the DIP Obligations in these Cases;

B.    pursuant to section 364(c)(2) of the Bankruptcy Code, a senior first-priority lien on all assets of the Debtors, including all property of their respective estates in these Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutes thereof, that are not subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

C.    pursuant to section 364(d) of the Bankruptcy Code, a senior first-priority priming lien on and security interest in all of the Debtors' assets (subject to Permitted Encumbrances (as defined in the DIP Documents) that have priority over such liens as a matter of law (other than the Pre-Petition Liens (as defined below)), including all property of their

respective estates in these Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutions thereof, that are subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

(V)     authorization for the DIP Agent, solely at the direction of the requisite DIP Lenders as set forth in the DIP Credit Agreement, to terminate the DIP Credit Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) on terms specified herein and in the DIP Credit Agreement;

(VI)     subject to entry of the Final Order (as defined below), authorization to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions");

(VII)    authorization for the Debtors to use, among other things, solely in accordance with the Budget, any cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code and described below) (the "Cash Collateral") in which the Pre-Petition Secured Parties (as defined below) may have an interest and the granting of adequate protection to the Pre-Petition Secured Parties with respect to any post-petition diminution in value of their interests in the Pre-Petition Collateral (as defined below) arising from, *inter alia*, the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral) and the priming of the liens of the Pre-Petition Secured Parties by the DIP Liens;

(VIII)  subject to and only effective upon the entry of a Final Order granting such relief, the waiver by the Debtors of any right to surcharge against the DIP Collateral or Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(IX)    this Court's modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(X)     this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(XI)    authorization that during the period (the "Interim Period") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, and (b) the occurrence of the Maturity Date, a portion of the DIP Facility Commitments may be borrowed by the Borrowers, subject to compliance with the terms, conditions, and covenants contained in the DIP Documents; and

(XII)   the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents filed with this Court and approving the Debtors' notice with respect to the Motion.

The hearing on the Motion (the "Interim Hearing") having been held by this Court on _____, 2014, pursuant to Bankruptcy Rules 2002, 4001(b)(2), and 4001(c)(2), and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m); and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing by the Debtors and the entire record herein; the *Declaration of Andrew J. Herning in Support of the First Day Motions*; and

this Court having heard and resolved or overruled any objections to the interim relief requested in the Motion; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors, and necessary to avoid immediate and irreparable harm to the Debtors' estates; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given under the circumstances; and after due deliberation and consideration, and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these Cases, the Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue of these Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m).

2.    <u>Notice</u>.  The notice given by the Debtors of the Motion and the Interim Hearing was the best available under the circumstances.  Such notice constitutes due and sufficient notice of the Debtors' request for the interim relief granted herein and of the Interim Hearing under the circumstances and complies with Bankruptcy Rules 4001(b) and (c), such that no other or further notice is necessary or required.

01:16263176.1

3.     <u>Debtors' Stipulations</u>.  Subject to the limitations thereon contained in paragraph 19 below, the Debtors acknowledge, admit, represent, stipulate, and agree that:

(a)     <u>The Pre-Petition Secured Facilities</u>.

(i)     <u>Pre-Petition ABL Facility</u>.  UniTek and the other Debtors are party to that certain Revolving Credit and Security Agreement dated as of July 10, 2013, as amended from time to time, by and among certain of the Debtors, Apollo Investment Corporation, as agent (together with its successors, the "<u>Pre-Petition ABL Facility Agent</u>"), the lenders and other secured parties party thereto from time to time (the "<u>Pre-Petition ABL Facility Lenders</u>;" and, the Pre-Petition ABL Facility Lenders together with the Pre-Petition ABL Facility Agent, the "<u>Pre-Petition ABL Facility Secured Parties</u>;"), and the other agents and credit parties party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Pre-Petition ABL Facility Credit Agreement</u>;" and, together with any other documents, schedules, instruments, or agreements related thereto, the "<u>Pre-Petition ABL Facility Credit Documents</u>"), which provides for a senior secured revolving credit facility (the "<u>Pre-Petition ABL Facility</u>"), including a letter of credit subfacility and a swingline subfacility.  The Pre-Petition ABL Facility also consists of, among other things, senior loans (the "<u>Pre-Petition Senior ABL Facility Loans</u>," held by the "<u>Pre-Petition Senior ABL Facility Lenders</u>") and "last out" junior loans (the "<u>Pre-Petition Junior ABL Facility Loans</u>," held by the "<u>Pre-Petition Junior ABL Facility Lenders</u>").  As of the Petition Date, the aggregate principal amount of loans (including accrued and unpaid interest) outstanding under the Pre-Petition ABL Facility was approximately $47,605,728.59, which consists of $38,792,875.28 on account of Pre-Petition Senior ABL Facility Loans and $8,812,453.31 on account of the Pre-Petition Junior ABL Facility Loans, and the undrawn amount of all outstanding letters of credit issued under the Pre-

Petition ABL Facility was approximately $21,646,300.00 (together with all other outstanding Obligations, as defined in the Pre-Petition ABL Facility Credit Agreement, including interest, fees and expenses, the "Pre-Petition ABL Indebtedness").

              (ii)     Pre-Petition Term Loan Facility.  UniTek and the other Debtors are also party to that certain Credit Agreement, dated as of April 15, 2011, as amended from time to time, among UniTek, certain other Debtors, FBR Capital Markets LT ("FBR"), which was thereafter succeeded by Cerberus Business Finance, LLC ("Cerberus"), as successor agent (Cerberus, together with its successors, the "Pre-Petition Term Loan Agent;" and, the Pre-Petition Term Loan Agent together with the Pre-Petition ABL Facility Agent, the "Pre-Petition Agents"), the lenders and other secured parties party thereto from time to time (the "Pre-Petition Term Loan Lenders;" and, the Pre-Petition Term Loan Lenders together with the Pre-Petition Term Loan Agent, the "Pre-Petition Term Loan Secured Parties;" and the Pre-Petition Term Loan Secured Parties together with the Pre-Petition ABL Facility Secured Parties, the "Pre-Petition Secured Parties"), and the other agents and credit parties party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Term Loan Credit Agreement;" and, together with any other documents, schedules, instruments, or agreements related thereto, the "Pre-Petition Term Loan Credit Documents;" and, the Pre-Petition Term Loan Credit Documents together with the Pre-Petition ABL Facility Credit Documents, the "Pre-Petition Credit Documents"), which provides for a senior secured term loan credit facility (the "Pre-Petition Term Loan Facility" and together with the Pre-Petition ABL Facility, the "Pre-Petition Secured Facilities").  As of the Petition Date, the aggregate principal amount (including accrued and unpaid interest) outstanding under the Pre-Petition Term Loan Facility was approximately $143,252,713.27 (together with all other outstanding

Obligations, as defined in the Pre-Petition Term Loan Credit Agreement, including interest, fees and expenses, the "Pre-Petition Term Loan Indebtedness"; and the Pre-Petition Term Loan Indebtedness together with the Pre-Petition ABL Indebtedness, the "Pre-Petition Indebtedness").

       (b)     Pre-Petition Collateral.

       (i)     Pre-Petition ABL Facility Liens.  To secure the Pre-Petition ABL Indebtedness, pursuant to the Pre-Petition ABL Facility Credit Documents and other security documents and subject to the Intercreditor Agreement and the Subordination Agreement (each as defined below), the Debtors granted to the Pre-Petition ABL Facility Agent, for itself and the ratable benefit of the Pre-Petition ABL Facility Lenders, valid, binding, enforceable, and perfected security interests (the "Pre-Petition ABL Facility Liens") in substantially all of the Debtors' property and assets, including, without limitation, (a) all of the personal property then owned or at any time thereafter acquired by any Debtor party to the Pre-Petition ABL Facility Credit Agreement or in which any such Debtor then had or at any time thereafter acquired any right, title or interest, (b) certain equity interests of the Debtors' subsidiaries, (c) all books and records pertaining to any of the foregoing, (d) all proceeds and products of any of the foregoing, and (e) all collateral security and guaranties given by any Person with respect to any of the foregoing (collectively, the "Pre-Petition ABL Facility Collateral").

       (ii)     Pre-Petition Term Loan Liens.  To secure the Pre-Petition Term Loan Indebtedness, the Debtors and FBR, as predecessor to the Pre-Petition Term Loan Agent, entered into that certain Guaranty and Collateral Agreement, dated as of April 15, 2011 (as amended, restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and

deeds of trust, the "Pre-Petition Term Loan Collateral Agreement").    Pursuant to the Pre-Petition Term Loan Collateral Agreement and other security documents and subject to the Intercreditor Agreement (as defined below), the Debtors granted to the Pre-Petition Term Loan Agent, for itself and the ratable benefit of the Pre-Petition Term Loan Lenders, valid, binding, enforceable, and perfected security interests (the "Pre-Petition Term Loan Liens", and together with the Pre-Petition ABL Facility Liens, the "Pre-Petition Liens") in substantially all of the Debtors' property and assets, including, without limitation, (a) all of the personal property then owned or at any time thereafter acquired by any Debtor party to the Pre-Petition Term Loan Agreement or in which any such Debtor then had or at any time thereafter acquired any right, title or interest, (b) certain equity interests of the Debtors' subsidiaries, (c) all books and records pertaining to any of the foregoing, (d) all proceeds and products of any of the foregoing, and (e) all collateral security and guaranties given by any Person with respect to any of the foregoing (collectively, the "Pre-Petition Term Loan Collateral", and together with the Pre-Petition ABL Facility Collateral, the "Pre-Petition Collateral").

(iii)    Intercreditor Agreement.    The relative rights, remedies, and priorities of the claims, liens, and security interest of the Pre-Petition ABL Facility Secured Parties, on the one hand, and the Pre-Petition Term Loan Secured Parties, on the other hand, are governed by the terms and conditions of that certain intercreditor agreement, dated as of April 15, 2011, by and among certain of the Debtors and their affiliates, the Pre-Petition ABL Facility Agent on behalf of the Pre-Petition ABL Facility Lenders, and FBR, as predecessor to the Pre-Petition Term Loan Agent on behalf of the Pre-Petition Term Loan Lenders, as such agreement may have been modified, amended, or restated from time to time (the "Intercreditor Agreement"), which provides, among other things, that (a) with respect to the Term Debt

Priority Collateral (as defined in the Intercreditor Agreement), the Pre-Petition ABL Facility

Liens are junior and subordinate to the Pre-Petition Term Loan Liens, and (b) with respect to

the ABL Priority Collateral (as defined in the Intercreditor Agreement), the Pre-Petition Term

Loan Liens are junior and subordinate to the Pre-Petition ABL Facility Liens.

        (iv)   <u>Subordination Agreement</u>.  The relative rights, remedies, and

priorities of the claims, liens, and security interests of the Pre-Petition Senior ABL Facility

Lenders and the Pre-Petition Junior ABL Facility Lenders are also governed by the terms and

conditions of that certain subordination agreement, dated as of August 13, 2014, by and among

certain of the Debtors and their affiliates, the Pre-Petition ABL Facility Agent, the Pre-Petition

Senior ABL Facility Lenders, and the Pre-Petition Junior ABL Facility Lenders, as such

agreement may have been modified, amended, or restated from time to time (the "<u>Subordination</u>

<u>Agreement</u>"), which provides, *inter alia*, that the Pre-Petition Junior ABL Facility Lenders

consent to the use of any "cash collateral" constituting Pre-Petition Collateral and to the

Borrowers obtaining the DIP Facility on the terms set forth in this Interim Order and the DIP

Documents.

        (c)   <u>Pre-Petition Indebtedness</u>.  The Pre-Petition Indebtedness constitutes

legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable

against them in accordance with their respective terms (other than in respect of the stay of

enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Pre-

Petition Indebtedness is subject to avoidance, recharacterization, reduction, set-off, offset,

counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery,

subordination, or any other challenges pursuant to the Bankruptcy Code or applicable

nonbankruptcy law or regulation by any person or entity.  The Debtors are jointly and severally

liable to the Pre-Petition ABL Facility Secured Parties on account of the Pre-Petition ABL Indebtedness and to the Pre-Petition Term Loan Secured Parties on account of the Pre-Petition Term Loan Indebtedness.

(d)     Pre-Petition Liens.  The Pre-Petition Liens constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests and liens on the Pre-Petition Collateral, were granted to, or for the benefit of, the applicable Pre-Petition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.

(e)     No Claims.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against any of the Pre-Petition Secured Parties with respect to the Pre-Petition Credit Documents, the Pre-Petition Indebtedness, the Pre-Petition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code.

(f)     Indemnity.  The Pre-Petition Secured Parties, the DIP Agent, and the DIP Lenders have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the Plan Support Agreement, the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or

01:16263176.1

objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Pre-Petition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph 3(f), in the Pre-Petition Credit Documents, or in the DIP Documents, to indemnify and/or hold harmless the Pre-Petition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be.

4.    <u>Findings Regarding the DIP Financing and Use of Cash Collateral</u>.

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code.

(c)    The Debtors have an immediate and critical need to obtain the DIP Financing and to use the Pre-Petition Collateral, including the Cash Collateral, to continue the operation of their businesses.  Among other things, entry of this Interim Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses.  The DIP Financing and the use of the Pre-Petition Collateral, including,

without limitation, the Cash Collateral, as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the DIP Financing and to the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, is not obtained. Consummation of the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, pursuant to the terms of this Interim Order therefore are in the best interests of the Debtors' estates.

(d)     The DIP Lenders are willing to provide the DIP Financing, and the Pre-Petition Secured Parties are willing to consent to the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Interim Order, as applicable, and provided that the DIP Liens (as defined below), the Superpriority Claims, and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, approved by this Interim Order. The DIP Agent and DIP Lenders have acted in good faith in agreeing to provide the DIP Financing approved by this Interim Order and to be further evidenced by the DIP Documents, and the Pre-Petition Secured Parties have acted in good faith in consenting (including under the Intercreditor Agreement and the Subordination Agreement) to the (i) Debtors' use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral pursuant to the terms of this Interim Order, (ii) priming of their Pre-Petition Liens by the DIP Liens on all Pre-Petition Collateral, and (iii) entry of this Interim Order and the granting of the relief set forth herein, and their reliance on the assurances referred to above is in good faith.

(e)     The DIP Documents and the DIP Financing contemplated thereunder, and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arms' length among the Debtors, the DIP Lenders, holders of 100% of the Pre-Petition Senior ABL Facility Loans, holders of 100% of the Pre-Petition Junior ABL Facility Loans, and holders of 100% of the Pre-Petition Term Loan Indebtedness, among others, and the terms of the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, respectively, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.   All of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Financing and the DIP Documents, including the DIP Obligations, shall be deemed to have been extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2(b).   The authorization granted herein on an interim basis to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, to enter into the DIP Documents, and to borrow up to an aggregate principal amount of $29,200,000 under the Initial Commitments, plus the full amount of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up, in the Interim

Period is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Interim Order is in the best interests of the Debtors and their estates and creditors because it will, among other things, allow the Debtors to maximize the value of their assets.

       (g)     The Pre-Petition Secured Parties have consented to the DIP Financing (including the priming of their Pre-Petition Liens by the DIP Liens) and the Debtors' use of the Pre-Petition Collateral, including the Cash Collateral, including pursuant to the Intercreditor Agreement and the Subordination Agreement. This Court concludes that the adequate protection provided to the Pre-Petition Secured Parties hereunder for any post-petition diminution in value of the security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral due to, *inter alia*, the Debtors' use of the Pre-Petition Collateral, including the Cash Collateral, the imposition of the automatic stay, and the priming of the Pre-Petition Liens by the DIP Liens, is authorized by sections 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code.

     5.     <u>Authorization of the DIP Financing and the DIP Documents</u>.

       (a)     The Debtors are hereby authorized and directed to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Credit Agreement and the other DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith, and borrow money and obtain letters of credit under the DIP Facility, on an interim basis, up to an aggregate principal amount not to exceed $29,200,000 under the Initial Commitments, plus the full amount of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up, in accordance with the terms of this Interim Order and the DIP Documents.

(b)    Upon the execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms subject to the terms of this Interim Order.   No obligation, payment, transfer, or grant of a security or other interest to the DIP Lenders under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment, or counterclaim.

(c)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, control agreements, and financing statements), and, without further application to this Court, to pay on a current basis all fees and expenses referred to in this Interim Order, the DIP Credit Agreement and DIP Documents, including, without limitation, all reasonable and documented fees and expenses paid, payable, or incurred prior to, on, or after the Petition Date of (i) Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP, counsel to certain of the DIP Lenders, (ii) Latham & Watkins LLP and Richards Layton and Finger LLP, counsel to certain of the DIP Lenders, and (iii) Alston & Bird, LLP and such Delaware counsel retained by the DIP Agent (if and when retention of such Delaware counsel becomes necessary), counsel to the DIP Agent (collectively, the "DIP Professional Fees and Expenses"). None of the DIP Professional Fees and Expenses shall be subject to further Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or

01:16263176.1

final fee application with this Court; *provided*, *however*, that the DIP Professional Fees and Expenses shall be payable in accordance with the procedures set forth in paragraph 14(c) hereof.

6.    <u>Rights and Benefits Under Intercreditor Agreement and Subordination Agreement</u>.

(a)    Except as otherwise set forth in this Interim Order, the terms and conditions of the Intercreditor Agreement (including with respect to the relative rights of the Pre-Petition Secured Parties) shall not be mitigated or modified as a result of the entry of this Interim Order, entry into the DIP Documents, or the incurrence of the DIP Obligations.

(b)    Except solely to the extent set forth in paragraph 14(a)(ii) hereof, the terms and conditions of the Subordination Agreement (including with respect to the relative rights of the Pre-Petition Secured Parties) shall not be mitigated or modified as a result of the entry of this Interim Order, entry into the DIP Documents, or the incurrence of the DIP Obligations.

7.    <u>DIP Superpriority Claims</u>.

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (the "<u>DIP Superpriority Claims</u>"), whether or not such expenses or claims may become secured by a

01:16263176.1

judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out; *provided*, *however*, that the DIP Superpriority Claims shall apply with respect to the proceeds of Avoidance Actions only upon entry of the Final Order.

       8.      <u>Carve Out Provisions</u>.

       (a)     <u>Carve Out</u>.  As used in this Interim Order and the DIP Documents, the "<u>Carve Out</u>" shall mean the sum of (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; (b) all Allowed Fees (as defined below) of Case Professionals (as defined below) not to exceed the amounts for such Case Professionals set forth in the Budget and incurred in the period prior to the occurrence of a Triggering Event (such period, the "<u>Pipeline Period</u>"); and (c) Allowed Fees of Case Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following the occurrence of a Triggering Event.  For the avoidance of doubt, Allowed Fees that are budgeted to be paid in any week during the Pipeline Period that are unused in such week may be carried forward and used in any subsequent week during the Pipeline Period.  For purposes of the foregoing, the terms:  (i) "<u>Allowed Fees</u>" shall mean accrued and unpaid fees and expense reimbursement of Case Professionals solely to the extent that such fees and expenses have been allowed by an order of the Bankruptcy Court that has not been vacated or stayed; (ii) "<u>Case Professionals</u>" shall mean attorneys, accountants, financial advisors, consultants and other professionals employed, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, as applicable, by the Debtors or any Committee in accordance with the DIP Documents; and (iii) "<u>Triggering Event</u>" shall mean the date that the DIP Agent, at the direction

01:16263176.1

20

of the Required Lenders, provides written notice to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the DIP Agent has terminated the Pipeline Period for purposes of the Carve Out.  The Carve Out and any payments made in respect of the Carve Out shall not reduce the amount of the DIP Obligations or the Prepetition Secured Obligations.

        (b)    <u>Carve Out Escrow</u>.  Without limiting the rights of the DIP Agent or DIP Lenders under the DIP Documents or this Interim Order, on the date of the Triggering Event, the Debtors shall be authorized and directed to request a draw under the DIP Facility equal to the unused portion of the Carve Out, which amount shall be deposited by the Debtors into an interest-bearing escrow account at a financial institution acceptable to the Required Lenders (the "<u>Carve Out Escrow Account</u>"); *provided*, *however,* that the Debtors shall notify the DIP Agent and the DIP Lenders of the amount deemed requested as promptly as possible following the Triggering Event and neither the DIP Agent nor the DIP Lenders shall be required to fund any amounts until the Debtors have notified the DIP Agent and the DIP Lenders of the requested amount.  Such funding of the Carve Out Escrow Account shall be in full and complete satisfaction of any and all obligations of the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties in respect of the Carve Out, *provided*, *however*, that nothing in this Interim Order limits any requirement of the Debtors to pay all outstanding quarterly fees to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) regardless of amount.  For the avoidance of doubt, the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties shall have a security interest in any residual interest in the Carve Out Escrow Account, with any excess paid

to the DIP Agent or the applicable Pre-Petition Agent, as applicable, for application in accordance with the DIP Documents and this Interim Order.

(c) <u>No Direct Obligation to Pay Allowed Fees; No Waiver of Right to Object to Fees</u>. The DIP Agent and DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Case Professional incurred in connection with these Cases, any Successor Cases, or otherwise. Nothing in this Interim Order or otherwise shall be construed: (i) to obligate the DIP Agent or DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Case Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if Allowed Fees are higher in fact than the estimated fees and disbursements of Case Professionals set forth in the Budget; (iii) as consent to the allowance of any fees and expenses of Case Professionals; or (iv) to affect the rights of the DIP Agent, the DIP Lenders, the Pre-Petition Secured Parties or any other party-in-interest to object to the allowance and payment of such fees and expenses.

(d) <u>Payment of Carve Out on or after the Triggering Event</u>. Any payment or reimbursement made on or after the occurrence of the Triggering Event in respect of any Allowed Fees (whether out of the Carve Out Escrow Account or otherwise) shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall otherwise be entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

01:16263176.1

9.        DIP Liens.

(a)        As security for the DIP Obligations, effective and perfected automatically upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by any DIP Lender of any DIP Collateral (as defined below), security interests and liens in the following property (all such liens and security interests granted to the DIP Lenders pursuant to this Interim Order and the DIP Documents, the "DIP Liens") are hereby granted to the DIP Agent and the DIP Lenders (subject and subordinate only to the Carve Out and Permitted Encumbrances):  (i) all of the Debtors' right, title, and interest in and to (but not any of the obligations, liabilities or indemnifications of the Debtors under) any tangible, intangible, real, personal, or mixed assets; (ii) subject to entry of the Final Order, Avoidance Actions of any type (and any recoveries therefrom); (iii) all property of any Debtor held by any DIP Lender, including all property of every description, in the custody of or in transit to a DIP Lender for any purpose, including safekeeping, collection or pledge, for the account of such Debtor or as to which such Debtor may have any right or power, including, but not limited to cash; (iv) all other goods (including, but not limited to fixtures) and personal property of the Debtors, whether tangible or intangible and wherever located; (v) all owned or leased real estate and real property leaseholds; (vi) all books and records pertaining to the foregoing; and (vi) all Proceeds (as defined in the DIP Credit Agreement) of the foregoing, including, subject to entry of the Final Order, proceeds of Avoidance Actions of any type, and any and all Pre-Petition Collateral (collectively, the "DIP Collateral").

(b)     The DIP Liens shall be senior in all respects to any current or future liens of the Pre-Petition Secured Parties (including, without limitation, any Adequate Protection Liens thereon) or any other party, but shall not be senior to any other valid, perfected and unavoidable interests and liens of other parties existing as of the Petition Date to which the Pre-Petition Liens were subordinate to as of the Petition Date or become subordinate to subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  The DIP Liens shall be subject to the Carve Out.

10.     <u>Maintenance of DIP Collateral</u>.  Until such time as all DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, the Debtors shall (a) maintain and insure the DIP Collateral in amounts, for the risks, and by the entities as required under the DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order (as defined in the DIP Credit Agreement), as modified, with the prior written consent of the Required Lenders (as defined in the DIP Credit Agreement), by any order that may be entered by this Court or as otherwise required by the DIP Documents.   The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent, at the direction of the Required Lenders, to exercise, upon not less than two (2) Business Days' prior written notice by email to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Committee, if any, and counsel to the Pre-Petition Agents following the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) (the "<u>Remedies Notice Period</u>"), all rights and remedies hereunder and under the DIP Documents against the Debtors and/or the DIP Collateral (including, without limitation, the right to set off monies of the Debtors in accounts maintained or controlled by the DIP Lenders

or the DIP Agent).  In the absence of a further order of this Court, and notwithstanding anything herein or in the DIP Documents to the contrary, the Debtors' rights to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, or the DIP Collateral shall automatically terminate upon the expiration of the Remedies Notice Period.  Notwithstanding the foregoing, the Debtors' rights to use the DIP Collateral or the Pre-Petition Collateral, including, without limitation, Cash Collateral shall immediately terminate (without notice from the DIP Agent or the DIP Lenders) at the time that any Debtor has actual knowledge of an Event of Default if the Debtors fail to promptly notify the DIP Agent, the DIP Lenders, the U.S. Trustee, the Committee, if appointed, and the Pre-Petition Agents of such Event of Default.  In any hearing regarding the exercise of rights or remedies by the DIP Agent or the DIP Lenders, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  The Debtors or any party in interest may seek a determination from this Court that no Event of Default has occurred and is continuing, and appropriate relief from this Court in the event it should so determine that no Event of Default has occurred and is continuing.

11.    <u>Limitation on Charging Expenses Against DIP Collateral and Pre-Petition Collateral</u>.  Upon entry of the Final Order, no expenses of administration of these Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of each of the DIP Agent, any DIP Lender, and/or any Pre-Petition

Secured Party that is adversely affected thereby, and no consent shall be implied from any action, inaction, or acquiescence by any of the DIP Agent, the DIP Lenders, or the Pre-Petition Secured Parties.

12.    <u>Marshaling</u>.  In no event shall the DIP Agent, the DIP Lenders, or any of the Pre-Petition Secured Parties be subject to (a) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code with respect to the DIP Collateral or proceeds, products, offspring or profits of any of the Pre-Petition Collateral, or (b) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral.

13.    <u>Cash Collateral</u>.  Subject to the terms of the DIP Documents, this Interim Order, the Final Order, and the Budget, the Debtors are hereby authorized to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral in which any of the Pre-Petition Secured Parties has a perfected security interest as of the Petition Date or at any time thereafter, including any cash on deposit in any deposit account or other account over which any Pre-Petition Secured Party has control, and including any cash proceeds of the Pre-Petition Collateral.

14.    <u>Pre-Petition Secured Lenders' Adequate Protection</u>.

(a)    <u>ABL Facility Adequate Protection</u>.  The Pre-Petition ABL Facility Agent and the Pre-Petition ABL Facility Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral, for any post-petition diminution in the value of such interests on account of, among other things, the priming of the Pre-Petition ABL Facility Agent's and the Pre-Petition ABL Facility Lenders' interests in the Pre-Petition Collateral by the DIP Liens, the imposition of the automatic stay, and the Debtors' use of the Pre-Petition

Collateral.  The Pre-Petition ABL Facility Agent is granted, for the benefit of itself and the Pre-Petition ABL Facility Lenders, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "ABL Facility Adequate Protection"):

     i.  ABL Facility Adequate Protection Liens.  The Pre-Petition ABL Facility Agent, for itself and for the benefit of the Pre-Petition ABL Facility Lenders, is hereby granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "ABL Facility Adequate Protection Liens"), which liens shall:  (i) be subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Encumbrances; (ii) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral; and (iii) be subject in all respects to the Intercreditor Agreement.

     ii.  Adequate Protection Payments.  The Pre-Petition ABL Facility Lenders (including the Pre-Petition Junior ABL Facility Lenders) shall be entitled to payment of interest and fees (in each case, at the applicable non-default rate) due under the Pre-Petition ABL Facility Credit Documents, including, for the avoidance of doubt, any such amounts accrued and unpaid before the Petition Date, at the times specified therein (and subject to the limitations therein on the portion of such interest payable in cash on account of the Pre-Petition Junior ABL Facility Loans), and, notwithstanding anything to the contrary in the Subordination Agreement, the Pre-Petition Junior ABL Facility Lenders shall be entitled to retain all such payments of interest and fees, without any obligation to turn over same to or for the benefit of the Pre-Petition Senior ABL Facility Lenders; *provided*, *however*, that the Pre-Petition ABL Facility Lenders shall cease to be bound by the agreements described in this sentence (excluding this proviso and the subsequent provisos to this sentence) in the event both (x) the Plan Support Agreement terminates or an Event of Default occurs that is not cured or waived and (y) the Pre-Petition

Senior ABL Facility Lenders elect by written notice to the Pre-Petition Junior ABL Facility Lenders to cease to be bound by the agreements described in this sentence (excluding this proviso and the subsequent provisos to this sentence); *provided*, *further*, that to the extent the Pre-Petition Senior ABL Facility Lenders make such election, all parties rights are reserved notwithstanding the entry of this Interim Order, the Final Order, or anything otherwise set forth herein; and *provided*, *further*, that all payments of interest and fees made prior to any such election shall not be subject to turn over.  Except as expressly set forth in the preceding sentence, the Subordination Agreement shall remain in full force and effect.

                iii.     <u>Section 507(b) Claim</u>.    To the extent of any post-petition diminution in value of the interests of the Pre-Petition ABL Facility Agent and the Pre-Petition ABL Facility Lenders in the Pre-Petition Collateral (if any), the Pre-Petition ABL Facility Agent, on behalf of itself and the Pre-Petition ABL Facility Lenders, shall be granted, subject to the Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "<u>ABL Superpriority Claim</u>"), which ABL Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.  Solely in the event the ABL Facility Adequate Protection is insufficient to satisfy

any allowed claims of the Pre-Petition ABL Facility Agent and the Pre-Petition ABL Facility Lenders related to any post-petition diminution in value of their interests in the Pre-Petition Collateral, the ABL Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

(b)     Term Loan Adequate Protection.  The Pre-Petition Term Loan Agent and the Pre-Petition Term Loan Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral, for any post-petition diminution in the value of such interests on account of, among other things, the priming of the Pre-Petition Term Loan Agent's and the Pre-Petition Term Loan Lenders' interests in the Pre-Petition Collateral by the DIP Liens, the imposition of the automatic stay, and the Debtors' use of the Pre-Petition Collateral. The Pre-Petition Term Loan Agent is granted, for the benefit of itself and the Pre-Petition Term Loan Lenders, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "Term Loan Adequate Protection," and, together with the ABL Facility Adequate Protection, the "Adequate Protection"):

i.     Term Loan Adequate Protection Liens.  The Pre-Petition Term Loan Agent, for itself and for the benefit of the Pre-Petition Term Loan Lenders, is hereby granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Term Loan Adequate Protection Liens;" and, the Term Loan Adequate Protection Liens together with the ABL Facility Adequate Protection Liens, the "Adequate Protection Liens"), which liens shall:  (i) be subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Encumbrances; (ii) otherwise be senior to all other security interests in,

liens on, or claims against any of the DIP Collateral; and (iii) be subject in all respects to the Intercreditor Agreement.

ii.       Interest.  The Pre-Petition Term Loan Lenders shall be entitled to accrue interest following the Petition Date (at the applicable non-default rate) and during these Cases, and such accrued postpetition interest will be added to the principal balance of the claims of the Pre-Petition Term Loan Lenders under the Pre-Petition Term Loan Credit Agreement; *provided*, *however*, that if the *Joint Prepackaged Plan of Reorganization of UniTek Global Services, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of October 21, 2014 (as amended, supplemented, or otherwise modified from time to time solely in accordance with the Plan Support Agreement, the "Plan") is not consummated, then the postpetition interest claim shall be treated in accordance with section 506(b), 506(c) or any other applicable provision of the Bankruptcy Code.

iii.       Section 507(b) Claim.  To the extent of any post-petition diminution in value of the interests of the Pre-Petition Term Loan Agent and the Pre-Petition Term Loan Lenders in the Pre-Petition Collateral (if any), the Pre-Petition Term Loan Agent, on behalf of itself and the applicable Pre-Petition Term Loan Lenders, shall be granted, subject to the Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "Term Loan Superpriority Claim"), which Term Loan Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any

01:16263176.1

other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.  Solely in the event the Term Loan Adequate Protection is insufficient to satisfy any allowed claims of the Pre-Petition Term Loan Agent and the Pre-Petition Term Loan Lenders related to any post-petition diminution in value of its interests in the Pre-Petition Collateral, the Term Loan Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

(c)  <u>Fees and Expenses</u>.  The Debtors are authorized and directed to pay: (i) on the date of the first advance under the DIP Facility, the outstanding prepetition reasonable and documented fees and expenses of counsel and financial advisor to the Pre-Petition ABL Facility Agent and the Pre-Petition Senior ABL Facility Lenders, counsel and financial advisors to the Pre-Petition Term Loan Agent, and counsel to the Specified Term Lenders (as defined in the Plan); and (ii) on an ongoing basis, from time to time after the Petition Date, and without duplication, pursuant to the procedures set forth in this paragraph 14, all reasonable and documented fees and expenses incurred by the Pre-Petition ABL Facility Agent and the Pre-Petition Term Loan Agent (acting in such capacities), the Pre-Petition Senior ABL Facility Lenders, and the Specified Term Lenders (as defined in the Plan) during and in connection with these Cases and required to be paid by the Debtors under the Pre-Petition Credit Documents, including the reasonable and documented fees and expenses of (i) Kirkland & Ellis LLP, counsel to the Pre-Petition ABL Facility Agent and the Pre-Petition Senior ABL Facility Lenders, (ii) Klehr Harrison Harvey Branzburg LLP, local counsel to the Pre-Petition ABL Facility Agent

and the Pre-Petition Senior ABL Facility Lenders, (iii) Latham & Watkins LLP, counsel to the Specified Term Lenders, and (iv) Klee, Tuchin, Bogdanoff & Stern LLP, counsel to the Pre-Petition Term Loan Agent and certain of the Pre-Petition Term Loan Lenders and Pre-Petition Junior ABL Facility Lenders (collectively, the "Adequate Protection Professional Fees and Expenses").  With respect to Adequate Protection Professional Fees and Expenses incurred postpetition, the Debtors shall pay such fees and expenses in cash within five (5) Business Days (if no written objection is received within such five (5) Business Days' period) after such professional has delivered an invoice to the Debtors describing such fees and expenses (but in any event providing a reasonable summary or detail with respect to the fees and expenses incurred), with a copy of such invoices delivered simultaneously to the DIP Lenders, the U.S. Trustee, and counsel to the Committee, if any; *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential, or proprietary information.  Parties in interest may deliver written objections to payment of the Adequate Protection Professional Fees and Expenses within five (5) Business Days following receipt of an invoice for Adequate Protection Professional Fees and Expenses.  None of the Adequate Protection Professional Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided*, *however*, if an objection to a professional's invoice is timely received, the Debtors shall pay in cash the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

15.  Intercreditor Adequate Protection Issues.  Notwithstanding anything to the contrary in paragraph 14 hereof, the ABL Facility Adequate Protection Liens and the ABL

Superpriority Claim shall have priority over the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim, as applicable, with respect to the ABL Priority Collateral and the proceeds thereof to the extent provided in the Intercreditor Agreement, and the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim shall have priority over the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim, as applicable, with respect to the Term Debt Priority Collateral and the proceeds thereof to the extent provided in the Intercreditor Agreement, and with respect to the DIP Collateral that is neither ABL Priority Collateral nor Term Debt Priority Collateral (the "Additional Collateral"), subject to the DIP Superpriority Claims and the Carve Out, the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim, on the one hand, and the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim, on the other hand, shall be of equal priority; *provided*, *however*, except as otherwise agreed by the ABL Facility Agent and the Required Term Loan Consenting Lenders (as defined in the Plan Support Agreement), including under the Plan Support Agreement, to the extent either (a) the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim are not satisfied in full from the ABL Priority Collateral (such extent, the "ABL Deficiency Amount") or (b) the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim are not satisfied in full from the Term Priority Collateral (such extent, the "Term Loan Deficiency Amount"), any liens or claims of any nature for the ABL Deficiency Amount and the Term Loan Deficiency Amount: (x) shall be entitled to recover from the Additional Collateral in an equal amount, dollar for dollar, until such ABL Deficiency Amount or Term Loan Deficiency Amount, and related obligations, have been satisfied in full, after which the applicable Pre-Petition Secured Parties holding claims to such satisfied ABL Deficiency Amount or Term Loan Deficiency Amount shall not be entitled to any further

recovery from the Additional Collateral and the remaining ABL Deficiency Amount or Term Loan Deficiency Amount, as applicable, shall thereafter be entitled to recover from the Additional Collateral until such ABL Deficiency Amount or Term Loan Deficiency Amount, as applicable, and any related obligations, are satisfied in full; and (y) may be treated in accordance with sections 506 and 1129 of the Bankruptcy Code.  Except and solely to the extent provided in paragraph 14(a)(ii) of this Interim Order, the rights of the Pre-Petition ABL Facility Lenders in respect of the ABL Superpriority Claim shall be subject to the provisions of the Subordination Agreement.

16.   <u>Cash Management</u>.   The Debtors shall not seek approval of, or make, any modifications to their cash management system existing as of the Petition Date without the prior approval of the Required Lenders and the DIP Agent, and any order approving such cash management system shall be acceptable to the Required Lenders and the DIP Agent.

17.   <u>Reservation of Rights</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (a) the right of the DIP Agent, the DIP Lenders, the Pre-Petition ABL Facility Agent, the Pre-Petition ABL Facility Lenders, the Pre-Petition Term Loan Agents, or the Pre-Petition Term Loan Lenders to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection, as applicable, in all cases subject to the terms of the Intercreditor Agreement and the Subordination Agreement, or (b) any of the rights of the DIP Agent, the DIP Lenders, the Pre-Petition ABL Facility Agent, the Pre-Petition ABL Facility Lenders, the Pre-Petition Term Loan Agent, or the Pre-Petition Term Loan Lenders under the Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreement and the Subordination Agreement), except as expressly

set forth in this Interim Order.  Nothing contained herein shall be deemed to be a finding by this Court or an acknowledgement by the Pre-Petition Secured Parties that the adequate protection granted herein does in fact adequately protect the Pre-Petition Secured Parties against any post-petition diminution in value of the Pre-Petition Collateral.

18.    <u>Perfection of DIP Liens.</u>

(a)    The DIP Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable, and duly perfected senior first-priority security interests and liens, and the DIP Agent and the DIP Lenders shall *not* be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust, or similar instruments which otherwise may be required under federal, state, or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens.  The DIP Lenders and the DIP Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not any DIP Lender or the DIP Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent or the DIP Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)    The Debtors shall execute and deliver to the DIP Lenders and the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP Agent, at the direction of the Required Lenders, may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

(d)    Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Subject to entry of the Final Order, any such provision shall have no force and effect with respect to the granting of postpetition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Agent or the DIP Lenders in accordance with the terms of the DIP Documents or this Interim Order.

19.    <u>Perfection of Adequate Protection Liens</u>.

(a)    The Adequate Protection Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable, and duly perfected security interests and liens, and the Pre-Petition Secured Parties shall *not* be required to file or serve financing statements,

notices of lien, mortgage deeds, deeds of trust, or similar instruments which otherwise may be required under federal, state, or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Adequate Protection Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens.  The Pre-Petition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not any Pre-Petition Secured Lender or Pre-Petition Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise (as they may elect) confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order.

(b)     A certified copy of this Interim Order may, in the discretion of the Pre-Petition ABL Facility Agent or the Pre-Petition Term Loan Agent, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     The Debtors shall execute and deliver to the Pre-Petition Secured Parties such agreements, financing statements, instruments and other documents as the Pre-Petition

Secured Parties may reasonably request to evidence, confirm, validate, or perfect the Adequate

Protection Liens.

(d)       Subject to entry of the Final Order, any provision of any lease or other

license, contract or other agreement that requires (i) the consent or approval of one or more

landlords or other parties or (ii) the payment of any fees or obligations to any governmental

entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such

leasehold interest, or the proceeds thereof, or other Pre-Petition Collateral related thereto, is

hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.

Subject to entry of the Final Order, any such provision shall have no force and effect with

respect to the granting of postpetition liens on such leasehold interest or the proceeds of any

assignment and/or sale thereof by any Debtor in favor of the Pre-Petition Secured Parties in

accordance with the terms of this Interim Order.

20.       <u>Other Automatic Perfection Matters</u>.  To the extent that any Pre-Petition Agent is

the secured party under any account control agreements, listed as loss payee under any of the

Debtors' insurance policies, or is the secured party under any Pre-Petition Credit Document, the

DIP Agent, on behalf of the DIP Lenders, is also deemed to be the secured party under such

account control agreements, loss payee under the Debtors' insurance policies, and the secured

party under each such Pre-Petition Credit Document, and shall have all rights and powers in

each case attendant to that position (including, without limitation, rights of enforcement), and

shall act in that capacity and distribute any proceeds recovered or received in accordance with

the terms of this Interim Order and the DIP Documents.  The Pre-Petition ABL Facility Agent

or the Pre-Petition Term Loan Agent, as applicable, shall serve as agent for the DIP Agent for

purposes of perfecting the DIP Agent's security interests in and liens on all Collateral that is of

a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

21.   <u>Release</u>.  Subject to entry of the Final Order, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Cases or any successor cases ("<u>Successor Cases</u>")) and any party acting by, through, or under any of the Debtors or any of their estates, hereby stipulate and agree that they forever and irrevocably (a) release, discharge, waive, and acquit the current or future DIP Agent and DIP Lenders, and the former, current, and future Pre-Petition Agents and Pre-Petition Secured Lenders, and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "<u>Released Parties</u>"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Pre-Petition Facilities, the Pre-Petition Credit Documents, or the transactions and relationships contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising

under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the Pre-Petition Agents, the Pre-Petition Secured Lenders, DIP Agent, and the DIP Lenders, and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the Pre-Petition Indebtedness, the Pre-Petition Liens, the DIP Obligations, and the DIP Liens.

22.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with that granted by this Interim Order to the DIP Lenders shall be granted or allowed while any portion of the DIP Obligations remains outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations and the Pre-Petition Indebtedness shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Credit Agreement if any of the Debtors seek, or if there is entered (i) any stay, vacatur, rescission or modification of this Interim Order or the Final Order without the prior written consent of the Required Lenders and the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Required Lenders, (ii) an order converting these Cases to cases under chapter 7 of the Bankruptcy Code or dismissing any of these Cases, or (iii) unless otherwise approved by the Required Lenders and the DIP Agent, an order granting a change of venue with respect to these Cases or any related adversary

proceeding.  If an order dismissing any of these Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims and other administrative claims granted under this Interim Order, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and all Pre-Petition Indebtedness shall have been paid and satisfied in full (and that such DIP Superpriority Claims, ABL Superpriority Claims, Term Loan Superpriority Claims, the other administrative claims granted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (y) this Court shall retain jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection incurred prior to the actual receipt of written notice by the DIP Agent or the Pre-Petition Agents, as applicable, of the effective date of such reversal, stay, modification or vacatur, or (ii) the validity, priority, or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of Collateral (including, without limitation, Cash Collateral), any DIP Obligations, or any Adequate Protection incurred by the Debtors to the DIP Agent, the DIP Lenders and/or the Pre-Petition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and/or the Pre-Petition Agents, as the case may be, of such reversal, stay, modification or

01:16263176.1

vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and pursuant to the DIP Documents with respect to all such uses of the DIP Collateral (including, without limitation, the Cash Collateral), all DIP Obligations, and all Adequate Protection.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents or as otherwise agreed by the DIP Lenders or the Pre-Petition Secured Parties, as applicable, the DIP Liens, the Superpriority Claims, the Adequate Protection, and all other rights and remedies of the DIP Agent, the DIP Lenders, or the Pre-Petition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of these Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of these Cases, or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of these Cases or approving a sale of any or all the assets of the Debtors.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any Successor Cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority Claims, and all other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, and all Pre-Petition Indebtedness are indefeasibly paid in full and discharged in accordance with the DIP

Documents (including the satisfactory cash collateralization of all issued and outstanding Letters of Credit and Roll-Up Letters of Credit in accordance with the DIP Documents) and this Interim Order.

23.     <u>Effect of Stipulations on Third Parties</u>.  The stipulations and admissions contained in this Interim Order, including, without limitation, paragraph 3 hereof (collectively, the "<u>Debtors' Stipulations</u>"), shall be binding on the Debtors in all circumstances.  The Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee (if appointed), unless, and solely to the extent that (a) any such party in interest, including the Committee (if appointed), with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations set forth in paragraph 23 hereof) against the Pre-Petition Secured Parties in connection with any matter related to the Pre-Petition Credit Documents or the Pre-Petition Collateral (a "<u>Challenge Proceeding</u>") by no later than on or before either (i) if no Committee has been appointed, the earlier of (A) 75 days from the Petition Date and (B) the date on which objections to confirmation of the Debtors' chapter 11 plan of reorganization are due, or (ii) if a Committee has been appointed, the earlier of (A) 60 days after the date of formation of such Committee, and (B) the date on which objections to confirmation of the Debtors' chapter 11 plan of reorganization are due (the "<u>Challenge Period</u>").  If no such Challenge Proceeding is timely commenced, then:  (w) any and all Challenge Proceedings by any party (including, without limitation, the Committee, any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (x) to the extent not theretofore repaid, the Pre-Petition

Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case; (y) the Pre-Petition Liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3 hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the obligations under the Pre-Petition Credit Documents and the Pre-Petition Liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by the Debtors, any committee or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto).  If any Challenge Proceeding is timely commenced, the stipulations and admissions contained in paragraph 3 of this Interim Order shall nonetheless remain binding and preclusive (as provided in this paragraph) on the Debtors, any committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Pre-Petition Credit Documents or the Pre-Petition Liens on the Pre-Petition Collateral.

24.    <u>Limitation on Use of DIP Financing Proceeds and Collateral</u>.  Notwithstanding anything contained herein or in any other order by this Court to the contrary, without the prior written consent, as applicable, of the Required Lenders and the DIP Agent or the Pre-Petition

Agents, none of the DIP Loans, the Cash Collateral, the DIP Collateral, or the Carve Out may be used to:  (a) challenge or investigate the validity, perfection, priority, extent, or enforceability of any rights or obligations arising under or related to the DIP Documents, the Pre-Petition Credit Documents, or the liens or security interest securing the obligations under any of the foregoing or to pursue any causes of action of any kind, including a Challenge Proceeding, against the Pre-Petition Secured Parties or the DIP Lenders; *provided*, *however*, that, if a Committee is appointed, not more than $25,000 in the aggregate of proceeds of the Carve Out, any Cash Collateral, or any proceeds of the DIP Facility or the DIP Collateral may be used by such Committee for purposes of such investigation; (b) object to, contest, delay, prevent, or interfere with the exercise of rights and remedies by the DIP Agent or the DIP Lenders; or (c) to make any payment of professional fees for any other constituent group, including, but not limited to, the Committee, other than solely in accordance with the Budget, the DIP Documents, and this Interim Order.

25.    Access to the Debtors; Subordination of Intercompany Indebtedness.    In accordance with the terms of the DIP Documents, the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the other Pre-Petition Secured Parties, and their respective professionals shall be afforded continued reporting as to collateral amounts and reasonable access to the DIP Collateral and the Pre-Petition Collateral and the Debtors' business premises, during normal business hours and upon reasonable advance notice, for purposes of verifying the Debtors' compliance with the terms of this Interim Order.  To the extent any Debtor owes any Indebtedness (as defined in the DIP Credit Agreement) to any other Debtor or any subsidiary or affiliate of any Debtor, such Indebtedness shall be subordinated to the DIP Obligations, and the guarantees (if any) thereof, until the DIP Obligations are indefeasibly repaid in full.

01:16263176.1

26.    <u>Modifications of DIP Documents</u>.   The Debtors and the Required Lenders are hereby authorized to implement, in accordance with the terms of the respective DIP Documents, any non-material modifications of the respective DIP Documents without further order of this Court, or any other modifications to the respective DIP Documents; *provided*, *however*, that notice of any material modification or amendment to the respective DIP Documents shall be provided to counsel to the Committee (to the extent one has been appointed), the Pre-Petition Agents, and the U.S. Trustee, each of whom shall have five (5) Business Days from the date of such notice within which to object in writing to such material modification or amendment.  If the Committee (to the extent one has been appointed), the Pre-Petition Agents, or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such material modification or amendment shall only be permitted pursuant to an order of this Court. The Debtors shall provide notice to the U.S. Trustee, the Pre-Petition Agents, and any Committee (if appointed) within five (5) Business Days following the execution of any non-material modifications to the DIP Documents.

27.    <u>Interim Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern. Any payments to be made under any order (including any "First Day" order, other than this Interim Order) of this Court shall be made in accordance with this Interim Order and the Budget.

28.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases and any Successor Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Pre-Petition Secured Parties, any Committee appointed in these Cases, and the

Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Pre-Petition Secured Parties, and the Debtors and their respective successors and assigns; *provided*, *however*, that the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan under the DIP Documents or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. § 9601 *et seq.*, as amended, or any similar federal or state statute).

      29.    <u>Proofs of Claim</u>.

      (a)    The DIP Agent and the DIP Lenders shall not be required to file proofs of claim or requests for payment of administrative expense claims in these Cases or any successor cases in order to maintain their respective claims for payment of principal or interest under the DIP Documents.  The statements of claims in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim and requests for payment of administrative expense claims in respect of such obligations and such secured status.

      (b)    The Pre-Petition ABL Facility Agent, the Pre-Petition Term Loan Agent, and the Pre-Petition Secured Lenders shall not be required to file proofs of claim or requests for payment of administrative expense claims in these Cases or any Successor Cases in order to

maintain their respective claims for payment of principal, interest, or any other obligations owing under the respective Pre-Petition Credit Documents and as set forth in this Interim Order.  The statements of claims in respect of the Pre-Petition ABL Facility Indebtedness and the Pre-Petition Term Loan Indebtedness, respectively, set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim and requests for payment of administrative expense claims in respect of such obligations and such secured status.

30.      _Effectiveness_.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable _nunc pro tunc_ to the Petition Date immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Interim Order.  Any findings of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

31.      _Retention of Jurisdiction_.  Notwithstanding any provision in the DIP Documents or Pre-Petition Credit Documents, this Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order, the DIP Facility, or the DIP Documents.

32.      _Final Hearing_.  The Final Hearing is scheduled for _____, 2014 at [_]:[_] [_].m. (ET) before this Court.  The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final

Hearing shall serve and file written objections; which objections shall be served (with a copy to the Court's chambers) no later than [_____], 2014 at [_]:[_]0 [_].m. (ET) upon:  (a) Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn:  Mark Kenney; (b)(i) proposed counsel for the Debtors, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060, Attn:  Neil E. Herman and James O. Moore, Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania 19103-2921, Attn:  Michael J. Pedrick and Justin W. Chairman, and (ii) proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn:  Robert S. Brady and M. Blake Cleary; (c)(i) counsel to certain of DIP Lenders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Joshua A. Sussberg and Yongjin Im, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Steven N. Serajeddini; (d) counsel to certain of the DIP Lenders, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn:  Richard A. Levy and Matthew L. Warren; (e) counsel to the Pre-Petition Term Loan Agent, Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067-6049, Attn:  David A. Fidler; (f) counsel to the DIP Agent, Alston & Bird LLP, 101 South Tryon Street, Suite 4000, Charlotte, North Carolina 28280-4000, Attn:  Jason J. Solomon; and (g) counsel to any official committee then appointed in these Cases.

Dated: _____, 2014

Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Budget**

# UniTek DIP Budget – Page 1

*$ in 000's*

| Week #<br>Week Ending | Actual<br>43<br>25-Oct | Fcst<br>44<br>1-Nov | Fcst<br>45<br>8-Nov | Fcst<br>46<br>15-Nov | Fcst<br>47<br>22-Nov | Fcst<br>48<br>29-Nov | Fcst<br>49<br>6-Dec | Fcst<br>50<br>13-Dec | Fcst<br>51<br>20-Dec | Fcst<br>52<br>27-Dec | Fcst<br>1.2<br>3-Jan | Fcst<br>2.2<br>10-Jan | Fcst<br>3.2<br>17-Jan | Fcst<br>4.2<br>24-Jan | Total Actual<br>+ Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BX filing | | | | | | | BX emerge | | | | | |
| **Cash Collections:** | | | | | | | | | | | | | | | |
| DSAT | 3,363 | 4,084 | 4,900 | 3,900 | 3,700 | 3,506 | 5,166 | 3,506 | 3,614 | 3,270 | 3,494 | 4,802 | 3,986 | 2,971 | 54,263 |
| FTS | 654 | 1,661 | 452 | 895 | 1,077 | 1,194 | 903 | 903 | 1,425 | 903 | 903 | 903 | 903 | 1,320 | 14,094 |
| Pinnacle | 360 | 437 | 250 | 757 | 850 | 728 | 688 | 1,157 | 1,417 | 1,577 | 1,252 | 753 | 1,446 | 1,050 | 12,723 |
| Other | 4 | - | - | - | - | - | - | - | - | - | - | - | - | - | 4 |
| Total Cash Collections | 4,382 | 6,182 | 5,602 | 5,552 | 5,627 | 5,428 | 6,757 | 5,565 | 6,456 | 5,750 | 5,649 | 6,458 | 6,334 | 5,341 | 81,084 |
| | | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| *G&A Accounts Payable* | | | | | | | | | | | | | | | |
| Legal & Ordinary Course Professional Fees | 50 | 81 | 75 | 60 | 150 | 175 | 75 | 175 | 75 | 175 | 75 | 175 | 75 | 75 | 1,491 |
| Insurance (Commercial & Healthcare) | 202 | 1,675 | 803 | 290 | 438 | 463 | 1,001 | 394 | 396 | 609 | 402 | 293 | 297 | 301 | 7,564 |
| D&O $40MM Tail Policy (6 Years) | - | - | - | - | 650 | - | - | - | - | - | - | - | - | - | 650 |
| Rent & Utilities | 54 | 6 | 610 | - | - | - | 610 | - | - | - | - | 610 | - | - | 1,890 |
| Other Core Services | 120 | 142 | 130 | 130 | 130 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 1,678 |
| Other A/P & Other Payments | 289 | 456 | 200 | 160 | 190 | 184 | 184 | 184 | 184 | 184 | 184 | 184 | 184 | 184 | 2,951 |
| Sub-Total | 716 | 2,360 | 1,818 | 640 | 1,558 | 936 | 1,984 | 867 | 769 | 1,082 | 775 | 1,376 | 670 | 674 | 16,225 |
| | | | | | | | | | | | | | | | |
| *Business Unit Accounts Payable* | | | | | | | | | | | | | | | |
| Fleet Related A/P (Maintenance & Fuel) | 196 | 196 | 732 | 830 | 230 | 250 | 250 | 877 | 450 | 250 | 250 | 877 | 450 | 250 | 6,087 |
| Pinnacle AP | 493 | 149 | 463 | 488 | 770 | 488 | 656 | 310 | 310 | 310 | 348 | 574 | 574 | 574 | 6,507 |
| DSAT AP | 72 | 91 | 100 | 170 | 100 | 87 | 86 | 83 | 83 | 83 | 83 | 79 | 78 | 78 | 1,274 |
| FTS AP | 9 | 48 | 50 | 10 | 50 | 40 | 40 | 41 | 41 | 41 | 41 | 48 | 49 | 49 | 556 |
| Sub-Total | 770 | 484 | 1,345 | 1,498 | 1,150 | 865 | 1,033 | 1,311 | 884 | 684 | 722 | 1,578 | 1,151 | 951 | 14,425 |
| | | | | | | | | | | | | | | | |
| *Payroll Processed with ADP* | | | | | | | | | | | | | | | |
| Salaried & Hourly Staff | 5,204 | 3 | 5,833 | - | 5,298 | - | 5,350 | - | 5,214 | - | 5,158 | - | 5,226 | - | 37,285 |
| Fulfillment Subcontractors | 1,288 | 1,175 | 1,175 | 1,175 | 1,150 | 1,051 | 1,051 | 1,051 | 1,025 | 989 | 989 | 989 | 1,112 | 910 | 15,130 |
| Sub-Total | 6,492 | 1,178 | 7,008 | 1,175 | 6,448 | 1,051 | 6,401 | 1,051 | 6,240 | 989 | 6,146 | 989 | 6,338 | 910 | 52,415 |
| | | | | | | | | | | | | | | | |
| Total Operating Disbursements | 7,978 | 4,021 | 10,171 | 3,313 | 9,156 | 2,852 | 9,418 | 3,229 | 7,893 | 2,755 | 7,643 | 3,943 | 8,159 | 2,535 | 83,065 |
| | | | | | | | | | | | | | | | |
| Operating Cash Flow | (3,596) | 2,161 | (4,568) | 2,239 | (3,529) | 2,576 | (2,662) | 2,337 | (1,437) | 2,995 | (1,994) | 2,515 | (1,825) | 2,806 | (1,981) |

# UniTek DIP Budget – Page 2

*$ in 000's*

| Week #<br>Week Ending | Actual<br>43<br>25-Oct | Fcst<br>44<br>1-Nov | Fcst<br>45<br>8-Nov<br>BX filing | Fcst<br>46<br>15-Nov | Fcst<br>47<br>22-Nov | Fcst<br>48<br>29-Nov | Fcst<br>49<br>6-Dec | Fcst<br>50<br>13-Dec | Fcst<br>51<br>20-Dec | Fcst<br>52<br>27-Dec<br>BX emerge | Fcst<br>1,2<br>3-Jan | Fcst<br>2,2<br>10-Jan | Fcst<br>3,2<br>17-Jan | Fcst<br>4,2<br>24-Jan | Total Actual<br>+ Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restructuring Disbursements** | | | | | | | | | | | | | | | |
| Debtor Professional Fees | 7 | - | 2,667 | - | - | - | - | - | 14 | 1,962 | - | - | - | - | 4,650 |
| Creditor Professional Fees | 78 | - | 949 | 190 | 190 | 190 | 190 | 180 | 180 | 615 | - | - | - | - | 2,762 |
| Pre/Post Filing Disbursements | - | - | 4,575 | - | - | - | - | - | - | 5,185 | - | - | - | - | 9,760 |
| Utilities Deposits | - | - | 214 | - | - | - | - | - | - | - | - | - | - | - | 214 |
| KEIP/KERP | - | - | - | - | - | - | 180 | - | - | 730 | - | - | - | - | 910 |
| Non-Debtor (Canada) Prefunding | - | - | 350 | - | - | - | - | - | - | - | - | - | - | - | 350 |
| Insurance Renewal | - | - | - | - | - | - | - | - | - | - | 3,100 | - | - | - | 3,100 |
| Other Restructuring | - | - | - | - | - | - | - | - | 1,200 | - | - | - | - | - | 1,200 |
| Total Restructuring Disbursements | 85 | - | 8,755 | 190 | 190 | 190 | 370 | 180 | 1,394 | 8,492 | 3,100 | - | - | - | 22,946 |
| | | | | | | | | | | | | | | | |
| **Financing Disbursements** | | | | | | | | | | | | | | | |
| Interest Expense & Fees | - | 685 | 455 | - | - | - | 668 | - | - | - | 734 | - | - | - | 2,543 |
| Capital Lease Payments | 144 | - | - | 250 | - | - | - | 250 | - | - | - | 250 | - | - | 894 |
| Total Financing Disbursements | 144 | 685 | 455 | 250 | - | - | 668 | 250 | - | - | 734 | 250 | - | - | 3,437 |
| | | | | | | | | | | | | | | | |
| Cash Flow | (3,825) | 1,476 | (13,779) | 1,799 | (3,719) | 2,386 | (3,700) | 1,907 | (2,831) | (5,497) | (5,828) | 2,265 | (1,825) | 2,806 | (28,364) |
| | | | | | | | | | | | | | | | |
| ABL Beginning Balance | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 |
| ABL Draw/(Repayment) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ABL Ending Balance | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 | 38,731 |
| | | | | | | | | | | | | | | | |
| Beginning Last Out ABL Balance | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 |
| Last Out ABL Draw/(Repayment) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Last Out ABL Balance | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 | 8,674 |
| | | | | | | | | | | | | | | | |
| Beginning DIP/Exit Loan Balance | - | - | - | 13,500 | 13,500 | 13,500 | 16,500 | 16,500 | 16,500 | 16,500 | 29,000 | 42,800 | 42,800 | 42,800 | - |
| DIP/Exit Loan Draw/(Repayment) | - | - | 13,500 | - | - | 3,000 | - | - | - | 12,500 | 13,800 | - | - | - | 42,800 |
| Ending DIP/Exit Loan Balance | - | - | 13,500 | 13,500 | 13,500 | 16,500 | 16,500 | 16,500 | 16,500 | 29,000 | 42,800 | 42,800 | 42,800 | 42,800 | 42,800 |
| | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 6,217 | 2,392 | 3,868 | 3,589 | 5,388 | 1,670 | 7,056 | 3,356 | 5,262 | 2,432 | 9,434 | 17,407 | 19,672 | 17,847 | 6,217 |
| Cash Flow | (3,825) | 1,476 | (13,779) | 1,799 | (3,719) | 2,386 | (3,700) | 1,907 | (2,831) | (5,497) | (5,828) | 2,265 | (1,825) | 2,806 | (28,364) |
| Draw/(Repayment) | - | - | 13,500 | - | - | 3,000 | - | - | - | 12,500 | 13,800 | - | - | - | 42,800 |
| Ending Cash Balance - Bank | 2,392 | 3,868 | 3,589 | 5,388 | 1,670 | 7,056 | 3,356 | 5,262 | 2,432 | 9,434 | 17,407 | 19,672 | 17,847 | 20,653 | 20,653 |
| | | | | | | | | | | | | | | | |
| Beginning Float | 1,531 | 1,005 | 1,242 | 69 | 709 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 1,531 |
| Checks issued | 579 | 1,250 | 56 | 1,000 | 800 | - | - | - | - | - | - | - | - | - | 3,685 |
| Checks cleared | (1,105) | (1,012) | (1,230) | (360) | (990) | - | - | - | - | - | - | - | - | - | (4,697) |
| Ending Float | 1,005 | 1,242 | 69 | 709 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 |
| Ending Cash Balance - Book | 1,387 | 2,625 | 3,520 | 4,679 | 1,151 | 6,537 | 2,837 | 4,744 | 1,913 | 8,916 | 16,888 | 19,153 | 17,328 | 20,134 | 20,134 |

**EXHIBIT B**

DEBTOR-IN-POSSESSION CREDIT

AND

SECURITY AGREEMENT

Dated as of November [●], 2014

among


UNITEK GLOBAL SERVICES, INC., UNITEK ACQUISITION, INC.,
PINNACLE WIRELESS USA, INC., UNITEK USA, LLC,
ADVANCED COMMUNICATIONS USA, INC.,
DIRECTSAT USA, LLC, and FTS USA, LLC
(each as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code),
as Borrowers

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Agent for Lenders

# Table of Contents

**Page**

I.    DEFINITIONS.................................................................................................1

    1.1    Accounting Terms...............................................................................1
    1.2    General Terms.....................................................................................1
    1.3    Uniform Commercial Code Terms....................................................33
    1.4    Certain Matters of Construction.......................................................34
    1.5    Accounting Change...........................................................................35
    1.6    Certain Bankruptcy Matters.............................................................35
    1.7    ...........................................................................................................35

II.    COMMITMENTS AND FACILITIES.......................................................36

    2.1    Advances...........................................................................................36
    2.2    Procedure for Requesting Advances; Procedures for Selection of
        Applicable Interest Rates..................................................................37
    2.3    Disbursement of Advance Proceeds.................................................40
    2.4    [(Intentionally Omitted].....................................................................40
    2.5    Maximum Advances..........................................................................40
    2.6    Repayment of Advances....................................................................40
    2.7    Repayment of Excess Advances.......................................................41
    2.8    Statement of Account........................................................................41
    2.9    Letters of Credit................................................................................42
    2.10   Issuance of Letters of Credit and Roll-Up Letters of Credit............42
    2.11   Requirements For Issuance of Letters of Credit...............................44
    2.12   Disbursements, Reimbursement.......................................................45
    2.13   Repayment of Participation Advances..............................................48
    2.14   Documentation..................................................................................49
    2.15   Determination to Honor Drawing Request........................................49
    2.16   Nature of Participation and Reimbursement Obligations..................49
    2.17   Indemnity..........................................................................................51
    2.18   Liability for Acts and Omissions......................................................52
    2.19   Additional Payments.........................................................................53
    2.20   Manner of Borrowing and Payment..................................................53
    2.21   Voluntary Prepayments, Voluntary Commitment Reductions, Mandatory
        Prepayments......................................................................................55
    2.22   Use of Proceeds.................................................................................57
    2.23   Defaulting Lender..............................................................................57
    2.24   Bankruptcy Matters...........................................................................61

III.   INTEREST AND FEES.............................................................................62

    3.1    Interest...............................................................................................62
    3.2    Letter of Credit Fees.........................................................................62
    3.3    Facility Fee........................................................................................64

3.4     Other Fees and Fee Letter ..................................................................64
3.5     Computation of Interest and Fees .........................................................65
3.6     Maximum Charges ..............................................................................65
3.7     Increased Costs ..................................................................................65
3.8     Basis For Determining Interest Rate Inadequate or Unfair .....................66
3.9     Capital Adequacy ...............................................................................66
3.10    Gross Up for Taxes .............................................................................67
3.11    Withholding Tax Exemption ................................................................67

IV.     COLLATERAL: GENERAL TERMS ...................................................68

4.1     Security Interest in the Collateral .......................................................68
4.2     Perfection of Security Interest ............................................................69
4.3     Disposition of Collateral ....................................................................69
4.4     Preservation of Collateral ...................................................................69
4.5     Ownership of Collateral and Assets .....................................................70
4.6     Defense of Agent's and Lenders' Interests ............................................70
4.7     Books and Records .............................................................................71
4.8     Financial Disclosure ...........................................................................71
4.9     Compliance with Laws ........................................................................72
4.10    Inspection of Premises and Inspections/Evaluation of Collateral.............72
4.11    Insurance ..........................................................................................72
4.12    Failure to Pay Insurance .....................................................................73
4.13    Payment of Taxes ...............................................................................73
4.14    Payment of Leasehold Obligations .......................................................74
4.15    Receivables .......................................................................................74
4.16    Inventory ..........................................................................................78
4.17    Maintenance of Equipment .................................................................78
4.18    Exculpation of Liability ......................................................................78
4.19    Environmental Matters .......................................................................78
4.20    Financing Statements .........................................................................80

V.      REPRESENTATIONS AND WARRANTIES..........................................80

5.1     Authority ...........................................................................................80
5.2     Formation and Qualification; Inactive Subsidiaries; Foreign Subsidiaries ...........81
5.3     Survival of Representations and Warranties............................................81
5.4     Tax Returns .......................................................................................81
5.5     Financial Statements ..........................................................................82
5.6     Entity Names......................................................................................82
5.7     OSHA and Environmental Compliance..................................................83
5.8     No Litigation, Violation, Indebtedness or Default; ERISA Compliance.............83
5.9     Patents, Trademarks, Copyrights and Licenses ......................................84
5.10    Licenses and Permits..........................................................................85
5.11    Chapter 11 Cases ...............................................................................85
5.12    No Default..........................................................................................85
5.13    No Burdensome Restrictions ...............................................................85
5.14    No Labor Disputes ..............................................................................85
5.15    Margin Regulations.............................................................................85

5.16    Investment Company Act .................................................................86
5.17    Disclosure .......................................................................................86
5.18    Perfection of Security Interests .......................................................86
5.19    Swaps ..............................................................................................86
5.20    Conflicting Agreements ...................................................................86
5.21    Application of Certain Laws and Regulations ................................86
5.22    Business and Property of Borrowers ...............................................86
5.23    Obligations as Administrative Superpriority Expense Claims .........86
5.24    Anti-Terrorism Laws .......................................................................87
5.25    Trading with the Enemy ...................................................................87
5.26    [RESERVED] ...................................................................................87
5.27    Equity Interests ...............................................................................88
5.28    Commercial Tort Claims ..................................................................88
5.29    Letter of Credit Rights .....................................................................88
5.30    Material Contracts ..............................................**Error! Bookmark not defined.**
5.31    Prepetition Obligations and Prepetition Liens. ...............................88
5.32    Material Adverse Effect ...................................................................88

VI.     . Since the Petition Date, there shall not have occurred any event, condition or
        state of facts which could reasonably be expected to have a Material Adverse
        Effect.AFFIRMATIVE COVENANTS .................................................88

6.1     Payment of Fees ..............................................................................88
6.2     Conduct of Business and Maintenance of Existence and Assets .........89
6.3     Violations ........................................................................................89
6.4     Government Receivables ..................................................................89
6.5     [Reserved] ........................................................................................89
6.6     Execution of Supplemental Instruments ..........................................89
6.7     Payment of Indebtedness .................................................................89
6.8     Standards of Financial Statements ..................................................90
6.9     Financing Orders .............................................................................90
6.10    Budget. .............................................................................................90
6.11    Ratification of Deposit Account Control Agreements ......................92
6.12    Roll-Up Letters of Credit .................................................................93
6.13    DIP Covenants. ................................................................................93
6.14    Business Separation Covenants. ......................................................94

VII.    NEGATIVE COVENANTS. ..............................................................94

7.1     Merger, Consolidation, Acquisition and Sale of Assets ..................94
7.2     Creation of Liens .............................................................................95
7.3     Guarantees .......................................................................................95
7.4     Investments ......................................................................................95
7.5     Loans ................................................................................................95
7.6     Certain Activities in the Chapter 11 Cases .....................................95
7.7     Dividends .........................................................................................96
7.8     Indebtedness .....................................................................................96
7.9     Nature of Business ...........................................................................97
7.10    Transactions with Affiliates .............................................................97

7.11    Leases ................................................................................97
7.12    Subsidiaries ........................................................................97
7.13    Fiscal Year and Accounting Changes ................................98
7.14    Pledge of Credit .................................................................99
7.15    Amendment of Organizational Documents .......................99
7.16    Compliance with ERISA ...................................................99
7.17    Prepayment of Indebtedness; Earn-Outs ...........................99
7.18    Anti-Terrorism Laws .......................................................100
7.19    Restrictive Agreements ....................................................100
7.20    Trading with the Enemy Act ............................................100
7.21    Subordinated Debt ...........................................................100
7.22    Amendments to Pre-Petition Debt Documents .................100
7.23    Amendment of DIRECTV Documents ..............................100
7.24    Use of Collateral .............................................................101

VIII.    CONDITIONS PRECEDENT. ......................................................101

8.1    Conditions to Initial Advances .......................................101
8.2    Conditions to Each Advance ...........................................105

IX.    INFORMATION AS TO BORROWERS. .....................................106

9.1    Disclosure of Material Matters .......................................106
9.2    Schedules .........................................................................106
9.3    Environmental Reports ....................................................106
9.4    Litigation .........................................................................106
9.5    Material Occurrences .......................................................107
9.6    Government Receivables ..................................................107
9.7    Annual Financial Statements ...........................................107
9.8    Quarterly Financial Statements .......................................108
9.9    Monthly Financial Statements .........................................108
9.10    Other Reports ...................................................................108
9.11    Additional Information .....................................................108
9.12    Projected Operating Budget .............................................109
9.13    Pleadings .........................................................................109
9.14    Notice of Suits, Adverse Events ......................................109
9.15    ERISA Notices and Requests ...........................................109
9.16    Additional Documents ......................................................110

X.    EVENTS OF DEFAULT. ............................................................110

10.1    Nonpayment .....................................................................110
10.2    Breach of Representation ..................................................110
10.3    Financial Information .......................................................111
10.4    Judicial Actions ...............................................................111
10.5    Noncompliance .................................................................111
10.6    Judgments ........................................................................111
10.7    Bankruptcy Case Events ..................................................111
10.8    Subsidiary Bankruptcy .....................................................113
10.9    Material Adverse Effect ....................................................113

10.10 Lien Priority ........................................................................................113
10.11 Cross Default ........................................................................................114
10.12 Breach of Guaranty or Pledge Agreement ...........................................114
10.13 Change of Control ................................................................................114
10.14 Invalidity ..............................................................................................114
10.15 Licenses ................................................................................................114
10.16 Seizures ................................................................................................114
10.17 Operations ............................................................................................115
10.18 Pension Plans .......................................................................................115
10.19 HSP Agreement ....................................................................................115
10.20 Plan Support Agreement ......................................................................115
10.21 ERISA 115

XI.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. ...................116

11.1   Rights and Remedies ............................................................................116
11.2   Agent's Discretion ...............................................................................117
11.3   Setoff ....................................................................................................117
11.4   Rights and Remedies not Exclusive .....................................................118
11.5   Allocation of Payments After Event of Default ...................................118

XII.   WAIVERS AND JUDICIAL PROCEEDINGS. .........................................119

12.1   Waiver of Notice ..................................................................................119
12.2   Delay ....................................................................................................119
12.3   Jury Waiver ..........................................................................................119

XIII.  EFFECTIVE DATE AND TERMINATION. ..............................................120

13.1   Term .....................................................................................................120
13.2   Termination ..........................................................................................120
13.3   One Month Extension Option ..............................................................120
13.4   Two Month Extension Option ..............................................................121

XIV.   REGARDING AGENT. ..............................................................................121

14.1   Appointment .........................................................................................121
14.2   Nature of Duties ...................................................................................122
14.3   Lack of Reliance on Agent and Resignation ........................................123
14.4   Certain Rights of Agent ........................................................................124
14.5   Reliance ................................................................................................125
14.6   Notice of Default ..................................................................................125
14.7   Indemnification .....................................................................................125
14.8   Agent in its Individual Capacity ..........................................................125
14.9   Delivery of Documents ........................................................................126
14.10  Borrowers' Undertaking to Agent ........................................................126
14.11  No Reliance on Agent's Customer Identification Program ...................126
14.12  Other Agreements .................................................................................126

XV.    BORROWING AGENCY. ...........................................................................126

15.1   Borrowing Agency Provisions ..............................................................126

15.2    Waiver of Subrogation ........................................................................127

XVI.    MISCELLANEOUS. ............................................................................128

16.1    Governing Law ....................................................................................128
16.2    Entire Understanding ..........................................................................128
16.3    Successors and Assigns; Participations; New Lenders.......................130
16.4    Application of Payments .....................................................................132
16.5    Indemnity .............................................................................................132
16.6    Notice ...................................................................................................133
16.7    Survival ................................................................................................135
16.8    Severability ..........................................................................................135
16.9    Expenses ..............................................................................................135
16.10   Injunctive Relief...................................................................................135
16.11   Consequential Damages ......................................................................135
16.12   Captions ...............................................................................................135
16.13   Counterparts; Facsimile Signatures ....................................................136
16.14   Construction .........................................................................................136
16.15   Confidentiality; Sharing Information...................................................136
16.16   Publicity ...............................................................................................136
16.17   Certifications From Banks and Participants; USA PATRIOT Act.....................136

EXHIBITS

Exhibit 1.2(a)    -    Form of Compliance Certificate
Exhibit 1.2(b)    -    Form of Interim Financing Order
Exhibit 2.1(a)    -    Form of Initial Commitment Note
Exhibit 2.1(b)    -    Form of Revolving Credit Note
Exhibit 2.1 (c)    -    Form of L/C Commitment Note
Exhibit 2.1 (d)    -    Form of Roll-Up Note
Exhibit 5.5(b)    -    Projections
Exhibit 16.3    -    Form of Commitment Transfer Supplement

01:16263179.1

DEBTOR-IN-POSSESSION CREDIT

AND

SECURITY AGREEMENT

Debtor-in-Possession Credit and Security Agreement dated as of November [●], 2014, among UNITEK GLOBAL SERVICES, INC., a corporation organized under the laws of the State of Delaware ("UniTek Parent"), UNITEK ACQUISITION, INC., a corporation organized under the laws of the State of Delaware ("UniTek Acquisition"),  PINNACLE WIRELESS USA, INC., a corporation organized under the laws of the State of Delaware ("Pinnacle"), UNITEK USA, LLC, a limited liability company organized under the laws of the State of Delaware ("UniTek USA"), ADVANCED COMMUNICATIONS USA, INC., a corporation organized under the laws of the State of Delaware ("Advanced Communications"), DIRECTSAT USA, LLC, a limited liability company organized under the laws of the State of Delaware ("DirectSat"), and FTS USA, LLC, a limited liability company organized under the laws of the State of Delaware ("FTS"), each as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (UniTek Parent, UniTek Acquisition, Pinnacle, UniTek USA, Advanced Communication, DirectSat, FTS and each Person joined hereto as a borrower from time to time, collectively, the "Borrowers", and each a "Borrower"), the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and each individually a "Lender") and WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative and collateral agent for Lenders (in such capacity, the "Agent").

IN CONSIDERATION of the mutual covenants and undertakings herein contained, Borrowers, Lenders and Agent hereby agree as follows:

## I.    DEFINITIONS.

1.1    Accounting Terms.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP; provided, however, that, notwithstanding anything to the contrary herein, all accounting or financial terms used herein shall be construed, and all financial computations pursuant hereto shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar effect) to value any Indebtedness or other liabilities of any Borrower at "fair value," as defined therein.

1.2    General Terms.  For purposes of this Agreement the following terms shall have the following meanings:

"Accountants" shall have the meaning set forth in Section 9.7 hereof.

"Adequate Protection Liens" shall have the meaning set forth in the Financing Orders.

"Advances" shall mean and include the Initial Commitment Advances, L/C Commitment Advances, Revolving Advances, Roll-Up Advances, Participation Advances, L/C Participation Advances and Roll-Up Participation Advances.

"Affiliate" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, manager, member, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 10% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Agreement" shall mean this Debtor-in-Possession Revolving Credit and Security Agreement, as it may be amended, modified, supplemented, restated or replaced from time to time.

"AIC" shall mean Apollo Investment Corporation and all of its successors and assigns.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the highest of (i) the Base Rate in effect on such day, (ii) the Federal Funds Open Rate in effect on such day plus one half of one-percent (0.50%), and (iii) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.00%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

"Anti-Terrorism Laws" shall mean any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Applicable Margin" shall mean (a) for Advances and the Revolving Letter of Credit Fees, the applicable percentage specified below:

01:16263179.1

| APPLICABLE MARGINS FOR DOMESTIC RATE LOANS | APPLICABLE MARGINS FOR EURODOLLAR RATE LOANS | APPLICABLE MARGIN FOR LETTERS OF CREDIT |
|:---:|:---:|:---:|
| 7.50% | 8.50% | 8.00% |

; and (b) for Roll-Up Letter of Credit Fees, 9.00% per annum.

"Avoidance Actions" means avoidance actions or causes of action under Chapter 5 of the Bankruptcy Code.

"Authority" shall have the meaning set forth in Section 4.19(d) hereof.

"BAML" shall mean Bank of America, N.A.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

"Base Rate" shall mean the "prime rate" of BAML as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by BAML as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by BAML to any particular class or category of customers of BAML.

"Benefited Lender" shall have the meaning set forth in Section 2.20(d) hereof.

"Blocked Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Blocked Account Bank" shall have the meaning set forth in Section 4.15(h) hereof.

"Blocked Person" shall have the meaning set forth in Section 5.24(b) hereof.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a Consolidated Basis" shall mean the consolidation in accordance with GAAP of the accounts or other items of the Borrowers and their respective Subsidiaries.

"Borrowers' Account" shall have the meaning set forth in Section 2.8 hereof.

"Borrowing Agent" shall mean UniTek Parent.

01:16263179.1

"Budget" shall mean the initial thirteen (13) week budget forecast to be delivered to Agent and Lenders in accordance with Section 6.10 hereof, setting forth (i) projected weekly cash receipts of the Debtors and their Subsidiaries for each week for the 13-week period commencing with the week during which the Petition Date occurs and (ii) projected weekly cash disbursements and weekly cash operating disbursements for each week during such 13-week period.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in New York, New York or Wilmington, Delaware and, if the applicable Business Day relates to any Eurodollar Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" shall have the meaning set forth in the Financing Orders.

"Cash Collateral Account" shall mean account number 8026559714 at PNC in the name "Unitek Global Services, Inc.", which account is subject to the control of the Pre-Petition ABL Agent.

"Cash Collateral Event" shall mean (a) any of the Chapter 11 Cases has converted to a chapter 7 case, or (b) a liquidation or sale process has commenced with respect to all or substantially all of the Debtors' assets (whether by voluntary action by the debtor or as a result of the exercise of remedies (including foreclosure) by the Agent and/or Lenders under this Agreement, the Other Documents and/or the Financing Orders).

"Cash Equivalents" shall mean (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Financial Services LLC ("S&P") or P-1 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of

01:16263179.1

not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Order" shall mean an order entered by the Bankruptcy Court in the Chapter 11 Cases relating to that certain Debtor's Motion for Entry of Order (I) approving continued use of cash management system, (II) authorizing the continuation of intercompany transactions, (III) granting administrative priority status to post-petition intercompany transactions, (IV) authorizing use of prepetition bank accounts, and (V) waiving the requirements of 11 U.S.C. §345(b) on an interim basis.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Cetus" shall mean Cetus Capital II, LLC.

"Change in Law" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Applicable Law, (b) any change in any Applicable Law or in the administration, interpretation or application thereof by any Governmental Body or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Body; provided however, for purposes of this Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines and directives in connection therewith are deemed to have gone into effect and adopted after the date of this Agreement, and provided further, for purposes of Section 3.9, all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or the United States financial regulatory authorities with respect to capital adequacy shall be deemed to be a Change in Law regardless of the date adopted, issued, promulgated or implemented.

"Change of Control" shall mean, except to the extent such event occurs pursuant to the Plan of Reorganization, (a) [reserved], (b) the occurrence of any event (whether in one or more transactions) which results in any Borrower other than UniTek Parent ceasing to be a 100% wholly-owned direct or indirect Subsidiary of UniTek Parent, (c) occupation of a majority of the seats (other than vacant seats) on the board of directors of UniTek Parent by Persons who are not continuing directors. For purposes of this definition, "continuing directors" shall mean members of the board of directors of each UniTek Parent on the Closing Date and any future member of

such board of directors that is nominated for election to such board of directors by at least a majority of the then continuing directors.

"Chapter 11 Cases" shall mean the cases commenced by the Borrowers under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean November __, 2014, or such other date as may be agreed to by the parties hereto, on which all conditions precedent to the making of the Initial Advances hereunder shall have been satisfied or waived in accordance with the terms hereof.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include, collectively, any and all assets of each Debtor's estate and any and all assets belonging to each Guarantor, whether real, personal, or mixed and wherever located, of any kind, nature or description, in each case whether now existing or hereafter arising or created and whether now owned or hereafter acquired and wherever located, including any such property in which a lien is granted to the Agent pursuant to the Other Documents, the Financing Orders, or any other order entered by the Bankruptcy Court to secure the Obligations, and shall include, without limitation:

> (i)     all Receivables and all supporting obligations relating thereto;

> (ii)    all Equipment (including motor vehicles), goods, Inventory (excluding DIRECTV Inventory) and fixtures;

> (iii)   all Instruments and chattel paper;

> (iv)    all Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing);

> (v)     all Securities Collateral;

> (vi)    all Investment Property;

> (vii)   all Intellectual Property;

> (viii)  the Commercial Tort Claims

(ix)    all General Intangibles;

(x)    all Depository Accounts;

(xi)    all Supporting Obligations

(xii)    all books and records pertaining to the Collateral;

(xiii)    all present and future claims, rights, interests, assets and properties recovered by or on behalf of Debtors or any trustee of any Debtor (whether in the Chapter 11 Cases or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all such property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, Sections 542, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code, subject to the terms of the Financing Orders;

(xiv)    all cash (including all cash held in the Cash Collateral Account);

(xv)    to the extent not covered by clauses (i) through (xv) of this sentence, choses in action and all other personal property of the Debtors, whether tangible or intangible; and

(xvi)    all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtors from time to time with respect to any of the foregoing. It is the intention of the parties that if Agent shall fail to have a perfected Lien in any particular property or assets of any Borrower or any Guarantor for any reason whatsoever, but the provisions of this Agreement and/or of the Other Documents, together with all financing statements and other public filings relating to Liens filed or recorded by Agent against Borrowers or Guarantors, would be sufficient to create a perfected Lien in any property or assets that such Borrower or such Guarantor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the Collateral.

All capitalized terms used in this definition and not defined have the meanings assigned to them in the UCC.

"Commitment" shall mean any of the Initial Commitments, the Revolving Commitments, the L/C Commitments and the Roll-Up Commitments, and "Commitments" shall mean the Initial Commitments, the Revolving Commitments, the L/C Commitments and the Roll-Up Commitments, collectively.

"Commitment Percentage" of any Lender shall mean, as applicable, the Initial Commitment Percentage, the Revolving Commitment Percentage, the L/C Commitment Percentage and the Roll-Up Commitment Percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by or to a Lender pursuant to Section 16.3(c) or (d) hereof.    A Lender's Initial Commitment Percentage, Revolving Commitment Percentage and L/C Commitment Percentage shall be the same (taking into account

the applicable Commitments of it and its Affiliates) and no Lender may assign such Commitments other than on a pro rata basis (except to its Affiliates).

"Commitment Termination Date" shall have the meaning set forth in Section 13.1 hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 16.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

"Committee" means an official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code.

"Compliance Certificate" shall mean a compliance certificate substantially in the form attached hereto as Exhibit 1.2(a) to be signed by the Chief Financial Officer or Controller of Borrowing Agent, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, (a) no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such default and, such certificate shall have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 7.4, 7.5, 7.7 and 7.8; and (b) that to the best of such officer's knowledge, each Borrower is in compliance in all material respects with all federal, state and local Environmental Laws, or if such is not the case, specifying all areas of non-compliance and the proposed action such Borrower will implement in order to achieve full compliance.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, and the Other Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"Contract Rate" shall have the meaning set forth in Section 3.1 hereof.

"Controlled Group" shall mean, at any time, each Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.11(b) hereof.

"Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the Reserve Percentage.

"Debtor" shall mean collectively, the Borrowers and any Guarantor.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall mean (I) in respect of Initial Commitments or Initial Commitment Advances, Revolving Commitments or Revolving Advances and L/C Commitments or L/C Commitment Advances, any Lender holding such Commitments or Advances that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans in respect of Initial Commitments, Revolving Commitments or L/C Commitments, (ii) fund any portion of its participations in Letters of Credit or the WTC Letter of Credit or (iii) pay over to Agent, the Issuer or any Lender any other amount required to be paid by it in respect of Initial Commitments or Initial Commitment Advances, Revolving Commitments or Revolving Advances and L/C Commitments or L/C Commitment Advances hereunder, unless, in the case of clause (i) above, such Lender notifies the Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified Borrowers or Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement in respect of Initial Commitments, Revolving Commitments or L/C Commitments (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding such a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within two Business Days after request by Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans and participations in then outstanding Letters of Credit and the WTC Letter of Credit under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Agent's receipt of such certification in form and substance satisfactory to the Agent, (d) has become the subject of a Bankruptcy Event or (e) has failed at any time to comply with the provisions of Section 2.22(d) with respect to purchasing participations from the other Lenders, whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its ratable share of such payments due and payable to all of the Lenders; and (II) in respect of Roll-Up Commitments or Roll-Up Advances, any Lender holding such Commitments or Advances that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its loans in respect of Roll-Up Commitments or Roll-Up Advances, (ii) fund any portion of its participations in the Roll-Up Letters of Credit or (iii) pay over to Agent or any Lender any other amount required to be paid by it in respect of Roll-Up Commitments or Roll-Up Advances hereunder, unless, in the case of clause (i) above, such Lender notifies the Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to

funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified Borrowers or Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement in respect of Roll-Up Commitments (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding such a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within two Business Days after request by Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans and participations in then outstanding Roll-Up Letters of Credit under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Agent's receipt of such certification in form and substance satisfactory to the Agent, (d) has become the subject of a Bankruptcy Event or (e) has failed at any time to comply with the provisions of Section 2.22(d) with respect to purchasing participations from the other Lenders, whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its ratable share of such payments due and payable to all of the Lenders.

As used in this definition and in Section 2.23, the term "Bankruptcy Event" means, with respect to any Person, such Person or such Person's direct or indirect parent company becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Depository Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Depository Account Bank" shall have the meaning set forth in Section 4.15(h) hereof.

"Designated Lender" shall have the meaning set forth in Section 16.3(g) hereof.

"Determining Lenders" shall mean at any time, collectively, (a) so long as AIC or any of its affiliates is a Lender hereunder, AIC, and (b) of the Lenders that are party to the Plan Support Agreement and are Pre-Petition Term Lenders, such Lenders holding at least 50.1% in principal amount of the aggregate amount of the claims held by those Pre-Petition Term Lenders who are Lenders hereunder and party to the Plan Support Agreement (it being understood that any reference herein to "each Determining Lender" (or words of similar effect) shall mean each of (x) AIC and (y) collectively, the Lenders described in clause (b); provided, however, that any reference herein to "any Determining Lender" (or words of similar effect) shall mean any of (x)

AIC, (y) NMC, or (z) Cetus, in each case so long as it or any of its Affiliates is a Lender hereunder).

"DIP Orders" shall mean collectively, the Financing Orders.

"DIP Superpriority Claim" means the allowed superpriority administrative expense claim granted to the Agent and the Lenders in each of the Chapter 11 Cases or Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and other claims against the Loan Parties or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered by the Bankruptcy Court pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Permanent Financing Order), 507(a), 507(b) (except as set forth in the Financing Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code or otherwise under Section 364(c)(1) of the Bankruptcy Code, which shall at all times be senior to the rights of the Loan Parties and their estates, and any successor trustee or other estate representative; provided, however, that, subject to entry of the Permanent Financing Order, the DIP Superpriority Claim shall attach to the proceeds of Avoidance Actions; provided, further, that the DIP Superpriority Claim shall be subject to Permitted Encumbrances and the Carve-Out.

"DIP Transactions" shall mean, collectively, the transactions contemplated under the Agreement to occur on the Closing Date, including the making of the Obligations and the payment of all fees, costs and expenses of the Agent and the Lenders to be paid in connection with the foregoing.

"DirectSat Business" shall mean the assets, liabilities and contractual rights and obligations relating to the business division of the Borrowers and their Subsidiaries which provides fulfillment installation, upgrade and maintenance services for satellite content providers, including DIRECTV.

"DirectSat Subsidiaries" shall mean DirectSat and each other Subsidiary (if any) of the Borrowers engaged primarily or exclusively in the DirectSat Business (and for the avoidance of doubt excluding Other Entities and UniTek Parent).

"DIRECTV Inventory" shall mean all Inventory purchased by any Borrower pursuant to and in connection with the HSP Agreement that is subject to a Lien in favor of DIRECTV, Inc. created under the HSP Agreement and in which, pursuant to the terms and conditions of the HSP Agreement, no Liens may be created in favor of any Person other than DIRECTV, Inc.

"Disqualified Capital Stock" with respect to any Person, shall mean any Equity Interests of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Equity Interests which are not Disqualified Capital Stock) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part; provided, however, that if such Equity Interests are issued to any plan for the benefit of

employees of any Borrower or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased in order to satisfy applicable statutory or regulatory obligations.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall mean, with respect to a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit, the date that an amount is paid by Issuer under such Letter of Credit, such WTC Letter of Credit or such Roll-Up Letter of Credit, as the case may be.

"Earn-Out Indebtedness" shall have the meaning set forth in the definition of Indebtedness.

"Effective Date" means the effective date of a plan of reorganization filed in the Chapter 11 Cases.

"Eligible Lender" means one or more additional banks or financial institutions that (i) is a Pre-Petition ABL Lender or Pre-Petition Term Lender, or an Affiliate of a Pre-Petition ABL Lender or Pre-Petition Term Lender, (ii) has executed and delivered a counterpart to the Plan Support Agreement and (iii) remains a party to the Plan Support Agreement.

"Employee Benefit Plan" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was maintained or contributed to by any Company or any of its ERISA Affiliates.

"Environmental Complaint" shall have the meaning set forth in Section 4.19(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including all equipment, machinery, apparatus, motor vehicles, fittings, furniture, furnishings, fixtures, parts, accessories and all replacements and substitutions therefor or accessions thereto.

"Equity Interests" of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act), including in each case

01:16263179.1

- 12 -

all of the following rights relating to such Equity Interests, whether arising under the Organizational Documents of the Person issuing such Equity Interests (the "issuer") or under the applicable laws of such issuer's jurisdiction of organization relating to the formation, existence and governance of corporations, limited liability companies or partnerships or business trusts or other legal entities, as applicable: (i) all economic rights (including all rights to receive dividends and distributions), (ii) all voting rights and rights to consent to any particular action(s) by the applicable issuer, (iii) all management rights with respect to such issuer, (iv) in the case of any Equity Interests consisting of a general partner interest in a partnership, all powers and rights as a general partner with respect to the management, operations and control of the business and affairs of the applicable issuer, (v) in the case of any Equity Interests consisting of the membership/limited liability company interests of a managing member in a limited liability company, all powers and rights as a managing member with respect to the management, operations and control of the business and affairs of the applicable issuer, (vi) all rights to designate or appoint or vote for or remove any officers, directors, manager(s), general partner(s), managing member(s) and/or any members of any board of members/managers/partners/directors that may at any time have any rights to manage and direct the business and affairs of the applicable issuer under its Organizational Documents as in effect from time to time, (vii) all rights to amend the Organizational Documents of such issuer, (viii) in the case of any Equity Interests in a partnership or limited liability company, the status of the holder of such Equity Interests as a "partner", general or limited, or "member" (as applicable) under the applicable Organizational Documents and/or applicable state law and (ix) all certificates evidencing such Equity Interests.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"ERISA Affiliate" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  Any former ERISA Affiliate of a person or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of such person or such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such person or such Subsidiary and with respect to liabilities arising after such period for which such person or such Subsidiary could reasonably be expected to be liable under the Code or ERISA, but in no event for more than six years after such period if no such liability has been asserted against such person or such Subsidiary; *provided*, *however*, that such person or such Subsidiary shall continue to be an ERISA Affiliate of such person or such Subsidiary after the expiration of the six-year period solely with respect to any liability asserted against such person or such Subsidiary prior to the expiration of such six-year period.

"ERISA Event" shall mean (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan; (ii) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Benefit Plan (whether or not waived in accordance with Section 412(d) of the Code) or the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Pension Benefit Plan or the failure to make any required contribution to a

Multiemployer Plan; (iii) the provision by the administrator of any Pension Benefit Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by any Company or any of its ERISA Affiliates from any Pension Benefit Plan with two or more contributing sponsors or the termination of any such Pension Benefit Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Benefit Plan; (vi) the imposition of liability on any Company or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of any Company or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Company or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan, or the assets thereof, or against any Company or any of its ERISA Affiliates in connection with any Employee Benefit Plan; (ix) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Benefit Plan to qualify for exemption from taxation under Section 501(a) of the Code; (x) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Code or pursuant to ERISA with respect to any Pension Benefit Plan; or (xi) the occurrence of a non-exempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to any Company or any of its ERISA Affiliates.

"Eurodollar Rate" shall mean for any Eurodollar Rate Loan for the then current Interest Period relating thereto, the interest rate per annum determined by Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (i) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which US dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent which has been approved by the British Bankers' Association as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (an "Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such Eurodollar Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any Alternate Source, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error)), by (ii) a number equal 1.00 minus the Reserve Percentage. The Eurodollar Rate may also be expressed by the following formula:

Average of London interbank offered rates quoted by Bloomberg or
appropriate Successor as shown on
<u>Bloomberg Page BBAM1</u>
Eurodollar Rate =      1.00 - Reserve Percentage

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date.  The Agent shall give prompt notice to the Borrowing Agent of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.  Notwithstanding any provision to the contrary in this Agreement, the Eurodollar Rate shall at no time be less than 1.00% per annum.

"<u>Eurodollar Rate Loan</u>" shall mean an Advance at any time that bears interest based on the Eurodollar Rate.

"<u>Event of Default</u>" shall have the meaning set forth in <u>Article X</u> hereof.

"<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended.

"<u>Excluded Taxes</u>" shall mean, with respect to Agent, any Lender, Issuer or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which Borrowers is located and (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with <u>Section 3.11</u>, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to <u>Section 3.10</u>.

"<u>Executive Order No. 13224</u>" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"<u>Existing L/C</u>" means each letter of credit outstanding as of the Closing Date that is described on <u>Schedule 1.1(a)</u> annexed hereto, as each such letter of credit may be amended, restated, supplemented or otherwise modified as permitted under this Agreement, and "<u>Existing L/Cs</u>" means all such letters of credit, collectively.

01:16263179.1

"Exposure" shall mean, with respect to any Lender, such Lender's Revolving Exposure, Initial Commitment Exposure, L/C Commitment Exposure and/or Roll-Up Exposure, as the context requires.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate)[1], or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Determining Lenders (an "Alternate Source") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the Determining Lenders at such time (which determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Open Rate changes, the rate of interest with respect to any advance to which the Federal Funds Open Rate applies will change automatically without notice to the Borrowers, effective on the date of any such change.

"Fee Letter" shall mean that certain letter agreement regarding fees, dated as of November __, 2014 between Borrowers and Agent, as it may be amended, modified, supplemented, restated or replaced from time to time.

"Financing Orders" shall mean the Interim Financing Order and the Permanent Financing Order, as amended and in effect from time to time in accordance herewith and therewith.

"First Day Orders" shall mean all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date (including, for the avoidance of doubt, the Cash Management Order) or based on motions filed on or about the Petition Date.

"Foreign Lender" shall mean any Lender that is organized under the Laws of a jurisdiction other than that in which Borrowers are resident for tax purposes.  For purposes of

---

[1]   [TBD: Agent confirming access]

this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Plan" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed outside the United States.

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired, including all payment intangibles, all choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trademark applications, service marks, trade secrets, goodwill, copyrights, design rights, software, computer information, source codes, codes, records and updates, registrations, licenses, franchises, customer lists, tax refunds, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Acts" shall have the meaning set forth in Section 2.17 hereof.

"Governmental Body" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee Obligation" as to any Person (the "guaranteeing person"), shall mean any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of

such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the applicable Borrower in good faith.

"Guarantor" shall mean any Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guarantor Security Agreement" shall mean any security agreement executed by any Guarantor in favor of Agent securing the Obligations or the Guaranty of such Guarantor, in form and substance satisfactory to Agent, provided that the terms and conditions thereof shall be consistent with the terms and conditions of this Agreement.

"Guaranty" shall mean any guaranty of the Obligations executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders, in form and substance satisfactory to Agent, provided that the terms and conditions thereof shall be consistent with the terms and conditions of this Agreement.

"Hazardous Discharge" shall have the meaning set forth in Section 4.19(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 5101, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"HSP Agreement" shall mean that certain DIRECTV, Inc. 2012 Homes Services Provider Agreement dated as of October 15, 2012 between DIRECTV, Inc. and DirectSat, including all exhibits and schedules thereto, as such agreement may have been or hereafter may be amended, modified, supplemented, restated or replaced from time to time.

"Inactive Subsidiary" shall mean any Subsidiary of any Borrower that does not (i) conduct any active business operations (including the operations of a holding company),

(ii) have assets with a fair market value of $500,000 or more or (iii) own any capital stock of any Borrower or any other Subsidiary (except another Inactive Subsidiary) of any Borrower; provided that, notwithstanding anything to the contrary contained in any of the foregoing, no Subsidiary may be deemed to be an Inactive Subsidiary for any purpose under this Agreement if the fair market value of all of the assets of such Subsidiary, together with the fair market value of the assets of all other Inactive Subsidiaries of Borrower, shall exceed $1,000,000 at any one time in the aggregate.

"Indebtedness" of any Person at any date, shall mean, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services earned but not paid (other than to the extent payable in common stock Equity Interests and other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capitalized Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, issued and drawn letters of credit, surety bonds or similar arrangements, (g) all obligations of such Person in respect of Disqualified Capital Stock, (h) all obligations of such Person for "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person payable in cash arising out of purchase and sale contracts ("Earn-Out Indebtedness"), (i) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (h) above, and (j) all obligations of the kind referred to in clauses (a) through (i) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Initial Commitment" of any Lender shall mean the Initial Commitment set forth below such Lender's name on the signature page hereof as the same may be adjusted upon any assignment by or to a Lender pursuant to Section 16.3(c) or (d) hereof.

"Initial Commitment Advances" shall mean Advances made under the Initial Commitments of the Lenders pursuant to Section 2.1(a) hereof.

"Initial Commitment Exposure" shall mean, with respect to any Lender as of any date of determination (i) prior to the termination of the Initial Commitments, that Lender's Initial Commitment, and (ii) after the termination of the Initial Commitments, the aggregate outstanding principal amount of the Initial Advances of that Lender.

"Initial Commitment Note" shall have the meaning set forth in Section 2.1(a) hereof.

"Initial Commitment Percentage" of a Lender shall mean the Initial Commitment Percentage set forth below such Lender's name on the signature page hereof as the same may be adjusted upon assignment by or to any Lender pursuant to Section 16.3(c) or (d) hereof.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"Interest Period" shall mean the period provided for any Eurodollar Rate Loan pursuant to Section 2.2(b) hereof.

"Interest Rate" shall mean, (a) with respect to Advances that are Domestic Rate Loans, an interest rate per annum equal to the sum of the appropriate Applicable Margin plus the Alternate Base Rate and (b) with respect to Advances that are Eurodollar Rate Loans, an interest rate per annum equal to the sum of the appropriate Applicable Margin plus the Eurodollar Rate.

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, adjustable strike cap, adjustable strike corridor or similar agreements entered into by any Borrower or its Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

"Interim Financing Order" shall mean an interim financing order, in the form attached hereto as Exhibit 1.2(b) or as otherwise acceptable to the Determining Lenders, as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

"Inventory" shall mean and include as to each Borrower all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Investment Property" shall mean and include as to each Borrower, all of such Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"Issuer" shall mean (i) AIC in its capacity as the issuer of Letters of Credit and Roll-Up Letters of Credit under this Agreement and (ii) any other Person whom Determining Lenders in their discretion shall designate as the issuer of and cause to issue any particular Letter of Credit under this Agreement in place of AIC as issuer.

"Joint Venture" shall mean a corporation, partnership, limited liability company or other entity in which Borrowers and their wholly-owned Subsidiaries hold, directly or indirectly, less than 51 % of the Equity Interests therein.

"L/C Commitment" of any Lender shall mean the L/C Commitment set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by or to a Lender pursuant to Section 16.3(c) or (d) hereof.

"L/C Commitment Advances" shall mean Advances made under the L/C Commitments of the Lenders pursuant to Section 2.01(c) hereof.

"L/C Commitment Exposure" shall mean, with respect to any Lender as of any date of determination (i) prior to the termination of the L/C Commitments, that Lender's L/C Commitment, and (ii) after the termination of the L/C Commitments, the sum of (a) the aggregate outstanding principal amount of the L/C Commitment Advances of that Lender plus (b) in the event that Lender is the Issuer of the WTC Letter of Credit, the aggregate Maximum Undrawn Amount in respect of the WTC Letter of Credit (in each case net of any participations purchased by other Lenders (other than Defaulting Lenders) in such WTC Letter of Credit or in any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in the WTC Letter of Credit or any unreimbursed drawings under the WTC Letter of Credit.

"L/C Commitment Lender" shall mean each Lender that has a commitment to make L/C Commitment Advances (or who holds any outstanding L/C Commitment Advances) and shall include any Person who becomes a Transferee, successor or assign of any L/C Commitment Lender.

"L/C Commitment Note" shall mean, collectively, the promissory notes referred to in Section 2.1(c) hereof, as any such note may be amended, modified, supplemented, restated or replaced from time to time.

"L/C Commitment Percentage" of a Lender shall mean the L/C Commitment Percentage set forth below such Lender's name on the signature page hereof as the same may be adjusted upon assignment by or to any Lender pursuant to Section 16.3(c) or (d) hereof.

"L/C Participation Advance" shall have the meaning set forth in Section 2.12(d) hereof.

"L/C Participation Commitment" shall mean each L/C Commitment Lender's obligation to buy a participation of the WTC Letter of Credit issued hereunder.

"Leasehold Interests" shall mean all of each Borrower's right, title and interest in and to, and as lessee, of the premises identified on Schedule 4.5 hereto.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.

"Letter of Credit Application" shall have the meaning set forth in Section 2.10 hereof.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d) hereof.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2 hereof.

"Letters of Credit" shall have the meaning set forth in Section 2.9 hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Agent from time to time to enter upon the premises to inspect or remove (or temporarily store) the Collateral from such premises.

"Loan Parties" shall mean each Borrower, each Guarantor and each other Person which executes a guaranty of the Obligations, which grants a Lien on all or substantially all of its assets to secure payment of the Obligations.

"Material Adverse Effect" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business or properties of any Borrower, (b) any Borrower's ability to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (c) the value of the Collateral, or Agent's Liens on the Collateral or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents; *provided* however, that none of the events leading up to nor the commencement of the Chapter 11 Cases nor the events that customarily occur following the commencement of a case under Chapter 11 of the Bankruptcy Code, in each case to the extent disclosed in writing to the AIC, NMC or Cetus prior to the Petition Date, shall constitute a Material Adverse Effect.

"Material Budget Deviation" shall have the meaning set forth in Section 6.10(c) hereof.

"Material Contract" shall mean any contract, agreement, instrument, permit, lease or license, written or oral, of Borrowers, which are material to any Borrower's business or which, the failure to comply with, could reasonably be expected to result in a Material Adverse Effect.

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit or Roll-Up Letter of Credit as of any date, the amount of such Letter of Credit or Roll-Up Letter of Credit, as applicable, that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit or Roll-Up Letter of Credit, as the case may be, whether or not any such automatic increase has become effective.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 16.3(d) hereof.

01:16263179.1

- 22 -

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA to which contributions are required by any Borrower or any member of the Controlled Group.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"NMC" shall mean New Mountain Finance Corporation.

"Non-Defaulting Lender" shall mean, at any time, any Lender that is not a Defaulting Lender at such time.

"Note" shall mean collectively, the Initial Commitment Note, the L/C Commitment Note, the Revolving Credit Note and the Roll-Up Note.

"Obligations" shall mean and include any and all loans (including without limitation, all Advances), advances, debts, liabilities, obligations (including, without limitation, all reimbursement obligations, indemnification obligations and cash collateralization obligations with respect to Letters of Credit issued hereunder as provided for herein), covenants and duties owing by any Borrower or any Guarantor to Issuer, Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent, Issuer or any Lender of any kind or nature, present or future (including any interest or other amounts accruing thereon, any fees accruing under or in connection therewith, any costs and expenses of any Person payable by any Borrower or any Guarantor and any indemnification obligations payable by any Borrower or any Guarantor arising or payable after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to any Borrower or any Guarantor, whether or not a claim for post-filing or post-petition interest, fees or other amounts is allowable or allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, in any such case to the extent advanced to any Borrower or any Guarantor under, arising under or out of and/or related to this Agreement, the Other Documents and any amendments, extensions, renewals or increases thereto, including all costs and expenses of Agent, Issuer and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of any Borrower or any Guarantor to Agent, Issuer or Lenders to perform acts or refrain from taking any action.

"One Month Extension Option" shall have the meaning specified in Section 13.3 hereof.

"Ordinary Course of Business" shall mean with respect to any Borrower, the ordinary course of such Borrower's business as conducted on the Closing Date.

"Organizational Documents" shall mean, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of

partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equity holders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"Other Business" shall mean the assets, liabilities and contractual rights and obligations relating to the business divisions of the Borrowers and their Subsidiaries other than the DirectSat Business (and for the avoidance of doubt excluding the DirectSat Subsidiaries and UniTek Parent).

"Other Documents" shall mean the Note, the Fee Letter, any Guaranty (if any), any Guarantor Security Agreement (if any), any Pledge Agreement, and any and all other agreements, instruments and documents, subordination and/or intercreditor agreements, guaranties, pledges, control agreements, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Other Entities" shall mean Borrowers and their subsidiaries that are engaged primarily or exclusively in the Other Business (and for the avoidance of doubt excluding the DirectSat Subsidiaries and UniTek Parent).

"Other Taxes" shall mean all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any Other Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any Other Document.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"Participation Advance" shall have the meaning set forth in Section 2.12(d) hereof.

"Participation Commitment" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"Payee" shall have the meaning set forth in Section 3.10 hereof.

"Payment Office" shall mean initially 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Pension Benefit Plan" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained or to which contributions are required by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained or to which contributions have been required by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"Permanent Financing Order" shall mean an order of the Bankruptcy Court authorizing on a final basis the secured financing on the terms and conditions set forth in this Credit Agreement, in substantially the form of the Interim Financing Order or as otherwise acceptable to the Determining Lenders and, to the extent affected thereby, the Agent, as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

"Permitted Encumbrances" shall mean, in each case, solely to the extent senior in priority to the Liens securing the Pre-Petition Obligations, (a) Liens for taxes, assessments or other governmental charges not delinquent or being Properly Contested; (b) [RESERVED]; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of like nature arising in the Ordinary Course of Business; (e) Liens arising by virtue of the rendition, entry or issuance against any Borrower or any Subsidiary, or any property of any Borrower or any Subsidiary, of any judgment, writ, order, or decree to the extent the rendition, entry, issuance or continued existence of such judgment, writ, order or decree (or any event or circumstance relating thereto) has not resulted in the occurrence of an Event of Default under Section 10.6 hereof; (f) mechanics', workers', materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not more than 30 days overdue or which are being Properly Contested; (g) Liens placed upon fixed assets hereafter acquired to secure Indebtedness incurred to pay any portion of the purchase price thereof, provided that any such lien shall not encumber any other property of any Borrower and such Indebtedness shall be permitted under the terms of Section 7.8(ii); (h) other Liens incidental to the conduct of any Borrower's business or the ownership of its property and assets which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially detract from Agent's or Lenders' rights in and to the Collateral or the value of any Borrower's property or assets or which do not materially impair the use thereof in the operation of any Borrower's business; (i) easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other charges or encumbrances, in each case, which do not interfere in any material respect with the Ordinary Course of Business of the Borrowers and their Subsidiaries; (j) Liens disclosed on Schedule 1.2 provided that such Liens shall secure only those obligations which they secure on the Closing Date and any refinancing thereof and shall not subsequently apply to any other property or assets of any Borrower other than the property and assets to which they apply as of the Closing Date (and with respect to Liens securing the Pre-Petition Obligations, only to the extent such Liens are subordinate in priority to the Liens granted under this Agreement and the Other Documents in all respects), (k) Liens in favor of DIRECTV on the DIRECTV Inventory created under the HSP Agreement and (l) deposits securing

Borrowers' obligations to WEX under credit cards and fuel cards issued by WEX to the Borrowers.

"Permitted Liens" shall mean Liens securing (a) the Pre-Petition Obligations and (b) Permitted Encumbrances.

"Permitted Foreign Operating Subsidiaries" shall mean, collectively, WireComm Systems (2008), Inc., a corporation organized under the laws of the province of Ontario, Canada, and UniTek Canada, Inc., a corporation organized under the laws of the province of Ontario, Canada.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

"Pinnacle Acquisition" shall mean that certain asset acquisition by one or more of the Borrowers pursuant to that certain Asset Purchase Agreement dated as of March 30, 2011 between UniTek Parent as buyer and Pinnacle Wireless, Inc. and certain others as sellers.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan and a Multiemployer Plan), maintained for employees of any Borrower or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute.

"Plan of Reorganization" shall mean the "Plan" as defined in the Plan Support Agreement.

"Plan Support Agreement" shall mean that certain Plan Support Agreement dated as of October 17, 2014 by and among the Debtors, AIC and the other persons party thereto, and certain shareholders of the Debtors, as amended from time to time in accordance therewith, in each case to the extent permitted hereunder.

"Pledge Agreement" shall mean, collectively, any pledge agreements executed subsequent to the Closing Date by any Person to secure the Obligations, as any such agreement may be amended, modified, supplemented, restated or replaced from time to time.

"PNC" means PNC Bank, National Association.

"Pre-Petition ABL Credit Agreement" shall mean that Revolving Credit and Security Agreement, dated as of July 10, 2013, among Unitek Global Services, Inc., Unitek Acquisition, Inc., Pinnacle Wireless USA, Inc., Unitek USA, LLC, Advanced Communications USA, Inc., DirectSat USA, LLC, FTS USA, LLC, as Borrowers and Apollo Investment Corporation, as agent for the lenders thereunder, as in effect on the Closing Date and as it may be amended, supplemented or otherwise modified.

"Pre-Petition ABL Agent" shall mean AIC in its capacity as the "Agent" under the Pre-Petition ABL Credit Agreement, together with its successors and assigns in such capacity including any successor "Agent" appointed in accordance with the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Lenders" means the parties identified as lenders under the Prepetition ABL Credit Agreement in their capacities as lenders under the Prepetition ABL Credit Agreement as of the Petition Date, together with their successors and permitted assigns.

"Pre-Petition ABL Loan Documents" means the Pre-Petition ABL Credit Agreement and all material instruments, agreements and documents executed in connection therewith.

"Pre-Petition Loan Documents" means the Pre-Petition ABL Loan Documents and Pre-Petition Term Loan Documents.

"Pre-Petition Obligations" means, collectively, (i) the "Obligations" (as defined in the Pre-Petition ABL Credit Agreement and (ii) the "Obligations" (as defined in the Guarantee and Collateral Agreement referred to in the Pre-Petition Term Loan Agreement).

"Pre-Petition Term Lenders" means the parties identified as lenders under the Prepetition Term Loan Agreement in their capacities as lenders under the Prepetition Term Loan Agreement as of the Petition Date, together with their successors and permitted assigns.

"Pre-Petition Term Loan Agreement" shall mean that Credit Agreement, dated as of April 15, 2011, among Unitek Global Services, Inc., Unitek Acquisition, Inc., Pinnacle Wireless USA, Inc., Unitek USA, LLC, Advanced Communications USA, Inc., DirectSat USA, LLC, FTS USA, LLC, and Cerberus Business Finance, LLC as successor administrative agent for the lenders thereunder, as in effect on the Closing Date and as it may be amended, supplemented or otherwise modified.

"Pre-Petition Term Loan Agent" shall mean Cerberus Business Finance, LLC in its capacity as the "Administrative Agent" under the Pre-Petition Term Loan Agreement, together with its successors and assigns in such capacity including any and all successor "Administrative Agent(s)" appointed in accordance with the Pre-Petition Term Loan Agreement.

"Pre-Petition Term Loan Documents" means the Pre-Petition Term Loan Agreement and all material instruments, agreements and documents executed in connection therewith.

"Pro Forma Financials" shall have the meaning set forth in Section 5.5(a) hereof.

"Pro Forma Financial Statements" shall have the meaning set forth in Section 5.5(b) hereof.

"Properly Contested" shall mean, in the case of any Indebtedness or Lien, as applicable, of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof: (i) such Indebtedness or Lien, as applicable, is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has

established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Projections" shall have the meaning set forth in Section 5.5(b) hereof.

"Published Rate" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the Eurodollar Rate for a one month period as published in another publication selected by the Agent).

"Purchasing CLO" shall have the meaning set forth in Section 16.3(d) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 16.3(c) hereof.

"Ratable Share" shall mean (i) with respect to a Lender's Revolving Commitments or Revolving Advances, the proportion that such Lender's Revolving Exposure bears to the aggregate Revolving Exposure of all Lenders, provided that in the case of Section 2.23 when a Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances or L/C Commitment Advances shall exist, "Ratable Share" under this clause (i) shall mean the percentage of the aggregate Revolving Exposure (disregarding any such Defaulting Lender's Revolving Exposure) represented by such Lender's Revolving Exposure; (ii) with respect to a Lender's Initial Commitments or Initial Commitment Advances, the proportion that such Lender's Initial Commitment Exposure bears to the aggregate Initial Commitment Exposure of all Lenders, provided that in the case of Section 2.23 when a Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances or L/C Commitment Advances shall exist, "Ratable Share" under this clause (ii) shall mean the percentage of the aggregate Initial Commitment Exposure of all Lenders (disregarding any such Defaulting Lender's Initial Commitment Exposure) represented by such Lender's Initial Commitment Exposure; (iii) with respect to a Lender's L/C Commitments or L/C Commitment Advances, the proportion that such Lender's L/C Commitment Exposure bears to the aggregate L/C Commitment Exposure of all Lenders, provided that in the case of Section 2.23 when a Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances or L/C Commitment Advances shall exist, "Ratable Share" under this clause (iii)  shall mean the percentage of the aggregate L/C Commitment Exposure of all Lenders (disregarding any such Defaulting Lender's L/C Commitment Exposure) represented by such Lender's L/C Commitment Exposure; (iv) with

respect to a Lender's Roll-Up Commitment or Roll-Up Advances, such Lender's Roll-Up Ratable Share; and (v) with respect to more than one of any Lender's Exposures, the proportion that the sum of such Lender's Exposures of such type bears to the aggregate sum of such Exposures of such type of all Lenders, provided that in the case of Section 2.23 when a Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances or L/C Commitment Advances shall exist, "Ratable Share" under this clause (v) shall mean the percentage of the Exposures of the relevant type (disregarding, if such Defaulting Lender is a Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances or L/C Commitment Advances, any such Defaulting Lender's Revolving Exposure, Initial Commitment Exposure and L/C Commitment Exposure, and, if such Defaulting Lender is a Defaulting Lender with respect to Roll-Up Advances, any such Defaulting Lender's Roll-Up Exposure) represented by such Lender's Exposures.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to the owned and leased premises identified on Schedule 4.5 hereto or which is hereafter owned or leased by any Borrower.

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to such Borrower by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, credit card receivables and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Register" shall have the meaning set forth in Section 16.3(e) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b) hereof.

"Release" shall have the meaning set forth in Section 5.7(c)(i) hereof.

"Reportable Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders (other than any Defaulting Lender) having more than fifty percent (50.0%) of the sum of the aggregate amount of the Revolving Exposure of all Lenders, plus the aggregate amount of the Initial Commitment Exposure of all Lenders, plus the aggregate amount of the L/C Commitment Exposure of all Lenders (excluding in any case any Defaulting Lender with respect to such Commitments).

"Reserve Percentage" shall mean as of any day the maximum percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and

emergency reserve requirements) with respect to eurocurrency funding (currently referred to as "<u>Eurocurrency Liabilities</u>".

"<u>Revolving Advances</u>" shall mean Advances made under the Revolving Commitments of the Lenders pursuant to <u>Section 2.1(b)</u> hereof.

"<u>Revolving Commitment</u>" of any Lender shall mean the Revolving Commitment set forth below such Lender's name on the signature page hereof as the same may be adjusted upon any assignment by or to a Lender pursuant to <u>Section 16.3(c)</u> or <u>(d)</u> hereof.

"<u>Revolving Commitment Percentage</u>" of any Lender shall mean the Revolving Commitment Percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by or to a Lender pursuant to <u>Section 16.3(c)</u> or <u>(d)</u> hereof or upon any Revolving Advance pursuant to <u>Section 2.1(b)</u>.

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof, as any such note may be amended, modified, supplemented, restated or replaced from time to time.

"<u>Revolving Exposure</u>" shall mean, with respect to any Lender as of any date of determination (i) prior to the termination of the Revolving Commitments, that Lender's Revolving Commitment, and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Advances of that Lender <u>plus</u> (b) in the event that Lender is the Issuer of Letters of Credit, the aggregate Maximum Undrawn Amount in respect of all Letters of Credit (in each case net of any participations purchased by other Lenders (other than Defaulting Lenders) in such Revolving Letters of Credit or in any unreimbursed drawings thereunder) <u>plus</u> (c) the aggregate amount of all participations purchased by that Lender in any outstanding Revolving Letters of Credit or any unreimbursed drawings under any such Revolving Letters of Credit.

"<u>Revolving Lender</u>" shall mean each Lender who has a commitment to make Revolving Advances (or who holds any outstanding Revolving Advances) and shall include each Person which becomes a Transferee, successor or assign of any Revolving Lender.

"<u>Revolving Letter of Credit Fees</u>" shall have the meaning set forth in <u>Section 3.2</u> hereof.

"<u>Roll-Up Advances</u>" shall mean Advances made under the Roll-Up Commitments of the Lenders pursuant to Section 2.1(d) hereof.

"<u>Roll-Up Commitment</u>" of any Lender shall mean the Roll-Up Commitment set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by or to a Lender pursuant to <u>Section 16.3(c)</u> or <u>(d)</u> hereof.

"<u>Roll-Up Commitment Note</u>" shall mean, collectively, the promissory notes referred to in <u>Section 2.1(d)</u> hereof, as any such note may be amended, modified, supplemented, restated or replaced from time to time.

"Roll-Up Commitment Percentage" of any Lender shall mean the Roll-Up Commitment Percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by or to a Lender pursuant to Section 16.3(c) or (d) hereof.

"Roll-Up Exposure" shall mean, with respect to any Lender as of any date of determination (i) prior to the termination of the Roll-Up Commitments, that Lender's Roll-Up Commitment, and (ii) after the termination of the Roll-Up Commitments, the sum of (a) the aggregate outstanding principal amount of the Roll-Up Advances of that Lender plus (b) in the event that Lender is the Issuer of Roll-Up Letters of Credit, the aggregate Maximum Undrawn Amount in respect of all Roll-Up Letters of Credit (in each case net of any participations purchased by other Lenders (other than Defaulting Lenders) in such Roll-Up Letters of Credit or in any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Roll-Up Letters of Credit or any unreimbursed drawings under any such Roll-Up Letters of Credit.

"Roll-Up Lender" shall mean each Lender who has a commitment to make Roll-Up Advances (or who holds any outstanding Roll-Up Advances) and shall include each Person which becomes a Transferee, successor or assign of any Roll-Up Lender.

"Roll-Up Letter of Credit" or "Roll-Up Letters of Credit" means letters of credit issued (or deemed issued) by Issuer pursuant to Section 2.10(d) (and shall include the WTC Letter of Credit except as expressly forth in this Agreement).

"Roll-Up Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d) hereof.

"Roll-Up Letter of Credit Fees" shall have the meaning set forth in Section 3.2 hereof.

"Roll-Up Participation Advance" shall have the meaning set forth in Section 2.12(d) hereof.

"Roll-Up Participation Commitment" shall mean each Roll-Up Lender's obligation to buy a participation of the Roll-Up Letters of Credit issued hereunder.

"Roll-Up Ratable Share" shall mean with respect to a Lender's Roll-Up Commitments or Roll-Up Advances, the proportion that such Lender's Roll-Up Commitment bears to the aggregate Roll-Up Commitments of all Lenders, provided that in the case of Section 2.23 when a Defaulting Lender with respect to Roll-Up Advances shall exist, "Roll-Up Ratable Share" shall mean the percentage of the aggregate Roll-Up Commitments of all Lenders (disregarding any such Defaulting Lender's Roll-Up Commitment) represented by such Lender's Roll-Up Commitment.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation,

or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"<u>Subsidiary Stock</u>" shall mean all of the issued and outstanding Equity Interests of any Subsidiary owned by any Borrower; provided that Subsidiary Stock with respect to any Foreign Subsidiary shall be limited to sixty-five percent (65%) of the voting Equity Interest and one hundred percent (100%) of non-voting Equity Interests of such Foreign Subsidiary.

"<u>Subordinated Debt</u>" shall mean, collectively, any and all unsecured Indebtedness for borrowed money incurred by any one or more Borrowers that is subordinated in favor of the payment in full of all Obligations on terms and conditions (including without limitation subordination terms (including any terms regarding the cash payment of interest) and provisions regarding enforcement standstills) acceptable to Determining Lenders in their discretion pursuant to a subordination agreement executed and delivered by the holders of such Indebtedness that is satisfactory in both form and substance to Determining Lenders in their discretion.

"<u>Successor Cases</u>" shall mean any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing.

"<u>Superpriority Claim</u>" shall mean a claim against the Borrower or a Guarantor in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 506(c), 507(b), 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"<u>Taxes</u>" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"<u>Term</u>" shall have the meaning set forth in <u>Section 13.1</u> hereof.

"<u>Termination Event</u>" shall mean: (i) a Reportable Event with respect to any Plan; (ii) the withdrawal of any Borrower or any member of the Controlled Group from a Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vi) the partial or complete withdrawal within the meaning of Section 4203 or 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan.

"<u>Testing Period</u>" shall mean for any calendar week (the "<u>subject week</u>") with respect to which compliance with <u>Section 6.10(b)</u> is being calculated, the period commencing with the first day of the first calendar week of the Budget and ending with the last day of such subject week;

provided, that the first Testing Period for which compliance with Section 6.10(b) shall be calculated shall be the Testing Period ending as of the end of third week ending after the Closing Date (for the avoidance of doubt, for purposes of this proviso, the "first" week ending after the Closing Date shall mean the week commencing prior to the Closing Date and ending after the Closing Date).

"Toxic Substance" shall mean and include any material present on the Real Property (including the Leasehold Interests) which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances.  Toxic Substance includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Trading with the Enemy Act" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Transactions" shall have the meaning set forth in Section 5.5 hereof.

"Transferee" shall have the meaning set forth in Section 16.3(d) hereof.

"Two Month Extension Option" shall have the meaning specified in Section 13.4 hereof.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Wex" shall mean Wex Bank.

"WTC Letter of Credit" means the letter of credit outstanding as of the Closing Date that is described on Schedule 1.1(b) annexed hereto, as such letter of credit may be amended, restated, supplemented or otherwise modified as permitted under this Agreement.

"WTC Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d) hereof.

1.3    Uniform Commercial Code Terms.    All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein.  Without limiting the foregoing, the terms "accounts", "chattel paper", "commercial tort claims", "instruments", "general intangibles", "goods", "payment intangibles", "proceeds", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such

expanded definition will apply automatically as of the date of such amendment, modification or revision.

      1.4   <u>Certain Matters of Construction</u>.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications, supplements or amendments thereto, any and all restatements or replacements thereof and any and all extensions or renewals thereof.  All references herein to the time of day shall mean the time in New York, New York.  Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in, first-out basis.  Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation".  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Determining Lenders or all Lenders, as applicable.  Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders.  Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

1.5     Accounting Change.   In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, negative covenants, standards or terms in this Agreement, then Borrowers and the Agent (at the direction of Determining Lenders) agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.   Until such time as such an amendment shall have been executed and delivered by Borrowers, the Agent and the Determining Lenders, all financial covenants, negative covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.   "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

1.6     Certain Bankruptcy Matters.

(a)     In the event of a conflict between, or inconsistency among, the Financing Orders, on the one hand, and this Agreement and any Other Documents, on the other hand, the applicable Financing Order shall control.

(b)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     Agent and the Lenders shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Financing Orders or any Other Document.  If Agent (at the direction of Determining Lenders or, following the occurrence of an Event of Default that has not been cured or waived, Required Lenders) from time to time elects to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Financing Order is entered and (B) shall not negate or impair the validity or effectiveness of this Section 1.6(c) or of the perfection of any other Liens in favor of Agent, for the benefit of the Lenders, on the Collateral.

(ii)     Except as otherwise agreed to by the Lenders, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Agent and the Lenders pursuant to this Agreement, the Financing Orders or the Other Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower or any other Loan Party (pursuant to Section 364

of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.

(c)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     subject only to Permitted Encumbrances and the Carve-Out and to the extent provided in any of the Financing Orders and subject to the Financing Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to any or on a parity with any claim of any Lender or Agent against the Borrowers or any other Loan Party in respect of any Obligations;

(ii)     other than as provided in the Financing Orders or the Other Documents, the Agent's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens (except Permitted Encumbrances and subject to the Carve-Out), now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     to the extent provided in any of the Financing Orders, the Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Agent's Liens under applicable non-bankruptcy law.

## II.     COMMITMENTS AND FACILITIES.

2.1     Advances.

(a)     Initial Commitment Advances.   Subject to the terms and conditions set forth in this Agreement and relying on the representations and warranties herein set forth, each Lender, severally and not jointly, will make advances (such advances are referred to as the "Initial Commitment Advances") from time to time on any Business Day during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount not exceeding its Initial Commitment Percentage of the aggregate amount of the Initial Commitments to be used for the purposes identified in Section 2.22; provided, however, that, after giving effect to any Borrowing of Initial Commitment Advances, the aggregate principal amount of all Initial Commitment Advances shall not exceed the original amount of the Initial Commitments of all Lenders.   Amounts borrowed as Initial Commitment Advances which are repaid or prepaid may not be reborrowed. The Initial Commitments Advances shall be evidenced by one or more secured promissory notes (collectively, the "Initial Commitment Note") substantially in the form attached hereto as Exhibit 2.1(a).

(b)     Revolving Advances.   Subject to the terms and conditions set forth in this Agreement and relying on the representations and warranties herein set forth, each Lender, severally and not jointly, will make advances (such advances are referred to as the "Revolving Advances") from time to time on any Business Day during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount not exceeding its

Revolving Commitment Percentage of the aggregate amount of the Revolving Commitments to be used for the purposes identified in <u>Section 2.22</u>; <u>provided</u> that no Revolving Advances may be borrowed on the Closing Date; and provided further, however, that, after giving effect to any borrowing of Revolving Advances, the aggregate principal amount of all outstanding Revolving Advances shall not exceed the aggregate Revolving Commitments then in effect minus the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit. Amounts borrowed under this Section 2.1(b) may be repaid and reborrowed to but excluding the Commitment Termination Date; and provided further, however, that, no Revolving Advance shall be requested, and no Revolving Lender shall be obligated to fund a Revolving Advance, if the funding thereof would result in a breach of any obligation under the Plan Support Agreement. The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "<u>Revolving Credit Note</u>") substantially in the form attached hereto as Exhibit 2.1(b).  Notwithstanding anything to the contrary herein, no Revolving Advances shall be available and no Revolving Advances shall be made until all amounts available for Initial Commitment Advances have been funded and the Initial Commitments are no longer available to be borrowed.

(c)     <u>L/C Commitment Advances</u>.  Subject to the terms and conditions set forth in this Agreement and relying on the representations and warranties herein set forth, each Lender, severally and not jointly, will make advances (such advances are referred to as the "<u>L/C Commitment Advances</u>") from time to time on any Business Day during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount not exceeding its L/C Commitment Percentage of the aggregate amount of the L/C Commitments to be used for the purpose of satisfying, reimbursing or participating in drawings under the WTC Letter of Credit; provided, however, that, after giving effect to any borrowing of L/C Commitment Advances, the aggregate principal amount of all L/C Commitment Advances shall not exceed the original amount of the L/C Commitments of all Lenders. Amounts borrowed as L/C Commitment Advances which are repaid or prepaid may not be reborrowed. The L/C Commitments Advances shall be evidenced by one or more secured promissory notes (collectively, the "<u>L/C Commitment Note</u>") substantially in the form attached hereto as Exhibit 2.1(c).

(d)     Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Borrowers herein set forth, each Lender, severally and not jointly, will make advances (such advances are referred to as the "<u>Roll-Up L/C Commitment Advances</u>"), from time to time on any Business Day during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount not exceeding its Roll-Up Commitment Percentage of the aggregate amount of the Roll-Up L/C Commitments to be used for the purpose of satisfying, reimbursing or participating in drawings under the Roll-Up Letters of Credit.  Amounts borrowed as Roll-Up L/C Commitment Advances and subsequently repaid may not be reborrowed.  The Roll-Up L/C Commitment Advances shall be evidenced by one or more secured promissory notes (collectively, the "<u>Roll-Up Advance Note</u>") substantially in the form attached hereto as Exhibit 2.1(d).

2.2     <u>Procedure for Requesting Advances; Procedures for Selection of Applicable Interest Rates</u>

(a)     Should any amount required to be paid as interest in cash hereunder, or as fees or other charges, costs or expenses under this Agreement or any Other Document, or with respect to any other Obligation, become due and payable, the same shall be deemed a request for an Initial Commitment Advance maintained as a Domestic Rate Loan as of the date such payment is due and payable, in the amount required to pay in full such interest, fee, charge, costs, expenses or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable, and such deemed request shall be deemed binding on Borrowers and Lenders shall be obliged to fund their respective Initial Commitment Percentages of the same regardless of whether any of the conditions under Sections 8.2 or 2.2 shall not be satisfied at such time.

(b)     On the Closing Date, with one day's written notice from the Borrowing Agent to the Agent and the initial Lenders, the Lenders shall make an Initial Commitment Advance in the aggregate amount of $13,500,000, which Initial Commitment Advance will be a Eurodollar Rate Loan with an initial Interest Period of one month.  In the event any Borrower desires to thereafter obtain a Eurodollar Rate Loan or a Domestic Rate Loan for any Advance, Borrowing Agent shall give Agent written notice by no later than 10:00 a.m. on the day which is four (4) Business Days prior to the date such Eurodollar Rate Loan or Domestic Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount on the date of such Advance to be borrowed, which amount shall be in a minimum amount of $500,000 and in integral multiples of $100,000 thereafter, and (iii) if such Advance is a Eurodollar Rate Loan, the duration of the first Interest Period therefor.  Interest Periods for Eurodollar Rate Loans shall be for one month; provided, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day.  No Eurodollar Rate Loan shall be made available to any Borrower during the continuance of a Default or an Event of Default.  After giving effect to each requested Eurodollar Rate Loan, including those which are converted from a Domestic Rate Loan under Section 2.2(d), there shall not be outstanding more than five (5) Eurodollar Rate Loans, in the aggregate.

(c)     Each Interest Period of a Eurodollar Rate Loan shall commence on the date such Eurodollar Rate Loan is made and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iii) above provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term.

Borrowing Agent shall elect the initial Interest Period applicable to a Eurodollar Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(d), as the case may be.  Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 10:00 a.m. on the day which is four (4) Business Days prior to the last day of the then current Interest Period applicable to such Eurodollar Rate Loan.  If Agent does not receive timely notice of the Interest Period elected by Borrowing Agent, Borrowing Agent shall be deemed to have elected to convert to a Domestic Rate Loan subject to Section 2.2(d) hereof.

(d)      Provided that no Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding Eurodollar Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a Eurodollar Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Eurodollar Rate Loan.  If Borrowing Agent desires to convert a loan, Borrowing Agent shall give Agent written notice by no later than 10:00 a.m. (i) on the day which is four (4) Business Days prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Eurodollar Rate Loan, or (ii) on the day which is four (4) Business Days prior to the date on which such conversion is to occur with respect to a conversion from a Eurodollar Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is from a Domestic Rate Loan to any other type of loan, the duration of the first Interest Period therefor.

(e)      At its option and upon written notice given prior to 10:00 a.m. at least four (4) Business Days prior to the date of such prepayment, any Borrower may prepay Eurodollar Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment.  In addition to any other information required by Section 2.21, and subject to Section 2.21, such Borrower shall specify the date of prepayment of Advances which are Eurodollar Rate Loans, which Advances are to be prepaid and the amount of such prepayment.  In the event that any prepayment of a Eurodollar Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, such Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.2(f) hereof.

(f)      Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any Eurodollar Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Eurodollar Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender (with a copy to Agent) to Borrowing Agent shall be conclusive absent manifest error.

(g)      Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (g), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Eurodollar Rate Loans) to make or maintain its Eurodollar Rate Loans, the obligation of Lenders to make Eurodollar Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected Eurodollar Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Eurodollar Rate Loans or convert such affected Eurodollar Rate Loans into loans of another type.  If any such payment or conversion of any Eurodollar Rate Loan is made on a day that is not the last day of

the Interest Period applicable to such Eurodollar Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts as may be necessary to compensate Lenders for any loss or expense sustained or incurred by Lenders in respect of such Eurodollar Rate Loan as a result of such payment or conversion, including (but not limited to) any interest or other amounts payable by Lenders to lenders of funds obtained by Lenders in order to make or maintain such Eurodollar Rate Loan.   A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or Lenders to Borrowing Agent (with a copy to Agent) shall be conclusive absent manifest error.

2.3     Disbursement of Advance Proceeds.   All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books.   During the Term, Borrowers may use the Revolving Advances by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of each Initial Commitment Advance, Revolving Advance or L/C Commitment Advance requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Section 2.2(a) hereof shall, with respect to requested Advances to the extent Lenders make such Advances, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with respect to Initial Commitment Advances deemed to have been requested by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4     [(Intentionally Omitted].

2.5     Maximum Advances.   The aggregate balance of Revolving Advances outstanding at any time shall not exceed the Revolving Commitments of all Lenders less the aggregate Maximum Undrawn Amount of all issued and outstanding Letters of Credit. The aggregate principal amount of all Initial Commitment Advances made shall not exceed the initial aggregate Initial Commitments, and upon the making of each Initial Commitment Advance the Initial Commitments shall be reduced by the principal amount of such Initial Commitment Advance. The aggregate principal amount of all L/C Commitment Advances made shall not exceed the initial aggregate L/C Commitments, and upon the making of each L/C Commitment Advance the L/C Commitments shall be reduced by the principal amount of such L/C Commitment Advance. The aggregate principal amount of all Roll-Up L/C Commitment Advances made shall not exceed the initial aggregate Roll-Up L/C Commitments, and upon the making of each Roll-Up L/C Commitment Advance the Roll-Up L/C Commitments shall be reduced by the principal amount of such Roll-Up L/C Commitment Advance.   At any time prior to entry by the Bankruptcy Court of the Permanent Financing Order, the aggregate balance of (i) all Initial Commitment Advances shall not exceed $29,200,000 and (ii) all Revolving Advances outstanding shall not exceed $10,000,000.   For the avoidance of doubt, Initial Commitment Advances in excess of $29,200,000 which may be funded following entry of the Permanent Financing Order may be applied solely for the uses specified in Section 2.22(a)(v).

2.6     Repayment of Advances.

(a)     The Advances shall be due and payable in full on the last day of the Term subject to earlier prepayment and to acceleration upon an Event of Default as herein provided, unless otherwise agreed by the Lenders, including pursuant to the Plan Support Agreement.

(b)     Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received.  In consideration of Agent's agreement to conditionally credit Borrowers' Account as of the next Business Day following Agent's receipt of those items of payment, each Borrower agrees that, in computing the charges under this Agreement, all items of payment shall be deemed applied by Agent on account of the Obligations one (1) Business Day after (i) the Business Day following Agent's receipt of such payments via wire transfer or electronic depository check or (ii) in the case of payments received by Agent in any other form, the Business Day such payment constitutes good funds in Agent's account.  Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned to Agent unpaid.

(c)     All payments of principal, interest and other amounts payable to Agent or the Lenders hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office for the ratable accounts of the Lenders (other than Obligations due and owing to the Agent for its own account) (i) in the case of any of the Advances other than Roll-Up Advances, in accordance with the Lenders' applicable Initial Commitment Percentages and (ii) in the case of any of the Roll-Up Advances, in accordance with the Lenders' applicable Roll-Up Commitment Percentages, in each case not later than 1:00 P.M. on the due date therefor in lawful money of the United States of America in federal funds by wire transfer or other funds immediately available to Agent.  Agent shall, upon the direction of the Determining Lenders, have the right to effectuate payment on any and all Obligations due and owing hereunder (other than Obligations due and owing to Agent for its own account) by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)     Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.7     Repayment of Excess Advances.  The aggregate balance of Initial Commitment Advances, Revolving Advances, L/C Commitment Advances and/or Roll-Up L/C Commitment Advances taken as a whole outstanding at any time in excess of the maximum amount of Initial Commitment Advances, Revolving Advances, L/C Commitment Advances and/or Roll-Up L/C Commitment Advances (as applicable) permitted hereunder shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred.

2.8     Statement of Account.  Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrowers' Account") in the name of Borrowers in which shall be recorded the date and amount of each Advance made by Lenders and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender.  Each month, Agent

shall send to Borrowing Agent a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent, Lenders and Borrowers during such month.   The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.9    Letters of Credit.   Subject to the terms and conditions hereof, Issuer may issue or cause the issuance of standby letters of credit ("Letters of Credit") for the account of any Borrower except to the extent the issuance thereof would then cause the sum of (i) the outstanding Revolving Advances plus (ii) the Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the aggregate Revolving Commitments then in effect.   For the avoidance of doubt, as used herein, "Letters of Credit" shall not include the WTC Letter of Credit or Roll-Up Letters of Credit.   All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the applicable Contract Rate; Letters of Credit that have not been drawn upon shall not bear interest (but fees shall accrue in respect of outstanding Letters of Credit as provided in Section 3.2 hereof).   All disbursements or payments related to Roll-Up Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Roll-Up Advances and shall bear interest at the applicable Contract Rate; all disbursements or payments related to the WTC Letter of Credit shall be deemed to be Domestic Rate Loans consisting of WTC L/C Commitment Advances and shall bear interest at the applicable Contract Rate; Roll-Up Letters of Credit that have not been drawn upon shall not bear interest (but fees shall accrue in respect of outstanding Roll-Up Letters of Credit as provided in Section 3.2 hereof).

2.10    Issuance of Letters of Credit and Roll-Up Letters of Credit.

(a)    Borrowing Agent, on behalf of Borrowers, may request Issuer to issue or cause the issuance of a Letter of Credit by delivering to Agent at the Payment Office and to Issuer, prior to 10:00 a.m., at least three (3) Business Days prior to the proposed date of issuance, Issuer's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent and Issuer; and, such other certificates, documents and other papers and information as Agent and Issuer may reasonably request.   Borrowing Agent, on behalf of Borrowers, also has the right to give instructions and make agreements with respect to any application, any applicable letter of credit and security agreement, any applicable letter of credit reimbursement agreement and/or any other applicable agreement, any letter of credit and the disposition of documents, disposition of any unutilized funds, and to agree with Agent and Issuer upon any amendment, extension or renewal of any Letter of Credit or Roll-Up Letter of Credit. Issuer shall not issue any requested Letter of Credit if such Issuer has received notice from Agent or any Lender that one or more of the applicable conditions set forth in Section 8.2 of this Agreement have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason.

(b)      Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term.  Each standby Letter of Credit and each Roll-Up Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (ISP98-International Chamber of Commerce Publication Number 590) (the "ISP98 Rules"), and any subsequent revision thereof at the time a standby Letter of Credit or Roll-Up Letter of Credit is issued, as determined by Issuer, and each trade Letter of Credit shall be subject to the UCP.

(c)      Agent shall use its reasonable efforts to notify Revolving Lenders of the request by Borrowing Agent for a Letter of Credit hereunder.  Agent shall have no obligations to confirm that a Letter of Credit satisfies the criteria set forth herein.

(d)      On the Closing Date, (a) any existing participation of a Roll-Up Lender (in its capacity as a Pre-Petition ABL Lender) in such Existing L/C shall terminate and be of no further force and effect, (b) any rights or obligations of Roll-Up Lenders (in their capacity as Pre-Petition ABL Lenders) to reimburse or participate in honored drawings under, or to participate in payments made by Borrowers or any of their respective Subsidiaries with respect to, such Existing L/C under the Prepetition ABL Credit Agreement shall be superseded by this Agreement, and (c) any and all rights, titles, claims (including "claims" within the meaning of Section 101(5) of the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.)), interests, powers and privileges of the issuer of any Existing L/C under the Prepetition ABL Credit Agreement shall be deemed to have reverted back to the Issuer of such Existing L/C and such Existing L/C shall be deemed to be converted on such date to a Roll-Up Letter of Credit that shall be deemed for purposes of this Agreement to be issued on the Closing Date.  Prior to the expiration date of any Roll-Up Letter of Credit, subject to compliance with Section 2.11(c), the Issuer with respect to such Roll-Up Letter of Credit may issue a Roll-Up Letter of Credit to replace such expiring Roll-Up Letter of Credit or amend or extend the expiration date of such expiring Roll-Up Letter of Credit, and upon such issuance or extension Borrowers shall be deemed to have requested that the Issuer with respect to such outstanding Roll-Up Letter of Credit issue a Roll-Up Letter of Credit to replace such Roll-Up Letter of Credit or so extend the maturity of such Roll-Up Letter of Credit, respectively; provided that no Issuer shall issue or extend the expiration date of any outstanding Roll-Up Letter of Credit:

(i)      if the underlying contractual obligation to provide any such Roll-Up Letter of Credit or a replacement thereto to the beneficiary thereof has terminated, and/or the beneficiary of such Roll-Up Letter of Credit has otherwise returned the same for cancellation without the expectation that a Roll-Up Letter of Credit will be issued contemporaneously with such cancellation in substitution therefor;

(ii)      unless the terms of such Roll-Up Letter of Credit as so replaced or extended are substantially identical to the terms of the corresponding Roll-Up Letter of Credit being replaced or extended;

(iii)    unless the stated amount of such Roll-Up Letter of Credit as so replaced or extended does not exceed the amount of the corresponding Roll-Up Letter of Credit being replaced or extended, as the case may be, and is denominated in the same currency;

(iv)    if such Roll-Up Letter of Credit as so replaced or extended has an expiration date later than the date which is one year from the date of issuance of such Roll-Up Letter of Credit, unless a later expiration date is necessary in the judgment of Issuer to avoid a drawing under the corresponding Roll-Up Letter of Credit being replaced or extended, and such later expiration date is no later than the first date on which such corresponding Roll-Up Letter of Credit being replaced or extended could expire without giving rise to a right of the beneficiary thereof to make a drawing thereunder solely as a result of or in anticipation of such expiration; or

(v)    if, after giving effect to such issuance or extension, the aggregate principal amount of Roll-Up Commitment Advances plus the Maximum Undrawn Amount of Roll-Up Letters of Credit outstanding would exceed the Roll-Up Commitments.

2.11    Requirements For Issuance of Letters of Credit.

(a)    Borrowing Agent shall authorize and direct Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit and Roll-Up Letter of Credit.  For each Roll-Up Letter of Credit and Letter of Credit, Borrowing Agent shall authorize and direct the Issuer to deliver to Agent all instruments, documents, and other writings and property received by the Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance thereof.

(b)    In connection with all Roll-Up Letters of Credit and Letters of Credit issued or caused to be issued by Issuer under this Agreement, each Borrower hereby appoints Issuer, or its designee, as its attorney, with full power and authority if an Event of Default shall have occurred and be continuing, (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances, (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department ("Customs") in the name of such Borrower or Issuer or Issuer's designee, and to sign and deliver to Customs officials powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's or Issuer's name, or in the name of Issuer's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof.  Neither Issuer nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for Issuer's or its attorney's willful misconduct or gross negligence.  This power, being coupled with an interest, is irrevocable as long as any Letters of Credit and/or Roll-Up Letters of Credit remain outstanding.

(c)    Whenever the Issuer with respect to such Roll-Up Letter of Credit desires to issue a Roll-Up Letter of Credit to replace such outstanding Roll-Up Letter of Credit, such

Issuer shall deliver to Agent a notice of such issuance no later than 12:00 Noon (New York City time) at least 5 days (or in each case such shorter period as may be agreed to by Agent in any particular instance) in advance of the proposed date of issuance, which notice shall describe the relevant Roll-Up Letter of Credit and the verbatim text of the Roll-Up Letter of Credit proposed to be issued and shall specify such proposed date of issuance. Unless the Commitment Termination Date shall have occurred, on such proposed date of issuance such Issuer shall issue a Roll-Up Letter of Credit in the form set forth in such notice (subject to the provisions of Section 2.10(d)) to replace such outstanding Roll-Up Letter of Credit.

(d)    Subject to any requirements herein to provide notice at an earlier time, on or prior to the date of issuance of any Letter of Credit the Issuer and Borrowers shall provide written notice to the Agent of the date of issuance of such Letter of Credit, amount of such Letter of Credit and such other information with respect thereto as the Agent shall reasonably request.

2.12    Disbursements, Reimbursement.

(a)    Immediately upon the issuance of each Letter of Credit, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Issuer a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Revolving Lender's Revolving Commitment Percentage of the Maximum Undrawn Amount of such Letter of Credit (as in effect from time to time) and the amount of such drawing, respectively. Immediately upon the issuance of any Roll-Up Letter of Credit (including any deemed issuance of a Roll-Up Letter of Credit pursuant to Section 2.11(c)) other than the WTC Letter of Credit, each Roll-Up Lender shall be deemed to, and hereby agrees to, have irrevocably purchased from the Issuer a participation in such Roll-Up Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Roll-Up Commitment Percentage of the maximum amount which is or at any time may become available to be drawn thereunder and the amount of such drawing, respectively. Immediately upon the issuance of the WTC Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Issuer a participation in such WTC Letter of Credit and each drawing thereunder in an amount equal to such Lender's L/C Commitment Percentage of the Maximum Undrawn Amount of such WTC Letter of Credit (as in effect from time to time) and the amount of such drawing, respectively. Each Borrower, with respect to each Existing L/C and Roll-Up Letter of Credit, hereby (1) represents, warrants, agrees, covenants and reaffirms that it has no (and it permanently and irrevocably waives and releases Agent, Issuer and Lenders from any, to the extent arising on or prior to the Closing Date with respect to the relevant Existing L/C) defense, set off, claim or counterclaim against Agent, Issuer or any Lender in regard to its obligations in respect of any such participation in a Roll-Up Letter of Credit or any drawings honored thereunder, and (2) affirms its obligation to pay such participations, and any amounts owed (whether or not then due and payable, and including all interest and fees accrued under the Prepetition ABL Credit Agreement to the Closing Date with respect to the relevant Existing L/C) with respect to each Roll-Up Letter of Credit in accordance with the terms and conditions of this Agreement and the Other Documents.

(b)    In the event of any request for a drawing under a Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit by the beneficiary or transferee thereof, Issuer will promptly notify Borrowing Agent. Regardless of whether Borrowing Agent shall

have received such notice, the Borrowers shall reimburse (such obligation to reimburse Issuer shall sometimes be referred to as a "Reimbursement Obligation") Issuer prior to 12:00 Noon on each Drawing Date with respect to a Letter of Credit in an amount equal to the amount so paid by Issuer. In the event Borrowers fail to reimburse Issuer for the full amount of any drawing under any Letter of Credit by 12:00 Noon on the Drawing Date, Issuer will promptly notify each Revolving Lender thereof, and Borrowers shall be deemed to have requested that a Revolving Advance maintained as a Domestic Rate Loan be made by the Revolving Lenders to be disbursed on the Drawing Date under such Letter of Credit, and Lenders having a Revolving Commitment shall be unconditionally obligated to fund such Revolving Advance (whether or not the conditions specified in Section 8.2 are then satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason) as provided for in Section 2.12(c) immediately below. Issuer will promptly notify each Lender having a L/C Commitment of any Drawing Date for the WTC Letter of Credit, and Borrowers shall be deemed to have requested that a L/C Commitment Advance maintained as a Domestic Rate Loan be made by the Lenders having a L/C Commitment to be disbursed on the Drawing Date under such WTC Letter of Credit, and Lenders having a L/C Commitment shall be unconditionally obligated to fund such L/C Commitment Advance (whether or not the conditions specified in Section 8.2 are then satisfied or the commitments of Lenders to make L/C Commitment Advances hereunder have been terminated for any reason) as provided for in Section 2.12(c) immediately below. Issuer will promptly notify each Roll-Up Lender of any Drawing Date under the Roll-Up Letters of Credit (other than the WTC Letter of Credit), and Borrowers shall be deemed to have requested that a Roll-Up Advance maintained as a Domestic Rate Loan be made by the Roll-Up Lenders to be disbursed on the Drawing Date under such Roll-Up Letter of Credit, and Roll-Up Lenders shall be unconditionally obligated to fund such Roll-Up Advance (whether or not the conditions specified in Section 8.2 are then satisfied or the commitments of Lenders to make Roll-Up Advances hereunder have been terminated for any reason) as provided for in Section 2.12(c) immediately below. Any notice given by Issuer pursuant to this Section 2.12(b) may be oral if promptly confirmed in writing and a copy of such notice shall be provided to the Agent; provided that the lack of such a confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)     Each Lender shall upon any notice pursuant to Section 2.12(b) make available to Issuer an amount in immediately available funds equal to its Initial Commitment Percentage, Revolving Commitment Percentage, L/C Commitment Percentage or Roll-Up Commitment Percentage, as applicable, of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.12(d)) each be deemed to have made (as applicable) (x) if reimbursing the Issuer for a drawing under a Letter of Credit, a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in that amount, (y) if reimbursing the Issuer for a drawing under the WTC Letter of Credit, a L/C Commitment Advance maintained as a Domestic Rate Loan to Borrowers in that amount, or (z) if reimbursing the Issuer for a drawing under a Roll-Up Letter of Credit, a Roll-Up Advance maintained as a Domestic Rate Loan to Borrowers in that amount. If any Lender so notified fails to make available to Issuer the amount of such Lender's Initial Commitment Percentage, Revolving Commitment Percentage or L/C Commitment Percentage of such amount or Roll-Up Commitment Percentage of such amount, as applicable, in each case by no later than 2:00 p.m. on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the

Federal Funds Effective Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances maintained as a Domestic Rate Loans on and after the fourth day following the Drawing Date. Issuer will promptly give notice of the occurrence of the Drawing Date, but failure of Issuer to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this Section 2.12(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.12(c)(i) and (ii) until and commencing from the date of receipt of notice from Issuer of a drawing.

(d)     With respect to any unreimbursed drawing under a Letter of Credit that is not converted into a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.12(b) for any reason, Borrowers shall be deemed to have incurred from Issuer a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing; with respect to any unreimbursed drawing under the WTC Letter of Credit that is not converted into a L/C Commitment Advance maintained as a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.12(b) for any reason, Borrowers shall be deemed to have incurred from Issuer a borrowing (each a "WTC Letter of Credit Borrowing") in the amount of such drawing; and with respect to any unreimbursed drawing under a Roll-Up Letter of Credit that is not converted into a Roll-Up Advance maintained as a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.12(b) for any reason, Borrowers shall be deemed to have incurred from Issuera borrowing (each a "Roll-Up Letter of Credit Borrowing") in the amount of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance maintained as a Domestic Rate Loan, such WTC Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a L/C Commitment Advance maintained as a Domestic Rate Loan, and such Roll-Up Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Roll-Up Advance maintained as a Domestic Rate Loan. Each Revolving Lender's payment to Issuer pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Revolving Lender in satisfaction of its Participation Commitment under this Section 2.12; each L/C Commitment Lender's payment to Issuer pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such WTC Letter of Credit Borrowing and shall constitute a "L/C Participation Advance" from such L/C Commitment Lender in satisfaction of its L/C Participation Commitment under this Section 2.12; and each Roll-Up Lender's payment to Issuer pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such Roll-Up Letter of Credit Borrowing and shall constitute a "Roll-Up Participation Advance" from such Roll-Up Lender in satisfaction of its Roll-Up Participation Commitment under this Section 2.12.

(e)     Each Lender's Participation Commitment shall continue until the last to occur of any of the following events: (x) Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled; and (z) all Persons (other than the Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit. Each Lender's L/C Participation Commitment shall continue until the last to occur of any of the following events:

(x) the WTC Letter of Credit is cancelled or no longer remains outstanding; and (y) all Persons (other than the Borrowers) have been fully reimbursed for all payments made under or relating to the WTC Letter of Credit.  Each Roll-Up Lender's Roll-Up Participation Commitment shall continue until the last to occur of any of the following events: (x) no Roll-Up Letter of Credit issued or deemed issued or created hereunder remains outstanding and uncancelled; and (y) all Persons (other than the Borrowers) have been fully reimbursed for all payments made under or relating to Roll-Up Letters of Credit.

(f)      If for any reason proceeds of Revolving Advances are not received by Issuer on the applicable Reimbursement Date in an amount equal to the amount of the payment made by Issuer to honor a drawing under a Letter of Credit, or if for any reason proceeds of Roll-Up Advances are not received by Issuer on the applicable Reimbursement Date in an amount equal to the amount of the payment made by Issuer to honor a drawing under a Roll-Up Letter of Credit, Borrowers shall reimburse such Issuer, on demand, in an amount in same day funds equal to the excess of the amount of such payment over the aggregate amount of such Revolving Advances, if any, or Roll-Up Advances, if any (as applicable), which are so received.  Nothing in this Section 2.12(f) shall be deemed to relieve any Lender from its obligation to make Revolving Advances or Roll-Up Advances, as the case may be, on the terms and conditions set forth in this Agreement, and Borrowers shall retain any and all rights each may have against any Lender resulting from the failure of such Lender to make such Revolving Advances or Roll-Up Advances under this Section 2.12(f).

2.13    Repayment of Participation Advances.

(a)      Upon (and only upon) receipt by Agent or Issuer for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by the Issuer as Issuer under the Letter of Credit with respect to which any Revolving Lender has made a Participation Advance to Issuer, or (ii) in payment of interest on such a payment made by Issuer or Agent under such a Letter of Credit, Agent or Issuer, as applicable, will pay to each Revolving Lender, in the same funds as those received by Agent or Issuer, the amount of such Revolving Lender's Revolving Commitment Percentage of such funds, except Agent or Issuer shall retain the amount of the Revolving Commitment Percentage of such funds of any Revolving Lender that did not make a Participation Advance in respect of such payment by Agent or Issuer.  Upon (and only upon) receipt by Agent or Issuer for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by the Issuer as Issuer under the WTC Letter of Credit with respect to which any L/C Commitment Lender has made a L/C Participation Advance to Issuer, or (ii) in payment of interest on such a payment made by Issuer or Agent under such WTC Letter of Credit, Agent or Issuer, as applicable, will pay to each L/C Commitment Lender, in the same funds as those received by Agent or Issuer, the amount of such L/C Commitment Lender's L/C Commitment Percentage of such funds, except Agent or Issuer shall retain the amount of the L/C Commitment Percentage of such funds of any L/C Commitment Lender that did not make a L/C Participation Advance in respect of such payment by Agent or Issuer.  Upon (and only upon) receipt by Agent or Issuer for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by the Issuer as Issuer under the Roll-Up Letter of Credit with respect to which any Roll-Up Lender has made a Roll-Up Participation Advance to Issuer, or (ii) in payment of interest on such a payment made by Issuer or Agent under such a Roll-Up Letter of Credit, Agent or Issuer, as applicable,

will pay to each Roll-Up Lender, in the same funds as those received by Agent or Issuer, the amount of such Roll-Up Lender's Roll-Up Commitment Percentage of such funds, except Agent or Issuer shall retain the amount of the Roll-Up Commitment Percentage of such funds of any Roll-Up Lender that did not make a Roll-Up Participation Advance in respect of such payment by Agent or Issuer.

(b)     If Issuer or Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by Borrowers to Issuer or Agent pursuant to Section 2.13(a) in reimbursement of a payment made under a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit or interest or fee thereon, each Lender shall, on demand of Agent, forthwith return to Issuer or Agent the amount of its Revolving Commitment Percentage, L/C Commitment Percentage, or Roll-Up Commitment Percentage (as applicable) of any amounts so returned by Issuer or Agent plus interest at the Federal Funds Effective Rate.

2.14    Documentation.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Issuer's interpretations of any Letter of Credit, WTC Letter of Credit and any Roll-Up Letter of Credit issued on behalf of such Borrower and by Issuer's written regulations and customary practices relating to letters of credit, though Issuer's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), Issuer shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following the Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit, WTC Letter of Credit or any Roll-Up Letters of Credit or any modifications, amendments or supplements thereto.

2.15    Determination to Honor Drawing Request.  In determining whether to honor any request for drawing under any Letter of Credit, WTC Letter of Credit or any Roll-Up Letter of Credit by the beneficiary thereof, Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit, WTC Letter of Credit or Roll-Up Letter of Credit, as the case may be, have been delivered and that they comply on their face with the requirements of such Letter of Credit, such WTC Letter of Credit or such Roll-Up Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit, WTC Letter of Credit or Roll-Up Letter of Credit, as applicable, has been satisfied in the manner so set forth.

2.16    Nature of Participation and Reimbursement Obligations.  Each Lender's obligation in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, the L/C Commitment Advances or L/C Participation Advances as a result of a drawing under the WTC Letter of Credit, or the Roll-Up Advances or Roll-Up Participation Advances as a result of a drawing under a Roll-Up Letter of Credit, and the obligations of Borrowers to reimburse Issuer upon a draw under a Letter of Credit, WTC Letter of Credit or Roll-Up Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.16 under all circumstances, including the following circumstances:

(i) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Issuer, Agent, any Borrower or any other Person, or which Borrower may have against Agent, any Lender or any other Person, or for any reason whatsoever;

(ii) the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, a WTC Letter of Credit Borrowing or a Roll-Up Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, a L/C Commitment Advance or a Roll-Up Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing, a WTC Letter of Credit Borrowing or a Roll-Up Letter of Credit Borrowing and the obligation of the Lenders to make Participation Advances, the L/C Participation Advances or Roll-Up Participation Advances under Section 2.12;

(iii) any lack of validity or enforceability of any Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit;

(iv) any claim of breach of warranty that might be made by Borrower or any Lender against the beneficiary of a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which any Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), Issuer, Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit, the WTC Letter of Credit or a Roll-Letter of Credit was procured);

(v) the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit, or the transport of any property or provisions of services relating to a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit, in each case even if Issuer or any of Issuer's Affiliates has been notified thereof;

(vi) payment by Issuer under any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit against presentation of a demand, draft or certificate or other document which is forged or does not fully comply with the terms of such Letter of Credit, the WTC Letter of Credit or such Roll-Up Letter of Credit, as applicable (provided that the foregoing shall not excuse Issuer from any obligation under the terms of any applicable Letter of Credit, the WTC Letter of Credit or any applicable Roll-Up Letter of Credit to require the presentation of documents that on their face appear to satisfy any applicable requirements for drawing under such Letter of Credit, the WTC Letter of Credit or such Roll-Up Letter of Credit, as applicable,  prior to honoring or paying any such draw);

(vii)   the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit;

(viii)   any failure by the Issuer or any of Issuer's Affiliates to issue any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit in the form requested by Borrowing Agent, unless the Issuer has received written notice from Borrowing Agent of such failure within three (3) Business Days after the Issuer shall have furnished Borrowing Agent a copy of such Letter of Credit, the WTC Letter of Credit or such Roll-Up Letter of Credit, as applicable, and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)   any Material Adverse Effect;

(x)   any breach of this Agreement or any Other Document by any party thereto;

(xi)   the occurrence or continuance of an insolvency proceeding with respect to any Borrower or any Guarantor;

(xii)   the fact that a Default or Event of Default shall have occurred and be continuing;

(xiii)   the fact that the Term shall have expired or this Agreement or the Obligations hereunder shall have been terminated; and

(xiv)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.17   <u>Indemnity</u>.   In addition to amounts payable as provided in <u>Section 16.5</u>, each Borrower hereby agrees to protect, indemnify, pay and save harmless Issuer and any of Issuer's Affiliates that have issued a Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Issuer or any of Issuer's Affiliates may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit, other than as a result of (a) the gross negligence or willful misconduct of the Issuer as determined by a final and non- appealable judgment of a court of competent jurisdiction or (b) the wrongful dishonor by the Issuer or any of Issuer's Affiliates of a proper demand for payment made under any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body (all such acts or omissions herein called "<u>Governmental Acts</u>").

2.18    <u>Liability for Acts and Omissions</u>.  As between Borrowers and Issuer, Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit, the WTC Letter of Credit and the Roll-Up Letters of Credit by, the respective beneficiaries of such Letters of Credit, the WTC Letter of Credit and the Roll-Up Letters of Credit.  In furtherance and not in limitation of the respective foregoing, Issuer shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, the WTC Letter of Credit or any such Roll-Up Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Issuer shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit, the WTC Letter of Credit or any such Roll-Up Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, the WTC Letter of Credit or any such Roll-Up Letter of Credit, or any other party to which such letter of credit may be transferred, to comply fully with any conditions required in order to draw upon such letter of credit or any other claim of any Borrower against any beneficiary of such letter of credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit, the WTC Letter of Credit or any such Roll-Up Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit, the WTC Letter of Credit or any such Roll-Up Letter of Credit of the proceeds of any drawing under such letter of credit; or (viii) any consequences arising from causes beyond the control of Issuer, including any governmental acts, and none of the above shall affect or impair, or prevent the vesting of, any of Issuer's rights or powers hereunder.  Nothing in the preceding sentence shall relieve Issuer from liability for Issuer's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non- appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence.  In no event shall Issuer or Issuer's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property, relating to a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit.

Without limiting the generality of the foregoing, Issuer and each of its Affiliates: (i) may rely on any oral or other communication believed in good faith by Issuer or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit, the WTC Letter of Credit or the relevant Roll-Up Letter of Credit, as applicable; (iii) may honor a previously dishonored presentation under a Letter of Credit, the WTC Letter of Credit or a Roll-Up Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored,

together with any interest paid by Issuer or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit, the WTC Letter of Credit or the relevant Roll-Up Letter of Credit, as applicable; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Issuer or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such letter of credit fail to conform in any way with such letter of credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Issuer under or in connection with the Letters of Credit-, the WTC Letter of Credit or the Roll-Up Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without willful misconduct or gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put Issuer under any resulting liability to any Borrower or any Lender.

2.19    Additional Payments.   Any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 4.2, 4.4, 4.12, 4.13, 4.14 and 4.15(e) hereof, may be charged to Borrowers' Account as an Initial Commitment Advance or, if the Initial Commitments have been fully drawn or are not available to be drawn, a Revolving Advance and added to the Obligations, and Borrowers shall be deemed to have authorized such charge and Lenders shall be obliged to fund their respective Commitment Percentages of the same regardless of whether any of the conditions under Sections 8.2 or 2.2 shall not be satisfied at the time such sum is expended or whether the Initial Commitments or Revolving Credit Commitments of the Lenders hereunder shall have otherwise been terminated at such time.

2.20    Manner of Borrowing and Payment.

(a)    Each borrowing of Initial Commitment Advances, Revolving Advances or L/C Commitment Advances shall be advanced according to the applicable Ratable Shares of Lenders (subject to the express provisions of Section 2.23).   Each borrowing of Roll-Up Advances shall be advanced according to the applicable Ratable Shares of Lenders (subject to the express provisions of Section 2.23).

(b)    Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Initial Commitment Advances, shall be applied to the Initial Commitment Advances according to the applicable Ratable Shares of Lenders with respect to the Initial Commitments (subject to the express provisions of Section 2.23).   Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Revolving Advances, shall be applied to the Revolving Advances according to the

applicable Ratable Shares of Revolving Lenders with respect to the Revolving Commitments (subject to the express provisions of <u>Section 2.23</u>). Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the WTC L/C Commitment Advances, shall be applied to the WTC L/C Commitment Advances according to the applicable Ratable Shares of Lenders with respect to the L/C Commitments (subject to the express provisions of <u>Section 2.23</u>). Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Roll-Up Advances, shall be applied to the Roll-Up Advances according to the applicable Ratable Shares of Lenders with respect to the Roll-Up Commitments (subject to the express provisions of <u>Section 2.23</u>). Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 P.M. in Dollars and in immediately available funds.

(c)      <u>Funding of Initial Commitment Advances and Revolving Advances</u>.

(i)      Promptly after receipt by Agent of a request for an Initial Commitment Advance pursuant to Section 2.2(b) or a Revolving Advance pursuant to Section 2.2(b), Agent shall notify Initial Commitment Lenders or Revolving Lenders, as the case may be, of its receipt of such request specifying the information provided by Borrowing Agent and the apportionment among Initial Commitment Lenders or Revolving Lenders, as applicable, of the requested Initial Commitment Advance or Revolving Advance as determined by Agent.  Each Initial Commitment Lender and each Revolving Lender shall remit the principal amount of each Initial Commitment Advance or each Revolving Advance, as applicable, to Agent such that Agent is able to, and Agent shall, to the extent Initial Commitment Lenders or Revolving Lenders, as applicable, have made funds available to it for such purpose and subject to <u>Section 8.2</u>, fund such Initial Commitment Advance or Revolving Advance to Borrower in U.S. Dollars and immediately available funds in accordance with <u>Section 2.3</u> prior to 1:00 p.m., on the applicable borrowing date; provided that if any Initial Commitment Lender or Revolving Lender fails to remit such funds to Agent in a timely manner, Agent may elect in its sole discretion (but shall not be obligated) to fund with its own funds the Initial Commitment Advance of such Initial Commitment Lender or the Revolving Advance of such Revolving Lender, as applicable, on such borrowing date, and such Lender shall be subject to the repayment obligation in <u>Section 2.20(c)(ii)</u>.

(ii)      Unless Agent shall have received notice from a Revolving Lender prior to the proposed date of any Revolving Advance that such Revolving Lender will not make available to Agent such Lender's Revolving Commitment Percentage of such Revolving Advance or notice from an Initial Commitment Lender prior to the proposed date of any Initial Commitment Advance that such Initial Commitment Lender will not make available to Agent such Lender's Initial Commitment Percentage of such Initial Commitment Advance, Agent may assume that such Revolving Lender or Initial Commitment Lender, as applicable, has made such share available on such date in accordance with <u>Section 2.20(c)(i)</u> and may, in reliance upon such assumption, make available to Borrower a corresponding amount; provided that nothing shall obligate the Agent to make such assumption and may in all cases confirm that such amounts have been made available prior to making available such amounts to Borrower.  In such event, if a Revolving Lender has not in fact made its share of the applicable Revolving Advance

available to Agent or an Initial Commitment Lender has not in fact made its share of the applicable Initial Commitment Advance available to Agent, then the applicable Revolving Lender or Initial Commitment Lender and Borrowers severally agree to pay to Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrowers to but excluding the date of payment to Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the interest rate applicable to Revolving Advances consisting of Domestic Rate Loans.  If such Revolving Lender pays its share of the applicable Revolving Advance to Agent, then the amount so paid shall constitute such Revolving Lender's Revolving Advance, and if such Initial Commitment Lender pays its share of the applicable Initial Commitment Advance to Agent, then the amount so paid shall constitute such Initial Commitment Lender's Initial Commitment Advance.  Any payment by Borrowers shall be without prejudice to any claim the Borrowers may have against a Revolving Lender that shall have failed to make such payment to Agent.

(d)     If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off and counterclaim) with respect to such portion as fully as if such Lender were the direct holder of such portion, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral.

2.21    Voluntary Prepayments, Voluntary Commitment Reductions, Mandatory Prepayments.

(a)     Borrowers shall have the right at its option from time to time to prepay the Advances in whole or part without premium or penalty (except if and to the extent applicable under Section 2.2(f)).  Whenever Borrowers desire to prepay any part of the Advances, it shall provide a written prepayment notice to the Agent by 1:00 p.m. (or 10:00 a.m. in the case of Eurodollar Rate Loans) at least four (4) Business Days prior to the date of prepayment of the Advances, setting forth the following information: (i) the date, which shall be a Business Day, on which the proposed prepayment is to be made; (ii) a statement indicating the application of the prepayment between the Initial Commitment Advances, Revolving Advances, L/C Commitment

Advances and Roll-Up Advances (provided that each such prepayment shall be applied ratably according to the then outstanding principal amount of all such Advances of such type); and (iii) a statement indicating the application of the prepayment between Advances which are Domestic Rate Loans and Advances which are Eurodollar Rate Loans.  All prepayment notices shall be irrevocable.  The principal amount of the Advances for which a prepayment notice is given, together with interest on such principal amount except with respect to Advances which are Domestic Rate Loans, shall be due and payable on the date specified in such prepayment notice as the date on which the proposed prepayment is to be made.  If Borrowers prepay Advances that are Eurodollar Rate Loans, the prepayment shall be applied to the Interest Periods in direct order of maturity.

       (b)     [Intentionally omitted].

       (c)     Subject to <u>Section 4.3</u> hereof, when any Borrower sells or otherwise disposes of any Collateral other than Inventory in the Ordinary Course of Business, including receipt of the proceeds of any condemnation or governmental taking with respect to any of the Collateral or any proceeds of any property or casualty insurance upon any loss or destruction of any of the Collateral, Borrowers shall repay the Advances in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale or disposition (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made without premium or penalty (except if and to the extent applicable under <u>Section 2.2(f)</u>) and promptly but in no event more than one (1) Business Day following receipt of such net cash proceeds, and until the date of payment, such proceeds shall be held in trust for Agent.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the then outstanding Advances (including cash collateralization of all Obligations relating to any outstanding Letters of Credit and Roll-Up Letters of Credit in accordance with the provisions of <u>Section 3.2(b)</u>), ratably according to the then outstanding principal amount of all such Advances and the face amount of all outstanding Letters of Credit and Roll-Up Letters of Credit not already then cash collateralized in accordance with the provisions of <u>Section 3.2(b)</u>.  Any such prepayment applied to the Advances shall be applied first to Domestic Rate Loans, then to Eurodollar Rate Loans (subject to the provisions of <u>Section 2.2(f)</u>), and to the extent so applied to any Eurodollar Rate Loans, the prepayment shall be applied to the Interest Periods in direct order of maturity.

       (d)     If any Capital Stock or Indebtedness shall be issued or incurred by any Debtor or their Subsidiaries (excluding any Indebtedness incurred in accordance with <u>Section 7.8</u> and excluding, for the avoidance of doubt, Capital Stock issued to the Pre-Petition Term Lenders pursuant to the Plan), Borrowers shall repay the Advances in an amount equal to one hundred percent (100%) of the net cash proceeds of such issuance or incurrence (i.e., gross proceeds less the reasonable costs of such issuance or incurrence), such repayments to be made without premium or penalty (except if and to the extent applicable under <u>Section 2.2(f)</u>) and promptly but in no event more than one (1) Business Day following receipt of such net cash proceeds, and until the date of payment, such proceeds shall be held in trust for Agent.  The foregoing shall not be deemed to be implied consent to any such issuance or incurrence otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the then outstanding Advances (including cash collateralization of all Obligations relating to any outstanding Letters of Credit and Roll-Up Letters of Credit in accordance with the provisions of <u>Section 3.2(b)</u>), ratably

according to the then outstanding principal amount of all such Advances and the face amount of all outstanding Letters of Credit and Roll-Up Letters of Credit not already then cash collateralized in accordance with the provisions of Section 3.2(b). Any such prepayment applied to the Advances shall be applied first to Domestic Rate Loans, then to Eurodollar Rate Loans (subject to the provisions of Section 2.2(f)), and to the extent so applied to any Eurodollar Rate Loans, the prepayment shall be applied to the Interest Periods in direct order of maturity.

2.22 Use of Proceeds.

(a) Borrowers shall apply the proceeds of Advances (i) to pay costs and expenses in connection with the DIP Facility and the Chapter 11 Cases, (ii) to provide ongoing working capital financing for Borrowers (including to reimburse drawings under Letters of Credit) and provide financial for general corporate purposes, including but not limited to investments in other Subsidiaries of the Borrowers to the extent not prohibited under this Agreement, in each case in accordance with the Budget, (iii) in the case of Revolving Advances, solely to fund operations and working capital and general corporate purposes of the DirectSat Business, (iv) in the case of L/C Commitment Advances, solely to reimburse the Issuer for any amount drawn under such WTC Letter of Credit, if and when such letter of credit is drawn, (v) in the case of Initial Commitment Advances, to pre-fund a segregated account maintained and held by the DirectSat Subsidiaries and the DirectSat Business in an amount of not less than $13.8 million solely for purposes of financing $8.0 million for corporate costs of the Other Business and $5.8 million for insurance costs of the Other Business, in each case to the extent such costs arise after December 31, 2014it being understood that such amount of such Initial Commitments shall not be permitted to be utilized for any other purpose and shall only be permitted to be funded (and shall be required to be funded into such segregated account) on the Business Day prior to (or on) the effective date of the Plan of Reorganization (except that a portion thereof needed to pay insurance costs of the Other Business may be funded in January of 2015 if the payment of such insurance costs is required at such time) and such funding shall be utilized solely for such purposes) for the benefit of the Other Business, and (vi) in the case of Roll-Up Advances, solely to reimburse the Issuer of Roll-Up Letters of Credit for any amount drawn under such Roll-Up Letters of Credit pursuant to Section 2.12(c), if and when any such letter of credit is drawn. Notwithstanding anything herein to the contrary, the proceeds of the Advances may not be used (1) to fund distributions to creditors or (2) for any purpose prohibited by Section 7.24 hereof.

(b) Without limiting the generality of Section 2.22(a) above, neither the Borrowers, any Guarantors nor any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower or Guarantor, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of the Trading with the Enemy Act.

2.23 Defaulting Lender. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a) except as otherwise expressly provided for in this Section 2.23, Advances under the relevant Commitments shall be incurred pro rata from the Non-Defaulting Lenders

based on their respective Initial Commitment Percentages, Revolving Commitment Percentages, L/C Commitment Percentages or Roll-Up Commitment Percentages, as applicable, and no Initial Commitment Percentage, Revolving Commitment Percentage, L/C Commitment Percentage or Roll-Up Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of any Lender becoming a Defaulting Lender.    Amounts received in respect of principal of any Initial Commitment Advances, Revolving Advances and L/C Commitment Advances shall be applied to reduce the Initial Commitment Advances, Revolving Advances and L/C Commitment Advances, respectively, of each Lender (other than any Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances and L/C Commitment Advances) in accordance with their respective Initial Commitment Percentages, Revolving Commitment Percentages and L/C Commitment Percentages; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender with respect to Initial Commitment Advances, Revolving Commitment Advances or L/C Commitment Advances any payments received by Agent for such Defaulting Lender's benefit, nor shall such a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees) in respect of Initial Commitments or Initial Commitment Advances, Revolving Commitments or Revolving Advances and L/C Commitments or L/C Commitment Advances.    Amounts received in respect of principal of any Roll-Up Advances shall be applied to reduce the Roll-Up Advances of each Roll-Up Lender (other than any Defaulting Lender with respect to Roll-Up Advances) in accordance with their Roll-Up Commitment Percentages; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender with respect to Roll-Up Advances any payments received by Agent in respect of the Roll-Up Commitments for the Defaulting Lender's benefit, nor shall such a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees) with respect to Roll-Up Advances or Roll-Up Commitments.    Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent.    Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender;

(b)    Commitment Fees accruing in respect of the Commitments with respect to which such Defaulting Lender is a Defaulting Lender shall cease to accrue in favor of such Defaulting Lender pursuant to Section 3.3;

(c)    the Initial Commitment Percentage, Revolving Commitment Percentage and L/C Commitment Percentage and outstanding Initial Commitment Advances, Revolving Commitment Advances and L/C Commitment Advances of such Defaulting Lender (if such Lender is a Defaulting Lender with respect to Initial Commitment Advances, Revolving Commitment Advances or L/C Commitment Advances) and the Roll-Up Commitment Percentage and outstanding Roll-Up Advances of such Defaulting Lender (if such Lender is a Defaulting Lender with respect to Roll-Up Advances) shall not be included in determining whether the Determining Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 16.2); provided, that this clause (c) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such particular Lender and/or each Lender directly affected thereby;

(d)       if any Letters of Credit, the WTC Letter of Credit or any Roll-Up Letters of Credit (or drawings under any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letters of Credit for which the Issuer has not been reimbursed) are outstanding or any exist at the time such Lender becomes a Defaulting Lender, then:

(i)       all or any part of the obligations of such Defaulting Lenders under its Participation Commitments and L/C Participation Commitments in respect of Letters of Credit and the WTC Letter of Credit (such Defaulting Lender's "Letter of Credit Obligations") shall be reallocated among the Lenders that are Non-Defaulting Lenders with respect to the Initial Commitments, the Revolving Commitments and the L/C Commitments in accordance with their respective Ratable Shares but only to the extent that (x) the aggregate sum of outstanding Revolving Advances plus the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit shall not exceed the aggregate of the Revolving Commitment Amount of all such Non-Defaulting Lenders, (y) the aggregate sum of outstanding L/C Commitment Advances plus the maximum undrawn face amount of the WTC Letter of Credit shall not exceed the aggregate of the L/C Commitment Amount of all such Non-Defaulting Lenders, and (z) no Potential Default or Event of Default has occurred and is continuing at such time; and all or any part of the obligations of such Defaulting Lenders under its Roll-Up Participation Commitments (such Defaulting Lender's "Roll-Up Letter of Credit Obligations") shall be reallocated among the Non-Defaulting Lenders with respect to the Roll-Up Commitments in accordance with their respective Roll-Up Ratable Shares but only to the extent that (x) the aggregate sum of outstanding Roll-Up Advances plus the aggregate Maximum Undrawn Amount of all outstanding Roll-Up Letters of Credit shall not exceed the aggregate of the Roll-Up Commitment Amount of all such Non-Defaulting Lenders, and (y) no Potential Default or Event of Default has occurred and is continuing at such time

(ii)       if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Agent cash collateralize for the benefit of the Issuer Borrowers' obligations corresponding to such Defaulting Lender's Participation Commitments or Roll-Up Participation Commitments with respect to outstanding Letters of Credit, the outstanding WTC Letter of Credit and outstanding Roll-Up Letters of Credit (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with Section 3.2(b) for so long as any Letters of Credit, the WTC Letter of Credit and any Roll-Up Letters of Credit, as applicable, are outstanding;

(iii)       if the Borrower cash collateralizes any portion of such Defaulting Lender's Letter of Credit Obligations or Roll-Up Letter of Credit Obligations, as applicable (in each case after giving effect to any partial reallocation pursuant to clause (i) above), pursuant to clause (ii) above, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2 with respect to such Defaulting Lender's Letter of Credit Obligations or Roll-Up Letter of Credit Obligations, as applicable, during the period such Defaulting Lender's Participation Commitments or Roll-Up Participation Commitments, as applicable, are cash collateralized;

(iv)       if any portion of the Non-Defaulting Lenders' Letter of Credit Obligations are reallocated pursuant to clause (i) above, then the fees payable to the Revolving Lenders or the L/C Commitment Lenders, as applicable, pursuant to Section 3.2 shall be adjusted

in accordance with such Non-Defaulting Lenders' Ratable Share, and if any portion of the Non-Defaulting Lender's Roll-Up Letter of Credit Obligations are reallocated pursuant to clause (i) above, then the fees payable to the Roll-Up Lenders pursuant to Section 3.2 shall be adjusted in accordance with such Non-Defaulting Lenders' Roll-Up Ratable Share; and

(v)      if all or any portion of such Defaulting Lender's Letter of Credit Obligations are neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of Issuer or any other Lender hereunder, all Letter of Credit Fees payable under Section 3.2 with respect to such Defaulting Lender's Letter of Credit Obligations shall be payable to Issuer (and not to such Defaulting Lender) until and to the extent that such Letter of Credit Obligations are reallocated and/or cash collateralized, and if all or any portion of such Defaulting Lender's Roll-Up Letter of Credit Obligations are neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of Issuer or any other Lender hereunder, all Roll-Up Letter of Credit Fees payable under Section 3.2 with respect to such Defaulting Lender's Roll-Up Letter of Credit Obligations shall be payable to Issuer (and not to such Defaulting Lender) until and to the extent that such Roll-Up Letter of Credit Obligations are reallocated and/or cash collateralized; and

(e)      so long as such Lender is a Defaulting Lender with respect to Initial Commitment Advances, Revolving Advances or L/C Commitment Advances, Issuer shall not be required to issue, amend or increase any Letter of Credit, unless Issuer is satisfied that the related exposure and the Defaulting Lender's then outstanding Letter of Credit Obligations will be 100% covered by the Revolving Credit Commitments and L/C Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.23(d)(iii), and participating interests in any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.23(d)(i) (and such Defaulting Lender shall not participate therein); and so long as such Lender is a Defaulting Lender with respect to Roll-Up Advances, Issuer shall not be required to amend or increase any Roll-Up Letter of Credit, unless Issuer is satisfied that the related exposure and the Defaulting Lender's then outstanding Roll-Up Letter of Credit Obligations will be 100% covered by the Roll-up Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.23(d)(iii), and participating interests in any newly issued or increased Roll-Up Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.23(d)(i) (and such Defaulting Lender shall not participate therein).

If (i) a Bankruptcy Event with respect to a parent company of any Revolving Lender shall occur following the date hereof and for so long as such event shall continue, or (ii) a Bankruptcy Event with respect to a parent company of any Roll-Up Lender shall occur following the date hereof and for so long as such event shall continue, Issuer shall not be required to issue, amend or increase any Letter of Credit, the WTC Letter of Credit or any Roll-Up Letter of Credit, as the case may be, unless Issuer shall have entered into arrangements with the Borrower or such Lender, satisfactory to Issuer to defease any risk to it in respect of such Lender hereunder.

In the event that Borrowers and Issuer agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then Issuer will so notify the parties hereto, and the Ratable Share of the Letter of Credit Obligations and Roll-Up

Letter of Credit Obligations of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment Percentages, Roll-Up Commitment Percentages, Revolving Commitment, L/C Commitment and Roll-Up Commitment, as applicable, and on such date such Lender shall purchase at par such of the Revolving Advances and Roll-Up Advances, as applicable, of the other Lenders as Agent shall determine may be necessary in order for such Lender to hold such Revolving Advances and L/C Commitment Advances in accordance with its Ratable Share and to hold such Roll-Up Advances in accordance with its Roll-Up Ratable Share.   Issuer shall thereupon release to the Borrower any cash collateral provided pursuant to Section 2.23(d)(iii) with respect to such Lender, unless a Default or Event of Default has occurred and is continuing at such time.

Other than as expressly set forth in this Section 2.23, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.23 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

      2.24   Bankruptcy Matters. (a)      The Chapter 11 Cases shall be commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice for (i) the motion seeking approval of this Agreement and the Other Documents and the Financing Orders, (ii) the hearing for the approval of the Interim Financing Order and (iii) the hearing for the approval of the Permanent Financing Order shall be given. The Debtors shall give, on a timely basis as specified in the Financing Orders, all notices required to be given to all parties specified in the Financing Orders.

      (b)      The Obligations constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind whatsoever.

      (c)      The Obligations will be secured by a perfected first priority Lien on all of the Collateral, subject to the terms of the Financing Orders and senior in priority to any other Liens on the Collateral (subject to the Carve-Out and Permitted Encumbrances).

      (d)      Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Financing Order or the Permanent Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of this Agreement and the Other Documents and (i) so long as it is effective, the Interim Financing Order and (ii) upon its entry, the Permanent Financing Order.

## III.    INTEREST AND FEES.

3.1    <u>Interest</u>.  Interest on Advances shall be payable in arrears on the first day of each month with respect to Domestic Rate Loans and, with respect to Eurodollar Rate Loans, at the end of each Interest Period.  Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to the applicable Interest Rate (as applicable, the "<u>Contract Rate</u>").  Except as expressly provided otherwise in this Agreement, any Obligations other than the Advances that are not paid when due shall accrue interest at the Interest Rate for Domestic Rate Loans, subject to the provision of the final sentence of this <u>Section 3.1</u> regarding the Default Rate.  Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, any applicable Contract Rate shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.  The Eurodollar Rate shall be adjusted with respect to Eurodollar Rate Loans without notice or demand of any kind on the effective date of any change in the Reserve Percentage as of such effective date.  Notwithstanding the foregoing to the contrary, a portion of such accrued interest amount on the date such interest is otherwise due and payable equal to the portion of such interest that is attributable to a per annum interest rate of one percent (1.0%) shall be capitalized on the due date therefor, and interest shall accrue on all amounts so capitalized at the applicable rate(s) set forth in this paragraph.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Agent, acting solely at the direction of Determining Lenders, may elect an increase in the interest rate to the Default Rate referenced below, and with written notice from Agent to Borrowers of the exercise of such direction (or, in the case of any Event of Default under <u>Section 10.1</u>, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Obligations shall bear interest at the applicable Contract Rate plus two (2.00%) percent per annum (as applicable, the "<u>Default Rate</u>").

3.2    <u>Letter of Credit Fees</u>.

(a)    Borrowers shall pay (w) to Agent, for the ratable benefit of Revolving Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by the Applicable Margin for Revolving Letter of Credit Fees per annum (the fees described in this clause (y), the "<u>Revolving Letter of Credit Fees</u>"), (y) to Agent, for the ratable benefit of Roll-Up Lenders (or in the case of such fees payable on account of the WTC Letter of Credit, for the ratable benefit of the Lenders holding L/C Commitments), fees for each Roll-Up Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Roll-Up Letter of Credit multiplied by the Applicable Margin for Roll-Up Letter of Credit Fees per annum (the fees described in this clause (y), the "<u>Roll-Up Letter of Credit Fees</u>"), and (z) to the Issuer for its own account, a fronting fee equal to the average daily face amount of each outstanding Letter of Credit and Roll-Up Letter of Credit, multiplied by one quarter of one percent (0.25%) per annum (all of the foregoing fees, the "<u>Letter of Credit Fees</u>"), such fees to be calculated on the basis of a 360- day year for the actual number of days elapsed and to be payable monthly in arrears on the first day of each month and on the last day of the Term.  In addition, Borrowers shall pay to Issuer for its own account any

and all administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and Roll-Up Letters of Credit and all fees and expenses as agreed upon by the Issuer and the Borrowing Agent in connection with any Letter of Credit or Roll-Up Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit or Roll-Up Letter of Credit and any acceptances created thereunder, all such charges, fees and expenses, if any, to be payable on demand.  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction.  All Letter of Credit Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Agent, acting solely at the direction of Determining Lenders, may elect an increase in the Letter of Credit Fees, and with written notice from Agent to Borrowers of the exercise of such direction (or, in the case of any Event of Default under <u>Section 10.1</u>, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any notice or any other affirmative action by any party), the Letter of Credit Fees described in clause (x) and clause (y) of this <u>Section 3.2(a)</u> shall be increased by an additional two percent (2.00%) per annum.

(b)    At any time following the occurrence of an Event of Default that has not been cured or waived, the Agent, acting solely at the direction of the Required Lenders, may elect that Letters of Credit and (if a Cash Collateral Event shall have occurred) Roll-Up Letters of Credit be cash collateralized, and with written notice from Agent to Borrowers of the exercise of such direction (or, in the case of any Event of Default under <u>Section 10.1</u>, immediately and automatically upon the occurrence of such Event of Default, without the requirement of any affirmative action by any party), and/or upon the expiration of the Term or any other termination of this Agreement (and also, if applicable, in connection with any mandatory prepayment under <u>Section 2.21</u>), Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit and (if a Cash Collateral Event shall have occurred) Roll-Up Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time.  Agent may, upon direction of Required Lenders, invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Required Lenders and such Borrower mutually agree (or, in the absence of such agreement, as Required Lenders may reasonably select) and the net return on such investments shall be credited to such account and constitute additional cash collateral.  In the absence of any such direction, the account provided for under this <u>Section 3.2(b)</u> shall be established by Agent as a non-interest bearing account and in such case Agent shall have no obligation (and Borrowers hereby waive any claim) under Article 9 of the UCC to pay interest on such cash collateral being held by Agent.  No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) payment and performance in full of all Obligations;

01:16263179.1

(y) expiration of all Letters of Credit and Roll-Up Letters of Credit; and (z) termination of this Agreement; provided that upon the expiration or termination of any particular Letter of Credit or Roll-Up Letter of Credit, solely if all such Letters of Credit and Roll-Up Letters of credit are then fully cash collateralized in accordance with the foregoing requirements, the Borrowers may withdraw and Agent shall release to Borrowers an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of such Letter of Credit or Roll-Up Letter of Credit, as applicable, at the time of such expiration or termination.  Borrowers hereby grant to Agent a Lien and security interest in any such cash collateral and any right, title and interest of Borrowers in any deposit account or investment account into which such cash collateral may be deposited from time to time.   Borrowers agree that upon the coming due of any Reimbursement Obligations (or any other Obligations, including Obligations for Letter of Credit Fees) with respect to the Letters of Credit or the Roll-Up Letters of Credit, Agent and Issuer may use such cash collateral to pay and satisfy such Obligations.

3.3   <u>Facility Fee</u>.  If, for any calendar month during the Term, (x) the average daily unpaid balance of the Initial Commitment Advances for each day of such calendar month does not equal the average daily aggregate outstanding Initial Commitments, then Borrowers shall pay to Agent for the ratable benefit of Initial Commitment Lenders a fee (the "<u>Initial Commitment Unused Fee</u>") at a rate equal to one-half percent (0.5%) per annum on the amount by which the aggregate outstanding Initial Commitments exceeds such average daily unpaid balance, and/or (y) the average daily unpaid balance of the Revolving Advances plus the average daily Maximum Undrawn Amount of all outstanding Letters of Credit for each day of such calendar month does not equal the average daily aggregate outstanding Revolving Commitments, then Borrowers shall pay to Agent for the ratable benefit of Revolving Lenders a fee (the "<u>Revolving Commitment Fee</u>") at a rate equal to one-half percent (0.5%) per annum on the amount by which the average daily aggregate outstanding Revolving Commitments exceeds such average daily unpaid balance; provided, however, that any Revolving Commitment Fee accrued with respect to the Revolving Commitment Amount of a Defaulting Lender and any Initial Commitment Unused Fee accrued with respect to the Initial Commitment Amount of a Defaulting Lender during the period prior to the time such Lender became such a Defaulting Lender and unpaid at such time shall not be payable by Borrowers so long as such Lender shall be a Defaulting Lender except to the extent that such Revolving Commitment Fee or Initial Commitment Unused Fee, as applicable, shall otherwise have been due and payable by the Borrower prior to such time; and provided further that no Revolving Commitment Fee shall accrue with respect to the Revolving Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender with respect to Revolving Advances and no Initial Commitment Unused Fee shall accrue with respect to the Initial Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender with respect to Initial Commitment Advances.  Subject to the provisos in the directly preceding sentence, all Revolving Commitment Fees and Initial Commitment Unused Fees shall be payable to Agent in arrears on the first day of each calendar month with respect to the previous calendar month.

3.4   <u>Other Fees and Fee Letter</u>.

(a)   Borrowers shall pay on the Closing Date to Agent, for distribution to each Lender, a fee equal to 1.0% of each such Lender's Revolving Commitment, Initial Commitment

and L/C Commitment on the Closing Date, which shall be deemed fully earned and non-refundable when paid.

(b)     Borrowers shall pay to Agent, for distribution to each Lender having Initial Commitments, Revolving Commitments and L/C Commitments, as a condition to the effectiveness of the One Month Extension Option, the fees described in Section 13.3 hereof.

(c)     Borrowers shall pay the amounts required to be paid in the Fee Letter in the manner and at the times required by the Fee Letter.

3.5     <u>Computation of Interest and Fees</u>.  Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed.  If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate during such extension.

3.6     <u>Maximum Charges</u>.  In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law.  In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.7     <u>Increased Costs</u>.  In the event that any Applicable Law, treaty or governmental regulation, or any Change in Law or in the interpretation or application thereof, or compliance by any Lender (for purposes of this <u>Section 3.7</u>, the term "<u>Lender</u>" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans) with any request or directive (whether or not having the force of law) from any central bank or other Governmental Body or financial, monetary or other authority, shall:

(a)     subject Agent or any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to Agent or any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.10</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the Issuing Lender);

(b)     impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)     impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, renewing or maintaining its Advances hereunder by an amount that Agent or such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent or such Lender deems to be material, then, in any case Borrowers shall promptly pay Agent or such Lender, upon its demand, such additional amount as will compensate Agent or such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the Eurodollar Rate, as the case may be.  Agent or such Lender shall certify the amount of such additional cost or reduced amount to Borrowing Agent, and such certification shall be conclusive absent manifest error.

3.8    Basis For Determining Interest Rate Inadequate or Unfair.  In the event that Agent or any Lender shall have determined that:

(a)    reasonable means do not exist for ascertaining the Eurodollar Rate applicable pursuant to Section 2.2 hereof for any Interest Period; or

(b)    Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank Eurodollar market, with respect to an outstanding Eurodollar Rate Loan, a proposed Eurodollar Rate Loan, or a proposed conversion of a Domestic Rate Loan into a Eurodollar Rate Loan, then Agent shall give Borrowing Agent prompt written or telephonic notice of such determination.  If such notice is given, (i) any such requested Eurodollar Rate Loan shall be made as a Domestic Rate Loan, unless Borrowing Agent shall notify Agent no later than 10:00 a.m. four (4) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of Eurodollar Rate Loan, (ii) any Domestic Rate Loan or Eurodollar Rate Loan which was to have been converted to an affected type of Eurodollar Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 10:00 a.m. four (4) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Eurodollar Rate Loan, and (iii) any outstanding affected Eurodollar Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 10:00 a.m. four (4) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Eurodollar Rate Loan, shall be converted into an unaffected type of Eurodollar Rate Loan, on the last Business Day of the then current Interest Period for such affected Eurodollar Rate Loan.  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of Eurodollar Rate Loan or maintain outstanding affected Eurodollar Rate Loans and no Borrower shall have the right to convert a Domestic Rate Loan or an unaffected type of Eurodollar Rate Loan into an affected type of Eurodollar Rate Loan.

3.9    Capital Adequacy.

(a)    In the event that Agent or any Lender shall have determined that any Change in Law, or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender (for purposes of this Section 3.9, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling

Agent or any Lender and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent or any Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent or such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction.  In determining such amount or amounts, Agent or such Lender may use any reasonable averaging or attribution methods.  The protection of this <u>Section 3.9</u> shall be available to Agent and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, regulation or condition.

(b)    A certificate of Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to <u>Section 3.9(a)</u> hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.10    <u>Gross Up for Taxes</u>.  Any and all payments by or on account of any obligation of Borrowers hereunder or under any Other Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required by Applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Agent, Lender or Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions and (iii) Borrowers shall timely pay the full amount deducted to the relevant Governmental Body (the "<u>Payee</u>") in accordance with Applicable Law.  Without limiting the provisions of the foregoing, Borrowers shall timely pay any Other Taxes to the relevant Payee in accordance with applicable Law.

3.11    <u>Withholding Tax Exemption</u>.

(a)    Each Payee that is not incorporated under the Laws of the United States of America or a state thereof (and, upon the written request of Agent, each other Payee) agrees that it will deliver to Borrowing Agent and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under §1.1441-1(c)(16) of the Income Tax Regulations ("<u>Regulations</u>")) certifying its status (i.e., U.S. or foreign person) and, if appropriate, making a claim of reduced, or exemption from, U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Code.  The term "<u>Withholding Certificate</u>" means a Form W-9; a Form W-8BEN; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under § 1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in §1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person.

(b)    Each Payee required to deliver to Borrowing Agent and Agent a valid Withholding Certificate pursuant to Section 3.11(a) hereof shall deliver such valid Withholding Certificate as follows: (i) each Payee which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by any Borrower hereunder for the account of such Payee; (ii) each Payee shall deliver such valid Withholding Certificate at least five (5) Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such Payee to deliver such Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent). Each Payee which so delivers a valid Withholding Certificate further undertakes to deliver to Borrowing Agent and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrowing Agent or Agent.

(c)    Notwithstanding the submission of a Withholding Certificate claiming a reduced rate of or exemption from U.S. withholding tax required under Section 3.11(b) hereof, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under § 1.1441-7(b) of the Regulations. Further, Agent is indemnified under § 1.1461-1(e) of the Regulations against any claims and demands of any Payee for the amount of any tax it deducts and withholds in accordance with regulations under § 1441 of the Code.

## IV.    COLLATERAL: GENERAL TERMS

4.1    Security Interest in the Collateral.    To secure the prompt payment and performance of the Obligations to Agent and each Lender and each other holder of any of the Obligations, each Borrower and each Guarantor hereby assigns, pledges and grants to Agent for its benefit and for the ratable benefit of each Lender, Issuer and each other holder of any of the Obligations a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located. Each Borrower and each Guarantor shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest. Each Borrower and each Guarantor shall provide Agent with written notice of all commercial tort claims promptly upon the occurrence of any events giving rise to any such claim(s) (regardless of whether legal proceedings have yet been commenced), such notice to contain a brief description of the claim(s), the events out of which such claim(s) arose and the parties against which such claims may be asserted and, if applicable in any case where legal proceedings regarding such claim(s) have been commenced, the case title together with the applicable court. Upon delivery of each such notice, such Borrower and such Guarantor shall be deemed to hereby grant to Agent a security interest and lien in and to such commercial tort claims described therein and all proceeds thereof. Each Borrower and each Guarantor shall provide Agent with written notice promptly upon becoming the beneficiary under any letter of credit or otherwise obtaining any right, title or interest in any letter of credit rights, and at

Agent's request shall take such actions as Agent may reasonably request for the perfection of Agent's security interest therein.

4.2     Perfection of Security Interest.  Each Borrower and each Guarantor shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens other than Permitted Liens, (ii) [reserved], (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law.  By its signature hereto, each Borrower hereby authorizes Agent to file against such Borrower, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein, including without limitation a description of collateral as "all assets' and/or "all personal property" of any Borrower).  All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto shall be paid to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.3     Disposition of Collateral.  Each Borrower will safeguard and protect all Collateral and make no disposition of any Collateral or any other property or assets of any Borrower whether by sale, lease or otherwise except (a) the sale of Inventory in the Ordinary Course of Business, and (b) the disposition or transfer of obsolete and worn-out Equipment in the Ordinary Course of Business during any fiscal year, provided that any such sale or disposition under clause (b) shall be subject to the provisions of Section 2.21(c).

4.4     Preservation of Collateral.  Following the occurrence and during the continuance of a Default or Event of Default, in addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) may at any time take such steps as Agent deems necessary or desirable to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrowers' owned or leased property.  Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may direct. All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall, if the Determining Lenders so elect, or may at the Agent's option,

be charged to Borrowers' Account as an Initial Commitment Advance or, if the Initial Commitments have been fully drawn or are not available to be drawn, a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations, and such charge shall be deemed authorized by Borrowers and Lenders shall be obliged to fund their respective Commitment Percentages (as applicable) of the same regardless of whether any of the conditions under Sections 8.2 or 2.2 shall not be satisfied at such time or whether the relevant Commitments of the Lenders hereunder shall have otherwise been terminated at such time.

4.5     Ownership of Collateral and Assets.

(a)     With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (i) each Borrower shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority (subject only to Permitted Encumbrances which by operation of law (including the priority granted under the Uniform Commercial Code to any purchase money security interests that are Permitted Encumbrances) have senior priority) security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Liens the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by each Borrower or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all respects; and (iii) all signatures and endorsements of each Borrower that appear on such documents and agreements shall be genuine and each Borrower shall have full capacity to execute same.  Each Borrower's Equipment and Inventory shall be located as set forth on Schedule 4.5 (as such Schedule 4.5 may be updated at any time upon at least thirty (30) days written notice to Agent) and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business and other sales and dispositions to the extent permitted in Section 4.3 hereof.

(b)     (1) There is no location at which any Borrower has any Inventory (except for Inventory in transit) other than those locations listed on Schedule 4.5 (as such Schedule 4.5 may be updated at any time upon at least thirty (30) days written notice to Agent); (ii) Schedule 4.5 hereto (as such Schedule 4.5 may be updated at any time upon at least thirty (30) days written notice to Agent) contains a correct and complete list of the legal names and addresses of each warehouse at which Inventory of any Borrower is stored; none of the receipts received by any Borrower from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.5 hereto (as such Schedule 4.5 may be updated at any time upon at least thirty (30) days written notice to Agent) sets forth a correct and complete list of (A) each place of business of each Borrower and (B) the chief executive office of each Borrower; and (iv) Schedule 4.5 hereto (as such Schedule 4.5 may be updated at any time upon at least thirty (30) days written notice to Agent) sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each Borrower, together with the names and addresses of any landlords.

4.6     Defense of Agent's and Lenders' Interests.

(a)     Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force

and effect.  During such period no Borrower shall, without Agent's prior written consent, pledge, sell (except for sales of Inventory in the Ordinary Course of Business and other sales and dispositions to the extent permitted in Section 4.3 hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Liens, any part of the Collateral or any other property or assets of any Borrower.  Each Borrower shall defend Agent's interests in the Collateral against any and all Persons whatsoever.

(b)     At any time following demand by Agent for payment of all Obligations pursuant to Section 11.1(a) following the occurrence and during the existence of an Event of Default, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials.  If Agent exercises this right to take possession of the Collateral following the occurrence and during the existence of an Event of Default, Borrowers shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law.  Each Borrower shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory (if and to the extent included in the Collateral), documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7     Books and Records.  Each Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business.  All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied, subject to the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable at such time.

4.8     Financial Disclosure.  Each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations.  Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

4.9     Compliance with Laws.  Subject to any other provisions of this Agreement or any Other Document which shall expressly require more strict compliance by any Borrower with respect to any particular Applicable Law, each Borrower shall comply in all material respects with all Applicable Laws with respect to the Collateral and Borrowers' other property and assets or any part thereof or to the operation of such Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.

4.10    Inspection of Premises and Inspections/Evaluation of Collateral.    At all reasonable times and from time to time as often as Agent or the Lenders elect in their sole respective discretion, Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and Borrowers' other property and assets and the operation of each Borrower's business.  Agent, any Lender and their agents may enter upon any premises of any Borrower at any time during business hours and at any other reasonable time, and from time to time as often as Agent or such Lender may elect in its sole discretion, for the purpose of inspecting, auditing and evaluating the Collateral and Borrowers' other property and assets and any and all records pertaining thereto and the operation of such Borrower's business.

4.11    Insurance.  The assets and properties of each Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of such Borrower so that such insurance shall remain in full force and effect.  Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral and Borrowers' other property and assets.  At each Borrower's own cost and expense in amounts and with carriers acceptable to the Determining Lenders, each Borrower shall (a) keep all its insurable properties and properties in which such Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain business interruption insurance for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's and public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Borrower is engaged in business; (e) [RESERVED]; (f) furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Determining Lenders, naming Agent as a co-insured and lender loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (a) and (c) above, and with respect to the insurance coverage referred to in clause (a), providing (A) that all proceeds of the insurance coverage referred to in clause (a) above shall be payable to Agent to the extent of its interest in the applicable Collateral (and subject to the interests of any holder of any Permitted Encumbrances as to any particular Collateral which by operation of law (including

the priority granted under the Uniform Commercial Code to any purchase money security interests that are Permitted Encumbrances) have senior priority), (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent.  In the event of any loss under the insurance coverage referred to in clause (a) above, the carriers named therein hereby are directed by Agent and the applicable Borrower to make payment for such loss to Agent as its interest may appear (and subject to the interests of any holder of any other Permitted Encumbrances as to any particular Collateral which by operation of law (including the priority granted under the Uniform Commercial Code to any purchase money security interests that are Permitted Encumbrances) have senior priority) and not to such Borrower and Agent jointly.  If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent (and, if applicable, to the holder of any other Permitted Encumbrances which by operation of law (including the priority granted under the Uniform Commercial Code to any purchase money security interests that are Permitted Encumbrances) have senior priority) jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash, and is hereby appointed as the attorney of each Borrower with the full power and authority to do the same.  Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in clause (a) above.  All loss recoveries received by Agent upon any such insurance shall be applied to the Obligations as a prepayment made and applied in accordance with Section 2.21(c).  Any surplus shall be paid by Agent to Borrowers or applied as may be otherwise required by law.  Any deficiency thereon shall be paid by Borrowers to Agent, on demand..

4.12   Failure to Pay Insurance.  If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if the Determining Lenders so elect, may obtain such insurance and pay the premium therefor on behalf of such Borrower, and charge Borrowers' Account therefor as an Initial Commitment Advance or, if the Initial Commitments have been fully drawn or are not available to be drawn, a Revolving Advance of a Domestic Rate Loan and such expenses so paid shall be part of the Obligations, and such charge shall be deemed authorized by Borrowers and Lenders shall be obliged to fund their respective Initial Commitment Percentages or Revolving Commitment Percentages of the same regardless of whether any of the conditions under Sections 8.2 or 2.2 shall not be satisfied at such time or whether the Revolving Credit Commitments of the Lenders hereunder shall have otherwise been terminated at such time.

4.13   Payment of Taxes.  In accordance with the Bankruptcy Code and subject to any required approval by any applicable order of the Bankruptcy Court, each Borrower will pay, when due, all material post-petition taxes, assessments and other Charges that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Chapter 11 Cases and all material obligations arising from contractual obligations entered into after the Petition Date or from contractual obligations entered into prior to the Petition Date and assumed.  If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral or any of Borrowers' other property and assets, Agent may,

if the Determining Lenders so elect, without notice to Borrowers pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof.  Agent will not pay any taxes, assessments or Charges to the extent that any applicable Borrower has Properly Contested those taxes, assessments or Charges.  The amount of any payment by Agent under this <u>Section 4.13</u> shall be charged to Borrowers' Account as an Initial Commitment Advance or, if the Initial Commitments have been fully drawn or are not available to be drawn, maintained as a Domestic Rate Loan and added to the Obligations (and such charge shall be deemed authorized by Borrowers and Lenders shall be obliged to fund their respective Initial Commitment Percentages or Revolving Commitment Percentages of the same regardless of whether any of the conditions under <u>Sections 8.2</u> or <u>2.2</u> shall not be satisfied at such time or whether the such Commitments of the Lenders hereunder shall have otherwise been terminated at such time) and, until Borrowers shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold without interest any balance standing to Borrowers' credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

4.14    <u>Payment of Leasehold Obligations</u>.  In accordance with the Bankruptcy Code and subject to any required approval by any applicable order of the Bankruptcy Court, each Borrower shall at all times pay, when and as due, its rental obligations under all material leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's request will provide evidence of having done so.

4.15    <u>Receivables</u>.

(a)    <u>Nature of Receivables</u>.  Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower as of the date each Receivable is created.  Same shall be due and owing in accordance with the applicable Borrower's standard terms of sale without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by Borrowers to Agent.

(b)    <u>Solvency of Customers</u>.  Each Customer, to the actual knowledge of each Borrower, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due or with respect to such Customers of any Borrower, to the actual knowledge of such Borrower, who are not solvent such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c)    <u>Location of Borrowers</u>.  Each Borrower's chief executive office is located at the location specified on <u>Schedule 4.5</u>.  Until written notice is given to Agent by Borrowing Agent of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)      Collection of Receivables.  Borrowers shall instruct their Customers to deliver all remittances upon Receivables to such Blocked Accounts or Depository Accounts (and/or lockboxes associated therewith) as contemplated by Section 4.15(h) of the Pre-Petition ABL Credit Agreement prior to the Closing Date.  Notwithstanding the foregoing, to the extent any Borrower directly receives any remittances upon Receivables, as between Borrowers on the one hand and Agent on the other: (i) such Borrower will, at such Borrower's sole cost and expense, but on Agent's behalf and for Agent's account, collect in trust for Agent (pursuant to an express trust created hereby) all amounts received on Receivables, and shall not commingle such collections with any Borrower's funds or use the same except to pay Obligations, and (ii) each Borrower shall deposit as soon as reasonably possible and in any event within one (1) Business Day of receipt thereof deposit any such amounts and collections in such Blocked Accounts or Depository Accounts provided for in this Agreement or the Other Documents or, upon request by Agent, deliver to Agent, in original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness.

(e)      Notification of Assignment of Receivables.  At any time, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral.  At any time after the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may, if the Determining Lenders so elect, be charged to Borrowers' Account and added to the Obligations, and such charge shall be deemed authorized by Borrowers and Lenders shall be obliged to fund their respective Initial Commitment Percentages of the same regardless of whether any of the conditions under Sections 8.2 or 2.2 shall not be satisfied at such time or whether the Commitments of the Lenders hereunder shall have otherwise been terminated at such time.

(f)      Power of Agent to Act on Borrowers' Behalf.  Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power (i) at any time: (A) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Receivables; (B) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (C) to send verifications of Receivables to any Customer; and (D) to sign such Borrower's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; and (ii) at any time following the occurrence and during the continuance of an Event of Default: (A) to demand payment of the Receivables; (B) to enforce payment of the Receivables by legal proceedings or otherwise; (C) to exercise all of such Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral; (D) to settle, adjust, compromise, extend or renew the Receivables; (E) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (F) to prepare, file and sign such Borrower's name on a proof of claim in

bankruptcy or similar document against any Customer; (G) to prepare, file and sign such Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; (H) to receive, open and dispose of all mail addressed to any Borrower; (I) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  Agent shall have the right at any time following the occurrence and during the continuance of an Event of Default to change the address for delivery of mail addressed to any Borrower.

        (g)    <u>No Liability</u>.  Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom.  Following the occurrence and during the continuance of an Event of Default, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any Supporting Obligations therefor and/or release any obligor thereof.  Agent is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

        (h)    <u>Establishment of a Lockbox Account, Dominion Account</u>.  All proceeds of the Collateral shall be deposited by Borrowers as required by the terms of Section 4.15(h) of the Pre-Petition ABL Credit Agreement as in effect on the Closing Date (i.e., by Borrowers into either (i) a lockbox account, dominion account or such other "blocked account" ("<u>Blocked Accounts</u>") established at a bank or banks (each such bank, a "<u>Blocked Account Bank</u>") pursuant to an arrangement with such Blocked Account Bank as may be selected by Borrowing Agent and be acceptable to AIC as agent under the Pre-Petition ABL Credit Agreement or (ii) depository accounts ("<u>Depository Accounts</u>") established at a bank or banks for the deposit of such proceeds (each such bank, a "<u>Depository Account Bank</u>") or (iii) the Cash Collateral Account).  Each Blocked Account Bank or Depository Account Bank, as applicable, shall transfer at the close of each Business Day such funds so deposited to the Cash Collateral Account.  As between Borrowers on the one hand and Agent on the other (and without derogation of any rights (if any) of any third parties including the Pre-Petition Term Lenders as between Borrowers on the one hand and such third parties on the other, or as between Agent and/or Lenders on the one hand and such third parties on the other), Borrowing Agent shall obtain the agreement by such Blocked Account Bank or Depository Account Bank, as applicable, to waive any offset rights against the funds so deposited.  Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank or Depository Account Bank thereunder.  All funds in the Cash Collateral Account shall be retained in such account until the earliest of (x) the Borrowers' request that the account bank release such funds; provided, that, any such release of funds (i) shall not be permitted (and the Borrowers shall not be permitted to request such release) so long as a Default or Event of Default shall have occurred and be

continuing and (ii) shall constitute a representation and warranty by each Borrower that as of the date of such release the conditions contained in Section 8.2 have been satisfied (and Borrowing Agent shall provide evidence as to such satisfaction promptly after Agent's request therefor), and (y) upon the occurrence of any Event of Default that has not been cured or waived, election by either the Determining Lenders or the Required Lenders to apply such amounts to prepay the Obligations in accordance with Section 11.5.

Notwithstanding anything to the contrary provided for in this Agreement, (i) at all times following the Closing Date, Borrowers shall give all Account Debtors that remit payments and collections on Receivables by wire transfer, ACH or other electronic transactions notice to remit such payments and collections to the Blocked Account Bank or Depository Account Bank, as applicable, and (ii) promptly upon notice to Borrowers from the Blocked Account Bank that the lockbox services for the collection account(s) of Borrowers established with such Blocked Account Bank are fully operational, Borrowers shall give all Account Debtors that remit payments and collections other than by wire transfer, ACH or other electronic transactions to remit such payments and collections to such lockboxes.

(i)      All deposit accounts (including all Blocked Accounts and Depository Accounts), securities accounts and investment accounts of each Borrower and its Subsidiaries as of the Closing Date are set forth on Schedule 4.15(i). No Borrower shall open any new deposit account, securities account or investment account unless (i) Borrowers shall have given at least thirty (30) days prior written notice to Agent and Determining Lenders and (ii) if such account is to be maintained with a bank, depository institution or securities intermediary, that bank, depository institution or securities intermediary, each applicable Borrower and Agent shall first have entered into an account control agreement in form and substance satisfactory to Agent and Determining Lenders sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account.

(j)      Notwithstanding anything to the contrary provided for in this Agreement, no later than forty-five (45) days after the Closing Date, with respect to any deposit account of any Borrower that is maintained with a bank or financial institution other than the Blocked Account Banks or the Depository Account Banks, Borrowers shall either (x) cause such deposit account to be subject to an account control agreement among such bank or financial institution, the applicable Borrowers and Agent that is sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account and is otherwise satisfactory in form and substance to Agent or (y) close such deposit account, provided that, Borrowers need not comply with the foregoing requirements of this Section 4.15(j) with respect to (1) any deposit accounts in which the total amount of funds on deposit therein or credited thereto do not exceed at any one time either $100,000 as to any one such deposit account or $250,000 as to all such deposit accounts taken together or (2) any deposit accounts used exclusively for payroll purposes so long as Borrowers shall not maintain funds on deposit therein or credited thereto at any time in excess of the amounts necessary to fund payroll obligations and any related payroll processing expenses routinely paid from such accounts on a current basis.

(k)      Adjustments.  No Borrower will, without Agent's consent, compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those

compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the Ordinary Course of Business of such Borrower.

4.16    Inventory.  To the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.17    Maintenance of Equipment.    The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved in all material respects.  No Borrower shall use or operate the Equipment in material violation of any law, statute, ordinance, code, rule or regulation.   Each Borrower shall have the right to sell Equipment to the extent set forth in Section 4.3 hereof.

4.18    Exculpation of Liability.    Nothing herein contained shall be construed to constitute Agent or any Lender as any Borrower's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any Borrower's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.19    Environmental Matters.

(a)    Borrowers shall ensure that the Real Property and all operations and businesses conducted thereon remains in compliance in all material respects with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except in compliance in all material respects with Applicable Law or appropriate governmental authorities.

(b)    Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws which system shall include periodic reviews of such compliance.

(c)    Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws.   Borrowers shall use their good faith efforts to obtain certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)    In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice

of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or any complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any such person or entity hereinafter the "Authority"), and the liabilities of such Borrower in connection therewith could reasonably be expected to have a Material Adverse Effect, then Borrowing Agent shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware giving rise to the Hazardous Discharge or Environmental Complaint.  Such information is to be provided to allow Agent to protect its security interest in and Lien on the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances that could reasonably be expected to have a Material Adverse Effect and shall continue to forward copies of correspondence between any Borrower and the Authority regarding such claims to Agent until the claim is settled.  Borrowing Agent shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws.  Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Real Property and the Collateral.

(f)     Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien.  If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Borrower shall fail to comply in all material respects with any of the requirements of any Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral: (i) give such notices or (ii) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint.  All reasonable costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans constituting Revolving Advances shall be paid upon demand by Borrowers, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, any Lender and any Borrower.

(g)     Borrowers shall defend and indemnify Agent and Lenders and hold Agent, Lenders and their respective employees, agents, directors and officers harmless from and against

all loss, liability, damage and expense, claims, costs, fines and penalties, including attorney's fees, suffered or incurred by Agent or Lenders under or on account of any Environmental Laws, including the assertion of any Lien thereunder, with respect to any Hazardous Discharge, the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of Agent or any Lender.  Borrowers' obligations under this Section 4.19 shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Substances.  Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement.

(h)     For purposes of Section 4.19 and 5.7, all references to Real Property shall be deemed to include all of each Borrower's right, title and interest in and to its owned and leased premises.

4.20    Financing Statements.  Except as respects the financing statements filed by Agent and the financing statements described on Schedule 1.2 or allowed as a Permitted Encumbrance, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

## V.     REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants as follows:

5.1     Authority.

(a)     Each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents and to perform all its respective Obligations hereunder and thereunder, subject to the entry by the Bankruptcy Court of the applicable Financing Orders, for the periods on and after the Petition Date.  Subject to the entry by the Bankruptcy Court of the applicable Financing Orders, this Agreement and the Other Documents have been duly executed and delivered by each Borrower, and this Agreement and the Other Documents constitute the legal, valid and binding obligation of such Borrower enforceable in accordance with their terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally.  Subject to the entry by the Bankruptcy Court of the applicable Financing Orders, the execution, delivery and performance of this Agreement and of the Other Documents (a) are within such Borrower's corporate or limited liability company powers, as applicable, have been duly authorized by all necessary corporate or limited liability company action, as applicable, are not in contravention of law or the terms of such Borrower's Organizational Documents or to the conduct of such Borrower's business or of any material agreement or undertaking to which such Borrower is a party or by which such Borrower is bound, in each case entered into after the Petition Date, (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body, any party to a Material Contract or any other Person, except those Consents set forth on Schedule 5.1 hereto, all

of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien other than under this Agreement and the Other Documents and the Financing Orders upon any asset of such Borrower under the provisions of any Organizational Documents, agreement, instrument, or other instrument to which such Borrower is a party or by which it or its property is a party or by which it may be bound.

    5.2    <u>Formation and Qualification; Inactive Subsidiaries; Foreign Subsidiaries</u>.

    (a)    Each Borrower is duly incorporated or formed and in good standing under the laws of the state listed on <u>Schedule 5.2(a)</u> and is qualified to do business and is in good standing in the states listed on <u>Schedule 5.2(a)</u> which constitute all states in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Borrower.  Each Borrower has delivered to Agent and the Lenders true and complete copies of its Organizational Documents and will promptly notify Agent of any amendment or changes thereto.

    (b)    <u>Schedule 5.2(b)</u> sets forth, as of the Closing Date, (i) a complete list of all Subsidiaries of each Borrower, (ii) a complete list of all such Subsidiaries which are Inactive Subsidiaries and (iii) a complete list of all such Subsidiaries which are Foreign Subsidiaries.

    (c)    No Subsidiary of any Borrower that has been designated as an Inactive Subsidiary (either on the Closing Date or on the date such Subsidiary was acquired by any Borrower) (i) conducts any active business operations (including the operations of a holding company), (ii) has assets with a fair market value of $50,000 or more or (iii) owns any capital stock of any Borrower or any other Subsidiary (except another Inactive Subsidiary) of any Borrower, and no entity that was originally designated as an Inactive Subsidiary (either on the Closing Date or on the date such Subsidiary was acquired by any Borrower) has ceased to satisfy all the requirements for an Inactive Subsidiary (excluding any such Subsidiaries which have complied with the requirements of <u>Section 7.12</u> hereof and are no longer designated as Inactive Subsidiaries).  The fair market value of all assets of all Inactive Subsidiaries does not exceed $100,000 at any one time in the aggregate.

    5.3    <u>Survival of Representations and Warranties</u>.  All representations and warranties of such Borrower contained in this Agreement and the Other Documents shall be true at the time of such Borrower's execution of this Agreement and the Other Documents, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

    5.4    <u>Tax Returns</u>.  Each Borrower's federal tax identification number is set forth on <u>Schedule 5.4</u>.  Each Borrower has filed all material federal, state and local tax returns and other reports each is required by law to file and, subject to any required approval by any applicable order of the Bankruptcy Court, has paid all material taxes, assessments, fees and other governmental charges that are due and payable.  The provision for taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current fiscal

year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

5.5    Financial Statements.

(a)    The pro forma financial statements of Borrowers (the "Pro Forma Financials") contained in the Disclosure Statement (prior to the Petition Date) relating to the Plan Support Agreement, reflecting the consummation of the transactions contemplated this Agreement and the Other Documents, including the funding of the initial Advances hereunder (collectively, the "Transactions"), are accurate, complete and correct in all material respects on a pro forma basis and fairly reflect the financial condition of Borrowers on a Consolidated Basis as of the Closing Date after giving effect to the Transactions, and have been prepared in accordance with GAAP (except as may be disclosed in such financial statements and subject to year-end adjustments and the absence of footnotes, and subject to the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable), applied consistently with Borrowers' audited annual financial statements for the fiscal year ended December 31, 2013.

(b)    The three year financial projections of Borrowers contained in the Disclosure Statement (prior to the Petition Date) relating to the Plan Support Agreement(the "Projections") and the Budget were prepared by the management of Borrowers and are based on underlying assumptions which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period. The Projections together with the Pro Forma Financials, are referred to as the "Pro Forma Financial Statements". It is understood and agreed that the Pro Forma Financial Statements have been delivered to the Determining Lenders.

(c)    The audited consolidated balance sheets of UniTek Holdings and its consolidated Subsidiaries as at December 31, 2012 and December 31, 2013, and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from Ernst & Young LLP, copies of which have been delivered to Agent and the Lenders, have been prepared in accordance with GAAP, consistently applied (except for changes in application in which such accountants concur), are accurate, complete and correct in all material respects and present fairly the financial position of Borrowers and their Subsidiaries and such other Persons at such dates and the results of their operations for such periods. The unaudited consolidated balance sheet of Borrowers and their consolidated Subsidiaries as at September 27, 2014 has been prepared in accordance with GAAP, consistently applied (subject to the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable at such time, and except for changes in application in which such accountants concur), are accurate, complete and correct in all material respects and present fairly the financial position of Borrowers and their Subsidiaries and such other Persons at such dates and the results of their operations for such period (subject to normal year-end audit adjustments and the absence of footnotes).

5.6    Entity Names. As of the date hereof, no Borrower has been known by any other corporate name in the past five years and does not sell Inventory under any other name except as

set forth on <u>Schedule 5.6</u>, nor has any Borrower been the surviving entity of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.7    <u>OSHA and Environmental Compliance</u>.

(a)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds, Real Property and Equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; there have been no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations.

(b)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c)    (i) There are no visible signs of material releases, spills, discharges, leaks or disposal (collectively referred to as "<u>Releases</u>") of Hazardous Substances at, upon, under or within any Real Property including any premises leased by any Borrower; (ii) to the best knowledge of Borrowers, there are no underground storage tanks or polychlorinated biphenyls on the Real Property including any premises leased by any Borrower, (iii) to the best knowledge of Borrowers, the Real Property including any premises leased by any Borrower has never been used as a treatment, storage or disposal facility of Hazardous Waste; and (iv) to the best knowledge of Borrowers, no Hazardous Substances are present on the Real Property including any premises leased by any Borrower, excepting such quantities as are handled in accordance with all applicable manufacturer's instructions and governmental regulations and in proper storage containers and as are necessary for the operation of the commercial business of any Borrower or of its tenants.

5.8    <u>No Litigation, Violation, Indebtedness or Default; ERISA Compliance</u>.

(a)    [Reserved].

(b)    Except as disclosed in <u>Schedule 5.8(b)</u>, no Borrower has (i) any pending or, to the best knowledge of any Borrower, threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect other than the Chapter 11 Cases, and (ii) any liabilities or Indebtedness for borrowed money other than the Obligations or any other Indebtedness permitted by <u>Section 7.8</u>.

(c)    No Borrower is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Borrower in violation of any order of any court, Governmental Body or arbitration board or tribunal naming such Borrower which could reasonably be expected to have a Material Adverse Effect.

(d)    No Borrower nor any member of the Controlled Group maintains or is required to contribute to any Plan other than those listed on Schedule 5.8(d) hereto. (i) No Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA and Section 412 of the Code in respect of each Plan, and each Plan is in compliance with Sections 412, 430 and 436 of the Code and Sections 206(g), 302 and 303 of ERISA, without regard to waivers and variances; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code; (iii) neither any Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan; (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and neither any Borrower nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither any Borrower nor any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither any Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4971, 4972 or 4980B of the Code, and no fact exists which could give rise to any such liability; (viii) neither any Borrower nor any member of the Controlled Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan; (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period has not been waived; (xi) neither any Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower or any member of the Controlled Group; (xii) neither any Borrower nor any member of the Controlled Group maintains or is required to contribute to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xiii) neither any Borrower nor any member of the Controlled Group has withdrawn, completely or partially, within the meaning of Section 4203 or 4205 of ERISA, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

5.9    Patents, Trademarks, Copyrights and Licenses.    All registered patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications and tradenames owned or utilized by any Borrower are set

forth on Schedule 5.9 (as such Schedule 5.9 may be updated at any time upon written notice to Agent to reflect any such Intellectual Property acquired after the Closing Date). There is no objection to or pending challenge to the validity of any such patent, trademark, copyright or tradename, and no Borrower is aware of any grounds for any challenge, except as set forth in Schedule 5.9 hereto. Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design rights, copyright, copyright application and copyright license owned or held by any Borrower and material to its business and all trade secrets used by any Borrower and material to its business consist of original material or property developed by such Borrower or was lawfully acquired by such Borrower from the proper and lawful owner thereof. Each of such items has been maintained so as to materially preserve the value thereof from the date of creation or acquisition thereof.

5.10    Licenses and Permits. Except as set forth in Schedule 5.10, each Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to procure such licenses or permits could have a Material Adverse Effect.

5.11    Chapter 11 Cases. The Chapter 11 Cases will be or were commenced on the Petition Date in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Final Financing Order will be or has been given as identified in the certificate of service that will be filed with the Bankruptcy Court.

5.12    No Default. No Default or Event of Default has occurred.

5.13    No Burdensome Restrictions. No Borrower is party to any contract or agreement the performance of which could have a Material Adverse Effect. No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance.

5.14    No Labor Disputes. As of the Closing Date, no Borrower is involved in any material labor dispute; there are no strikes or walkouts or union organization of any Borrower's employees threatened (to the best knowledge of Borrowers) or in existence and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto.

5.15    Margin Regulations. No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16    Investment Company Act.  No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17    Disclosure.   No representation or warranty made by any Borrower in this Agreement, any Other Documents, the Budget or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading.  There is no fact known to any Borrower or which reasonably should be known to such Borrower which such Borrower has not disclosed to Agent in writing with respect to the Transactions which could reasonably be expected to have a Material Adverse Effect.

5.18    Perfection of Security Interests.  The provisions of this Agreement and the Other Documents and the Interim Financing Order or the Permanent Financing Order, as applicable (i) are effective to create in favor of the Agent, for the benefit of the Lenders, legal valid and perfected first priority Liens on and security interests in all rights, title and interests in the Collateral subject only to the Carve-Out and Permitted Encumbrances and (ii) are enforceable against the Borrowers and the Guarantors.

5.19    Swaps.  No Borrower is a party to, nor will it be a party to, any swap agreement whereby such Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.20    Conflicting Agreements.  Upon entry by the Bankruptcy Court of the applicable Financing Order, for the periods on and after the Petition Date, no provision of any mortgage, indenture, contract, agreement, judgment, decree or order binding on any Borrower or affecting the Collateral conflicts with, or requires any Consent which has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.21    Application of Certain Laws and Regulations.  Neither any Borrower nor any Affiliate of any Borrower is subject to any law, statute, rule or regulation which regulates the incurrence of any Indebtedness, including laws, statutes, rules or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.22    Business and Property of Borrowers.  Upon and after the Closing Date, Borrowers do not propose to engage in any business other than those business in which the Borrowers are engaged on the date of this Agreement or that are reasonably related thereto and activities necessary to conduct the foregoing.  On the Closing Date, each Borrower will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Borrower.

5.23    Obligations as Administrative Superpriority Expense Claims.  Pursuant to clauses (c)(1) and (d) of section 364 of the Bankruptcy Code and the Interim Financing Order or the Permanent Financing Order, as applicable, all Obligations hereunder and all other obligations of

the Borrowers under the Other Documents (i) constitute DIP Superpriority Claims, (ii) are senior to the rights of the Borrowers and any successor trustee or estate representative in the Chapter 11 Cases or any Successor Cases and (iii) are subject as to priority only to the Carve-Out.

5.24    Anti-Terrorism Laws.

(a)    General. Neither any Borrower nor any Affiliate of any Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)    Executive Order No. 13224.  Neither any Borrower nor any Affiliate of any Borrower or their respective agents acting or benefiting in any capacity in connection with the Advances or other transactions hereunder, is any of the following (each a "Blocked Person"):

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(iii)    a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(v)    a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(vi)    a Person or entity who is affiliated or associated with a Person or entity listed above.

Neither any Borrower nor to the knowledge of any Borrower, any of its agents acting in any capacity in connection with the Advances or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

5.25    Trading with the Enemy.  No Borrower has engaged, nor does it intend to engage, in any business or activity prohibited by the Trading with the Enemy Act.

5.26    [RESERVED].

01:16263179.1

5.27    Equity Interests.    The authorized and outstanding Equity Interests of each Borrower (other than Unitek Parent), and each legal and beneficial holder thereof as of the Closing Date, is as set forth on Schedule 5.27 hereto.    All of the Equity Interests of each Borrower have been duly and validly authorized and issued and are fully paid and, in the case of Equity Interests evidencing corporate interests, non-assessable and have been sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal and state laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities.    Except for the rights and obligations set forth on Schedule 5.27, there are no subscriptions, warrants, options, calls, commitments, rights or agreement by which any Borrower or any of the shareholders of any Borrower is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of Borrowers.    Except as set forth on Schedule 5.27, Borrowers have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

5.28    Commercial Tort Claims.    No Borrower is a party to any commercial tort claims except as set forth on Schedule 5.28 hereto (which Schedule 5.28 may be updated at any time upon written notice to Agent).

5.29    Letter of Credit Rights.    No Borrower has any letter of credit rights, except as set forth on Schedule 5.29 hereto (which Schedule 5.29 may be updated at any time upon written notice to Agent).

5.30    Prepetition Obligations and Prepetition Liens.

.    (a) Borrowers have no defense to, right of set off, counterclaim or other basis to challenge the Pre-Petition Obligations; (b) the Pre-Petition Obligations were and are secured by valid, enforceable and perfected Liens on all Collateral; (c) subject to the entry of the Permanent Financing Order, the Liens securing the Pre-Petition Obligations and encumbering the Collateral are not avoidable in any way, including without limitation, by operation of any section of the Bankruptcy Code, including sections 541 through 550, or any other law and (d) the Pre-Petition Obligations and Liens are not subject to subordination in favor of any other person on any basis except as specifically provided in the Pre-Petition Loan Documents.

5.31    Material Adverse Effect.    Since the Petition Date, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect.

## VI.    AFFIRMATIVE COVENANTS.

Each Borrower shall, until payment in full of the Obligations and termination of this Agreement:

6.1    Payment of Fees.    Pay to Agent on demand all usual and customary fees and expenses which Agent incurs in connection with (a) the forwarding of Advance proceeds and (b) the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.15(h).    Agent shall, if the Determining Lenders so elect, or may, at its

option, without making demand, charge Borrowers' Account for all such fees and expenses, which shall be added to the Obligations, and such expenses shall be deemed authorized by Borrowers and Lenders shall be obliged to fund their respective Initial Commitment Percentages of the same regardless of whether any of the conditions under Sections 8.2 or 2.2 shall not be satisfied at such time or whether the Commitments of the Lenders hereunder shall have otherwise been terminated at such time.

6.2     Conduct of Business and Maintenance of Existence and Assets.   (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral, expect to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect; (b) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business; and (c) make all such reports and pay all such franchise and other taxes and license fees (other than any payments of any tax, assessment, charge, levy or claim stayed by Section 362(a)(8) of the Bankruptcy Code) and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof (to the extent such rights, licenses, leases, powers and franchises are material).

6.3     Violations.   Promptly notify Agent and Determining Lenders in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Borrower (to the extent such law, statute, regulation, or ordinance is material).

6.4     Government Receivables.   Take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code and all other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them.

6.5     [Reserved].

6.6     Execution of Supplemental Instruments.   Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent or Determining Lenders may request, in order that the full intent of this Agreement may be carried into effect.

6.7     Payment of Indebtedness.   In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of

whatever nature arising after the Petition Date that constitute administrative expenses as determined by the Bankruptcy Court under Section 503(b) of the Bankruptcy Code in the Chapter 11 Cases, except when the amount or validity thereof is currently being Properly Contested, subject at all times to any applicable subordination arrangement in favor of Lenders.

6.8    Standards of Financial Statements.    Cause all financial statements referred to in Sections 9.7, 9.8, 9.9 and 9.10 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein, and subject to the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable).

6.9    Financing Orders.    Prior to the expiration of the Interim Financing Order and in any event not later than 30 days after the Petition Date, obtain the Permanent Financing Order, with no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order.

6.10    Budget.

(a)    Borrowers have prepared and delivered to Agent and Lenders an initial thirteen (13) week Budget satisfying the conditions in this Section 6.10 below.  The Budget has been reviewed by Borrowers and their management and sets forth for the periods covered thereby: (i) projected weekly cash receipts of the Debtors and their Subsidiaries for each week for the 13-week period commencing with the week during which the Petition Date occurs and (ii) projected cash disbursements of the Debtors and their Subsidiaries for each week during such 13-week period, including operating disbursements and non-operating disbursements, separately identified.   In addition to the Budget, (A) by no later than the Wednesday of each week following the Petition Date commencing with November 12, 2014, Borrowers shall furnish to Agent and Lenders a revised forecast prepared on a cumulative, weekly roll-forward basis for the 13-weeks commencing with the week immediately succeeding the delivery of such forecast, setting forth projected weekly cash receipts of the Debtors and their Subsidiaries for each week for the 13-week period commencing with the week immediately succeeding the delivery of such forecast and projected cash disbursements of the Debtors and their Subsidiaries for each week during such 13-week period, together with a report that sets forth for the immediately preceding week a comparison of the actual operating and non-operating cash receipts and disbursements for the Testing Period ending with such week with the projected operating and non-operating cash receipts and disbursements for such Testing Period set forth in the Budget on a cumulative, weekly roll-forward basis, together with (x) a comparison of the actual operating and non-operating cash flow for the Testing Period ending with such week with the projected operating and non-operating cash flow for such Testing Period set forth in the Budget on a cumulative, weekly roll-forward basis and (y) a certification from the chief financial officer of Borrowers that no Material Budget Deviation has occurred or if a Material Budget Deviation has occurred, a detailed explanation of such occurrence; and (B) concurrently with each demonstration of compliance with the covenants contained in Sections 6.10(b)(iii) and 6.10(b)(iv), Borrowers shall furnish to Agent and Lenders a revised forecast prepared on a cumulative, weekly roll-forward

basis for the 13-weeks commencing with the week immediately succeeding the delivery of such forecast, setting forth projected weekly cash receipts of the Debtors and their Subsidiaries for each week for the 13-week period commencing with the week immediately succeeding the delivery of such forecast and projected cash disbursements of the Debtors and their Subsidiaries for each week during such 13-week period, which revised forecast shall be in form and substance reasonably satisfactory to Determining Lenders and shall demonstrate to the Determining Lenders' reasonable satisfaction that the Borrowers will have sufficient liquidity through January 21, 2015 or, if later, the effective date of the Plan of Reorganization.  Borrowers shall be deemed to certify, represent and warrant, upon delivery of each forecast required by the preceding sentence, that such forecast was prepared by the management of Borrowers and is based on underlying assumptions which provide a reasonable basis for the projections contained therein and reflect Borrowers' good faith, reasonable judgment based on then present circumstances of the most likely set of conditions and course of action for the projected period.  For the avoidance of doubt, such updated forecasts shall not be deemed to amend or otherwise modify the Budget for purposes of calculating a Material Budget Deviation, and the Budget may only be amended upon the written approval of the Determining Lenders.

(b)      Borrowers shall not permit, (i) for any Testing Period ending with a week ending after the Closing Date, the amount of Actual Cumulative Receipts for such Testing Period to be lower than the amount of Projected Cumulative Receipts for such Testing Period by more than (A) 20% of such amount of Projected Cumulative Receipts for such Testing Period, for the first Testing Period, and (B) 15% of such amount of Projected Cumulative Receipts for such Testing Period for each Testing Period thereafter, (ii) for any Testing Period ending with a week ending after the Closing Date, the amount of Actual Cumulative Operating Disbursements for such Testing Period to be higher than the amount of Projected Cumulative Operating Disbursements for such Testing Period by more than 15% of such amount of Projected Cumulative Operating Disbursements for such Testing Period, (iii) for the period from the first day of the first calendar week of the Budget through Dec 6, 2014 (the "***Initial Cumulative Variance Testing Date***"), the amount of Actual Cumulative Operating Cash Flow to be more than $7,000,000 (in the aggregate) less than the amount of Projected Cumulative Operating Cash Flow (it being understood that compliance with this clause (iii) shall be demonstrated by the Borrowers to the reasonable satisfaction of the Determining Lenders on or prior to December 9, 2014), and (iv) as of any day that is a one month anniversary of the Initial Cumulative Variance Testing Date (each such date, a "***Cumulative Variance Testing Date***"), for the period from the first day of the first calendar week of the Budget through such Cumulative Variance Testing Date, the amount of Actual Cumulative Operating Cash Flow to be more than $7,000,000 (in the aggregate) less than the amount of Projected Cumulative Operating Cash Flow (it being understood that compliance with this clause (iv) shall be demonstrated by the Borrowers to the reasonable satisfaction of the Determining Lenders on or prior to the second Business Day following the applicable monthly anniversary).  For the avoidance of doubt, the parties hereto acknowledge and confirm that the covenant in this Section 6.10(b) measures, at the end of each applicable week or over the relevant period, cumulative variance for the period from the first day of the first calendar week of the Budget and ending with the last day of such applicable week or applicable period.  "***Actual Cumulative Receipts***" shall mean, for any period of determination, the amount of operating cash collections for the Debtors and their Subsidiaries on a consolidated basis during such period (in each case calculated on an actual and not a GAAP basis).  "***Projected Cumulative Receipts***" shall mean, for any period of determination, the amount of

projected operating cash collections for the Debtors and their Subsidiaries on a consolidated basis during such period as set forth in the Budget.  "***Actual Cumulative Operating Disbursements***" shall mean, for any period of determination, the amount of operating cash disbursements of the Debtors and their Subsidiaries on a consolidated basis during such period. "***Projected Cumulative Operating Disbursements***" shall mean, for any period of determination, the amount of projected operating cash disbursements of the Debtors and their Subsidiaries on a consolidated basis during such period as set forth in the Budget. ***Actual Cumulative Operating Cash Flow***" shall mean, for any period of determination, the Actual Cumulative Receipts for such period minus the Actual Cumulative Operating Disbursements for such period. ***Projected Cumulative Operating Cash Flow***" shall mean, for any period of determination, the Projected Cumulative Receipts for such period minus the Projected Cumulative Operating Disbursements for such period.

(c)    Borrowers and each Guarantor hereby confirms, acknowledges and agrees that (i) an adverse variance between Projected Cumulative Receipts set forth in the Budget and Actual Cumulative Receipts in any Testing Period, an adverse variance between Projected Cumulative Operating Disbursements set forth in the Budget and Actual Cumulative Operating Disbursements, or an adverse variance between Projected Cumulative Operating Cash Flow and Actual Cumulative Operating Cash Flow, in each case, that exceeds the adverse variance permitted under Section 6.10(b), shall constitute a material deviation from the Budget and an additional Event of Default (each, a "***Material Budget Deviation***") and (ii) the failure to deliver an updated forecast weekly or monthly as required by Section 6.10(a) hereof shall constitute an Event of Default.  Notwithstanding the foregoing, a Material Budget Deviation under clause (i) of Section 6.10(b) shall not occur for any applicable Testing Period to the extent (i) Actual Cumulative Receipts would not have been below Projected Cumulative Receipts for such Testing Period but for purchases of equipment from DirecTV that are offset against weekly collections (a "***DirecTV Offset***"), and (ii) the Borrower reasonably expects that a Material Budget Deviation shall not occur for the two Testing Periods that immediately succeed the Testing Period in which such DirecTV Offset first occurs; *provided*, that notwithstanding the foregoing, (x) the exclusion of a DirecTV Offset from the determination of whether a Material Budget Deviation has occurred shall be limited solely to the Testing Period in which such DirecTV Offset first occurs and the Testing Period ending the following calendar week and (y) for all Testing Periods ending in any consecutive four week period, only one DirecTV Offset is permitted to be excluded from the determination of whether a Material Budget Deviation has occurred for such Testing Periods. Notwithstanding any approval by Determining Lenders or any Lender of any amendment to the Budget, Lenders shall only provide the Advances in accordance with the terms and conditions set forth in this Agreement, the Other Documents and the Financing Orders.  Agent and Lenders are relying upon Borrowers' delivery of, and compliance with, the Budget and other covenants in this Section 6.10 in determining to enter into the post-petition financing arrangements provided for herein.

(d)    Unless authorized by the Bankruptcy Court and approved by Determining Lenders in writing, no portion of the proceeds of the Obligations may be used for any purpose that would be prohibited by Section 7.24 hereof.

6.11    Ratification of Deposit Account Control Agreements.  To the extent Determining Lenders deems it necessary in their discretion and upon Determining Lenders' request, Borrower

and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the existing deposit account control agreements and other deposit account arrangements provided for under the Agreement and Other Documents have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the Chapter 11 Cases, that Borrower and each Subsidiary Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to Borrower or such Subsidiary Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations.

6.12    Roll-Up Letters of Credit.  With respect to any Existing L/C, or with respect to any Roll-Up Letter of Credit issued to replace any such Existing L/C, Company shall use commercially reasonable efforts at all relevant times to cause the proportionate release, return and/or cancellation by the beneficiaries thereof and the reduction, by amendment or reissuance, of the face amount of such Roll-Up Letter of Credit or Existing L/C, as the case may be, from time to time as any liabilities supported by such letters of credit are extinguished by full or partial payment thereof or otherwise, prior to the reduction or release of any other obligations of the Borrowers or any of their Subsidiaries supporting those same liabilities, and to make payments of the liabilities supported by such Roll-Up Letter of Credit or Existing L/C, as the case may be, consistent with the Budget, so as to avoid drawings thereunder.  To the extent that a Roll-Up Letter of Credit has not yet been issued to replace any Existing L/C pursuant to subsection 3.1, Borrowers may amend or reissue such Existing L/C as necessary and appropriate to give effect to the terms of this Section 6.12.  The Roll-Up Commitments shall be reduced by the amount of any such release, return, cancellation or reduction of a Roll-Up Letter of Credit provided for under this Section 6.12 and such reduction of the Roll-Up Commitments shall reduce each Roll-Up Lender's Roll-Up Commitment ratably.

6.13    DIP Covenants.

(a)    Financing Orders and DIP Documents.  Borrowers shall take all necessary acts and make diligent effort to request and obtain approval of this Agreement and the Other Documents, the financing and transactions and the rights, interests, claims, liens, priorities, benefits,  privileges, waivers, releases and remedies in favor of Agent as contemplated hereunder and thereunder, and entry of the Financing Orders.

(b)    Bankruptcy Events.   Borrowers shall promptly advise and provide reasonable access to Agent and Determining Lenders, their respective consultants, agents (which may include Lenders), professionals and attorneys, and shall make its employees, consultants, agents, professionals and attorneys available to discuss with Agent and Determining Lenders, their respective consultants, agents, professionals and attorneys any and all material information and developments in connection with the Chapter 11 Cases, including any sale of assets other than in the ordinary course of business, any asset valuation, and any other event or condition that is reasonably likely to have a material effect on Borrowers or the Chapter 11 Cases.

(c)    Post-Filing Pleadings.  On or after the Petition Date, each Loan Party agrees that it shall not, without the prior written consent of the Determining Lenders, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Loan Party to (i) use any of the material properties or assets of the Loan Parties outside the ordinary course of

business, (ii) satisfy prepetition claims of the Loan Parties or (iii) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget), (b) seeking to reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party or (c) seeking relief that is otherwise inconsistent with this Agreement or the Financing Orders.

6.14    Business Separation Covenants.

(a)    The Loan Parties shall, and shall cause their Subsidiaries to, use commercially reasonable efforts to cause (i) all contractual obligations entered into after the Closing Date that primarily generate revenue for the DirectSat Business and/or primarily impose liabilities or expenses relating to the DirectSat Business to be entered into by DirectSat Subsidiaries, and (ii) all contractual obligations entered into after the Closing Date that primarily generate revenue for the Other Business and/or primarily impose liabilities or expenses relating to the Other Business to be entered into by the Other Entities, except that contractual obligations that relate to both the DirectSat Business and the Other Business may be entered into by Unitek Parent or the DirectSat Subsidiaries.  Borrowers shall use commercially reasonable best efforts to prepare and maintain accurate and complete accounts, books and records recording each Borrower's and each Subsidiary's assets, liabilities, expenses and income, separate and distinct from the books and records, assets and liabilities, expenses and income of each other Borrower and Subsidiary, and the Loan Parties and their Subsidiaries will observe customary corporate formalities as between each other.

(b)    Each of UniTek Parent and the DirectSat Subsidiaries will hold itself out as an entity that is separate from the Other Entities and promptly correct any known misrepresentation with respect to the foregoing, and vice versa.

## VII.    NEGATIVE COVENANTS.

No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement:

7.1    <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

(a)    Enter into any merger, consolidation or other reorganization with or into any other Person or permit any other Person to consolidate with or merge with it.

(b)    Acquire all or a substantial portion of the assets or Equity Interests of any Person (or any division or business line of any Person).  Notwithstanding anything to the contrary contained in any provision of this Agreement, no Borrower shall purchase any Equity Interests in or become or agree to become party to a Joint Venture except as an Investment permitted under <u>Section 7.4</u> hereof.

(c)    Sell, lease, transfer or otherwise dispose of any of its properties or assets, except dispositions of Inventory and Equipment, and dispositions of other property or assets, to the extent expressly permitted by <u>Section 4.3</u>.

7.2     Creation of Liens.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Liens.  Without limiting the generality of the foregoing, no Borrower shall create or suffer to exist any Lien or transfer upon or against any of its DIRECTV Inventory in favor of any Person other than DIRECTV (other than Permitted Encumbrances arising under clauses (a), (e), (f) or (k) to the extent such Permitted Encumbrances would not violate the provisions of the HSP Agreement).

7.3     Guarantees.  Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) as disclosed on Schedule 7.3, (b) guarantees by one or more Borrower(s) of the Indebtedness or obligations of any other Borrower(s) to the extent such Indebtedness or obligations are permitted to be incurred and/or outstanding pursuant to the provisions of this Agreement and (c) the endorsement of checks in the Ordinary Course of Business.

7.4     Investments.  Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except (a) investments in cash and Cash Equivalents, (b) [reserved], (c) intercompany investments by any Borrower in another Borrower, (d) investments in any Subsidiary (valued at cost) that is not a Borrower hereunder (excluding any Inactive Subsidiary) existing on the Petition Date (including any refinancings or extensions thereof but excluding any increases thereof or any further advances of any kind in connection therewith) and (e) Investments described in the Budget.

7.5     Loans.  Make advances, loans or extensions of credit to any Person, including any Parent, Subsidiary or Affiliate except with respect to (a) loans or extension of credit in connection with the extension of commercial trade credit in connection with the sale of Inventory in the Ordinary Course of Business, (b) intercompany loans between and among Borrowers, so long as each such intercompany loan is evidenced by a promissory note (including, if applicable, any master intercompany note executed by Borrowers) on terms and conditions (including terms subordinating payment of the indebtedness evidenced by such note to the prior payment in full of all Obligations) acceptable to Determining Lenders in their sole discretion that has been delivered to Agent either endorsed in blank or together with an undated instrument of transfer executed in blank by the applicable Borrower(s) that are the payee(s) on such note, (c) loans and advances to employees of any Borrower in the Ordinary Course of Business (including payroll advances and advances for travel, entertainment and relocation expenses) in an aggregate amount for all Borrowers not to exceed $50,000 at any one time outstanding, (d) [reserved], and (e) advances, loans and extensions existing on the date hereof and described on Schedule 7.5(e) hereto with any modifications, replacements, renewals or extensions thereof; provided that the amount of the original Investment is not increased except by the existing terms of such Investment or as otherwise expressly permitted by this Section 7.5(e).

7.6     Certain Activities in the Chapter 11 Cases.  Engage in any of the following: (a) seek or consummate a sale of assets under a plan of reorganization, Section 363(b) of the Bankruptcy Code or otherwise outside the ordinary course of business without the consent of the Determining Lenders; (b) except for the Carve-Out, incur administrative expense claims pari passu with or senior to the Obligations (or to any replacement liens or claims provided as adequate protection to the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the Pre-Petition Term Loan Agent or the Pre-Petition Term Lenders pursuant to the Financing Orders);

(c) seek or consent to any modification, stay, vacatur or amendment with respect to (i) the Interim Financing Order, (ii) the Permanent Financing Order or (iv) this Agreement and the Other Documents, except in each case as agreed to by the Determining Lenders; (d) create any Lien that ranks senior to, or *pari passu* with, the Liens securing the Obligations; (e) make cash expenditures on account of (or enter into any agreement for the compromise or settlement of) claims incurred prior to the Petition Date, including general unsecured claims or claims pursuant to Section 503(b)(9) of the Bankruptcy Code, except in each case as agreed to by the Determining Lenders or specifically described in the Budget; (f) apply to (or support, directly or indirectly, any application by any other party to) the Bankruptcy Court for authority to take any action prohibited by this Article VII (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Determining Lenders and such consent is provided), (g) seek authorization for or permit the existence of, any claims that are senior to or pari passu with the DIP Superpriority Claim or (h) make or commit to make payments to holders of "claims" (as defined in Section 101(5) of the Bankruptcy Code) against a Loan Party in respect of prepetition amounts in excess of the line item amount for such claim included in the Budget, other than the payment of those claims that are approved in writing by the Determining Lenders.

7.7    <u>Dividends</u>.  (i) Declare, pay or make any dividend or distribution on any Equity Interests of any Borrower (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock, in each case, as contemplated by the plan of reorganization in the Chapter 11 Cases) or (ii) apply any of its funds, property or assets to the purchase, redemption or other retirement of any Equity Interest, or of any options to purchase or acquire any Equity Interest of any Borrower or (iii) make any payments of management fees except that: so long as (a) a notice of termination with regard to this Agreement shall not be outstanding, and (b) no Event of Default or Default shall have occurred after giving pro forma effect to such dividends, Borrowers other than UniTek Parent shall be permitted to pay dividends to any other Borrower; provided, however, that notwithstanding anything herein to the contrary, in no event shall any Debtors issue Equity Interests during the duration of the Chapter 11 Cases, except as contemplated by the Reorganization Plan.

7.8    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except in respect of (i) Indebtedness to Lenders and the other Obligations; (ii) Indebtedness of Borrowers outstanding on the Petition Date or approved by Determining Lenders, consisting of Capitalized Lease Obligations and purchase money indebtedness for the Capital Expenditures, so long as such Indebtedness is not secured by any Collateral or other assets or property of Borrowers other than the assets purchased with the initial proceeds of such Indebtedness; (iii) any guarantees constituting Indebtedness that are permitted under <u>Section 7.3</u> above, (iv) Pre-Petition Obligations in an aggregate principal amount not to exceed the amount outstanding as of the Closing Date, (v) Indebtedness consisting of intercompany loans made by one or more Borrower(s) to any other Borrower(s) in accordance with the provisions of <u>Section 7.5(b)</u>;  (vi) [reserved];  (vii) [reserved];  (viii) [reserved],  (ix) Indebtedness in respect of performance, surety, bid, appeal bonds or other similar obligations provided in the ordinary course of business, but excluding Indebtedness incurred through the borrowing of money, Capitalized Lease Obligations and purchase money obligations; (x) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the

ordinary course of business; (xi) [reserved]; (xii) cash management obligations and other Indebtedness in respect of netting services, overdraft protections and similar arrangements in each case in connection with cash management and deposit accounts in the ordinary course of business; (xiii) Indebtedness consisting of the financing of insurance premiums approved by the Determining Lenders, so long as the aggregate amount payable pursuant to such Indebtedness does not materially exceed the amount of the premium for such insurance; (xiv) Indebtedness arising in connection with endorsement of instruments for deposit in the Ordinary Course of Business; (xv) [reserved]; (xvi) [reserved]; (xv) Indebtedness that is outstanding on the Petition Date and listed on Schedule 7.8 hereto, (xvi) Indebtedness incurred in connection with the rejection of leases and executory contracts in the Chapter 11 Cases, to the extent any such rejection is approved by Determining Lenders, and (xvii) additional unsecured Indebtedness of the Borrowers incurred in the Ordinary Course of Business prior to the Petition Date in an aggregate principal amount not to exceed $500,000 at any one time outstanding.

7.9     Nature of Business.    Change the nature of the business in which it is presently engaged, except as may be reasonably related thereto, nor except as otherwise specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted.

7.10    Transactions with Affiliates.    Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except for (i) transactions among Borrowers which are not expressly prohibited by the terms of this Agreement, (ii) payment by Borrowers of dividends and distributions permitted under Section 7.7 hereof, and (iii) transactions disclosed to the Agent and Determining Lenders and approved by Determining Lenders in writing, which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate.  Notwithstanding anything to the contrary provided for in the foregoing or in any other provision of this Agreement, no Borrower shall, directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Subsidiary of any Borrower that is not a Borrower under this Agreement or a Guarantor of the Obligations, specifically including any Inactive Subsidiary or any Foreign Subsidiary, except for Investments described in the Budget.

7.11    Leases.    Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 7.6 hereof) unless approved in writing by Determining Lenders, except for (i) operating leases in the ordinary course of business, the payment of which is provided for in the Budget and (ii) leases of real property in the ordinary course of business with monthly payments not to exceed $30,000 in the aggregate for all such leases or property so long as payment of the same is provided for in the Budget.

7.12    Subsidiaries.

(a)    Subject to the provisions of Sections 7.12(b) and 7.12(c), hold any Equity Interests in or form or acquire any Subsidiary unless (i) such Subsidiary either (x) expressly joins in this Agreement and the Other Document as a borrower and becomes jointly and severally

liable for the Obligations or (y) if Agent shall agree in its sole discretion, becomes a Guarantor of the Obligations and executes a Guarantor Security Agreement, and in either case (x) or (y), such Subsidiary shall grant first priority (subject only to the Carve-Out) Liens on substantially all of its assets to secure its liabilities for the Obligations, (ii) both prior to and after giving effect to such acquisition or formation, (x) no Default or Event of Default shall exist and (y) each of the representations and warranties made by any Borrower in or pursuant to this Agreement, any Other Document and any related agreements to which it is a party, or each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, any Other Document or any related agreement shall be true and correct in all respects on and as of such date as if made on and as of such date (except to the extent any such representation or warranty was expressly made only as of a specified date, in which case such representation or warranty was true and correct as of such date) and (iii) Agent shall have received all documents, including legal opinions, it may reasonably require to establish compliance with each of the foregoing conditions; provided, however, that notwithstanding anything in this Section to the contrary, no Borrower shall form or acquire any Subsidiary after the Petition Date.

(b)     Notwithstanding anything to the contrary provided for in paragraph (a) above, if any Subsidiary shall constitute an Inactive Subsidiary as of the Closing Date and be designated by Borrowers as an Inactive Subsidiary by listing such Subsidiary as an Inactive Subsidiary on Schedule 5.2(b) on the Closing Date, Borrowers shall be deemed to be in compliance with the provisions of this Section 7.12 without otherwise satisfying the requirements set forth in paragraph (a) above so long as Borrower shall take all actions requested by Agent to create a first priority pledge and Lien over one hundred percent of the Equity Interests of such Inactive Subsidiary.  If at any time any Subsidiary that has previously been designated as an Inactive Subsidiary in accordance with this Section 7.12(b) shall cease to satisfy any of the requirements for an Inactive Subsidiary, Borrowers shall promptly give written notice of such occurrence to Agent and promptly take all steps necessary to comply fully with all the requirements of paragraph (a) above with respect to such Subsidiary.

(c)     Notwithstanding anything to the contrary provided for in paragraph (a) above, with respect to any Foreign Subsidiary, Borrowers shall be deemed to be in compliance with the provisions of this Section 7.12 without otherwise satisfying the requirements set forth in paragraph (a) above so long as Borrower shall take all actions requested by Agent to create a first priority (subject to the Carve-Out) pledge and Lien over at least sixty-five percent (65%) of the voting Equity Interest and one hundred percent of non-voting Equity Interests of such Foreign Subsidiary under the laws of New York and/or the laws of the foreign jurisdiction in which such Foreign Subsidiary is organized (including delivery of any applicable foreign law legal opinions requested by Agent).

(d)     Enter into any partnership, Joint Venture or similar arrangement, except as permitted by Section 7.1(b) and 7.4 above.

7.13    Fiscal Year and Accounting Changes.  Change its fiscal year ending date from December 31st or make any significant change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.

01:16263179.1

7.14    <u>Pledge of Credit</u>.  Now or hereafter pledge Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of any Advance in or for any business other than such Borrower's business as conducted on the date of this Agreement.

7.15    <u>Amendment of Organizational Documents</u>.  (i) Change its legal name, (ii) change its form of legal entity (e.g., converting from a corporation to a limited liability company or vice versa), (iii) change its jurisdiction of organization or become (or attempt or purport to become) organized in more than one jurisdiction, or (iv) otherwise amend, modify or waive any term or material provision of its Organizational Documents.

7.16    <u>Compliance with ERISA</u>.  (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on <u>Schedule 5.8(d)</u>, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA or Section 4975 of the Code, (iii) incur, or permit any Plan to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan not disclosed on <u>Schedule 5.8(d)</u>, (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any Termination Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA and the Code, without regard to any waivers or variances, or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan, or (x) cause, or permit any member of the Controlled Group to cause, a representation or warranty in <u>Section 5.8(d)</u> to cease to be true and correct.

7.17    <u>Prepayment of Indebtedness; Earn-Outs</u>.

Except as otherwise allowed pursuant to any Financing Order or any order of the Bankruptcy Court and approved by the Determining Lenders, at any time, directly or indirectly, (A) prepay or repurchase, redeem, retire, cancel, or otherwise acquire prior to the scheduled maturity thereof (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) any Indebtedness of any Borrower, (B) pay any interest on any Pre-Petition Obligations (whether in cash, in kind securities or otherwise) or (C) make any payment or create or permit any Lien pursuant to section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection) on the property of the Borrowers, or apply to the Bankruptcy Court for the authority to do any of the foregoing (or permit any Subsidiary of any Borrower to do any of the foregoing) with respect to any Indebtedness of any Borrower except for: (1) prepayments of the Obligations, (2) prepayments for administrative expenses that are allowed

and payable under sections 330 and 331 of the Bankruptcy Code, (3) prepayments of obligations expressly permitted by the First Day Orders and (4) payments to such other claimants in such amounts as may be consented to by the Determining Lenders and approved by the Bankruptcy Court.

7.18    Anti-Terrorism Laws.   No Borrower shall, nor shall it permit any Affiliate or agent to:

(a)    Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person.

(b)    Deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

(c)    Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA PATRIOT Act or any other Anti-Terrorism Law. Borrower shall deliver to Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming Borrower's compliance with this Section.

7.19    Restrictive Agreements.   Enter into or otherwise permit itself or its assets to become bound by any contract, instrument or other agreement (other than the Pre-Petition Loan Documents) which would prohibit or limit the ability of any Borrower other than UniTek Parent to make any dividend or other distribution of any nature (whether in cash, property, securities or otherwise) on account of or in respect of its Equity Interests.

7.20    Trading with the Enemy Act.   Engage in any business or activity in violation of the Trading with the Enemy Act.

7.21    Subordinated Debt.   At any time, directly or indirectly, pay, prepay, repurchase, redeem, retire or otherwise acquire, or make any payment on account of any principal of, interest on or premium payable in connection with the repayment or redemption of any Subordinated Debt.

7.22    Amendments to Pre-Petition Debt Documents.   Enter into any amendment, waiver or modification of the Pre-Petition Loan Documents in any manner adverse to the Agent or Lenders.

7.23    Amendment of DIRECTV Documents.   Amend, modify or waive, or permit any amendment, modification or waiver of, any term or provision of the HSP Agreement in any manner materially adverse to Agent or Lenders; terminate the HSP Agreement; permit a modification of the HSP Agreement that results in such contract or letter allowing termination of the HSP Agreement earlier than that in effect on the date hereof; or receive a notice of termination of the HSP Agreement and permit such notice to remain in effect and not be withdrawn for a period of 90 days.

7.24    Use of Collateral.    Without limiting Section 2.22, no Collateral, proceeds of Advances, portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)    to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Other Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Lenders in "full" in cash; or

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of Agent, the Lenders, the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the Pre-Petition Term Loan Agent or the Pre-Petition Term Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Other Documents, Pre-Petition Loan Documents, the Pre-Petition Obligations or the Liens securing such Pre-Petition Obligations; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations or the Pre-Petition Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) Agent or the Lenders hereunder or under any of the Other Documents or (B) the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the Pre-Petition Term Loan Agent or the Pre-Petition Term Lenders (in each case, as applicable, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Other Documents and the Financing Orders); or (vi) objecting to, contesting, or interfering with, in any way, Agent's and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred.

## VIII.    CONDITIONS PRECEDENT.

8.1    Conditions to Initial Advances.    The effectiveness of the Commitments hereunder and the agreement of Lenders to make the initial Advances under the Initial Commitments requested to be made on the Closing Date is subject to the satisfaction, or waiver by the Determining Lenders, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent on the Closing Date, which Closing Date shall be no more than 5 days after the Petition Date:

(a)    <u>Agreement and Notes</u>.  Agent shall have received this Agreement and the Notes payable to each Lender as of the Closing Date, in each case duly executed and delivered by an authorized officer of each Borrower.

(b)    <u>Filings, Registrations and Recordings</u>.  Each Uniform Commercial Code financing statement required by this Agreement, any related agreement or under law or reasonably requested by any of the Determining Lenders to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested.

(c)    [Reserved].

(d)    <u>Pledge Agreements and Other Documents</u>.  Agent shall have received the executed Other Documents, all in form and substance satisfactory to Agent and Determining Lenders and all duly executed and delivered by an authorized officer of each applicable Borrower.

(e)    <u>Closing Certificate</u>.  Agent shall have received a closing certificate signed by the Chief Financial Officer of each Borrower dated as of the date hereof, stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date no Default or Event of Default has occurred and is continuing.

(f)    <u>Secretary's Certificates, Authorizing Resolutions and Good Standings of Borrowers</u>.  Agent shall have received a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of each Borrower in form and substance satisfactory to Determining Lenders dated as of the Closing Date which shall certify (i) copies of resolutions in form and substance reasonably satisfactory to Determining Lenders, of the board of directors (or other equivalent governing body, member or partner) of such Borrower authorizing (x) the execution, delivery and performance of this Agreement, the Notes and each Other Document to which such Borrower is a party (including authorization of the incurrence of indebtedness, borrowing of Advances and requesting of Letters of Credit and Roll-Up Letters of Credit on a joint and several basis with all Borrowers as provided for herein), and (y) the granting by such Borrower of the security interests in and liens upon the Collateral to secure all of the joint and several Obligations of the Borrowers (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (ii) the incumbency and signature of the officers of such Borrower authorized to execute this Agreement and the Other Documents, (iii) copies of the Organizational Documents of such Borrower as in effect on such date, complete with all amendments thereto, and (iv) the good standing (or equivalent status) of such Borrower in its jurisdiction of organization and each applicable jurisdiction where the conduct of such Borrower's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not more than thirty (30) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each such jurisdiction as attached to such certificate.

(g)    [Reserved].

(h)    No Litigation.  There shall not have been instituted, threatened or be pending against, or with respect to, the Debtors or any of their Subsidiaries any action, bankruptcy or insolvency, injunction, proceeding, application, order, claim counterclaim or investigation (whether formal or informal) (and there shall have been no material adverse development to any action, application, claim counterclaim or proceeding currently instituted, threatened or pending) before or by any court or any governmental, regulatory or administrative agency or instrumentally, domestic or foreign, or by any other person, domestic or foreign, in connection with the Obligations that would or would reasonably be expected to (i) prohibit, prevent, restrict or delay consummation of the transactions contemplated hereby, (ii) impose burdensome restrictions on the Obligations or (iii) have a Material Adverse Effect.

(i)    Fees and Expenses.  Agent shall have received (i) all fees payable to Agent and Lenders and any other applicable Persons on or prior to the Closing Date hereunder, including pursuant to Article III hereof, (ii) all costs and expenses of Agent and Lenders to the extent payable under Section 16.9 hereof and (iii) all fees and expenses to the extent payable on the Closing Date in accordance with the Plan Support Agreement.

(j)    [Reserved].

(k)    Insurance.  Agent shall have received in form and substance satisfactory to the Determining Lenders, (i) certified copies of Borrowers' casualty insurance policies, together with (x) lender loss payable endorsements on the applicable insurers' standard form of loss payee endorsement reasonably acceptable to the Determining Lenders naming Agent as a lenders' loss payee and (y) certificates of insurance on appropriate ACORD insurance industry forms naming Agent as a certificate holder, and (ii) certified copies of Borrowers' liability insurance policies, together with (x) endorsements naming Agent as a co-insured on the applicable insurers' standard form of additional endorsement reasonably acceptable to the Determining Lenders and (y) certificates of insurance on appropriate ACORD insurance industry forms naming Agent as a certificate holder.

(l)    Notice of Borrowing; Payment Instructions. Agent shall have received (i) a notice from Borrowers requesting any Advances to be made on the Closing Date, which shall be limited to Advances under the Initial Commitments, and (ii) written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement.

(m)    Consents.  Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent, Determining Lenders and their respective counsel shall deem necessary.

(n)    No Material Adverse Change. (i) Since December 31, 2013, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect other than those events, conditions or states of facts that have been

disclosed by filing of a Form 8-K or disclosed in the Disclosure Statement (prior to the Petition Date) relating to the Plan Support Agreement and (ii) no representations made or information supplied to Agent or Lenders shall have proven to be inaccurate or misleading in any material respect or fail to state any material fact necessary to make the statements therein not misleading.

(o)    <u>Compliance with Laws</u>.    Agent and Determining Lenders shall be reasonably satisfied that each Borrower is in compliance (and that the Advances, Commitments and the transactions contemplated hereby to occur on the Closing Date shall be in compliance) with all pertinent federal, state, local or territorial regulations with respect to which the failure to comply could reasonably be expected to have a Material Adverse Effect, including those with respect to the Federal Occupational Safety and Health Act, the Environmental Protection Act, ERISA and the Trading with the Enemy Act.

(p)    <u>Financing Orders</u>.    The Interim Financing Order shall grant to the Agent and the Lenders (a) DIP Superpriority Claims, (b) security interests in, and liens on, the Post-Petition Collateral securing the Obligations pursuant to Section 364(c)(2) and (3) of the Bankruptcy Code and (c) priming security interest in, and liens on, the Pre-Petition Collateral pursuant to Section 364(d) of the Bankruptcy Code, shall have been entered by the Bankruptcy Court and shall not have been reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent and Determining Lenders) and shall not be subject to any pending stay.

(q)    <u>First Day Orders</u>.    All material provisions of the First Day Orders of the Debtors entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases, whether entered on a final basis or on an interim basis pursuant to Federal Bankruptcy Rule 6003, shall be in form and substance reasonably satisfactory to the Agent and Determining Lenders.

(r)    <u>"Know-Your-Customer" Documentation</u>.    The Debtors shall have delivered all documentation and other information reasonably required by regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in any case, requested in writing by the Agent or Lenders at least one Business Day prior to the Closing Date.

(s)    <u>Budget</u>. The Budget shall be in form and substance satisfactory to the Determining Lenders.

(t)    <u>Federal Reserve Requirements</u>.    The Determining Lenders shall be reasonably satisfied that the Debtors are in full compliance with Regulations T, U and X of the Board of Governors of the Federal Reserve System of the United States, and the Agent shall have received reasonably satisfactory evidence of such compliance reasonably requested by the Determining Lenders.

(u)    <u>Plan Support Agreement; Plan Solicitation</u>.    The Plan Support Agreement shall be in full force and effect on the Closing Date, without any waiver, amendment or other modification thereto that has not been approved to in writing by the Determining Lenders, and no "PSA Termination Event" as defined in the Plan Support Agreement shall have occurred.  On the

Closing Date, the solicitation of votes on the "Plan" (as defined in the Plan Support Agreement) commenced on October 21, 2014 shall have resulted in approval of such Plan by those creditors whose approval is required and sufficient in order for such Plan to be consummated.

(v)     HSP Agreement.  The HSP Agreement shall be in full force and effect on the Closing Date, without any waiver, amendment or other modification thereto that has not been approved to in writing by the Determining Lenders, and the Determining Lenders shall have received on the Closing Date a true and complete copy thereof, certified by the Borrowers as being a true and complete copy of the HSP Agreement as in effect on the Closing Date.  On the Closing Date, no "HSP Termination Notice" or "HSP Condition Notice" (as defined in the Plan Support Agreement) or other notice of termination or breach by any party under the HSP Agreement, which notice shall not have been withdrawn upon effectiveness of the Plan Support Agreement, shall have been delivered by any party to the HSP Agreement, and none of the Borrowers nor the Determining Lenders shall be aware of any such notice being threatened as of the Closing Date.

(w)     Perfection of Security Interests.  The Agent shall have received on or prior to the Closing Date, pursuant to (i) Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, and entry of the Interim Financing Order, a fully perfected, first priority security interest in the Collateral, which security interest shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected and shall be subject solely to the Carve-Out and Permitted Encumbrances.

(x)     Engagement of Professionals.  The Agent shall have received on or prior to the filing of the applicable retention application to the Bankruptcy Court each engagement letter (or amended engagement letter) for each of the Borrowers' professionals that have been or that will be retained under section 327(a), 327(e), 328 or 363 of the Bankruptcy Code.  Any professionals that will be retained under section 327(a), 327(e), 328 or 363 of the Bankruptcy Code that did not have an engagement letter with the Debtors prior to the Petition Date shall execute an engagement letter in form and substance acceptable to the Determining Lenders, and all fees in connection therewith, shall be acceptable to the Determining Lenders, and all such engagement letters (or amendments thereto) and all post-petition amendments to any engagement letters for any of the Borrowers' professionals referenced in the first sentence of this subsection (x) shall be in form and substance satisfactory to the Determining Lenders.

(y)     Other.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Determining Lenders and their respective counsel.

8.2     Conditions to Each Advance.  The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advances on the Closing Date), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)     Representations and Warranties.  Each of the representations and warranties made by any Borrower in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under

or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all respects on and as of such date as if made on and as of such date (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified date, in which case such representation or warranty shall have been true and correct in all respects on such date);

(b)     No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date;

(c)     Maximum Advances.  In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement; and

(d)     Financing Orders.  The Interim Financing Order (or the Permanent Financing Order, as applicable) shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent and Determining Lenders) and shall not be subject to any pending stay.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

## IX.     INFORMATION AS TO BORROWERS.

Each Borrower shall, or (except with respect to Section 9.11) shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1     Disclosure of Material Matters.  Immediately upon learning thereof, report to Agent and Lenders all matters materially affecting the value, enforceability or collectability of any portion of the Collateral, including any Borrower's reclamation or repossession of, or the return to any Borrower of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

9.2     Schedules.  [Intentionally Omitted].

9.3     Environmental Reports.  Furnish Agent and Lenders, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8, with a certificate signed by the President of Borrowing Agent stating, to the best of his knowledge, that each Borrower is in compliance in all material respects with all federal, state and local Environmental Laws.  To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action such Borrower will implement in order to achieve full compliance.

9.4     Litigation.  Promptly notify Agent and Lenders in writing of (a) any claim, litigation, suit or administrative proceeding affecting any Borrower or any Guarantor, whether or

not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects a material portion of the Collateral or which could reasonably be expected to have a Material Adverse Effect and (b) periodic updates (no less frequently than once every two weeks) and any material developments with respect to the litigation in connection with the Pinnacle Acquisition.

9.5     Material Occurrences.  Promptly notify Agent and Lenders in writing upon the occurrence of: (a) any Event of Default or Default, (b) any event of default under any Indebtedness permitted by Section 7.8 and incurred after the Petition Date (or the receipt of any notice from the holder of any such Indebtedness alleging the occurrence of any such event); (c) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Borrower as of the date of such statements (subject to the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable at such time); (d) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (e) each and every default by any Borrower which might result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; (f) any Borrower becomes involved in any material labor dispute, or any strikes or walkouts or union organization of any Borrower's employees is threatened (to the best knowledge of Borrowers) or occurs or any labor contract is entered into which is scheduled to expire during the Term, (g) any communications received from DIRECTV asserting the termination of (or giving notice of an election to terminate) or a default under the HSP Agreement and (h) any other development in the business or affairs of any Borrower or any Guarantor, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Borrowers propose to take with respect thereto.

9.6     Government Receivables.  [Reserved].

9.7     Annual Financial Statements.  Furnish Agent and Lenders within ninety (90) days after the end of each fiscal year of Borrowers, (i) financial statements of Borrowers on a consolidated basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and complete and correct in all material respects (subject to the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable), and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Determining Lenders (the "Accountants") and (ii) management prepared financial statements of Borrowers on a consolidating basis, including, but not limited to, statements of income and stockholders' equity from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and complete and correct in all material respects (subject to the impact of the

commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable). The report of the Accountants with respect to the audited financial statements described in clause (i) of the foregoing sentence shall be accompanied by a statement of the Accountants certifying that (x) they have caused this Agreement to be reviewed, and (y) in making the examination upon which such report was based either no information came to their attention which to their knowledge constituted an Event of Default or a Default or, if such information came to their attention, specifying any such Default or Event of Default, its nature, when it occurred and whether it is continuing. In addition, the reports shall be accompanied by a Compliance Certificate.

9.8    Quarterly Financial Statements. Furnish Agent and Lenders within forty-five (45) days after the end of each fiscal quarter, (i) an unaudited balance sheet of Borrowers on a consolidated basis as at the end of such quarter and unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated basis reflecting results of operations from the beginning of the fiscal year to the end of such quarter and for such quarter, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and complete and correct in all material respects, subject to normal and recurring year end adjustments that individually and in the aggregate are not material to Borrowers' business and the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable, and (ii) management-prepared financial statements on a consolidating basis (exclusive of cash flows) for the business divisions of Borrowers as have been prepared by Borrowers consistent with past practice.

9.9    Monthly Financial Statements. Furnish Agent and Lenders within thirty (30) days after the end of each fiscal month, an unaudited balance sheet of Borrowers on a consolidated basis as at the end of such month and unaudited statements of income of Borrowers on a consolidated reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and complete and correct in all material respects, subject to normal and recurring year end adjustments that individually and in the aggregate are not material to Borrowers' business and the impact of the commencement of the Chapter 11 Cases and the transactions contemplated thereby, and any impairment that may be applicable at such time.

9.10    Other Reports. Furnish Agent and Lenders (i) as soon as available, but in any event within ten (10) days after the issuance thereof, (x) with copies of such financial statements, reports and returns as UniTek Parent shall send to its stockholders and (y) copies of all notices, reports, financial statements and other materials sent pursuant to the Pre-Petition Loan Documents and (ii) as soon as available, but in any event within three (3) Business Days after the filing thereof, any and all reports , including Forms 10-K, 10-Q and 8-K, registration statements and prospectuses and other shareholder communications, filed by any Borrower with the SEC.

9.11    Additional Information. Furnish Agent and Lenders with such additional information as Agent or each of the Determining Lenders shall reasonably request in order to enable Agent or Determining Lenders to determine whether the terms, covenants, provisions and conditions of this Agreement and the Other Documents have been complied with by Borrowers

including, without the necessity of any request by Agent or Determining Lenders, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening of any new office or place of business or any Borrower's closing of any existing office or place of business, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Borrower is a party or by which any Borrower is bound, in each case which could reasonably be expected to have a Material Adverse Effect.

9.12    Projected Operating Budget.  Furnish Agent and Lenders, no later than sixty (60) days following the beginning of each Borrower's fiscal years, commencing with fiscal year 2015, a month by month projected operating budget and cash flow of Borrowers on a consolidated basis for such fiscal year (including an income statement for each month and a balance sheet as at the end of the last month in each fiscal quarter), such projections to be accompanied by a certificate signed by the Chief Financial Officer of each Borrower to the effect that such projections have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared.

9.13    Pleadings.  Furnish Agent and Lenders, no later than two Business Days prior to filing or distribution, copies of all pleadings, motions, applications, judicial information, financial information and other documents to be filed by or on behalf of the Borrowers or any Guarantors with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases, or to be distributed by or on behalf of the Borrowers or any of the Guarantors to any official committee appointed in the Chapter 11 Cases (except that with respect to emergency pleadings, motions or other filings for which, despite such Debtor's commercially reasonable efforts, two Business Days' notice is impracticable, Borrowers shall be required to furnish the same no later than concurrently with such filing or distribution thereof, as applicable).

9.14    Notice of Suits, Adverse Events.  Furnish Agent and Lenders with prompt written notice of (i) any lapse or other termination of any material Consent issued to any Borrower by any Governmental Body or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such material Consent; and (iii) copies of any periodic or special reports filed by any Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Borrower or any Guarantor.

9.15    ERISA Notices and Requests.  Furnish Agent and Lenders with immediate written notice in the event that (i) any Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or

PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter, (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; or (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

9.16    <u>Additional Documents</u>.  Execute and deliver to Agent and Determining Lenders, upon request, such documents and agreements as Agent or any Determining Lender may, from time to time, reasonably request regarding Borrowers, their Subsidiaries, their businesses and assets and properties and/or to carry out the purposes, terms or conditions of this Agreement.

## X.    EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>":

10.1    <u>Nonpayment</u>.  Failure by any Borrower to pay any principal on the Obligations when due or within the period of grace, if any, provided in the instrument or agreement under which such Obligation was created, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or by notice of intention to prepay, or by required prepayment (including pursuant to <u>Section 2.7</u>), or failure to pay when due any interest on the Obligations or other liabilities or make any other payment, fee or charge provided for herein or in any Other Document when due, which failure continues for a period of three (3) Business Days (but further provided that such grace period under this <u>Section 10.1</u> may not be exercised more than one (1) time during the Term); or

10.2    <u>Breach of Representation</u>.  Any representation or warranty made or deemed made by any Borrower or any Guarantor in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in

connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made; or

10.3    <u>Financial Information</u>.  Failure by any Borrower to permit the inspection of its books or records or access for appraisals in accordance with the terms hereof; or

10.4    <u>Judicial Actions</u>.  Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's Inventory or Receivables or against a material portion of any Borrower's other property which is not stayed or lifted within thirty (30) days; or

10.5    <u>Noncompliance</u>.  (i) Except as otherwise provided for in <u>Sections 10.1</u> and <u>10.5(ii)</u>, failure or neglect of any Borrower or any Guarantor or any Person to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in this Agreement, any Other Document, the Plan Support Agreement, the Financing Orders or any other agreement or arrangement, now or hereafter entered into between any Borrower or any Guarantor or such Person, and Agent or any Lender, or (ii) failure or neglect of any Borrower to perform, keep or observe any term, provision, condition or covenant, contained in <u>Sections 4.6</u>, <u>4.7</u>, <u>4.9</u>, <u>4.13</u>, <u>4.14</u>, <u>6.3</u>, <u>6.4</u>, <u>9.4</u> or <u>9.6</u> hereof which, in the case of any such failure or neglect pursuant to this <u>Section 10.5(ii)</u>, is not cured within twenty (10) days from the occurrence of such failure or neglect; or

10.6    <u>Judgments</u>.

Any judgment or judgments , writ(s), order(s) or decree(s) for the payment of money are rendered after the Closing Date against any Borrower or any Guarantor for an aggregate amount in excess of $1,000,000 or against all Borrowers or Guarantors for an aggregate amount in excess of $1,000,000, as an administrative expense, and (i) action shall be legally taken by any judgment creditor to levy upon assets or properties of any Borrower or any Guarantor to enforce any such judgment, or (ii) there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) any Liens arising by virtue of the rendition, entry or issuance of such judgment upon assets or properties of any Borrower or any Guarantor shall be senior to any Liens in favor of Agent on such assets or properties; or

10.7    <u>Bankruptcy Case Events</u>.

(a)    The entry of the Interim Financing Order shall not have occurred by the 3rd day following the Petition Date in form and substance satisfactory to Determining Lenders; or

(b)    the entry of the Permanent Financing Order shall not have occurred by the 30th day following the Petition Date in form and substance satisfactory to Determining Lenders; or

(c)    the existence of any other Superpriority Claim (other than the Carve-Out) in any of the Chapter 11 Cases which is *pari passu* with or senior to the claims of the Agent and the Lenders against the Borrowers or any Guarantor hereunder, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim (other than the Carve-Out); or

(d)      payment of pre-Petition Date liabilities without the consent of the Determining Lenders other than as set forth in the First Day Orders or the Financing Orders; or

(e)      entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay to allow any creditor to execute upon or enforce a lien on or security interest in any assets of the Debtors with a fair market value in excess of $100,000 (other than with respect to those Debtors for which the Determining Lenders consent to such relief); provided that this clause (a) shall not apply (x) to any order granting relief from the automatic stay to the extent of permitting a creditor to exercise valid setoff rights pursuant to section 553 of the Bankruptcy Code, the Financing Orders, the First Day Orders or (y) to any order to the extent the relevant claim is covered by insurance of Debtors and their Subsidiaries; or

(f)      entry of any order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered reversing or vacating, or modifying (in a manner adverse in any material respect to the Lenders) without the consent of the Determining Lenders, any Financing Order, this Agreement or any of the Other Documents, and such order shall not be reversed or vacated for a period in excess of three (3) days after the entry thereof;

(g)      the filing by any Debtor of (or the consent by any Debtor to) a motion or pleading seeking to reverse, amend, stay or vacate any Financing Order or to challenge this Agreement or any of the Other Documents; or

(h)      dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case to a chapter 7 case, or the appointment of a chapter 11 trustee or of an examiner or responsible officer (in any such case with expanded powers relating to the operation of the Debtors' businesses (powers beyond those set forth in section 1106(a) and section 1106(b) of the Bankruptcy Code)) with respect to any Chapter 11 Case shall have occurred; or

(i)      filing of any motion by any Debtor seeking authority of the Bankruptcy Court to consummate a sale of assets of any Debtor (including any Collateral) having a value in excess of $100,000 outside the ordinary course of business, without the prior written consent of the Determining Lenders; or

(j)      filing by any Debtor of any plan of reorganization under the Bankruptcy Code, other than the Plan of Reorganization; or

(k)      institution of any judicial proceeding by the Debtors or any official committee appointed in the Chapter 11 Cases, or consent by any Borrowers or any Guarantors to any such judicial proceeding filed by any other person, seeking to challenge the validity of the Agreement or any Other Document, or the applicability, priority or enforceability of the same, or which seeks to void, avoid, limit, subordinate or otherwise adversely affect any security interest created by or granted under the Financing Orders, this Agreement or the Other Documents or any payment made pursuant thereto; or

(l)      except as provided in the Financing Orders, filing by any Debtor of a motion, application or other petition to effect or consent to any order of the Bankruptcy Court to obtain credit or incur Indebtedness that is: (i) secured by a lien on all or any portion of the

Collateral which is equal or senior to any lien in favor of the Agent described in this Agreement or the Other Documents securing the Obligations, or (ii) entitled to administrative priority status which is equal or senior to the claims of the Agent (other than the Carve-Out) or any replacement liens or claims provided as adequate protection to the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the Pre-Petition Term Loan Agent or the Pre-Petition Term Lenders pursuant to the Financing Orders; or

(m)    the assertion of any claim arising under Section 506(c) of the Bankruptcy Code against the Lenders or any of the Lenders' pre- or post-petition collateral or the commencement of other actions adverse to the Lenders or their respective rights and remedies under this Agreement or any Bankruptcy Court order; or

(n)    Borrower shall fail to comply with any covenant in <u>Section 6.10</u>; or

(o)    the Bankruptcy Court shall not have entered an order confirming the Plan of Reorganization (or other plan of reorganization acceptable to the Determining Lenders) on or before the date that is 66 days from the Petition Date; or

(p)    the effective date of the Plan of Reorganization (or other plan of reorganization acceptable to the Determining Lenders) shall not have occurred on or before January 21, 2015; or

(q)    any Loan Party asserts or prosecutes any claim or cause of action against the Pre-Petition ABL Agent, the Pre-Petition ABL Lenders, the Pre-Petition Term Loan Agent or the Pre-Petition Term Lenders; or

10.8    <u>Subsidiary Bankruptcy</u>.  Any Subsidiary of any Borrower, or any Guarantor, in each case other than the Debtors, shall (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy or receivership laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent (including by entry of any order for relief in any involuntary bankruptcy or insolvency proceeding commenced against it), (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, within sixty (60) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing; or

10.9    <u>Material Adverse Effect</u>.  The occurrence of any Material Adverse Effect; or

10.10    <u>Lien Priority</u>.

(a)    Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not (or shall be asserted by any Debtor not to be) a valid and perfected Lien having the priority  as set forth under this Agreement or the Other Documents and the Financing Orders; or

10.11  <u>Cross Default</u>.  Either (x) any "event of default" under any other Indebtedness of any Borrower incurred after the Petition Date with a then-outstanding principal balance (or, in the case of any Indebtedness not so denominated, with a then-outstanding total obligation amount or total amount potentially due and payable by any Borrower(s)) of $100,000 or more, or any other event or circumstance which would permit the holder of any such Indebtedness of any Borrower to accelerate such Indebtedness (and/or the obligations of Borrower thereunder) prior to the scheduled maturity or termination thereof, shall occur (regardless of whether the holder of such Indebtedness shall actually accelerate, terminate or otherwise exercise any rights or remedies with respect to such Indebtedness), in any such case after giving effect to any applicable notice, grace or cure periods, and the application of section 362 of the Bankruptcy Code, or (y) a default of the obligations of any Borrower under any other agreement to which it is a party shall occur which causes a Material Adverse Effect which default is not cured within any applicable grace period; or

10.12  <u>Breach of Guaranty or Pledge Agreement</u>.  Termination or breach of any Guaranty, Guaranty Security Agreement, Pledge Agreement or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor attempts to terminate, challenges the validity of, or its liability under, any such Guaranty, Guaranty Security Agreement, Pledge Agreement or similar agreement; or

10.13  <u>Change of Control</u>.  Any Change of Control shall occur; or

10.14  <u>Invalidity</u>.  Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so claim in writing to Agent or any Lender; or

10.15  <u>Licenses</u>.  To the extent it could reasonably be expected to have a Material Adverse Effect: (i) Any Governmental Body shall (a) revoke, terminate, suspend or adversely modify any license, permit, patent trademark or tradename of any Borrower or any Guarantor, the continuation of which is material to the continuation of any Borrower's or Guarantor's business, or (b) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (c) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Borrower's or Guarantor's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; (ii) any agreement which is necessary or material to the operation of any Borrower's or any Guarantor's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within five (5) days after the date of such revocation or termination, and such revocation or termination and non-replacement would reasonably be expected to have a Material Adverse Effect; or

10.16  <u>Seizures</u>.  Other than with respect to de minimis items of Collateral not exceeding $100,000 in the aggregate, any portion of the Collateral shall be seized or taken by a Governmental Body, or any Borrower or any Guarantor or the title and rights of any Borrower, any Guarantor which is the owner of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit or other proceeding which could reasonably be expected

to, in the opinion of Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents; or

10.17   <u>Operations</u>.  The business operations of any Borrowers are interrupted at any time for more than 4 consecutive calendar days, unless such Borrower or Guarantor shall (i) be entitled to receive for such period of interruption, proceeds of business interruption insurance in respect of which a solvent and unaffiliated insurance company has acknowledged coverage in writing and in an amount sufficient to assure that its per diem cash needs during such period is at least equal to its average per diem cash needs for the consecutive three month period immediately preceding the initial date of interruption and (ii) receive such proceeds in the amount described in clause (i) preceding not later than thirty (30) days following the initial date of any such interruption; provided, however, that notwithstanding the provisions of clauses (i) and (ii) of this section, an Event of Default shall be deemed to have occurred if such Borrower shall be receiving the proceeds of business interruption insurance for a period of thirty (30) consecutive days;

10.18   <u>Pension Plans</u>.  An event or condition specified in <u>Sections 7.16</u> or <u>9.15</u> hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or

10.19   <u>HSP Agreement</u>.  The HSP Agreement shall be amended, modified or waived in any manner that has not been approved in writing by the Determining Lenders; or the HSP Agreement shall cease to be in full force and effect; or an "HSP Termination Notice" or "HSP Condition Notice" (as defined in the Plan Support Agreement) or other notice of termination or breach by any party under the HSP Agreement shall have been delivered by any party to the HSP Agreement; or

10.20   <u>Plan Support Agreement</u>.   The Plan Support Agreement shall be amended, modified or waived in any manner that has not been approved to in writing in accordance with the terms thereof; or the Plan Support Agreement shall cease to be in full force and effect or a "Termination Date" (as defined in the Plan Support Agreement) shall occur thereunder; or any notice under the Plan Support Agreement of the occurrence of any "PSA Termination Event" (as defined in the Plan Support Agreement) shall have been delivered by any party to the Plan Support Agreement; or

10.21   <u>ERISA</u>.   One or more ERISA Events or noncompliance with respect to Foreign Plans shall have occurred that, when taken together with all other such ERISA Events and noncompliance with respect to Foreign Plans that have occurred, could reasonably be expected to result in liability of any Debtor and its ERISA Affiliates in an aggregate amount exceeding $100,000 or the imposition of a Lien on any properties of a Debtor, except any liability that is reasonably expected to be treated as a general unsecured claim in the Chapter 11 Cases and would not reasonably be expected to result in a Material Adverse Effect.

## XI.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1    <u>Rights and Remedies</u>.

(a)    Upon the occurrence of any Event of Default, and in every such event, without further order of or application to the Bankruptcy Court, and at any time thereafter during the continuance of such Event of Default, the Agent, at the direction of the Required Lenders shall, deliver written notice to Borrowers and counsel for the Debtors and the Office of the United States Trustee (and any Committee) of the occurrence of an Event of Default, and declaring the Obligations to be accelerated, and on the date that is five (5) Business Days following such delivery of such written notice by Agent (i) the Debtors' ability to borrow will automatically terminate and all Obligations shall become immediately due and payable, and (ii) subject to the Financing Orders, the Agent, at the direction of the Required Lenders, shall be permitted to set-off amounts in any accounts of the Debtors, and Agent, at the direction of the Required Lenders, shall be permitted to exercise all rights and remedies, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code, in each case for the benefit of the Lenders on account of the Obligations held by such Lenders, and apply amounts received in connection with such exercise of remedies to the payment of the Obligations in accordance with the terms of the Agreement, the Other Documents and the Financing Orders, and under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process.  Agent may enter any of Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion (or at the direction of the Required Lenders) without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place.  With or without having the Collateral at the time or place of sale, Agent may, at the direction of the Required Lenders, sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent (at the direction of the Required Lenders) may elect.  Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification.  At any public sale Agent (at the direction of the Required Lenders) or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by each Borrower.  In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Borrower's (a) trademarks, trademark applications, trade styles, trade names, patents, patent applications, copyrights, copyright applications, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the

manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof. Noncash proceeds will only be applied to the Obligations as they are converted into cash. If any deficiency shall arise, Borrowers shall remain liable to Agent and Lenders therefor.

(b)   To the extent that Applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for the Agent: (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral; (iv) to exercise collection remedies against Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as any Borrower, for expressions of interest in acquiring all or any portion of such Collateral; (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Each Borrower acknowledges that the purpose of this Section 11.1(b) is to provide non-exhaustive indications of what actions or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.1(b). Without limitation upon the foregoing, nothing contained in this Section 11.1(b) shall be construed to grant any rights to any Borrower or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.1(b).

11.2   Agent's Discretion. Agent, acting at the direction of the Determining Lenders or, following the occurrence of any Event of Default that has not been cured or waived. the Required Lenders, as applicable, shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder.

11.3   Setoff. Subject to Section 14.12, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence of an Event of Default

hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Borrower's property held by Agent and such Lender to reduce the Obligations and to exercise any and all rights of setoff which may be available to Agent and such Lender with respect to any deposits held by Agent or such Lender.

11.4    <u>Rights and Remedies not Exclusive</u>.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5    <u>Allocation of Payments After Event of Default</u>.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations (including without limitation any amounts outstanding under any of the Other Documents), or in respect of the Collateral may, at Agent's discretion, or shall, upon direction of the Required Lenders, be paid over or delivered as follows:

FIRST, to the payment of all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented attorneys' fees) of the Agent in connection with enforcing its rights and the rights of the Lenders under this Agreement and the Other Documents;

SECOND, to payment of any fees and other amounts owed to the Agent under this Agreement;

THIRD, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of AIC, New Mountain and Cetus to the extent owing to such Lender pursuant to the terms of this Agreement;

FOURTH, to the payment of all of the Obligations consisting of accrued fees and interest with respect to the Advances or otherwise provided for in this Agreement or the Other Documents;

FIFTH, to the payment of the outstanding principal amount of the Advances, including the payment or cash collateralization, on a pro rata basis, of the funded exposure and unfunded exposure (at 105% of the unfunded exposure), respectively, under any outstanding Letters of Credit and Roll-Up Letters of Credit (provided, that no cash collateralization of unfunded exposure under Roll-Up Letters of Credit (including the WTC Letter of Credit) shall be required by this clause "FIFTH" unless a Cash Collateral Event shall have occurred) in accordance with <u>Section 3.2(b)</u> hereof;

SIXTH, to all other Obligations provided for in this Agreement or the Other Documents or otherwise which shall have become due and payable and not repaid pursuant to clauses "<u>FIRST</u>" through "<u>FIFTH</u>" above (including the cash collateralization, on a pro rata basis, of any outstanding Roll-Up Letters of Credit (including the WTC Letter of Credit), at 105% of the unfunded exposure, to the extent such Roll-Up Letters of Credit are not already cash collateralized), and

SEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of the Lenders shall receive an amount equal to its Ratable Share of amounts available to be applied pursuant to clauses "FOURTH", "FIFTH" and "SIXTH" above; and (iii) to the extent that any amounts available for distribution pursuant to clauses "FIFTH" and "SIXTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit or Roll-Up Letters of Credit, such amounts shall be held by the Agent as cash collateral as provided for in Section 3.2(b) hereof and applied (A) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and Roll-Up Letters of Credit and (B) then, following the expiration of all Letters of Credit and Roll-Up Letters of Credit, to all other obligations of the types described in clauses "SIXTH" and "SEVENTH" above in the manner provided in this Section 11.5.

## XII.    WAIVERS AND JUDICIAL PROCEEDINGS.

12.1    Waiver of Notice.  Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2    Delay.  No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3    Jury Waiver.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## XIII.   EFFECTIVE DATE AND TERMINATION.

13.1   Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Borrower, Agent and each Lender, shall become effective on the date hereof and shall continue in full force and effect until the earliest of (the "Commitment Termination Date"): (a) January 21, 2015 (the "Term Date"; provided that upon the effectiveness of the One Month Extension Option, the Term Date shall be extended to February 20, 2015; and provided further that upon the effectiveness of the Two Month Extension Option, the Term Date shall be extended to March 20, 2015), (b) the effective date of the Plan of Reorganization, and (c) termination of the Commitments as a result of an Event of Default (the period from the Closing Date until the Commitment Termination Date, the "Term"), unless sooner terminated as herein provided.  Borrowers may terminate this Agreement at any time upon thirty (30) days' prior written notice (which notice shall be revocable) upon payment in full of the Obligations.

13.2   Termination.  The termination of the Agreement shall not affect Agent's, Issuer's or any Lender's rights, protections and indemnities, or any of the Obligations having their inception prior to the effective date of such termination or any Obligations which pursuant to the terms hereof continue to accrue after, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated.  The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been indefeasibly paid and performed in full after the termination of this Agreement or each Borrower has furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto.  Accordingly, each Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations have been indefeasibly paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are indefeasibly paid and performed in full. Notwithstanding anything in this Agreement to the contrary, the parties hereto agree that upon effectiveness of the Plan of Reorganization and the closing of the "New First Lien Debt Facility" in accordance with the "New First Lien Debt Facility Term Sheet" (as such terms are defined in the Plan of Reorganization), (i) the outstanding Obligations may be satisfied upon conversion thereof into obligations under such "New First Lien Debt Facility" in accordance with such "New First Lien Debt Facility Term Sheet", and (ii) any cash collateral provided under this Agreement to secure the Letters of Credit and Roll-Up Letters of Credit (including the WTC Letter of Credit) not previously applied to pay amounts due and payable under this Agreement shall be returned to the Borrowers, net of any reimbursement obligations then outstanding with respect to the drawn portion of such Letters of Credit and Roll-Up Letters of Credit.

13.3   One Month Extension Option.  The Borrowers may extend the Term Date from January 21, 2015 to February 20, 2015 (the "One Month Extension Option") subject to, and the

Term Date shall be so extended upon satisfaction of, the following conditions precedent:  (a) the Borrowers shall provide written notice to the Agent and Determining Lenders on or after January 11, 2015 but before January 15, 2015 of its intention to exercise the One Month Extension Option; (b) the Borrowers shall pay a fee to the Agent on the date of delivery of such notice for the account of each Lender having Initial Commitments, L/C Commitments or Revolving Commitments equal to 0.50% of the outstanding Initial Commitments, L.C Commitments and Revolving Commitments of such Lender; (c) as of the initial Term Date, the representations and warranties contained in this Agreement and each Other Document shall be correct in all material respects on and as of such date, immediately before and immediately after giving effect to such extension, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such extension, in which case such representations or warranties were true and correct in all material respects as of such specific date; (d) [reserved]; (e) the Borrowers and Guarantors shall have provided to the Agent certified copies of resolutions of the boards of directors of the Borrowers and the Guarantors duly approving the One Month Extension Option, in form and substance reasonably satisfactory to the Agent; and (f) no Default or Event of Default shall have occurred and be continuing as of the initial Commitment Termination Date.  The Agent will notify the Borrowers and the Lenders upon the effectiveness of the One Month Extension Option.

13.4   Two Month Extension Option.   The Borrowers may extend the Commitment Termination Date from February 20, 2015 to March 20, 2015 (the "Two Month Extension Option") subject to, and the Commitment Termination Date shall be so extended upon satisfaction of, the following conditions precedent:  (a) the Borrowers shall provide written notice to the Agent and Determining Lenders on or after February 15, 2015 but before February 18, 2015 of its intention to exercise the Two Month Extension Option; (b) as of February 20, 2015, the representations and warranties contained in this Agreement and each Other Document shall be correct in all material respects on and as of such date, immediately before and immediately after giving effect to such extension, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such extension, in which case such representations or warranties were true and correct in all material respects as of such specific date; (c) as of February 20, 2015, no material adverse change shall have occurred (since the Closing Date) with respect to the business, operations, financial condition, future prospects or expected funding capacity or liquidity of the Borrowers and their Subsidiaries, taken as a whole; (d) each Determining Lender shall have approved in writing the request for extension of the Commitment Termination Date to March 20, 2015; (e) Borrowers and Guarantors shall have provided to the Agent certified copies of resolutions of the boards of directors of the Borrowers and the Guarantors duly approving the Two Month Extension Option, in form and substance reasonably satisfactory to the Agent; and (f) no Default or Event of Default shall have occurred and be continuing as of February 20, 2015.  The Agent will notify the Borrowers and the Lenders upon the effectiveness of the Two Month Extension Option.

## XIV.   REGARDING AGENT.

14.1   Appointment.   Each Lender hereby designates Wilmington Trust, National Association to act as Agent for such Lender under this Agreement and the Other Documents. Each Lender hereby irrevocably authorizes Agent and Determining Lenders to take such action

on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent or Determining Lenders, as the case may be, by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in 3.4(a) and the Fee Letter), charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders.   Agent may perform any of its duties hereunder by or through its agents or employees.

(a)     The Agent shall not have any duties or obligations except those expressly set forth herein and in the Other Documents to which it is a party, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Agent:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the Other Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in this Agreement or Other Documents); *provided* that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability (unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto) or that is contrary to this Agreement or any Other Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law;

(iii)     shall not, except as expressly set forth herein and in the Other Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Subsidiaries or Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity; and

(iv)     shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

14.2   Nature of Duties.  Neither Determining Lenders nor Agent shall have duties or responsibilities except those expressly set forth in this Agreement and the Other Documents.  Neither Agent nor Determining Lenders nor any of their officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non- appealable judgment), or

(ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder.  Determining Lenders and Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower.  The duties of Agent as respects the Advances to Borrowers shall be mechanical and administrative in nature; neither Determining Lenders nor Agent shall have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent or Determining Lenders any obligations in respect of this Agreement except as expressly set forth herein.

14.3    Lack of Reliance on Agent and Resignation.  Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower and each Guarantor.  Neither Determining Lenders nor Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof.  Neither Determining Lenders nor Agent shall be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default.

Agent may resign on sixty (60) days' written notice to each of Lenders and Borrowing Agent, and the Determining Lenders shall have the right, at any time, to remove the Agent, and upon such resignation or removal, the Determining Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers (provided that no such approval by Borrowers shall be required (i) in any case where the successor Agent is one of the Lenders or (ii) after the occurrence and during the continuance of any Event of Default).  Any such successor Agent shall succeed to the rights, powers and duties of Agent, and shall in particular succeed to all of Agent's right, title and interest in and to all of the Liens in the Collateral securing the Obligations created hereunder or any Other Document (including Pledge Agreement and all account control agreements), and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent.  However,

notwithstanding the foregoing, if at the time of the effectiveness of the new Agent's appointment, any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to new Agent and/or for the perfection of any Liens in the Collateral as held by new Agent or it is otherwise not then possible for new Agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, former Agent shall continue to hold such Liens solely as agent for perfection of such Liens on behalf of new Agent until such time as new Agent can obtain a fully valid, enforceable and perfected Lien on all Collateral, provided that Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens).  After any Agent's resignation or removal as Agent, the provisions of this <u>Article XIV</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement (and in the event resigning or removed Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this <u>Article XIV</u> shall inure to its benefit as to any actions taken or omitted to be taken by it in connection with such Liens).

14.4   <u>Certain Rights of Agent</u>.

(a)   If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Determining Lenders, or, following the occurrence of an Event of Default, the Required Lenders and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Determining Lenders, or, following the occurrence of an Event of Default, the Required Lenders.

(b)   The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any representation and warranty or any other statement made in or in connection with this Agreement or any Other Document or, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any Other Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article VIII or elsewhere herein.

(c)   In determining compliance with any condition hereunder to the making of an Advance that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants, and other experts selected by it, and shall not be liable for any action taken or not taken by it in reliance upon the advice of any such counsel, accountants or experts.

(d)     No provision of this Agreement or any Other Document shall require the Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

14.5   Reliance.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it.  Agent may employ agents and attorneys-in fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.6   Notice of Default.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders.  Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.7   Indemnification.   To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances (or, if no Advances are outstanding, according to its Revolving Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

14.8   Agent in its Individual Capacity.  At any time, Agent is also a Lender hereunder, with respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender.  Agent may engage in business with any Borrower as if it were not performing the duties

specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9    <u>Delivery of Documents</u>.    To the extent Agent receives financial statements required under <u>Sections 9.7</u>, <u>9.8</u>, <u>9.9</u> and <u>9.12</u> which any Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders.

14.10    <u>Borrowers' Undertaking to Agent</u>.    Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.11    <u>No Reliance on Agent's Customer Identification Program</u>.    Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "<u>CIP Regulations</u>"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any Borrower, its Affiliates or its agents, this Agreement, the Other Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any record-keeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

14.12    <u>Other Agreements</u>.    Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or any deposit accounts of any Borrower now or hereafter maintained with such Lender.  Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by the Determining Lenders or, following the occurrence of any Event of Default that has not been cured or waived, the Required Lenders, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of the Determining Lenders or, following the occurrence of any Event of Default that has not been cured or waived, the Required Lenders.

## XV.    BORROWING AGENCY.

15.1    <u>Borrowing Agency Provisions</u>.

(a)    Each Borrower hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity to (i) borrow, (ii) request advances, (iii) request the issuance of Letters of Credit, (iv) sign and endorse notes, (v) execute and deliver all instruments,

documents, applications, security agreements, reimbursement agreements and letter of credit agreements for Letters of Credit and all other certificates, notice, writings and further assurances now or hereafter required hereunder, (vi) make elections regarding interest rates, (vii) give instructions regarding Letters of Credit and agree with Issuer upon any amendment, extension or renewal of any Letter of Credit and (viii) otherwise take action under and in connection with this Agreement and the Other Documents, all on behalf of and in the name such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.  Such designation of the Borrowing Agent shall remain in full force and effect unless and until the Determining Lenders shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been designated to replace the Borrowing Agent in such capacity.

(b)      The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request.  Neither Agent nor any Lender shall incur liability to Borrowers as a result thereof.  To induce Agent and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 15.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)      All Obligations shall be joint and several, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted to Agent or any Lender to any Borrower, failure of Agent or any Lender to give any Borrower notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Borrower, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.  Each Borrower waives all suretyship defenses.

15.2    Waiver of Subrogation.  Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

01:16263179.1

## XVI.  MISCELLANEOUS.

16.1    <u>Governing Law</u>.  This Agreement and each Other Document (unless and except to the extent expressly provided otherwise in any such Other Document), and all matters relating hereto or thereto or arising herefrom or therefrom (whether arising under contract law, tort law or otherwise) shall be governed by and construed in accordance with the laws of the State of New York applied to contracts to be performed wholly within the State of New York, and to the extent applicable, the Bankruptcy Code.  Any judicial proceeding brought by or against any Borrower with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement may be brought in any court of competent jurisdiction in the State of New York, United States of America, except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing, and, by execution and delivery of this Agreement, each Borrower accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.  Each Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified or registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in <u>Section 16.6</u> and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the Agent's option, by service upon Borrowing Agent which each Borrower irrevocably appoints as such Borrower's Agent for the purpose of accepting service within the State of New York.  Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against any Borrower in the courts of any other jurisdiction.  Each Borrower waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  Each Borrower waives the right to remove any judicial proceeding brought against such Borrower in any state court to any federal court.  Any judicial proceeding by any Borrower against Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of New York, State of New York, except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing.  Notwithstanding anything to the contrary contained in this <u>Section 16.1</u>, each Party hereto irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court for purposes of any action, suit or proceeding or other contested matter arising out of or relating to the Obligations, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding or other contested matter.

16.2    <u>Entire Understanding</u>.

(a)    This Agreement and the documents executed concurrently herewith contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Borrower's, Agent's and each Lender's respective officers.  Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated

orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.  Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)    The Determining Lenders (or Agent with the consent in writing of the Determining Lenders) and Borrowers may, subject to the provisions of this Section 16.2(b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Borrowers, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Borrowers thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall:

(i)    increase the Revolving Commitment or Revolving Credit Commitment Amount of any Lender without the consent of such Lender;

(ii)    extend the Term or the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrowers to Lenders pursuant to this Agreement without the consent of each Lender directly affected thereby other than any waiver of the application of the Default Rate hereunder;

(iii)    alter, amend or modify the definition of the term Required Lenders, Determining Lenders, Section 2.20(a), Section 2.20(b), any provision regarding the pro rata treatment of or sharing of payments by the Lenders or requiring all Lenders to authorize the taking of any action or this Section 16.2(b), in each case without the consent of all of the Lenders;

(iv)    release any Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $1,000,000 without the consent of all of the Lenders (other than Defaulting Lenders);

(v)    change the rights and duties of Agent, Determining Lenders or each Determining Lender or any Determining Lender, Required Lenders, or Issuer without the consent of Agent, Determining Lenders, each Determining Lender any Determining Lender, Required Lenders or each Issuer (as applicable);

(vi)    [RESERVED];

(vii)    [RESERVED]; or

(viii)    release any Borrower or Guarantor without the consent of all of the Lenders (other than Defaulting Lenders).

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrowers, Lenders and Agent and all future holders of the Obligations.  In the case of any waiver, Borrowers, Agent and Lenders shall be restored to their former positions and

rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

Notwithstanding anything to the contrary herein in or in any Other Documents, (i) any notices, information or documents required under this Agreement or any Other Document to be delivered or provided to the Agent shall also be required to be concurrently delivered or provided to the Determining Lenders (provided that if originals of any documents are required to be delivered to the Agent, then the Debtors only need to concurrently provide copies of same to the Determining Lenders), and (ii) the Agent shall not provide any approvals, consents or waivers or exercise any default-related rights and remedies under this Agreement, the Other Documents and/or applicable law without the prior written consent of the Required Lenders.

16.3    Successors and Assigns; Participations; New Lenders.

(a)    This Agreement shall be binding upon and inure to the benefit of Borrowers, Agent, each Lender, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)    Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to an Eligible Lender (each such transferee or purchaser of a participating interest, a "Participant"); provided that no Lender may grant any such Participant any rights to consent with respect to any amendments, supplement, modification or waiver with respect to this Agreement or any Other Documents except that such Participant may be granted consent rights with respect to any amendments, supplement, modification or waiver requiring the consent of such Lender or of all Lenders under Section 16.2(b)(i), (ii) or (iv) (but provided further that if the Lender granting such participation is or at any time becomes a Defaulting Lender, no such Participant of any such Lender shall have any rights to consent greater than the voting rights of such Lender under such circumstances).  Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Each Borrower hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

(c)    Any Lender may sell, assign or transfer all or any part of its rights and obligations under or relating to Commitments and Advances under this Agreement and the Other Documents to an Eligible Lender (each a "Purchasing Lender"), in minimum amounts of not less

than $5,000,000, pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording.  Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with the Commitments, Initial Commitment Percentage, Revolving Commitment Percentage, L/C Commitment Percentage and Roll-Up Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose.  Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitments arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Notwithstanding anything to the contrary herein, each transfer of Commitments and Advances hereunder shall transfer to the Transferee thereof an equal percentage of each of the Initial Commitments, the Revolving Commitments and the L/C Commitments, and of each of the Initial Advances, the Revolving Advances and the L/C Commitment Advances. Each Borrower hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Commitments arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.  For the avoidance of doubt, no Person shall constitute a Purchasing Lender or Participant unless such Person is an Eligible Lender, and any attempted assignment or transfer to any Person that is not an Eligible Lender or otherwise in violation hereof shall be null and void.

(d)      [Reserved].

(e)      Agent shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder.  The entries in the Register shall be conclusive, in the absence of manifest error, and each Borrower, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Commitments and Advances recorded therein for the purposes of this Agreement.  The Register shall be available for inspection by Borrowing Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.  Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender.

(f)      Each Borrower authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning such Borrower which has been delivered to such Lender by or on behalf of such Borrower pursuant to this Agreement or in connection with such Lender's credit evaluation of such Borrower.

01:16263179.1

(g)    In the event that any Lender (i) gives notice under Section 3.8, (ii) requests compensation under Section 3.7, or requires the Borrower to pay any additional amount to any Lender or any Official Body for the account of any Lender pursuant to Section 3.10, (iii) is a Defaulting Lender, (iv) becomes subject to the control of an Governmental Body (other than normal and customary supervision), or (v) Agent requests the consent of a Lender pursuant to Section 16.2 and such consent is denied, then either Borrower, at its sole expense upon notice to such Lender and the Agent, or Agent, at its option, may require such Lender to assign, without recourse (in accordance with the otherwise applicable requirements of this Section 16.3), its Commitments and interest in the Advances to another Lender or to any other Eligible Lender designated by the Determining Lenders (the "Designated Lender"), for a price equal to (i) the then outstanding principal amount thereof plus (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Borrowers; provided that in the case of any assignment resulting from a claim for increased compensation or amounts payable under Section 3.7 or 3.10, the assignment to the Designated Lenders must result in a reduction in such compensation or amounts payable.  In the event Borrower or Agent elects to require any Lender to assign its interest to the Designated Lender in accordance with this paragraph, Borrowers or Agent, as applicable, will so notify such Lender and such Lender will assign its interest to the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, the Designated Lender, as appropriate, and Agent; provided that a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower or Agent to require such assignment and delegation cease to apply.

16.4    Application of Payments.  The Required Lenders, if they so elect, shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations.  To the extent that any Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

16.5    Indemnity.  Each Borrower shall indemnify Agent, Issuer, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent, Issuer or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent, Issuer or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct or gross negligence of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,

expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the indemnitees described above in this Section 16.5 by any Person under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Substances and Hazardous Waste, or other Toxic Substances. Additionally, if any Taxes (other than Excluded Taxes but including any Other Taxes) shall be payable by Agent, Lenders or Borrowers on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrowers will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the indemnitees described above in this Section 16.5 harmless from and against all liability in connection therewith.

16.6     Notice.  Any notice or request hereunder may be given to Borrowing Agent or any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section.  Any notice, request, demand, direction or other communication (for purposes of this Section 16.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a site on the World Wide Web (a "Website Posting") if Notice of such Website Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6.  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 16.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6.  Any Notice shall be effective:

(a)     In the case of hand-delivery, when delivered;

(b)     If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c)     In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)     In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)     In the case of electronic transmission, when actually received;

(f)     In the case of a Website Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g)     If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrowing Agent or any Borrower shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders of its receipt of such Notice.

(A)     If to Agent at:

50 South Sixth Street, Suite 1290
Minneapolis, MN  55402
Attention: Joshua James
Telephone: 612-217-5637
Facsimile: 612-217-5651

with an additional copy to:

Alston & Bird LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Attn: Jason Solomon
Telephone: 704-444-1295
Facsimile: 704-444-1795

(B)     If to a Lender other than Agent, as specified on the signature pages hereof

(C)     If to Borrowing Agent or any Borrower:

UniTek Global Services, Inc.
1777 Sentry Parkway West
Gwynedd Hall, Suite 202
Blue Bell, Pennsylvania 19422
Attention: Andrew J. Herning, Chief Financial Officer
Telephone: 267-464-1700
Facsimile: 484-493-1613

with a copy to:

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Attention: Michael J. Pedrick
Telephone: (215) 963-4808
Facsimile: (215) 963-5001

01:16263179.1

16.7    <u>Survival</u>.    The obligations of Borrowers under <u>Sections 2.2(f)</u>, <u>3.7</u>, <u>3.8</u>, <u>3.9</u>, <u>4.19(g)</u>, <u>16.5</u> and <u>16.9</u> and the obligations of Lenders under <u>Sections 2.2</u>, <u>2.16</u>, <u>2.20(c)</u> and <u>14.7</u>, shall survive termination of this Agreement and the Other Documents, the resignation or removal of the Agent (as to such retiring Agent) and payment in full of the Obligations.

16.8    <u>Severability</u>.    If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

16.9    <u>Expenses</u>.    All costs and expenses including attorneys' fees (including the allocated costs of in house counsel and outside counsel to each of the Agent, AIC, NMC and Cetus) and disbursements incurred by Agent on its behalf or on behalf of Issuer, Lenders and the other holders of the Obligations, and by AIC, NMC and/or Cetus on its behalf or on behalf of Issuer, Lenders and the other holders of the Obligations, (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral or enforcement of this Agreement or any of the Other Documents, or (b) in connection with the preparation, negotiation, execution, delivery, entering into, syndication, modification, amendment and administration of this Agreement or any of the Other Documents or any consents or waivers hereunder or thereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, or maintaining, preserving or enforcing any of Agent's or any Lender's rights hereunder or under any of the Other Documents and under all related agreements, documents and instruments, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's or any Lender's transactions with any Borrower or any Guarantor or (e) in connection with any advice given to Agent or any Lender with respect to its rights and obligations under this Agreement or any of the Other Documents and all related agreements, documents and instruments, shall, unless otherwise paid by the Borrowers, as such invoices are presented, be charged to the Borrowers' Account and shall be part of the Obligations.

16.10    <u>Injunctive Relief</u>.    Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.11    <u>Consequential Damages</u>.    Neither Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Borrower or any Guarantor (or any Affiliate of any such Person) (and Agent shall not be liable to any Lender) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

16.12    <u>Captions</u>.    The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

01:16263179.1

16.13   <u>Counterparts; Facsimile Signatures</u>.   This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF copy) shall be deemed to be an original signature hereto.

16.14   <u>Construction</u>.   The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

16.15   <u>Confidentiality; Sharing Information</u>.   Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees, and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Borrower of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials furnished by any Borrower other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.  Each Borrower acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Borrower hereby authorizes each Lender to share any information delivered to such Lender by such Borrower and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this <u>Section 16.15</u> as if it were a Lender hereunder.  Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

16.16   <u>Publicity</u>.   Each Borrower and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Borrowers, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

16.17   <u>Certifications From Banks and Participants; USA PATRIOT Act</u>.  Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States

of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

Each of the parties has signed this Agreement as of the day and year first above written.

UNITEK GLOBAL SERVICES, INC.

By: _____
Name:
Title:

UNITEK ACQUISITION, INC,
BCI COMMUNICATIONS, INC.
PINNACLE WIRELESS USA, INC.
UNITEK USA, LLC
ADVANCED COMMUNICATIONS USA,
INC.
DIRECTSAT USA, LLC
FTS USA, LLC

By: _____
Name:
Title:

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Agent


By: _____
Name:
Title:

01:16263179.1
DB1/ 74821982.4

APOLLO INVESTMENT
CORPORATION, as Lender

By: Apollo Investment Management, L.P.,
as Advisor
By: ACC Management, LLC, as its General
Partner


By: _____
Name:
Title:

Notice Address:

Apollo Investment Corporation
c/o Apollo Capital Management, L.P.
9 West 57th Street
New York NY 10019
Attention: Joseph D. Glatt and Gregory W.
Hunt
Telephone: (212) 515-3450
Facsimile: (646) 417-6605

with an additional copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Yongjin Im
Telephone: (212) 446-4880
Facsimile: (212) 446-6460


Initial Commitment: $[_____]
Initial Commitment Percentage: [____]%
Revolving Commitment:  $[____]
Revolving Commitment Percentage: 50.0%
L/C Commitment:  $[____]
L/C Commitment Percentage: 50.0%

Revolving Commitment: $[_____]
Revolving Commitment Percentage:  [__]%

Roll-Up Commitment: $[_____]
Roll-Up Commitment Percentage: 100.0%

CETUS CAPITAL II LLC, as Lender

By: _____
Name:
Title:

Notice Address:

Initial Commitment: $[_____]
Initial Commitment Percentage: [____]%
Revolving Commitment:  $[___]
Revolving Commitment Percentage:
L/C Commitment:  $[___]
L/C Commitment Percentage:

Revolving Commitment: $[_____]
Revolving Commitment Percentage:  [__]%

Roll-Up Commitment: $[_____]
Roll-Up Commitment Percentage:

LITTLEJOHN OPPORTUNITIES
MASTER FUND LP, as Lender

By: _____
Name:
Title:


Notice Address:




Initial Commitment: $[_____]
Initial Commitment Percentage: [____]%
Revolving Commitment:  $[____]
Revolving Commitment Percentage:
L/C Commitment:  $[____]
L/C Commitment Percentage:


Revolving Commitment: $[_____]
Revolving Commitment Percentage:  [__]%


Roll-Up Commitment: $[_____]
Roll-Up Commitment Percentage:

MAIN STREET CAPITAL
CORPORATION, as Lender

By: _____
Name:
Title:

Notice Address:



Initial Commitment: $[_____]
Initial Commitment Percentage: [____]%
Revolving Commitment:  $[___]
Revolving Commitment Percentage:
L/C Commitment:  $[___]
L/C Commitment Percentage:


Revolving Commitment: $[_____]
Revolving Commitment Percentage:  [__]%


Roll-Up Commitment: $[_____]
Roll-Up Commitment Percentage:

NEW MOUNTAIN FINANCE
CORPORATION, as Lender

By: _____
Name:
Title:

Notice Address:

Initial Commitment: $[_____]
Initial Commitment Percentage: [____]%
Revolving Commitment:  $[____]
Revolving Commitment Percentage:
L/C Commitment:  $[____]
L/C Commitment Percentage:

Revolving Commitment: $[_____]
Revolving Commitment Percentage:  [___]%

Roll-Up Commitment: $[_____]
Roll-Up Commitment Percentage:

PENNANT PARK FLOATING RATE
CAPITAL LTD., as Lender

By: _____
Name:
Title:

Notice Address:




Initial Commitment: $[_____]
Initial Commitment Percentage: [____]%
Revolving Commitment:  $[____]
Revolving Commitment Percentage:
L/C Commitment:  $[____]
L/C Commitment Percentage:

Revolving Commitment: $[_____]
Revolving Commitment Percentage:  [__]%

Roll-Up Commitment: $[_____]
Roll-Up Commitment Percentage: