## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNITEK GLOBAL SERVICES, INC., | ) | Case No. 14- 12471 (PJW) |
| a Delaware Corporation, *et al.*[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Ref. Docket No. 19** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507, AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507; (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND 9014; (IV) ESTABLISHING RELATED NOTICE REQUIREMENTS; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion"), dated November 3, 2014, of UniTek Global Services, Inc. ("UniTek") and its affiliated debtors as debtors and debtors-in-possession (collectively, the "Debtors" or the "Borrowers") in the above-captioned chapter 11 cases (these "Cases"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure (as amended, the "Local Bankruptcy Rules") of the United States Bankruptcy Court for the District of Delaware (this "Court"), seeking, among other things:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: UniTek Global Services, Inc. (3445), UniTek Holdings, Inc. (4120), UniTek Midco, Inc. (5642), UniTek Acquisition, Inc. (4123), Nex-link USA Communications, Inc. (9084), UniTek USA, LLC (0279), Pinnacle Wireless USA, Inc. (1746), DirectSAT USA, LLC (3465), FTS USA, LLC (6247), Advanced Communications USA, Inc. (0091). For the avoidance of doubt, Wirecomm Systems (2008) Inc. (FKA UniTek Canada), an affiliate of the Debtors and wholly owned subsidiary of UniTek USA, LLC, is not a Debtor in the chapter 11 cases. The Debtors' main corporate address is 1777 Sentry Parkway West, Gwynedd Hall, Suite 302, Blue Bell, Pennsylvania 19422.

(I)      authorization for the Debtors to obtain post-petition financing (the "<u>DIP Financing</u>" or the "<u>DIP Facility</u>" and the loans made thereunder, the "<u>DIP Loans</u>") on the terms and conditions set forth in this Interim Order and the Debtor-in-Possession Credit and Security Agreement (substantially in the form attached to the Motion as **Exhibit B**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>DIP Credit Agreement</u>,"[2] and together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, including the Other Documents as defined in the DIP Credit Agreement, collectively, the "<u>DIP Documents</u>"), by and among the Debtors, Wilmington Trust, National Association, as agent (the "<u>DIP Agent</u>"), and the lenders party thereto (the "<u>DIP Lenders</u>"), secured by the DIP Collateral (as defined below), providing for, *inter alia*:

A.      commitments to lend an aggregate principal amount of up to $43,000,000 as term advances that, once borrowed and repaid, may not be reborrowed (the "<u>Initial Commitments</u>");

B.      revolving credit commitments of $10,000,000 for the purpose of providing liquidity for working capital and general corporate purposes of the DirectSAT Business (the "<u>Revolving Commitments</u>");

C.      commitments to purchase participations in, and reimburse the ABL Facility Agent for any amount drawn under, the $3.7 million letter of credit (the "<u>WTC Letter of Credit</u>") issued to secure certain obligations of the Other Business under the ABL Facility Credit

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

Agreement, if and when such WTC Letter of Credit is drawn (the "L/C Commitment"; collectively, the Initial Commitments, the Revolving Commitments, and the L/C Commitment are the "DIP Facility Commitments"); and

D.    a roll up of all outstanding letters of credit under the ABL Facility existing as of the Petition Date (the "L/C Roll Up").  All loans and letters of credit made to or for the benefit of any of the Debtors on or after the Petition Date in accordance with the DIP Documents, all interest thereon and all fees, costs, expenses, indemnification obligations, and other liabilities owing by the Debtors to the DIP Lenders or the DIP Agent in accordance with and relating to this Interim Order and the other DIP Documents, including, without limitation, the "Obligations" as defined under the DIP Credit Agreement, shall hereinafter be referred to as the "DIP Obligations;"

(II)    authorization to use the proceeds of the DIP Facility as expressly provided in the DIP Documents and solely in accordance with the Budget (as defined in the DIP Credit Agreement):  (A) to pay costs, fees, and expenses in connection with the DIP Facility and adequate protection payments in respect of the Pre-Petition Indebtedness (as defined below) as provided for in this Interim Order and the DIP Documents; (B) to provide financing for working capital and for other general corporate purposes of the Debtors, including but not limited to investments in other subsidiaries of the Debtors to the extent not prohibited under the DIP Documents; (C) in the case of the DIP Loans borrowed and letters of credit issued under the Revolving Commitments, solely to fund operations and working capital and general corporate purposes of the DirectSAT Business; (D) in the case of DIP Loans borrowed under the L/C Commitment, solely to reimburse the Pre-Petition ABL Facility Agent (as defined below) for any amount drawn under the WTC Letter of Credit, if and when such letter of credit is drawn;

(E) in the case of DIP Loans borrowed under the Initial Commitments, to fund, among other things, the Separation of Businesses Transactions (as defined in the DIP Credit Agreement); and (F) to pay administration costs of these Cases and claims or amounts approved by this Court;

(III)    authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(IV)    that this Court grant to the DIP Lenders and the DIP Agent, in accordance with the relative priorities as set forth more fully below, and subject to the Carve Out (as defined below), the following:

A.    pursuant to section 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claim status in respect of the DIP Obligations in these Cases;

B.    pursuant to section 364(c)(2) of the Bankruptcy Code, a senior first-priority lien on all assets of the Debtors, including all property of their respective estates in these Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutes thereof, that are not subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

C.    pursuant to section 364(d) of the Bankruptcy Code, a senior first-priority priming lien on and security interest in all of the Debtors' assets (subject to Permitted Encumbrances (as defined in the DIP Documents) that have priority over such liens as a matter of law (other than the Pre-Petition Liens (as defined below)), including all property of their

respective estates in these Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds, profits, rents, accessions and substitutions thereof, that are subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

(V)    authorization for the DIP Agent, solely at the direction of the requisite DIP Lenders as set forth in the DIP Credit Agreement, to terminate the DIP Credit Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) on terms specified herein and in the DIP Credit Agreement;

(VI)    subject to entry of the Final Order (as defined below), authorization to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions");

(VII)    authorization for the Debtors to use, among other things, solely in accordance with the Budget, any cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code and described below) (the "Cash Collateral") in which the Pre-Petition Secured Parties (as defined below) may have an interest and the granting of adequate protection to the Pre-Petition Secured Parties with respect to any post-petition diminution in value of their interests in the Pre-Petition Collateral (as defined below) arising from, *inter alia*, the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral) and the priming of the liens of the Pre-Petition Secured Parties by the DIP Liens;

(VIII)  subject to and only effective upon the entry of a Final Order granting such relief, the waiver by the Debtors of any right to surcharge against the DIP Collateral or Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(IX)    this Court's modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(X)    this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(XI)    authorization that during the period (the "Interim Period") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, and (b) the occurrence of the Maturity Date, a portion of the DIP Facility Commitments may be borrowed by the Borrowers, subject to compliance with the terms, conditions, and covenants contained in the DIP Documents; and

(XII)    the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents filed with this Court and approving the Debtors' notice with respect to the Motion.

The hearing on the Motion (the "Interim Hearing") having been held by this Court on November 4, 2014, pursuant to Bankruptcy Rules 2002, 4001(b)(2), and 4001(c)(2), and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m); and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing by the Debtors and the entire record herein; the *Declaration of Andrew J. Herning in Support of the First Day Motions*; and

this Court having heard and resolved or overruled any objections to the interim relief requested in the Motion; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors, and necessary to avoid immediate and irreparable harm to the Debtors' estates; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given under the circumstances; and after due deliberation and consideration, and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these Cases, the Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue of these Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m).

2.      <u>Notice</u>.  The notice given by the Debtors of the Motion and the Interim Hearing was the best available under the circumstances.  Such notice constitutes due and sufficient notice of the Debtors' request for the interim relief granted herein and of the Interim Hearing under the circumstances and complies with Bankruptcy Rules 4001(b) and (c), such that no other or further notice is necessary or required.

3.    <u>Debtors' Stipulations</u>.    Subject to the limitations thereon contained in paragraph 23 below, the Debtors acknowledge, admit, represent, stipulate, and agree that:

(a)    <u>The Pre-Petition Secured Facilities</u>.

(i)    <u>Pre-Petition ABL Facility</u>.  UniTek and the other Debtors are party to that certain Revolving Credit and Security Agreement dated as of July 10, 2013, as amended from time to time, by and among certain of the Debtors, Apollo Investment Corporation, as agent (together with its successors, the "<u>Pre-Petition ABL Facility Agent</u>"), the lenders and other secured parties party thereto from time to time (the "<u>Pre-Petition ABL Facility Lenders;</u>" and, the Pre-Petition ABL Facility Lenders together with the Pre-Petition ABL Facility Agent, the "<u>Pre-Petition ABL Facility Secured Parties;</u>"), and the other agents and credit parties party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Pre-Petition ABL Facility Credit Agreement;</u>" and, together with any other documents, schedules, instruments, or agreements related thereto, the "<u>Pre-Petition ABL Facility Credit Documents</u>"), which provides for a senior secured revolving credit facility (the "<u>Pre-Petition ABL Facility</u>"), including a letter of credit subfacility and a swingline subfacility.  The Pre-Petition ABL Facility also consists of, among other things, senior loans (the "<u>Pre-Petition Senior ABL Facility Loans</u>," held by the "<u>Pre-Petition Senior ABL Facility Lenders</u>") and "last out" junior loans (the "<u>Pre-Petition Junior ABL Facility Loans</u>," held by the "<u>Pre-Petition Junior ABL Facility Lenders</u>").  As of the Petition Date, the aggregate principal amount of loans (including accrued and unpaid interest) outstanding under the Pre-Petition ABL Facility was approximately $47,605,728.59, which consists of $38,792,875.28 on account of Pre-Petition Senior ABL Facility Loans and $8,812,453.31 on account of the Pre-Petition Junior ABL Facility Loans, and the undrawn amount of all outstanding letters of credit issued under the Pre-

Petition ABL Facility was approximately $21,646,300.00 (together with all other outstanding Obligations, as defined in the Pre-Petition ABL Facility Credit Agreement, including interest, fees and expenses, the "Pre-Petition ABL Indebtedness").

(ii)    Pre-Petition Term Loan Facility.  UniTek and the other Debtors are also party to that certain Credit Agreement, dated as of April 15, 2011, as amended from time to time, among UniTek, certain other Debtors, FBR Capital Markets LT ("FBR"), which was thereafter succeeded by Cerberus Business Finance, LLC ("Cerberus"), as successor agent (Cerberus, together with its successors, the "Pre-Petition Term Loan Agent;" and, the Pre-Petition Term Loan Agent together with the Pre-Petition ABL Facility Agent, the "Pre-Petition Agents"), the lenders and other secured parties party thereto from time to time (the "Pre-Petition Term Loan Lenders;" and, the Pre-Petition Term Loan Lenders together with the Pre-Petition Term Loan Agent, the "Pre-Petition Term Loan Secured Parties;" and the Pre-Petition Term Loan Secured Parties together with the Pre-Petition ABL Facility Secured Parties, the "Pre-Petition Secured Parties"), and the other agents and credit parties party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Term Loan Credit Agreement;" and, together with any other documents, schedules, instruments, or agreements related thereto, the "Pre-Petition Term Loan Credit Documents;" and, the Pre-Petition Term Loan Credit Documents together with the Pre-Petition ABL Facility Credit Documents, the "Pre-Petition Credit Documents"), which provides for a senior secured term loan credit facility (the "Pre-Petition Term Loan Facility" and together with the Pre-Petition ABL Facility, the "Pre-Petition Secured Facilities").  As of the Petition Date, the aggregate principal amount (including accrued and unpaid interest) outstanding under the Pre-Petition Term Loan Facility was approximately $143,252,713.27 (together with all other outstanding

Obligations, as defined in the Pre-Petition Term Loan Credit Agreement, including interest, fees and expenses, the "Pre-Petition Term Loan Indebtedness"; and the Pre-Petition Term Loan Indebtedness together with the Pre-Petition ABL Indebtedness, the "Pre-Petition Indebtedness").

   (b) <u>Pre-Petition Collateral</u>.

     (i) <u>Pre-Petition ABL Facility Liens</u>.  To secure the Pre-Petition ABL Indebtedness, pursuant to the Pre-Petition ABL Facility Credit Documents and other security documents and subject to the Intercreditor Agreement and the Subordination Agreement (each as defined below), the Debtors granted to the Pre-Petition ABL Facility Agent, for itself and the ratable benefit of the Pre-Petition ABL Facility Lenders, valid, binding, enforceable, and perfected security interests (the "Pre-Petition ABL Facility Liens") in substantially all of the Debtors' property and assets, including, without limitation, (a) all of the personal property then owned or at any time thereafter acquired by any Debtor party to the Pre-Petition ABL Facility Credit Agreement or in which any such Debtor then had or at any time thereafter acquired any right, title or interest, (b) certain equity interests of the Debtors' subsidiaries, (c) all books and records pertaining to any of the foregoing, (d) all proceeds and products of any of the foregoing, and (e) all collateral security and guaranties given by any Person with respect to any of the foregoing (collectively, the "Pre-Petition ABL Facility Collateral").

     (ii) <u>Pre-Petition Term Loan Liens</u>.  To secure the Pre-Petition Term Loan Indebtedness, the Debtors and FBR, as predecessor to the Pre-Petition Term Loan Agent, entered into that certain Guaranty and Collateral Agreement, dated as of April 15, 2011 (as amended, restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and

deeds of trust, the "Pre-Petition Term Loan Collateral Agreement"). Pursuant to the Pre-Petition Term Loan Collateral Agreement and other security documents and subject to the Intercreditor Agreement (as defined below), the Debtors granted to the Pre-Petition Term Loan Agent, for itself and the ratable benefit of the Pre-Petition Term Loan Lenders, valid, binding, enforceable, and perfected security interests (the "Pre-Petition Term Loan Liens", and together with the Pre-Petition ABL Facility Liens, the "Pre-Petition Liens") in substantially all of the Debtors' property and assets, including, without limitation, (a) all of the personal property then owned or at any time thereafter acquired by any Debtor party to the Pre-Petition Term Loan Agreement or in which any such Debtor then had or at any time thereafter acquired any right, title or interest, (b) certain equity interests of the Debtors' subsidiaries, (c) all books and records pertaining to any of the foregoing, (d) all proceeds and products of any of the foregoing, and (e) all collateral security and guaranties given by any Person with respect to any of the foregoing (collectively, the "Pre-Petition Term Loan Collateral", and together with the Pre-Petition ABL Facility Collateral, the "Pre-Petition Collateral").

(iii)    Intercreditor Agreement.    The relative rights, remedies, and priorities of the claims, liens, and security interest of the Pre-Petition ABL Facility Secured Parties, on the one hand, and the Pre-Petition Term Loan Secured Parties, on the other hand, are governed by the terms and conditions of that certain intercreditor agreement, dated as of April 15, 2011, by and among certain of the Debtors and their affiliates, the Pre-Petition ABL Facility Agent on behalf of the Pre-Petition ABL Facility Lenders, and FBR, as predecessor to the Pre-Petition Term Loan Agent on behalf of the Pre-Petition Term Loan Lenders, as such agreement may have been modified, amended, or restated from time to time (the "Intercreditor Agreement"), which provides, among other things, that (a) with respect to the Term Debt

11

Priority Collateral (as defined in the Intercreditor Agreement), the Pre-Petition ABL Facility Liens are junior and subordinate to the Pre-Petition Term Loan Liens, and (b) with respect to the ABL Priority Collateral (as defined in the Intercreditor Agreement), the Pre-Petition Term Loan Liens are junior and subordinate to the Pre-Petition ABL Facility Liens.

(iv)     Subordination Agreement.     The relative rights, remedies, and priorities of the claims, liens, and security interests of the Pre-Petition Senior ABL Facility Lenders and the Pre-Petition Junior ABL Facility Lenders are also governed by the terms and conditions of that certain subordination agreement, dated as of August 13, 2014, by and among certain of the Debtors and their affiliates, the Pre-Petition ABL Facility Agent, the Pre-Petition Senior ABL Facility Lenders, and the Pre-Petition Junior ABL Facility Lenders, as such agreement may have been modified, amended, or restated from time to time (the "Subordination Agreement"), which provides, *inter alia*, that the Pre-Petition Junior ABL Facility Lenders consent to the use of any "cash collateral" constituting Pre-Petition Collateral and to the Borrowers obtaining the DIP Facility on the terms set forth in this Interim Order and the DIP Documents.

(c)     Pre-Petition Indebtedness.     The Pre-Petition Indebtedness constitutes legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Pre-Petition Indebtedness is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.  The Debtors are jointly and severally

12

liable to the Pre-Petition ABL Facility Secured Parties on account of the Pre-Petition ABL Indebtedness and to the Pre-Petition Term Loan Secured Parties on account of the Pre-Petition Term Loan Indebtedness.

(d)     Pre-Petition Liens.  The Pre-Petition Liens constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests and liens on the Pre-Petition Collateral, were granted to, or for the benefit of, the applicable Pre-Petition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.

(e)     No Claims.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against any of the Pre-Petition Secured Parties with respect to the Pre-Petition Credit Documents, the Pre-Petition Indebtedness, the Pre-Petition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code.

(f)     Indemnity.  The Pre-Petition Secured Parties, the DIP Agent, and the DIP Lenders have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the Plan Support Agreement, the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or

objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the Pre-Petition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph 3(f), in the Pre-Petition Credit Documents, or in the DIP Documents, to indemnify and/or hold harmless the Pre-Petition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be.

4.    Findings Regarding the DIP Financing and Use of Cash Collateral.

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code.

(c)    The Debtors have an immediate and critical need to obtain the DIP Financing and to use the Pre-Petition Collateral, including the Cash Collateral, to continue the operation of their businesses. Among other things, entry of this Interim Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses. The DIP Financing and the use of the Pre-Petition Collateral, including,

without limitation, the Cash Collateral, as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the DIP Financing and to the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, is not obtained. Consummation of the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, pursuant to the terms of this Interim Order therefore are in the best interests of the Debtors' estates.

(d)     The DIP Lenders are willing to provide the DIP Financing, and the Pre-Petition Secured Parties are willing to consent to the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Interim Order, as applicable, and provided that the DIP Liens (as defined below), the Superpriority Claims, and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, approved by this Interim Order. The DIP Agent and DIP Lenders have acted in good faith in agreeing to provide the DIP Financing approved by this Interim Order and to be further evidenced by the DIP Documents, and the Pre-Petition Secured Parties have acted in good faith in consenting (including under the Intercreditor Agreement and the Subordination Agreement) to the (i) Debtors' use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral pursuant to the terms of this Interim Order, (ii) priming of their Pre-Petition Liens by the DIP Liens on all Pre-Petition Collateral, and (iii) entry of this Interim Order and the granting of the relief set forth herein, and their reliance on the assurances referred to above is in good faith.

(e)     The DIP Documents and the DIP Financing contemplated thereunder, and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arms' length among the Debtors, the DIP Lenders, holders of 100% of the Pre-Petition Senior ABL Facility Loans, holders of 100% of the Pre-Petition Junior ABL Facility Loans, and holders of 100% of the Pre-Petition Term Loan Indebtedness, among others, and the terms of the DIP Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, respectively, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.   All of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Financing and the DIP Documents, including the DIP Obligations, shall be deemed to have been extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2(b).  The authorization granted herein on an interim basis to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, to enter into the DIP Documents, and to borrow up to an aggregate principal amount of $29,200,000 under the Initial Commitments, plus the full amount of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up, in the Interim

Period is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Interim Order is in the best interests of the Debtors and their estates and creditors because it will, among other things, allow the Debtors to maximize the value of their assets.

(g)     The Pre-Petition Secured Parties have consented to the DIP Financing (including the priming of their Pre-Petition Liens by the DIP Liens) and the Debtors' use of the Pre-Petition Collateral, including the Cash Collateral, including pursuant to the Intercreditor Agreement and the Subordination Agreement.   This Court concludes that the adequate protection provided to the Pre-Petition Secured Parties hereunder for any post-petition diminution in value of the security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral due to, *inter alia*, the Debtors' use of the Pre-Petition Collateral, including the Cash Collateral, the imposition of the automatic stay, and the priming of the Pre-Petition Liens by the DIP Liens, is authorized by sections 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code.

5.     <u>Authorization of the DIP Financing and the DIP Documents</u>.

(a)     The Debtors are hereby authorized and directed to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Credit Agreement and the other DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith, and borrow money and obtain letters of credit under the DIP Facility, on an interim basis, up to an aggregate principal amount not to exceed $29,200,000 under the Initial Commitments, plus the full amount of the Revolving Commitments, the L/C Commitments, and the L/C Roll Up, in accordance with the terms of this Interim Order and the DIP Documents.

(b)    Upon the execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms subject to the terms of this Interim Order. No obligation, payment, transfer, or grant of a security or other interest to the DIP Lenders under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment, or counterclaim.

(c)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, control agreements, and financing statements), and, without further application to this Court, to pay on a current basis all fees and expenses referred to in this Interim Order, the DIP Credit Agreement and DIP Documents, including, without limitation, all reasonable and documented fees and expenses paid, payable, or incurred prior to, on, or after the Petition Date of (i) Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP, counsel to certain of the DIP Lenders, (ii) Latham & Watkins LLP and Richards Layton and Finger LLP, counsel to certain of the DIP Lenders, and (iii) Alston & Bird, LLP and such Delaware counsel retained by the DIP Agent (if and when retention of such Delaware counsel becomes necessary), counsel to the DIP Agent (collectively, the "DIP Professional Fees and Expenses"). None of the DIP Professional Fees and Expenses shall be subject to further Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or

final fee application with this Court; *provided, however,* that the DIP Professional Fees and Expenses shall be payable in accordance with the procedures set forth in paragraph 14(c) hereof.

      6.    <u>Rights and Benefits Under Intercreditor Agreement and Subordination Agreement</u>.

      (a)    Except as otherwise set forth in this Interim Order, the terms and conditions of the Intercreditor Agreement (including with respect to the relative rights of the Pre-Petition Secured Parties) shall not be mitigated or modified as a result of the entry of this Interim Order, entry into the DIP Documents, or the incurrence of the DIP Obligations.

      (b)    Except solely to the extent set forth in paragraph 14(a)(ii) hereof, the terms and conditions of the Subordination Agreement (including with respect to the relative rights of the Pre-Petition Secured Parties) shall not be mitigated or modified as a result of the entry of this Interim Order, entry into the DIP Documents, or the incurrence of the DIP Obligations.

      7.    <u>DIP Superpriority Claims</u>.

      (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (the "<u>DIP Superpriority Claims</u>"), whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out; *provided, however,* that the DIP Superpriority Claims shall apply with respect to the proceeds of Avoidance Actions only upon entry of the Final Order.

        8.     Carve Out Provisions.

        (a)     Carve Out.  As used in this Interim Order and the DIP Documents, the "Carve Out" shall mean the sum of (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), in such amounts as agreed to by the United States Trustee or as determined by order of this Court, and any fees payable to the clerk of the Bankruptcy Court; (b) all Allowed Fees (as defined below) of Case Professionals (as defined below) not to exceed the amounts for such Case Professionals set forth in the Budget and incurred in the period prior to the occurrence of a Triggering Event (such period, the "Pipeline Period"); and (c) Allowed Fees of Case Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following the occurrence of a Triggering Event.  For the avoidance of doubt, Allowed Fees that are budgeted to be paid in any week during the Pipeline Period that are unused in such week may be carried forward and used in any subsequent week during the Pipeline Period.  For purposes of the foregoing, the terms:  (i) "Allowed Fees" shall mean accrued and unpaid fees and expense reimbursement of Case Professionals solely to the extent that such fees and expenses have been allowed by an order of the Bankruptcy Court that has not been vacated or stayed; (ii) "Case Professionals" shall mean attorneys, accountants, financial advisors, consultants and other professionals employed, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, as applicable, by the Debtors or any Committee in accordance

with the DIP Documents; and (iii) "Triggering Event" shall mean the date that the DIP Agent, at the direction of the Required Lenders, provides written notice to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the DIP Agent has terminated the Pipeline Period for purposes of the Carve Out. The Carve Out and any payments made in respect of the Carve Out shall not reduce the amount of the DIP Obligations or the Prepetition Secured Obligations.

      (b)    Carve Out Escrow. Without limiting the rights of the DIP Agent or DIP Lenders under the DIP Documents or this Interim Order, on the date of the Triggering Event, the Debtors shall be authorized and directed to request a draw under the DIP Facility equal to the unused portion of the Carve Out, which amount shall be deposited by the Debtors into an interest-bearing escrow account at a financial institution acceptable to the Required Lenders (the "Carve Out Escrow Account"); *provided, however,* that the Debtors shall notify the DIP Agent and the DIP Lenders of the amount deemed requested as promptly as possible following the Triggering Event and neither the DIP Agent nor the DIP Lenders shall be required to fund any amounts until the Debtors have notified the DIP Agent and the DIP Lenders of the requested amount. Such funding of the Carve Out Escrow Account shall be in full and complete satisfaction of any and all obligations of the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties in respect of the Carve Out, *provided, however*, that nothing in this Interim Order limits any requirement of the Debtors to pay all outstanding quarterly fees to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) regardless of amount. For the avoidance of doubt, the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties shall have a security interest in any residual interest in the Carve Out Escrow Account, with any excess paid

to the DIP Agent or the applicable Pre-Petition Agent, as applicable, for application in accordance with the DIP Documents and this Interim Order.

(c)    No Direct Obligation to Pay Allowed Fees; No Waiver of Right to Object to Fees.    The DIP Agent and DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Case Professional incurred in connection with these Cases, any Successor Cases, or otherwise.    Nothing in this Interim Order or otherwise shall be construed:  (i) to obligate the DIP Agent or DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Case Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if Allowed Fees are higher in fact than the estimated fees and disbursements of Case Professionals set forth in the Budget; (iii) as consent to the allowance of any fees and expenses of Case Professionals; or (iv) to affect the rights of the DIP Agent, the DIP Lenders, the Pre-Petition Secured Parties or any other party-in-interest to object to the allowance and payment of such fees and expenses.

(d)    Payment of Carve Out on or after the Triggering Event.    Any payment or reimbursement made on or after the occurrence of the Triggering Event in respect of any Allowed Fees (whether out of the Carve Out Escrow Account or otherwise) shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall otherwise be entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

9.    DIP Liens.

(a)    As security for the DIP Obligations, effective and perfected automatically upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by any DIP Lender of any DIP Collateral (as defined below), security interests and liens in the following property (all such liens and security interests granted to the DIP Lenders pursuant to this Interim Order and the DIP Documents, the "DIP Liens") are hereby granted to the DIP Agent and the DIP Lenders (subject and subordinate only to the Carve Out and Permitted Encumbrances): (i) all of the Debtors' right, title, and interest in and to (but not any of the obligations, liabilities or indemnifications of the Debtors under) any tangible, intangible, real, personal, or mixed assets; (ii) subject to entry of the Final Order, Avoidance Actions of any type (and any recoveries therefrom); (iii) all property of any Debtor held by any DIP Lender, including all property of every description, in the custody of or in transit to a DIP Lender for any purpose, including safekeeping, collection or pledge, for the account of such Debtor or as to which such Debtor may have any right or power, including, but not limited to cash; (iv) all other goods (including, but not limited to fixtures) and personal property of the Debtors, whether tangible or intangible and wherever located; (v) all owned or leased real estate and real property leaseholds; (vi) all books and records pertaining to the foregoing; and (vi) all Proceeds (as defined in the DIP Credit Agreement) of the foregoing, including, subject to entry of the Final Order, proceeds of Avoidance Actions of any type, and any and all Pre-Petition Collateral (collectively, the "DIP Collateral").

(b)    The DIP Liens shall be senior in all respects to any current or future liens of the Pre-Petition Secured Parties (including, without limitation, any Adequate Protection Liens thereon) or any other party, but shall not be senior to any other valid, perfected and unavoidable interests and liens of other parties existing as of the Petition Date to which the Pre-Petition Liens were subordinate to as of the Petition Date or become subordinate to subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  The DIP Liens shall be subject to the Carve Out.

10.    Maintenance of DIP Collateral.  Until such time as all DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, the Debtors shall (a) maintain and insure the DIP Collateral in amounts, for the risks, and by the entities as required under the DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order (as defined in the DIP Credit Agreement), as modified, with the prior written consent of the Required Lenders (as defined in the DIP Credit Agreement), by any order that may be entered by this Court or as otherwise required by the DIP Documents.  The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent, at the direction of the Required Lenders, to exercise, upon not less than five (5) Business Days' prior written notice by email to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Committee, if any, and counsel to the Pre-Petition Agents following the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) (the "Remedies Notice Period"), all rights and remedies hereunder and under the DIP Documents against the Debtors and/or the DIP Collateral (including, without limitation, the right to set off monies of the Debtors in accounts maintained or controlled by the DIP Lenders

or the DIP Agent).  In the absence of a further order of this Court, and notwithstanding anything herein or in the DIP Documents to the contrary, the Debtors' rights to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, or the DIP Collateral shall automatically terminate upon the expiration of the Remedies Notice Period.  Notwithstanding the foregoing, the Debtors' rights to use the DIP Collateral or the Pre-Petition Collateral, including, without limitation, Cash Collateral shall immediately terminate (without notice from the DIP Agent or the DIP Lenders) at the time that any Debtor has actual knowledge of an Event of Default if the Debtors fail to promptly notify the DIP Agent, the DIP Lenders, the U.S. Trustee, the Committee, if appointed, and the Pre-Petition Agents of such Event of Default.  In any hearing regarding the exercise of rights or remedies by the DIP Agent or the DIP Lenders, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  The Debtors or any party in interest may seek a determination from this Court that no Event of Default has occurred and is continuing, and appropriate relief from this Court in the event it should so determine that no Event of Default has occurred and is continuing.

11.     <u>Limitation on Charging Expenses Against DIP Collateral and Pre-Petition Collateral</u>.  Upon entry of the Final Order, no expenses of administration of these Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of each of the DIP Agent, any DIP Lender, and/or any Pre-Petition

Secured Party that is adversely affected thereby, and no consent shall be implied from any action, inaction, or acquiescence by any of the DIP Agent, the DIP Lenders, or the Pre-Petition Secured Parties.

12.     Marshaling.  In no event shall the DIP Agent, the DIP Lenders, or any of the Pre-Petition Secured Parties be subject to (a) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code with respect to the DIP Collateral or proceeds, products, offspring or profits of any of the Pre-Petition Collateral, or (b) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral.

13.     Cash Collateral.  Subject to the terms of the DIP Documents, this Interim Order, the Final Order, and the Budget, the Debtors are hereby authorized to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral in which any of the Pre-Petition Secured Parties has a perfected security interest as of the Petition Date or at any time thereafter, including any cash on deposit in any deposit account or other account over which any Pre-Petition Secured Party has control, and including any cash proceeds of the Pre-Petition Collateral.

14.     Pre-Petition Secured Lenders' Adequate Protection.

(a)     ABL Facility Adequate Protection.  The Pre-Petition ABL Facility Agent and the Pre-Petition ABL Facility Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral, for any post-petition diminution in the value of such interests on account of, among other things, the priming of the Pre-Petition ABL Facility Agent's and the Pre-Petition ABL Facility Lenders' interests in the Pre-Petition Collateral by the DIP Liens, the imposition of the automatic stay, and the Debtors' use of the Pre-Petition

Collateral.  The Pre-Petition ABL Facility Agent is granted, for the benefit of itself and the Pre-Petition ABL Facility Lenders, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "ABL Facility Adequate Protection"):

i.        ABL Facility Adequate Protection Liens.  The Pre-Petition ABL Facility Agent, for itself and for the benefit of the Pre-Petition ABL Facility Lenders, is hereby granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "ABL Facility Adequate Protection Liens"), which liens shall:  (i) be subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Encumbrances; (ii) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral; and (iii) be subject in all respects to the Intercreditor Agreement.

ii.        Adequate Protection Payments.  The Pre-Petition ABL Facility Lenders (including the Pre-Petition Junior ABL Facility Lenders) shall be entitled to payment of interest and fees (in each case, at the applicable non-default rate) due under the Pre-Petition ABL Facility Credit Documents, including, for the avoidance of doubt, any such amounts accrued and unpaid before the Petition Date, at the times specified therein (and subject to the limitations therein on the portion of such interest payable in cash on account of the Pre-Petition Junior ABL Facility Loans), and, notwithstanding anything to the contrary in the Subordination Agreement, the Pre-Petition Junior ABL Facility Lenders shall be entitled to retain all such payments of interest and fees, without any obligation to turn over same to or for the benefit of the Pre-Petition Senior ABL Facility Lenders; *provided, however*, that the Pre-Petition ABL Facility Lenders shall cease to be bound by the agreements described in this sentence (excluding this proviso and the subsequent provisos to this sentence) in the event both (x) the Plan Support Agreement terminates or an Event of Default occurs that is not cured or waived and (y) the Pre-Petition

Senior ABL Facility Lenders elect by written notice to the Pre-Petition Junior ABL Facility Lenders to cease to be bound by the agreements described in this sentence (excluding this proviso and the subsequent provisos to this sentence); *provided, further*, that to the extent the Pre-Petition Senior ABL Facility Lenders make such election, all parties rights are reserved notwithstanding the entry of this Interim Order, the Final Order, or anything otherwise set forth herein; and *provided, further*, that all payments of interest and fees made prior to any such election shall not be subject to turn over.  Except as expressly set forth in the preceding sentence, the Subordination Agreement shall remain in full force and effect.

iii.    Section 507(b) Claim.    To the extent of any post-petition diminution in value of the interests of the Pre-Petition ABL Facility Agent and the Pre-Petition ABL Facility Lenders in the Pre-Petition Collateral (if any), the Pre-Petition ABL Facility Agent, on behalf of itself and the Pre-Petition ABL Facility Lenders, shall be granted, subject to the Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "ABL Superpriority Claim"), which ABL Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.  Solely in the event the ABL Facility Adequate Protection is insufficient to satisfy

any allowed claims of the Pre-Petition ABL Facility Agent and the Pre-Petition ABL Facility Lenders related to any post-petition diminution in value of their interests in the Pre-Petition Collateral, the ABL Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

(b)      Term Loan Adequate Protection.  The Pre-Petition Term Loan Agent and the Pre-Petition Term Loan Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral, for any post-petition diminution in the value of such interests on account of, among other things, the priming of the Pre-Petition Term Loan Agent's and the Pre-Petition Term Loan Lenders' interests in the Pre-Petition Collateral by the DIP Liens, the imposition of the automatic stay, and the Debtors' use of the Pre-Petition Collateral. The Pre-Petition Term Loan Agent is granted, for the benefit of itself and the Pre-Petition Term Loan Lenders, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "Term Loan Adequate Protection," and, together with the ABL Facility Adequate Protection, the "Adequate Protection"):

i.      Term Loan Adequate Protection Liens.  The Pre-Petition Term Loan Agent, for itself and for the benefit of the Pre-Petition Term Loan Lenders, is hereby granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Term Loan Adequate Protection Liens;" and, the Term Loan Adequate Protection Liens together with the ABL Facility Adequate Protection Liens, the "Adequate Protection Liens"), which liens shall:  (i) be subject and subordinate to the Carve Out, the DIP Liens, and the Permitted Encumbrances; (ii) otherwise be senior to all other security interests in,

liens on, or claims against any of the DIP Collateral; and (iii) be subject in all respects to the Intercreditor Agreement.

ii.      Interest.  The Pre-Petition Term Loan Lenders shall be entitled to accrue interest following the Petition Date (at the applicable non-default rate) and during these Cases, and such accrued postpetition interest will be added to the principal balance of the claims of the Pre-Petition Term Loan Lenders under the Pre-Petition Term Loan Credit Agreement; *provided, however*, that if the *Joint Prepackaged Plan of Reorganization of UniTek Global Services, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of October 21, 2014 (as amended, supplemented, or otherwise modified from time to time solely in accordance with the Plan Support Agreement, the "Plan") is not consummated, then the postpetition interest claim shall be treated in accordance with section 506(b), 506(c) or any other applicable provision of the Bankruptcy Code.

iii.      Section 507(b) Claim.   To the extent of any post-petition diminution in value of the interests of the Pre-Petition Term Loan Agent and the Pre-Petition Term Loan Lenders in the Pre-Petition Collateral (if any), the Pre-Petition Term Loan Agent, on behalf of itself and the applicable Pre-Petition Term Loan Lenders, shall be granted, subject to the Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "Term Loan Superpriority Claim"), which Term Loan Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any

30

other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. Solely in the event the Term Loan Adequate Protection is insufficient to satisfy any allowed claims of the Pre-Petition Term Loan Agent and the Pre-Petition Term Loan Lenders related to any post-petition diminution in value of its interests in the Pre-Petition Collateral, the Term Loan Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

(c)    Fees and Expenses.    The Debtors are authorized and directed to pay: (i) on the date of the first advance under the DIP Facility, the outstanding prepetition reasonable and documented fees and expenses of counsel and financial advisor to the Pre-Petition ABL Facility Agent and the Pre-Petition Senior ABL Facility Lenders, counsel and financial advisors to the Pre-Petition Term Loan Agent, and counsel to the Specified Term Lenders (as defined in the Plan); and (ii) on an ongoing basis, from time to time after the Petition Date, and without duplication, pursuant to the procedures set forth in this paragraph 14, all reasonable and documented fees and expenses incurred by the Pre-Petition ABL Facility Agent and the Pre-Petition Term Loan Agent (acting in such capacities), the Pre-Petition Senior ABL Facility Lenders, and the Specified Term Lenders (as defined in the Plan) during and in connection with these Cases and required to be paid by the Debtors under the Pre-Petition Credit Documents, including the reasonable and documented fees and expenses of (i) Kirkland & Ellis LLP, counsel to the Pre-Petition ABL Facility Agent and the Pre-Petition Senior ABL Facility Lenders, (ii) Klehr Harrison Harvey Branzburg LLP, local counsel to the Pre-Petition ABL Facility Agent

and the Pre-Petition Senior ABL Facility Lenders, (iii) Latham & Watkins LLP, counsel to the Specified Term Lenders, (iv) Klee, Tuchin, Bogdanoff & Stern LLP, counsel to the Pre-Petition Term Loan Agent and certain of the Pre-Petition Term Loan Lenders, and (v) Richards Layton and Finger LLP, local counsel to the Pre-Petition Term Loan Agent and certain of the Pre-Petition Term Loan Lenders (collectively, the "Adequate Protection Professional Fees and Expenses").    With respect to Adequate Protection Professional Fees and Expenses incurred postpetition, the Debtors shall pay such fees and expenses in cash within five (5) Business Days (if no written objection is received within such five (5) Business Days' period) after such professional has delivered an invoice to the Debtors describing such fees and expenses (but in any event providing a reasonable summary or detail with respect to the fees and expenses incurred), with a copy of such invoices delivered simultaneously to the DIP Lenders, the U.S. Trustee, and counsel to the Committee, if any; *provided, however*, that any such invoice may be redacted to protect privileged, confidential, or proprietary information.    Parties in interest may deliver written objections to payment of the Adequate Protection Professional Fees and Expenses within five (5) Business Days following receipt of an invoice for Adequate Protection Professional Fees and Expenses.    None of the Adequate Protection Professional Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided, however*, if an objection to a professional's invoice is timely received, the Debtors shall pay in cash the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

15.  <u>Intercreditor Adequate Protection Issues</u>.  Notwithstanding anything to the contrary in paragraph 14 hereof, the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim shall have priority over the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim, as applicable, with respect to the ABL Priority Collateral and the proceeds thereof to the extent provided in the Intercreditor Agreement, and the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim shall have priority over the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim, as applicable, with respect to the Term Debt Priority Collateral and the proceeds thereof to the extent provided in the Intercreditor Agreement, and with respect to the DIP Collateral that is neither ABL Priority Collateral nor Term Debt Priority Collateral (the "<u>Additional Collateral</u>"), subject to the DIP Superpriority Claims and the Carve Out, the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim, on the one hand, and the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim, on the other hand, shall be of equal priority; *provided, however*, except as otherwise agreed by the ABL Facility Agent and the Required Term Loan Consenting Lenders (as defined in the Plan Support Agreement), including under the Plan Support Agreement, to the extent either (a) the ABL Facility Adequate Protection Liens and the ABL Superpriority Claim are not satisfied in full from the ABL Priority Collateral (such extent, the "<u>ABL Deficiency Amount</u>") or (b) the Term Loan Adequate Protection Liens and the Term Loan Superpriority Claim are not satisfied in full from the Term Priority Collateral (such extent, the "<u>Term Loan Deficiency Amount</u>"), any liens or claims of any nature for the ABL Deficiency Amount and the Term Loan Deficiency Amount:  (x) shall be entitled to recover from the Additional Collateral in an equal amount, dollar for dollar, until such ABL Deficiency Amount or Term Loan Deficiency Amount, and related obligations, have been satisfied in full,

after which the applicable Pre-Petition Secured Parties holding claims to such satisfied ABL Deficiency Amount or Term Loan Deficiency Amount shall not be entitled to any further recovery from the Additional Collateral and the remaining ABL Deficiency Amount or Term Loan Deficiency Amount, as applicable, shall thereafter be entitled to recover from the Additional Collateral until such ABL Deficiency Amount or Term Loan Deficiency Amount, as applicable, and any related obligations, are satisfied in full; and (y) may be treated in accordance with sections 506 and 1129 of the Bankruptcy Code.  Except and solely to the extent provided in paragraph 14(a)(ii) of this Interim Order, the rights of the Pre-Petition ABL Facility Lenders in respect of the ABL Superpriority Claim shall be subject to the provisions of the Subordination Agreement.

16.    <u>Cash Management</u>.    The Debtors shall not seek approval of, or make, any modifications to their cash management system existing as of the Petition Date without the prior approval of the Required Lenders and the DIP Agent, and any order approving such cash management system shall be acceptable to the Required Lenders and the DIP Agent.

17.    <u>Reservation of Rights</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (a) the right of the DIP Agent, the DIP Lenders, the Pre-Petition ABL Facility Agent, the Pre-Petition ABL Facility Lenders, the Pre-Petition Term Loan Agents, or the Pre-Petition Term Loan Lenders to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection, as applicable, in all cases subject to the terms of the Intercreditor Agreement and the Subordination Agreement, or (b) any of the rights of the DIP Agent, the DIP Lenders, the Pre-Petition ABL Facility Agent, the Pre-Petition ABL Facility Lenders, the Pre-Petition Term Loan Agent, or the Pre-Petition Term Loan Lenders

under the Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreement and the Subordination Agreement), except as expressly set forth in this Interim Order.  Nothing contained herein shall be deemed to be a finding by this Court or an acknowledgement by the Pre-Petition Secured Parties that the adequate protection granted herein does in fact adequately protect the Pre-Petition Secured Parties against any post-petition diminution in value of the Pre-Petition Collateral.

18.    Perfection of DIP Liens.

(a)    The DIP Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable, and duly perfected senior first-priority security interests and liens, and the DIP Agent and the DIP Lenders shall *not* be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust, or similar instruments which otherwise may be required under federal, state, or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens.  The DIP Lenders and the DIP Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not any DIP Lender or the DIP Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected,

allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent or the DIP Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)    The Debtors shall execute and deliver to the DIP Lenders and the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP Agent, at the direction of the Required Lenders, may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

(d)    Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Subject to entry of the Final Order, any such provision shall have no force and effect with respect to the granting of postpetition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Agent or the DIP Lenders in accordance with the terms of the DIP Documents or this Interim Order.

19.    <u>Perfection of Adequate Protection Liens</u>.

(a)    The Adequate Protection Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable, and duly perfected security interests and liens, and the Pre-Petition Secured Parties shall *not* be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust, or similar instruments which otherwise may be required under federal, state, or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Adequate Protection Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens. The Pre-Petition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not any Pre-Petition Secured Lender or Pre-Petition Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise (as they may elect) confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order.

(b)    A certified copy of this Interim Order may, in the discretion of the Pre-Petition ABL Facility Agent or the Pre-Petition Term Loan Agent, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements,

mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     The Debtors shall execute and deliver to the Pre-Petition Secured Parties such agreements, financing statements, instruments and other documents as the Pre-Petition Secured Parties may reasonably request to evidence, confirm, validate, or perfect the Adequate Protection Liens.

(d)     Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Pre-Petition Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Subject to entry of the Final Order, any such provision shall have no force and effect with respect to the granting of postpetition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Pre-Petition Secured Parties in accordance with the terms of this Interim Order.

20.     <u>Other Automatic Perfection Matters</u>.  To the extent that any Pre-Petition Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies, or is the secured party under any Pre-Petition Credit Document, the DIP Agent, on behalf of the DIP Lenders, is also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies, and the secured party under each such Pre-Petition Credit Document, and shall have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement), and

shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and the DIP Documents. The Pre-Petition ABL Facility Agent or the Pre-Petition Term Loan Agent, as applicable, shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's security interests in and liens on all Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

21.    <u>Release</u>. Subject to the provisions of paragraph 23 and the entry of the Final Order, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Cases or any successor cases ("<u>Successor Cases</u>")) and any party acting by, through, or under any of the Debtors or any of their estates, hereby stipulate and agree that they forever and irrevocably (a) release, discharge, waive, and acquit the current or future DIP Agent and DIP Lenders, and the former, current, and future Pre-Petition Agents and Pre-Petition Secured Lenders, and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "<u>Released Parties</u>"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract,

of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Pre-Petition Facilities, the Pre-Petition Credit Documents, or the transactions and relationships contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the Pre-Petition Agents, the Pre-Petition Secured Lenders, DIP Agent, and the DIP Lenders, and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the Pre-Petition Indebtedness, the Pre-Petition Liens, the DIP Obligations, and the DIP Liens.

22.     <u>Preservation of Rights Granted Under this Interim Order.</u>

(a)     Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with that granted by this Interim Order to the DIP Lenders shall be granted or allowed while any portion of the DIP Obligations remains outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations and the Pre-Petition Indebtedness shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Credit Agreement if any of the Debtors seek, or if there is entered (i) any stay, vacatur, rescission or modification of this Interim Order or the Final Order without

the prior written consent of the Required Lenders and the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Required Lenders, (ii) an order converting these Cases to cases under chapter 7 of the Bankruptcy Code or dismissing any of these Cases, or (iii) unless otherwise approved by the Required Lenders and the DIP Agent, an order granting a change of venue with respect to these Cases or any related adversary proceeding. If an order dismissing any of these Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, regardless of what order (in accordance with sections 105 and 349 of the Bankruptcy Code) so provides or otherwise, (x) the Superpriority Claims and other administrative claims granted under this Interim Order, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and all Pre-Petition Indebtedness shall have been paid and satisfied in full (and that such DIP Superpriority Claims, ABL Superpriority Claims, Term Loan Superpriority Claims, the other administrative claims granted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (y) this Court shall retain jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection incurred prior to the actual receipt of written notice by the DIP Agent or the Pre-Petition Agents, as applicable, of the effective date of such reversal, stay, modification or vacatur, or (ii) the validity, priority, or enforceability of the DIP Liens or the Adequate Protection Liens.

Notwithstanding any such reversal, stay, modification or vacatur, any use of Collateral (including, without limitation, Cash Collateral), any DIP Obligations, or any Adequate Protection incurred by the Debtors to the DIP Agent, the DIP Lenders and/or the Pre-Petition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and/or the Pre-Petition Agents, as the case may be, of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and pursuant to the DIP Documents with respect to all such uses of the DIP Collateral (including, without limitation, the Cash Collateral), all DIP Obligations, and all Adequate Protection.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents or as otherwise agreed by the DIP Lenders or the Pre-Petition Secured Parties, as applicable, the DIP Liens, the Superpriority Claims, the Adequate Protection, and all other rights and remedies of the DIP Agent, the DIP Lenders, or the Pre-Petition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of these Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of these Cases, or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of these Cases or approving a sale of any or all the assets of the Debtors. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any Successor Cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP

Obligations, the Superpriority Claims, and all other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Pre-Petition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, and all Pre-Petition Indebtedness are indefeasibly paid in full and discharged in accordance with the DIP Documents (including the satisfactory cash collateralization of all issued and outstanding Letters of Credit and Roll-Up Letters of Credit in accordance with the DIP Documents) and this Interim Order.

23.     Effect of Stipulations on Third Parties. The stipulations and admissions contained in this Interim Order, including, without limitation, paragraph 3 hereof (collectively, the "Debtors' Stipulations"), shall be binding on the Debtors in all circumstances. The Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee (if appointed), unless, and solely to the extent that (a) any such party in interest, including the Committee (if appointed), with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations set forth in paragraph 23 hereof) against the Pre-Petition Secured Parties in connection with any matter related to the Pre-Petition Credit Documents or the Pre-Petition Collateral (a "Challenge Proceeding") by no later than on or before either (i) if no Committee has been appointed, the earlier of (A) 75 days from the Petition Date and (B) the date on which objections to confirmation of the Debtors' chapter 11 plan of reorganization are due, or (ii) if a Committee has been appointed, the earlier of (A) 60 days after the date of formation of such Committee, and (B) the beginning of the confirmation hearing on the Debtors' chapter 11 plan of reorganization (the "Challenge Period"). If no such Challenge Proceeding is timely

commenced, then: (w) any and all Challenge Proceedings by any party (including, without limitation, the Committee, any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (x) to the extent not theretofore repaid, the Pre-Petition Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case; (y) the Pre-Petition Liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3 hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the obligations under the Pre-Petition Credit Documents and the Pre-Petition Liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by the Debtors, any committee or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto). If any Challenge Proceeding is timely commenced, the stipulations and admissions contained in paragraph 3 of this Interim Order shall nonetheless remain binding and preclusive (as provided in this paragraph) on the Debtors, any committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without

limitation, claims and defenses with respect to the Pre-Petition Credit Documents or the Pre-Petition Liens on the Pre-Petition Collateral. For the avoidance of doubt, any trustee appointed or elected in these Cases shall, until the expiration of the periods provided herein for asserting claims and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph 23 (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations, stipulations and waivers of the Debtors in this Interim Order.

24.   _Limitation on Use of DIP Financing Proceeds and Collateral_. Notwithstanding anything contained herein or in any other order by this Court to the contrary, without the prior written consent, as applicable, of the Required Lenders and the DIP Agent or the Pre-Petition Agents, none of the DIP Loans, the Cash Collateral, the DIP Collateral, or the Carve Out may be used to: (a) challenge or investigate the validity, perfection, priority, extent, or enforceability of any rights or obligations arising under or related to the DIP Documents, the Pre-Petition Credit Documents, or the liens or security interest securing the obligations under any of the foregoing or to pursue any causes of action of any kind, including a Challenge Proceeding, against the Pre-Petition Secured Parties or the DIP Lenders; _provided, however_, that, if a Committee is appointed, not more than $25,000 in the aggregate of proceeds of the Carve Out, any Cash Collateral, or any proceeds of the DIP Facility or the DIP Collateral may be used by such Committee for purposes of such investigation; (b) object to, contest, delay, prevent, or interfere with the exercise of rights and remedies by the DIP Agent or the DIP Lenders; or (c) to make any payment of professional fees for any other constituent group, including, but not

45

limited to, the Committee, other than solely in accordance with the Budget, the DIP Documents, and this Interim Order.

25.     <u>Access to the Debtors; Subordination of Intercompany Indebtedness</u>.    In accordance with the terms of the DIP Documents, the DIP Agent, the DIP Lenders, the Pre-Petition Agents and the other Pre-Petition Secured Parties, and their respective professionals shall be afforded continued reporting as to collateral amounts and reasonable access to the DIP Collateral and the Pre-Petition Collateral and the Debtors' business premises, during normal business hours and upon reasonable advance notice, for purposes of verifying the Debtors' compliance with the terms of this Interim Order.    To the extent any Debtor owes any Indebtedness (as defined in the DIP Credit Agreement) to any other Debtor or any subsidiary or affiliate of any Debtor, such Indebtedness shall be subordinated to the DIP Obligations, and the guarantees (if any) thereof, until the DIP Obligations are indefeasibly repaid in full.

26.     <u>Modifications of DIP Documents</u>.    The Debtors and the Required Lenders are hereby authorized to implement, in accordance with the terms of the respective DIP Documents, any non-material modifications of the respective DIP Documents without further order of this Court, or any other modifications to the respective DIP Documents; *provided, however*, that notice of any material modification or amendment to the respective DIP Documents shall be provided to counsel to the Committee (to the extent one has been appointed), the Pre-Petition Agents, and the U.S. Trustee, each of whom shall have five (5) Business Days from the date of such notice within which to object in writing to such material modification or amendment.  If the Committee (to the extent one has been appointed), the Pre-Petition Agents, or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such material modification or amendment shall only be permitted pursuant to an order of this Court.

The Debtors shall provide notice to the U.S. Trustee, the Pre-Petition Agents, and any Committee (if appointed) within five (5) Business Days following the execution of any non-material modifications to the DIP Documents.

27.     <u>Interim Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern. Any payments to be made under any order (including any "First Day" order, other than this Interim Order) of this Court shall be made in accordance with this Interim Order and the Budget.

28.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases and any Successor Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Pre-Petition Secured Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Pre-Petition Secured Parties, and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan under the DIP Documents or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lenders, solely by virtue of their capacities as DIP Lenders or Pre-Petition Secured Parties, shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are

47

used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. § 9601 *et seq.*, as amended, or any similar federal or state statute).

29.      Proofs of Claim.

(a)      The DIP Agent and the DIP Lenders shall not be required to file proofs of claim or requests for payment of administrative expense claims in these Cases or any successor cases in order to maintain their respective claims for payment of principal or interest under the DIP Documents.  The statements of claims in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim and requests for payment of administrative expense claims in respect of such obligations and such secured status.

(b)      The Pre-Petition ABL Facility Agent, the Pre-Petition Term Loan Agent, and the Pre-Petition Secured Lenders shall not be required to file proofs of claim or requests for payment of administrative expense claims in these Cases or any Successor Cases in order to maintain their respective claims for payment of principal, interest, or any other obligations owing under the respective Pre-Petition Credit Documents and as set forth in this Interim Order.  The statements of claims in respect of the Pre-Petition ABL Facility Indebtedness and the Pre-Petition Term Loan Indebtedness, respectively, set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim and requests for payment of administrative expense claims in respect of such obligations and such secured status.

30.      Effectiveness.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof, and there shall be no stay of

execution of effectiveness of this Interim Order. Any findings of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

31. <u>Retention of Jurisdiction</u>. Notwithstanding any provision in the DIP Documents or Pre-Petition Credit Documents, this Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order, the DIP Facility, or the DIP Documents.

32. <u>Final Hearing</u>. The Final Hearing is scheduled for December 3, 2014 at 11:00 a.m. (ET) before this Court. The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served (with a copy to the Court's chambers) no later than [November 26 2014 at 4:00 p].m. (ET) upon: (a) Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Mark Kenney; (b)(i) proposed counsel for the Debtors, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060, Attn: Neil E. Herman and James O. Moore, Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania 19103-2921, Attn: Michael J. Pedrick and Justin W. Chairman, and (ii) proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady and M. Blake Cleary; (c)(i) counsel to certain of DIP Lenders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York

10022, Attn:  Joshua A. Sussberg and Yongjin Im, and Kirkland & Ellis LLP, 300 North

LaSalle, Chicago, Illinois 60654, Attn:  Steven N. Serajeddini; (d) counsel to certain of the DIP

Lenders, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois

60611, Attn:  Richard A. Levy and Matthew L. Warren; (e) counsel to the Pre-Petition Term

Loan Agent, Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los

Angeles, California 90067-6049, Attn:  David A. Fidler; (f) counsel to the DIP Agent, Alston &

Bird LLP, 101 South Tryon Street, Suite 4000, Charlotte, North Carolina 28280-4000, Attn:

Jason J. Solomon; and (g) counsel to any official committee then appointed in these Cases.

Dated:  November __4__, 2014
        Wilmington, Delaware

Peter J. Walsh
United States Bankruptcy Judge